U.S. Department of Transportation
Federal Highway Administration

WESTERN FEDERAL LANDS HIGHWAY DIVISION
610 EAST FIFTH STREET
VANCOUVER, WA 98661-3801
(360) 696-7700 FAX: (360) 696-7846

| CONCURRENCES |
|---|
| SIGNATURE |
| DATE |
| SIGNATURE |
| DATE |
| SIGNATURE |
| DATE |
| SIGNATURE |
| DATE |
| SIGNATURE |
| DATE |

NOV 23 2001

Dick Standerfer, President
Universal Construction, Inc.
134 North Washington Avenue
Emmett, Idaho 83617

RE: CURE NOTICE
ID RRP CAMA 101(1)
Camas NWR Complex
Contract No. DTFH70-01-C-00034

Dear Mr. Standerfer:

The Government is hereby notifying you that it considers your progress on the project to be jeopardizing the timely completion of your contract. You are requested to respond by November 30, 2001 with a detailed plan on how you propose to finish the project within the time allotted by the contract.

The Government's concern is based on the following information. Your preliminary schedule, dated September 12, 2001, showed the parking lot being paved on October 5, 2001. At best, the parking lot might be paved within the next week. The schedule also showed the bridge abutments being formed, reinforced, and poured between October 5 and October 9. As of November 21, the existing abutments have been removed but the new abutments have not been formed, reinforced, or poured. The schedule also showed surface course aggregate placement as follows: Parking Lot and New Entrance road complete on October 4; Closure #1 area complete on October 11; Closure #2 area complete on November 2; and Closure #3 area complete on December 4. To date, only about 1000 tons of surface course aggregate have been placed on the Parking Lot and New Entrance road, which is 5.5 percent of the tons required for all areas. The project is to be completed by December 11, 2001.

In your November 1 letter to Mr. Butikofer, FHWA Project Engineer, you indicated that the initial start of project activities was delayed due to FHWA's submittal requirements. Specifically, you mentioned the preliminary construction schedule, the accident prevention plan, and the Contractor Quality Control Plan (QC Plan). As the QC Plan was the last one to be approved by FHWA, I will only discuss that submittal. My review of the submittal dates for the QC Plan revealed the following sequence. The first QC Plan was faxed to Mr. Butikofer on

OFFICIAL FILE COPY

September 10. It was rejected on September 11 because it failed to comply with the contract requirements. The submitted plan did not address subcontractor work, key personnel, or explain how each phase of work would be accomplished. See SCR 153.03 Quality Control Plan. It was then resubmitted by fax on September
17 and again rejected that same day because it did not address subcontractor work, key personnel, or explain how each phase of work would be accomplished. See SCR 153.03 Quality Control Plan. The third re-submittal occurred by fax on September 25. This QC Plan was rejected because it was submitted as a disorganized mass of four different documents, which included materials that had no relevance to the project. See SCR 153.03 Quality Control Plan. The rejection was conveyed to the Project Superintendent by phone on September 25 and in writing on September 27. The fourth re-submittal of the QC Plan occurred by fax on September 28. This submittal was approved the same day. Subsection 153.03 of the contract states that the contractor may not commence work until the QC plan is accepted by the CO. Based on the contract requirements and Mr. Butikofer's diligence in reviewing your QC Plan, I find that the project was not started late due to government related causes, but due to your submittals not meeting the contract requirements.

Your November 1 letter also mentioned that an alleged Type II differing site condition at Borrow Source 1 has prevented you from achieving compaction with 'reasonable equipment effort.' Our analysis of the situation concluded that it is not a Type II differing site condition and that your inability to achieve compaction is due to the minimal and ineffective material processing efforts expended by your crew. To constitute a Type II differing site condition, the material must be materially different than what could reasonably be anticipated. In the present situation, the material is precisely what could reasonably be anticipated in that area. It does not differ from the material around the area or what could be seen on the surface. While there was difference in the material as you went deeper into the Borrow Source, such depth of excavation was not permitted by the contract. The material within the top meter does not appear to be any different than the material on the surface.

The problem apparently was that you expected to be able to use the material without processing. On several occasions you have told Mr. Butikofer that you expected to load the material from the borrow source, haul it to the roadway, place it, and compact it with a hoe-pack on your excavator, with little or no processing (adding water and mixing the material) effort. Paragraphs (a), (b), and (c) of Subsection 204.11 of the contract require you to adjust the moisture content of the material to a moisture content suitable for compaction. Processing is generally a part of construction projects. In this case, a reasonable amount of processing should have been expected when bidding on the project.
Solely in an effort to work with you, FHWA added an <u>optional</u> compaction specification (roller pass method) in an effort to eliminate any difficulty that you had in determining densities and compacting the material. The roller pass method should take less time or effort than your hoe-pack method. In any event, your difficulty in achieving compaction is not due to an alleged differing site condition.

It appears that the most significant factor affecting your progress on the project is the lack of

diligence in performing the work. For example, during the week of November 12, work on the project occurred as follows:

| | |
|---|---|
| Monday, November 12: | There were two operators and one truck driver working on the project today. They used an excavator to shape, finish and place topsoil on cut and fill slopes, a motor grader to finish subgrade, and a roller to compact subgrade of the new entrance road and parking lot. |
| Tuesday, November 13: | There were two operators, two truck drivers and one office assistant working on the project today. They hauled 15 loads of aggregate to the new entrance road and parking lot. Using an excavator, motor grader, front-end loader, and a roller they repaired soft areas and finished the subgrade of the new entrance road and parking lot. |
| Wednesday, November 14: | There was one operator and two truck driver working on the project today. They hauled 10 loads of aggregate to the new entrance road and parking lot. Using a motor grader and water truck material was processed and placed on the new entrance road and parking lot. |
| Thursday, November 15: | There was one operator and one truck driver working on the project today. They processed and compacted material on the new entrance road and parking lot with a motor grader and roller. Late in the day an excavator was used to work on widening of the Auto Tour Route. |
| Friday, November 16: | There was one operator and one truck driver working on the project today. They processed, shaped and rolled the aggregate on the new entrance road and parking lot with a blade and roller. Late in the day an excavator and small roller was used to work on widening the Auto Tour Route. The Project Manager and Project Superintendent moved excavator to bridge site and removed cut concrete from abutments and piers. |

The level of effort put forth so far on the project has caused the project to fall far behind the

construction schedule. You are notified that the Government considers your lack of progress to be a condition that is endangering performance of the contract.

Please provide by November 30 a plan describing how you intend to complete the project. This plan should include the equipment and labor force you intend to use for each major activity, and the dates on which you plan to complete the bridge, paving at the parking lot, and aggregate surface course placement for each closure. Failure to provide such a plan may lead the Government to terminate the present contract for default pursuant to FAR Clause 52.249-10 (Default (Fixed-Price Construction)).

Sincerely,

Original Signed by
*William L. Parsons*

William L. Parsons
Contracting Officer

cc: Michael Z. English
Insurance Company of the West
545 N. Benjamin, Ste 135
Boise, Idaho 83704