F:6

U.S. Department
of Transportation
**Federal Highway
Administration**

WESTERN FEDERAL LANDS HIGHWAY DIVISION
610 EAST FIFTH STREET
VANCOUVER, WA 98661-3801
(360) 619-7700 FAX: (360) 619-7846

June 20, 2002

**Faxed to: (208) 365-1089 and sent**
**Certified Mail - Return Receipt Requested**

Mr. Dick Standerfer
President, Universal Construction, Inc.
P.O. Box 187
Emmett, Idaho 83617

Re: ID RRP CAMA 101(1)
Camas NWR Complex
Contract No. DTFH70-01-C-00034

Dear Mr. Standerfer

On December 4, 2001 the Federal Highway Administration received Universal Construction, Inc.'s (UCI) November 30, 2001 response to our Cure Notice. Contained in your response was a claim for three issues, a differing site condition encountered in the borrow sources, a change due to Government directed changes, and a delay by the Government during the start of the project. The total cost for the claim is $641,950.15 with a contract time extension of 181 calendar days.

## FACTS

### 1. Contract Clauses

The following FAR Clauses were included in this contract. Pertinent sections of the Clauses are included.

### 52.236-2 Differing Site Conditions (April 1984)

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.
(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in (a) above for giving written notice may be extended by the Contracting Officer.
(d) No request by the Contractor for an equitable adjustment to the contractor for differing site conditions shall be allowed if made after final payment under this contract.

**52.236-3 Site Investigation And Conditions Affecting The Work (April 1984)**

(a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to (1) conditions bearing upon transportation, disposal, handling, and storage of materials; (2) the availability of labor, water, electric power, and roads; (3) uncertainties of weather, river stages, tides, or similar physical conditions at the site; (4) the conformation and conditions of the ground; and (5) the character of equipment and facilities needed preliminary to and during work performance. The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from the drawings and specifications made a part of this contract. Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceeding to successfully perform the work without additional expense to the Government.
(b) The Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government. Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract unless that understanding or representation is expressly stated in this contract.

**52.236-13 Accident Prevention (November 1991) Alternate 1 (November 1991)**

[text omitted]

(f) Before commencing the work, the Contractor shall--
(1) Submit a written proposed plan for implementing this clause. The plan shall include an analysis of the significant hazards to life, limb, and property inherent in contract work performance and a plan for controlling these hazards; and
(2) Meet with representatives of the Contracting Officer to discuss and develop a mutual understanding relative to administration of the overall safety program.

**52.243-4 Changes (August 1987)**

(a) The Contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes-
(1) In the specifications (including drawings and designs);
(2) In the method or manner of performance of the work;
(3) In the Government-furnished facilities, equipment, materials, services, or site; or
(4) Directing acceleration in the performance of the work.

(b) Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; provided, that the Contractor gives the Contracting Officer written notice stating (1) the date, circumstances, and source of the order and (2) that the Contractor regards the order as a change order.

(c) Except as provided in this clause, no order, statement, or conduct of the Contracting Officer shall be treated as a change under this clause or entitle the Contractor to an equitable adjustment.

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However, except for an adjustment based on defective specifications, no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required. In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.

(e) The Contractor must assert its right to an adjustment under this clause within 30 days after (1) receipt of a written change order under paragraph (a) of this clause or (2) the furnishing of a written notice under paragraph (b) of this clause, by submitting to the Contracting Officer a written statement describing the general nature and amount of the proposal, unless this period is extended by the Government. The statement of proposal for adjustment may be included in the notice under paragraph (b) above.

(f) No proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this contract.

## 2. Contract Requirements

**Standard Specifications, FP-96:**

***Subsection 105.02 Local Material Sources.*** *[text omitted]*

***(a) Government-provided sources.***

*[text omitted]*

*The quality of material in provided sources is acceptable in general, but may contain layers or pockets of unacceptable material. It is not feasible to ascertain from samples the quality of material for an entire deposit and variations may be expected. Determine the quantity and type of equipment and work necessary to select and produce acceptable material.*

***Subsection (Materials) 204.03*** *Conform to the following Subsections:*
*[text omitted]*
*Unclassified borrow* *704.06*
*[text omitted]*

***Subsection 704.06 Unclassified Borrow.*** *Furnish granular material free of excess moisture, muck, frozen lumps, roots, sod, or other deleterious material conforming to the following:*

| | |
|---|---|
| *(a) Maximum dimension* | *600 mm* |
| *(b) Soil classification, AASHTO M 145* | *A-1, A-3, or A-2-4* |

## Special Contract Requirements:

***Subsection 153.03 Quality Control Plan.*** *Before the start of the work, submit a written plan for acceptance. Do not begin the work until the quality control plan is accepted.*

*[text omitted]*

***Subsection 155.02 General.*** *Submit 3 copies of a preliminary construction schedule at least 7 days before the preconstruction conference.*

*A preliminary construction schedule is a written narrative with a detailed breakdown of all contract activities for the first 45 days after the notice to proceed is issued. Within 7 days after the preconstruction conference, the preliminary construction schedule will be accepted or rejected. If rejected, submit a revised schedule within 3 days. Do not begin work, except mobilization, traffic control, and Section 637 work, without an accepted preliminary construction schedule.*

*[text omitted]*

***Subsection 204.11 Compaction.*** *Delete the text of this Subsection and substitute the following:*

*Compact material according to the following paragraphs based on the amount of material retained on a 4.75 millimeter sieve as determined by AASHTO T27.*

> *(a) [text omitted]*
>
> *(b) [text omitted]*
>
> ***(C) 50 percent or less of the material is retained on 4.75 mm sieve.*** *Classify the material according to AASHTO M 145. For material classified A-1 or A-2-4, determine the maximum density according to AASHTO T 180 method D. For other material classifications, determine the optimum moisture content and maximum density according to AASHTO T 99 method C.*
>
> *Adjust the moisture content of material classified A-1 through A-5 to a moisture content suitable for compaction. Adjust the moisture content of material classified A-6 and A-7 to within 2 percent of the optimum moisture content.*
>
> *Compact material placed in all embankment layers and the material scarified in cut sections to at least 95 percent of the maximum density. Determine the in place density and moisture content according to AASHTO T 238 and AASHTO T 239 or other approved test procedures.*
>
> *When required, use AASHTO T 224 to correct for coarse particles.*

**3. Contract Modification**

Contract Modification Number 0001 modified subsection 204.11 as follows:

***Subsection 204.11 Compaction.***

*(c) 50 percent or less of the material is retained on 4.75 mm sieve.* Add the following after the fourth paragraph:

*As an alternate to classifying and determining the maximum density of the material, the contractor may use either or both of the following options. The choice to use either or both of these options, or to use the method set forth in the solicitation package, is entirely the contractors option.*

*Continuously roll for at least one hour for each 115 cubic meters of material or portion thereof. Use compaction equipment meeting the minimum requirements of Subsection 301.05 Compacting, (a), (b), and (c).*

*In sliver fill areas along the Auto Tour Route, Cut-Off Road, and New Entrance Road where it is not possible to use the minimum compaction equipment as listed in Subsection 301.05 Compaction, (a), (b), and (c), use a double drum vibratory roller at least 91 cm in width. Compact each 200 mm layer of material full width with eight roller passes.*

*Adjust the moisture content of the material to a moisture content suitable for compaction.*

*Provide support documentation which verifies the rolling performed for each section of roadway.*

*Operate compression-type rollers at speeds less than 2 meters per second, vibratory rollers at speeds less than 1 meter per second.*

**4. Permits**

Pertinent soil information provided in permit section of Contract, Page H-17.

3. Construction plans

[text omitted]

Soils: excavation, grading, proposed substrate composition, import, topsoil or hydric soil - The proposed action would remove the top 6 inches of gravel and earth of the existing wildlife viewing road and place this material on the sides of the road to widen the road base from 14 feet to 16 feet. Earth fill would be excavated, hauled, and placed in areas where additional fill is needed.

Imported material would be from the two proposed mitigation sites and is primarily sandy loam which may be underlain with layers of clayey soils. The excavations would average three feet deep from the existing ground surface with a 2:1 side-slope and would be connected to the adjacent wetland basin.

# ANALYSIS

UCI is claiming on three issues, a differing site condition encountered in the borrow sources, a change due to Government directed changes, and a delay by the Government during the start of the project.

## Differing Site Condition Analysis

UCI claims the Government provided material source is substantially different than the information contained in the contract, and observations and descriptions obtained during the pre bid tours of the site. The Government did not investigate the material source prior to advertising the project; therefore no Geotechnical information or report was available. However, the permit section of the contract did include a brief description of the borrow sources. Since some information was provided about the material sources in the contract; this would be a Type 1 differing site condition.[1] During the project, UCI stated that the differing site condition was a Type 2.[2] In its Cure Notice sent to UCI, the Government analyzed the differing site condition as a Type 2. To fully analyze this claim, the Government will perform an analysis for both a Type 1 and a Type 2 differing site condition.

### Type 1 Analysis

There are four requisite elements a contractor must establish to support a Type 1 differing site condition claim. First, the contractor must prove that actual subsurface or latent physical conditions at the site differed materially from those indicated in the contract documents. Second, it must establish that the differing site condition could not have been ascertained by a reasonable pre-bid site inspection and review of the contract documents. Third, the contractor must prove that it relied upon its interpretation of the contract documents when preparing its bid. Finally, the contractor must establish that it was financially damaged as a result of the differing site condition.

The first element UCI needs to establish is that the material encountered in the borrow sources was materially different than indicated in the contract. Information included in the contract was a brief general description in the permit section stating the sites are primarily sandy loam which may be underlain with layers of clayey soils. A report provided by UCI developed from post award site investigation shows five different specific soil types classified using the AASHTO M145 Classification.[3] While this report gives specific soil type classification, the soil classifications would all meet the general description of primarily sandy loam which may be underlain with layers of clayey soils. The subsurface conditions do not differ materially from those indicated in the contract. UCI has not met the first element so does not meet the requirements for a Type 1 differing site condition.

---

[1] A type 1 differing Site Condition requires that the physical condition of the site differ materially from what was indicated in the contract.

[2] A type 2 differing site condition requires that the physical conditions at the site be unknown and of an unusual nature, which differ materially from those ordinarily encountered.

[3] Copy of report by Materials Testing & Inspection supplied by UCI is contained in Appendix A.

**Type 2 Analysis**

There are three elements the contractor must establish to support a Type 2 differing site condition claim. First, the contractor must show that it did not know about the physical condition. Second, the contractor must show that it could not have anticipated the condition from inspection or general experience. Third, the contractor must show that the condition varied from the norm in similar contracting work.

For the first element UCI must show that it did not know what type of material the borrow sources would contain. UCI has stated that they did a site investigation and talked to the refuge personnel. The contractor was provided plans and specifications for bid preparation that provided general soil description within the permit section, a description that is consistent with what exists at the site. UCI appears to have had knowledge of the type of material the borrow sources would contain. Therefore, UCI has not met the first element for a type 2 differing site condition.

For the second element UCI needs to establish that it could not have anticipated the material types the borrow sources would contain from inspection or general experience. The site was available to the contractor for pre-bid inspection. UCI in their February 4, 2002 letter stated its pre bid investigation consisted of visual observation and comments from refuge personnel. The materials are similar to what a visual investigation would provide; the materials seen in the area are sands, silts and clays in varying quantities. The area is a wildlife refuge with controlled flooding; that would indicate sands, silts and clays in various layers because of transportation and settlement of fine materials by water. The second element of type 2 also has not been met.

The third element UCI needs to establish is that the type of material in the borrow sources varied from the norm in similar contracting work. The Soil Survey of Jefferson County, Idaho by United States Department of Agriculture Soil Conservation Service described the soil in the area of borrow source # 1 as a Levelton-Medano complex. Soils are described as sandy and clay loams with silts and course sands in layers.[4] This information is consistent with material found in the site and is not different from what should have been learned from inspection of the site. This material is to be used to widen a refuge access road and to build a parking are for the refuge. The existing refuge access road was built from similar material; some obtained from the same borrow areas listed for this project. Accordingly, I find that UCI has not met this element.

UCI has not met the requirements for a Type 2 differing site condition.

UCI has not met the requirements for either a Type 1 or Type 2 differing site condition, so this portion of the claim is denied.

[4] Information found in the USDA Soil Conservation Service for Jefferson County is included in Appendix B.

## Directed Change in Construction

UCI claims the Government has directed its construction means and methods by issuing unilateral Contract Modification Number 0001 (CM). UCI claims that the method specification for compaction contained in the CM has caused additional time and cost to build the embankments.

**Directing UCI's construction means and methods**

On October 17, 2001 UCI told the Project Engineer that the embankment could not be built using the materials from the mandatory borrow sources because of the varying soil types. In order to work with UCI, the Government proposed a method specification for placing the material. On October 18, 2001 the Project Engineer explained the specification change to UCI and stated that if UCI did not want to use the method specification it could continue to use the solicitation package specification. On October 22, 2001 UCI verbally agreed to the specification, and work proceeded using the method specification. UCI refused to sign a contract modification because no additional time or costs were offered.

On October 29, 2001 a draft unsigned unilateral CM was faxed to UCI.[5] This draft CM directed the contractor in a method specification to obtain compaction. Included in this draft CM was the option to decrease the compactive effort if the as-bid density test specification could be met.

On November 19, 2001 a signed copy of the unilateral CM was faxed to UCI. The CM was modified from the October 29, 2001 draft to state plainly the method for which the contractor chooses to embank is entirely the contractor's option. The method specification was provided to give the contractor an option to place material for which he was having difficulty meeting the as-bid density specification.

UCI always had the option to perform the compaction in compliance with the as-bid specifications. The Government merely gave the contractor another option to obtain compaction. UCI was told during the proposal of the CM it had the choice of which specification to use. The draft CM included an option for a density test specification. During a meeting with the Project Engineer and the Construction Operations Engineer it was explained verbally that UCI has the option of which specification to use. The final signed CM is very clear that to use the method specification is clearly the choice of the contractor.

**Increasing UCI's costs for embankment work**

UCI has claimed that the Government's direction has increased its time and cost to embank the material. Although I have found that UCI always had the option as to the compaction method, an analysis of actual costs will show what the actual impact to the time and cost was to embank in accordance with the method specification versus the as-bid density testing specification.

[5] A copy of draft unilateral CM0001 is included in Appendix C.

Regardless of which specification is used the material to be embanked requires processing to adjust moisture content suitable for compaction. For this reason costs for processing the material would be similar and I will focus on the compaction effort needed to place the embankments.

**Non-Sliver Fills Areas**

According to the October 8, 2001 to October 11, 2001 Contractor Daily Reports 655.3 cubic meters of embankment was placed from station 0+000 to 0+276. During this time 28.5 hours of compaction effort was provided by an 84" Dynapac roller. This equates to 23 cubic meters of material per hour. It should be noted that only 2 of 13 density tests preformed on October 11, 2001 passed, so this compaction rate is less than what would have been required for the material to meet the contract density requirements.

The method specification requires compaction at the rate of 115 cubic meters of material per hour using the equipment specified in the specification. This shows that embanking in the non-sliver fills areas required less effort using the method specification than using the density specification.

**Sliver Fill Areas**

UCI has not provided conclusive evidence its method of operation (a hoe-pac attached to an excavator) would be more efficient than the method specification contained in CM 0001. To date UCI has not embanked enough sliver fills using a hoe-pac to analyze how efficient it is. UCI has only compacted the existing ground and placed the first layer of material and either failed density tests or did not test. In UCI's analysis it used bid-estimating costs, however UCI has not shown it can perform on this project as per bid. UCI has completed sliver fill embankment using the method specification. UCI has shown that it can perform in accordance with the method specification; however, it has not shown it can perform in accordance with the density specification.

In a meeting on November 6, 2001, UCI informed the Government four to five hours are required to compact approximately 144 cubic meters of material in the sliver fill areas using a hoe-pac method. By using the method specification two to three hours would be necessary to compact this same material. While a cost comparison based on actual equipment production rates is not possible, this estimate by the contractor shows that the method specification would be more efficient, and thus less costly than the density specification.

The Government believes the materials in the mandatory borrow sources can be embanked with proper processing using the specification in the solicitation package. The change to the contract was provided to the benefit of the contractor to aid in his process; therefore, no time or cost adjustment was provided in the change. This portion of the claim is denied.

## Contractor Delays by FHWA

UCI claims the Government delayed the project and showed bad faith in administering the contract by "nit picking" contract submittals. Details of the delay were not included in your claim. However, earlier correspondence indicated the approval of three submittals, the preliminary construction schedule, the accident prevention schedule and the Contractor Quality Control Plan (QC Plan) as the cause for delay. The QC Plan was the latest to be approved, so I will start with that submittal.

Section 153.03 of the contract requires the QC Plan be accepted prior to beginning work. A time line for the QC Plan submittal is as follows:

September 10, 2001: QC Plan faxed to project engineer.
September 11, 2001: QC Plan rejected by project engineer because it did not address subcontractor work as required by Special Contract Requirement 153.03, key personnel as required by Special Contract Requirement 153.03(a), or explain how each phase of work would be accomplished as required by Special Contract Requirement 153.03(b).
September 17, 2001: QC Plan faxed to project engineer.
September 17, 2001: QC Plan rejected by project engineer for the same reasons the September 10, 2001 plan was rejected.
September 25, 2001: QC Plan faxed to project engineer.
September 25, 2001: QC Plan rejected by project engineer verbally (in writing on September 27, 2001) because it was a disorganized mass of four different documents, which included materials that had no relevance to the project.
September 28, 2001: QC Plan faxed to project engineer.
September 28, 2001: QC Plan accepted by project engineer.

In the four submissions of the QC Plan, the Government took no more than 1 day to verbally notify UCI of rejection/acceptance, and no more than 2 days in writing to confirm any verbal direction. This is a reasonable time frame for review, well less than what is allowed. The delays were not due to the Government's review of the documents, but rather due to the submittals not being in compliance with the contract requirements.

As the QC Plan was rejected/accepted within the contract requirements, and it was the last submittal to be approved, I will not review the other submittals. This portion of the claim is denied.

## DECISION

UCI claim has three parts, a differing site condition encountered in the borrow sources, a change due to Government directed changes, and a delay by the Government during the start of the project. The analysis above did not substantiate any of the parts of the claim, so this claim is denied in its entirety.

193

This is the final decision of the Contracting Officer. This decision may be appealed to the Department of Transportation Board of Contract Appeals, 400 Seventh Street SW, Washington, D.C. 20590. If you decide to make such an appeal, you must mail or otherwise furnish written notice to the Board of Contract Appeals within 90 days from the date you receive this decision. A copy of the notice shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, should reference this decision, and identify the contract by number. With regard to appeals to the Department of Transportation Board of Contract Appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims $100,000 or less. In lieu of appealing to the Board of Contract Appeals, you may bring action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

*Original signed by William L. Parsons*

William L. Parsons
Contracting Officer

cc: Frederick J. Hahn, III, Holden, Kidwell, Hahn & Crapo, PLLC (faxed to 208-523-9518)
Art Hamilton, FLH Headquarters
Tim Binder, WFL
Todd Butikofer, WFL
Ronald Carmichael, WFL
Charles Dissen, WFL
Elizabeth Firestone, WFL
Dave Heckman, WFL
Ricardo Suarez, WFL
Jane Traffalis, WFL
File