MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT

PAGE 1
REVISION DATE OCTOBER 22, 2001

C:\DOCUMENTS AND SETTINGS\MJN\LOCAL SETTINGS\TEMPORARY INTERNET FILES\OLK5\PROCTOR BP1.DOC

Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| Project: | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| Source: | Borrow Pit 1 – Roadway Stockpile | | |
| Date Obtained: | October 10 2001 | | |
| Sample ID: | BP1 | | |
| Atterburg Limits: | | | |
| ASHTO M145 Classification: | A-2-4 Silty Sand | | |
| Sample Prepared: | Moist:<br>Dry: | Manual,<br>Mechanical: | |
| Test Standard: | AASHTO T 99:<br>ASTM D 698: | AASHTO T 180: X<br>ASTM D 1557: | Method<br>D |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 5.4 | 1728.4 | 1945.3 kg/m^3 | 11.2 % |
| | 2 | 8.6 | 1898.5 | ASTM D-4718, Correction | |
| | 3 | 11.7 | 1947.0 | for Oversize Particles | |
| | 4 | 16.0 | 1785.6 | 1945.3 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | | |
| #8 | | |
| #10 | | |
| #16 | | |
| #20 | | |
| #30 | | |
| #40 | | |
| #50 | | |
| #60 | | |
| #80 | | |
| #100 | | |
| #200 | | |

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Comment [Bab1]: If there is more than 30% retained (below 70% passing) on the ¾" screen, please include a note stating the following: "This proctor does not meet the criteria set forth in ASTM 4718; There is more than 30 percent retained on the ¾" screen."

Comment [Bab2]:

Reviewed by: Dan King
Eastern Idaho Division Manager



240

MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT

PAGE # 1
REVISION DATE
OCTOBER 29, 2001

C:\DOCUMENTS AND SETTINGS\MJN\LOCAL SETTINGS\TEMPORARY INTERNET FILES\OLK5\PROCTOR BP10.DOC

Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| Project: | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| Source: | Borrow Pit 1 | | |
| Date Obtained: | October 25, 2001 | | |
| Sample ID: | BP10 | | |
| Atterberg Limits: | | | |
| ASHTO M145 Classification: | A-2-4 Silty Sand | | |
| Sample Prepared: | Moist: X<br>Dry: | Manual: X<br>Mechanical: | |
| Test Standard: | AASHTO T 99:<br>ASTM D 698: | AASHTO T 180: X<br>ASTM D 1557: | Method<br>D |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 5.6 | 1751.4 | 1950.8 kg/m^3 | 11.2 % |
| | 2 | 8.5 | 1889.9 | ASTM D-4718, Correction | |
| | 3 | 10.1 | 1959.9 | for Oversize Particles | |
| | 4 | 12.4 | 1936.1 | 1950.8 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | | |
| #8 | | |
| #10 | | |
| #16 | | |
| #20 | | |
| #30 | | |
| #40 | | |
| #50 | | |
| #60 | | |
| #80 | | |
| #100 | | |
| #200 | | |

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Comment [Babs1]: If there is more than 30% retained (below 70% passing) on the ¾" screen, please include a note stating the following: "This proctor does not meet the criteria as set forth in ASTM 4718. There is more than 30 percent retained on the ¾" screen."

Comment [Bat42]:

Reviewed by: Dan King
Eastern Idaho Division Manager



241

MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT



Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| Project: | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| Source: | Borrow Pit 1 – Hole # 1 0-0.2m | | |
| Date Obtained: | October 15, 2001 | | |
| Sample ID: | BP2 | | |
| Atterberg Limits: | Non-Plastic | | |
| ASHTO M145 Classification: | A-2-4 Silty Sand | | |
| Sample Prepared: | Moist:<br>Dry: | Manual:<br>Mechanical: | |
| Test Standard: | AASHTO T 99:<br>ASTM D 698: | AASHTO T 180: X<br>ASTM D 1557: | Method<br>D |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 8.9 | 1856.2 | 1905.9 kg/m^3 | 11.7 % |
| | 2 | 11.3 | 1901.5 | ASTM D-4718, Correction | |
| | 3 | 14.8 | 1853.0 | for Oversize Particles | |
| | 4 | 16.2 | 1781.2 | 1905.9 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Spec |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | 100 | |
| #8 | 100 | |
| #10 | 100 | |
| #16 | 100 | |
| #20 | | |
| #30 | | |
| #40 | 94 | |
| #50 | 79 | |
| #60 | | |
| #80 | | |
| #100 | 37 | |
| #200 | 29.8 | |

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

**Comment [Babs1]:** If there is more than 30% retained (below 70% passing) on the ½" screen, please include a note stating the following: "This proctor does not meet the requirement for the ASTM 4718. There is more than 30 percent retained on the ¾" screen."

**Comment [Babs2]:**

Reviewed by: **Dan King**
Eastern Idaho Division Manager

1230 North Skyline Drive, Ste. C, Idaho Falls, ID 83402 208 529-8242 Fax 208 529-6911

242

MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT

PAGE # 1
OCTOBER 17, 2001

C:\DOCUMENTS AND SETTINGS\MJN\LOCAL SETTINGS\TEMPORARY INTERNET FILES\OLK5\PROCTOR BP3.DOC

Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| Project: | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| Source: | Borrow Pit 1 – Hole # 1 0.53-1m | | |
| Date Obtained: | October 15, 2001 | | |
| Sample ID: | BP3 | | |
| Atterberg Limits: | Liquid Limit 20.2 Plastic Limit 15.2 | Plastic Index 5.0 | |
| ASHTO M145 Classification: | A-4 Clayey Silt | | |
| Sample Prepared: | Moist.<br>Dry: | Manual:<br>Mechanical: | |
| Test Standard: | AASHTO T 99: X<br>ASTM D 698: | AASHTO T 180:<br>ASTM D 1557: | Method<br>C |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 8.4 | 1718.2 | 1790.6 kg/m^3 | 13.4 % |
| | 2 | 13.8 | 1786.5 | ASTM D-4718, Correction | |
| | 3 | 16.8 | 1758.7 | for Oversize Particles | |
| | 4 | 20.0 | 1655.3 | 1790.6 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | 100 | |
| #4 | 97 | |
| #8 | | |
| #10 | 94 | |
| #16 | 92 | |
| #20 | | |
| #30 | | |
| #40 | 86 | |
| #50 | 78 | |
| #60 | | |
| #80 | | |
| #100 | 59 | |
| #200 | 52.1 | |

Note:

Comment [Balis1]: If there is more than 30% retained (below 70% passing) on the ¾" screen, please include a note stating the following: "This proctor does not meet the criteria set forth in ASTM 4718. There is more than 30 percent retained on the ¾" screen."

Comment [Balis2]:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Reviewed by: Dan King
Eastern Idaho Division Manager



243

MATERIALS
TESTING &
INSPECTION

# MOISTURE DENSITY
# PROCTOR TEST REPORT



Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| Project: | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| Source: | Borrow Pit 1 – Hole #2 0-0.2m | | |
| Date Obtained: | October 15, 2001 | | |
| Sample ID: | BP4 | | |
| Atterberg Limits: | Non-Plastic | | |
| ASHTO M145 Classification: | A-2-4 Silty Sand | | |
| Sample Prepared: | Moist:<br>Dry: | Manual:<br>Mechanical: | |
| Test Standard: | AASHTO T 99:<br>ASTM D 698: | AASHTO T 180: X<br>ASTM D 1557: | Method<br>D |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 7.6 | 1708.4 | 1796.2 kg/m^3 | 10.8 % |
| | 2 | 9.5 | 1774.6 | ASTM D-4718, Correction | |
| | 3 | 11.3 | 1799.6 | for Oversize Particles | |
| | 4 | 14.2 | 1690.0 | 1796.2 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | | |
| #8 | 99 | |
| #10 | 99 | |
| #16 | 99 | |
| #20 | | |
| #30 | | |
| #40 | 91 | |
| #50 | 66 | |
| #60 | | |
| #80 | | |
| #100 | 17 | |
| #200 | 11.7 | |

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Reviewed by: **Dan King**
Eastern Idaho Division Manager

Comment [Babs1]: If there is more than 30% retained (below 70% passing) on the ¾" screen, please include a note stating the following: "This proctor does not meet the criteria set forth in ASTM D 4718. There is more than 30 percent retained on the ¾" screen."

Comment [Babs2]:

1230 North Skyline Drive, Ste. C, Idaho Falls, ID 83402 208 529-8242 Fax 208 529-6811

MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT

PAGE 1
REVISION DATE
DECEMBER 4, 2001

C:\DOCUMENTS AND SETTINGS\MJN\LOCAL SETTINGS\TEMPORARY INTERNET FILES\OLK0\PROCTOR SPD.DOC

Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| Project: | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| Source: | Borrow Pit 1 – Hole # 2 .36-1m | | |
| Date Obtained: | October 15, 2001 | | |
| Sample ID: | BP5 | | |
| Atterberg Limits: | Non-Plastic | | |
| ASHTO M145 Classification: | A-3 Fine Sand | | |
| Sample Prepared: | Moist:<br>Dry: | Manual:<br>Mechanical: | |
| Test Standard: | AASHTO T 99: X<br>ASTM D 698. | AASHTO T 180:<br>ASTM D 1557· | Method<br>C |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 7.9 | 1560.1 | 1599.7 kg/m^3 | 14.5 % |
| | 2 | 10.4 | 1585.3 | ASTM D-4718, Correction for Oversize Particles | |
| | 3 | 13.7 | 1598.8 | | |
| | 4 | 21.8 | 1550.0 | 1599.7 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | | |
| #8 | 99 | |
| #10 | 99 | |
| #16 | 99 | |
| #20 | 98 | |
| #30 | | |
| #40 | 93 | |
| #50 | 66 | |
| #60 | | |
| #80 | | |
| #100 | 6 | |
| #200 | 1.2 | |

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Reviewed by: **Dan King**
Eastern Idaho Division Manager

**Comment [Babs1]:** If there is more than 30% retained (below 70% passing) on the ¾" screen, please include a note saying the following: "This proctor does not meet the criteria set forth in ASTM 4718. There is more than 30 percent retained on the ¾" screen."

**Comment [Babs2]:**



245

# MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT

PAGE # 1
OCTOBER 18, 2001

C:\DOCUMENTS AND SETTINGS\MJN\LOCAL SETTINGS\TEMPORARY INTERNET FILES\OLK5\PROCTOR BP6.DOC

Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

Corrected – Method C used

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| Project: | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| Source: | Borrow Pit 1 – Hole #4 0.8-1m | | |
| Date Obtained: | October 15, 2001 | | |
| Sample ID: | BP6 | | |
| Atterberg Limits: | Liquid Limit 30.8 | Plastic Limit 19.1 | Plasticity Index 11.7 |
| ASHTO M145 Classification: | A-6 Silty Clay | | |
| Sample Prepared: | Moist:<br>Dry: | Manual:<br>Mechanical: | |
| Test Standard: | AASHTO T 99: X<br>ASTM D 698: | AASHTO T 180:<br>ASTM D 1557: | Method<br>C |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density |
|---|---|---|---|
| 2.60 | 1 | 16.5 | 1455.8 |
| | 2 | 20.6 | 1655.9 |
| | 3 | 21.1 | 1622.8 |

Maximum Dry Density: 1684.7 kg/m^3 Optimum Moisture: 19.5%

ASTM D-4718, Correction for Oversize Particles
1684.7 Kg/m^3




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | | |
| #8 | 100 | |
| #10 | 99 | |
| #16 | 99 | |
| #20 | | |
| #30 | | |
| #40 | 96 | |
| #50 | 93 | |
| #60 | | |
| #80 | | |
| #100 | 83 | |
| #200 | 78.0 | |

Comment [Babc1]: If there is more than 30% retained (below 70% passing) on the ¾" screen, please include a note stating the following: "This proctor does not meet the criteria set forth in ASTM 4718. There is more than 30 percent retained on the ¾" screen"

Comment [Babc2]:

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Reviewed by: Dan King
Eastern Idaho Division Manager



246

# MATERIALS TESTING & INSPECTION

## MOISTURE DENSITY PROCTOR TEST REPORT



Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| Project: | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| Source: | Borrow Pit 1 – 0-0.35m | | |
| Date Obtained: | October 17, 2001 | | |
| Sample ID: | BP7 | | |
| Atterberg Limits: | | | |
| ASHTO M145 Classification: | A-2-4 Silty Sand | | |
| Sample Prepared: | Moist. X<br>Dry: | Manual: X<br>Mechanical: | |
| Test Standard: | AASHTO T 99<br>ASTM D 698 | AASHTO T 180 X<br>ASTM D 1557 | Method<br>D |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 1.7 | 1676.5 | 1792.2 kg/m^3 | 7.9 % |
| | 2 | 4.1 | 1751.8 | ASTM D-4718, Correction | |
| | 3 | 7.8 | 1788.7 | for Oversize Particles | |
| | 4 | 10.0 | 1782.0 | 1792.2 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | | |
| #8 | | |
| #10 | | |
| #16 | | |
| #20 | | |
| #30 | | |
| #40 | | |
| #50 | | |
| #60 | | |
| #80 | | |
| #100 | | |
| #200 | | |

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Reviewed by: Dan King
Eastern Idaho Division Manager

Comment [Babs1]: If there is more than 30% retained (below 70% passing) on the ¼" screen, please include a note stating the following: "This proctor does not meet the criteria set forth in ASTM 4718. There is more than 30 percent retained on the ¼" screen."

Comment [Babs2]:



247

MATERIALS
TESTING &
INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT



C:\DOCUMENTS AND SETTINGS\MJN\LOCAL SETTINGS\TEMPORARY INTERNET FILES\OLK8\PROCTOR BP8.DOC

Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| Project: | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| Source: | Borrow Pit 2 – Pit 1 0.8-1m | | |
| Date Obtained: | October 16, 2001 | | |
| Sample ID: | BP8 | | |
| Atterberg Limits: | Liquid Limit 25.9 Plastic Limit 15.6 Plasticity Index 10.3 | | |
| ASHTO M145 Classification: | A-6 Clayey Silt | | |
| Sample Prepared: | Moist:<br>Dry: | Manual:<br>Mechanical: | |
| Test Standard: | AASHTO T 99: X<br>ASTM D 698: | AASHTO T 180:<br>ASTM D 1557: | Method<br>B |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 14.4 | 1640.1 | 1694.9 kg/m^3 | 18.2 % |
| | 2 | 17.4 | 1683.0 | ASTM D-4718, Correction | |
| | 3 | 18.9 | 1702.8 | for Oversize Particles | |
| | 4 | 21.5 | 1648.0 | 1694.9 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | 100 | |
| #8 | 99 | |
| #10 | 99 | |
| #16 | 99 | |
| #20 | | |
| #30 | | |
| #40 | 96 | |
| #50 | 90 | |
| #60 | | |
| #80 | | |
| #100 | 57 | |
| #200 | 45.1 | |

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Reviewed by: Dan King
Eastern Idaho Division Manager

**Comment [Babs1]:** If there is more than 30% retained (below 70% passing) on the ¾" screen, please include a note stating the following: "This proctor does not meet the criteria set forth in ASTM D 4718. There is more than 30 percent retained on the ¾" screen."

**Comment [Babs2]:**

# MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT

PAGE # 1
REVISION DATE OCTOBER 22, 2001

C:\DOCUMENTS AND SETTINGS\MJN\LOCAL SETTINGS\TEMPORARY INTERNET FILES\OLK5\PROCTOR BP8.DOC

Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| **Project:** | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| **Source:** | Borrow Pit 2 – 0.5-1m | | |
| **Date Obtained:** | October 16, 2001 | | |
| **Sample ID:** | BP9 | | |
| **Atterberg Limits:** | Non-Plastic | | |
| **ASHTO M145 Classification:** | A-2-4 Silty Sand | | |
| **Sample Prepared:** | Moist:<br>Dry | Manual:<br>Mechanical: | |
| **Test Standard:** | AASHTO T 99:<br>ASTM D 698: | AASHTO T 180: X<br>ASTM D 1557: | Method<br>D |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 8.1 | 1710.1 | 1813.8 kg/m^3 | 12.3 % |
| | 2 | 10.3 | 1786.1 | ASTM D-4718, Correction | |
| | 3 | 13.2 | 1814.3 | for Oversize Particles | |
| | 4 | 14.6 | 1775.3 | 1813.8 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | 100 | |
| #8 | 99 | |
| #10 | 99 | |
| #16 | 98 | |
| #20 | | |
| #30 | | |
| #40 | 93 | |
| #50 | 85 | |
| #60 | | |
| #80 | | |
| #100 | 40 | |
| #200 | 18.1 | |

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Reviewed by: Dan King
Eastern Idaho Division Manager

**Comment [Babs1]:** If there is more than 30% retained (below 70% passing) on the ¾" screen, please include a note stating the following: "This proctor does not meet the criteria set forth in ASTM 4718. There is more than 30 percent retained on the ¾" screen."

**Comment [Babs2]:**

# MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT



Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | |
|---|---|
| Project: | Camas NWR Complex ID RRP-CAMA 101(1) |
| Source: | Method 1 spec- Parking lot "Windrow" |
| Date Obtained: | November 15, 2001 |
| Sample ID: | PC-30802-4 |
| Atterberg Limits: | |
| ASHTO M145 Classification: | |
| Sample Prepared: | Moist: X Dry: Manual: X Mechanical: |
| Test Standard: | AASHTO T 99: ASTM D 698: AASHTO T 180 X ASTM D 1557: Method D |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 3.7 | 2131.2 | 2165.0 kg/m^3 | 5.9 % |
| | 2 | 5.8 | 2174.9 | ASTM D-4718, Correction for Oversize Particles | |
| | 3 | 7.6 | 2136.7 | | |
| | 4 | 9.2 | 2104.1 | 2165.0 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | | |
| #8 | | |
| #10 | | |
| #16 | | |
| #20 | | |
| #30 | | |
| #40 | | |
| #50 | | |
| #60 | | |
| #80 | | |
| #100 | | |
| #200 | | |

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Comment [Babs1]: If there is more than 30% retained (below 70% passing) on the ¾" screen, please include a note stating the following: "This proctor does not meet the criteria set forth in ASTM 4718. There is more than 30 percent retained on the ¾" screen."

Comment [Babs2]:

Reviewed by: Dan King
Eastern Idaho Division Manager



250

MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT

PAGE # 1
REVISION DATE
NOVEMBER 14, 2001

C:\DOCUMENTS AND SETTINGS\MJN\LOCAL SETTINGS\TEMPORARY INTERNET FILES\OLK5\PROCTOR PC-30802-CC21.DOC

Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | | |
|---|---|---|---|---|
| Project: | Camas NWR Complex ID RRP-CAMA 101(1) | | | |
| Source: | Method 1 spec– Roadway Aggregate | | | |
| Date Obtained: | November 1, 2001 | | | |
| Sample ID: | PC-30802-CC21 | | | |
| Atterberg Limits: | | | | |
| ASHTO M145 Classification: | | | | |
| Sample Prepared: | Moist: X<br>Dry: | Manual: X<br>Mechanical: | | |
| Test Standard: | AASHTO T 99:<br>ASTM D 698: | AASHTO T 180: X<br>ASTM D 1557: | Method<br>D | |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 4.2 | 1963.9 | 1982.6 kg/m^3 | 7.0 % |
| | 2 | 6.7 | 1981.1 | ASTM D-4718, Correction | |
| | 3 | 9.2 | 1971.3 | for Oversize Particles | |
| | 4 | 11.7 | 1925.8 | 1982.6 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | | |
| #8 | | |
| #10 | | |
| #16 | | |
| #20 | | |
| #30 | | |
| #40 | | |
| #50 | | |
| #60 | | |
| #80 | | |
| #100 | | |
| #200 | | |

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Comment [Babs1]: If there is more than 30% retained (below 70% passing) on the ¾" screen please include a note, stating the following: "This proctor does not meet the criteria set forth in ASTM D-4718. There is more than 30 percent retained on the ¾" screen."

Comment [Babs2]:

Reviewed by: Dan King
Eastern Idaho Division Manager

**MATERIALS TESTING & INSPECTION**

# MOISTURE DENSITY PROCTOR TEST REPORT

PAGE # 1
REVISION DATE
NOVEMBER 28, 2001

C:\DOCUMENTS AND SETTINGS\MJN\LOCAL SETTINGS\TEMPORARY INTERNET FILES\OLK5\PROCTOR NOV 28.DOC

Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

«FirstName» «LastName»
«Company»
«Address1»
«City», «State» «PostalCode»

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | | |
|---|---|---|---|---|
| Project: | Camas NWR Complex ID RRP-CAMA 101(1) | | | |
| Source: | | | | |
| Date Obtained: | November 28, 2001 | | | |
| Sample ID: | | | | |
| Atterberg Limits: | | | | |
| ASHTO M145 Classification: | Silty Sand | | | |
| Sample Prepared: | Moist: X<br>Dry: | | Manual: X<br>Mechanical: | |
| Test Standard: | AASHTO T 99: X<br>ASTM D 698: | | AASHTO T 180:<br>ASTM D 1557: | Method<br>C |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 7.8 | 1711.3 | 1822.7 kg/m^3 | 12.8 % |
| | 2 | 9.8 | 1777.3 | ASTM D-4718, Correction | |
| | 3 | 11.8 | 1822.8 | for Oversize Particles | |
| | 4 | 14.7 | 1804.3 | 1822.7 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | 100 | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | | |
| #8 | | |
| #10 | | |
| #16 | | |
| #20 | | |
| #30 | | |
| #40 | | |
| #50 | | |
| #60 | | |
| #80 | | |
| #100 | | |
| #200 | | |

Comment [Babs1]: If there is more than 30% retained (below 70% passing) on the ¾" screen, please include a note stating the following: "This proctor does not meet the criteria set forth in ASTM 4718, 'There is more than 30 percent retained on the ¾" screen.'"

Comment [Babs2]:

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Reviewed by: **Dan King**



253

**MATERIALS TESTING & INSPECTION**

PAGE # 1 OF 2
Date February 18, 2005
Doc ID: g:\boise\2005 reports\000-199\b50105e\e-mail 2-14-05 letter to larkin.doc

❑ Environmental Services ❑ Geotechnical Engineering ❑ Construction Materials Testing ❑ Special Inspections

Thomas Larkin
STEWART SOKOL & GRAY, LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
(503) 221-0699
(503) 223-5706

Mr. Larkin,

This letter is in response to your e-mail dated 2-14-05 regarding your request to have MTI provide copies of MTI reports related to the RRP CAMA 101(1) Camas NWR Complex, FHWA contract number DTFH70-01-C-00034 (attached) and supplemental finding based upon a review of court records and depositions. Our supplemental finding are as follows:

1. MTI believes the crux of the issue is to determine if the soil type "sandy loam" that was stated in the original contract documents correlates to the soil type that was actually found at Borrow Pit #1 and used during construction. MTI reviewed our technical data as well as the data obtained from the WFLHD materials section. The WFLHD materials section data was based on split samples collected by MTI from borrow source #1. Using the USDA soil textural triangle, MTI identified possible soil types of the samples. The USDA soil textural triangle was used to identify if a soil could be a sandy loam based upon percentages of sand, silt, and clay. The USDA textural triangle is also attached to this e-mail. MTI collected fourteen samples from the borrow sources and one from the roadway stockpile. Of those fifteen samples, seven of them were not considered sandy loam as stated in the contract documents. Of the five samples analyzed by the WFLHD materials section, two did not meet the requirements of a sandy loam USDA classification. A summary of the soil types are also included in the following table. The bolded items in the table below are the samples <u>**not**</u> considered to be sandy loam.

2. A second point that has not been addressed as of yet but may be worthwhile pursuing is that the plans indicated unclassified borrow to be placed in the "sliver fills" on sheet C-1 and in specifications page E-5 *Sect 105. - Control of Material, (a) (1) government-provided mandatory sources* "obtain material for use as unclassified borrow from borrow source #1 and borrow source #2, as shown on the plans." Our point of contention is that unclassified borrow is defined as A-1, A-3, or A-2-4 in accordance with AASHTO Classification system. <u>Two of the five samples collected from borrow source #1 do not meet the definition of unclassified borrow, per the WFLHD materials section results</u>.

Three main types of soil classification systems are available, with each used for a specific purpose. The USDA soil textural classification allows soil scientists to know the particle size of the material and better understand agricultural properties of the soil. The Unified Classification System is used in the engineering field to determine the engineering properties of soil and how that will affect building design. The AASHTO classification system is based upon gradation and particle size like the USDA system but is used by engineers for road building and engineering design.

MATERIALS TESTING & INSPECTION

PAGE # 2 OF 2
Date February 18, 2005
Doc ID: g:\boise\2005 reports\000-199\b50105e\e-mail 2-14-05 letter to larkin.doc

❑ Environmental Services ❑ Geotechnical Engineering ❑ Construction Materials Testing ❑ Special Inspections

| Sample ID | USDA Class. | Lab | Identified Location |
|---|---|---|---|
| BP-1 | Loam sandy loam | WFLHD | Borrow #1 Hole #1 |
| BP-1 | loamy and, sandy loam, sandy clay loam | WFLHD | Borrow #1 Roadway Stockpile |
| 285-S | Sandy loam, loamy sand | WFLHD | Borrow #1 Center Pit |
| BP-3 | Sandy loam, sandy clay loam, sandy clay | MTI | Borrow Pit #1 Hole #1 0.53-1.0 M |
| BP-7 | Unknown no gradation, proctor only | MTI | Borrow Pit #1 0-0.35 M |
| BP-8 | Sandy loam, sandy clay loam, sandy clay | MTI | Borrow Pit #2 0.8-1.0 M |
| BP-10 | Unknown no gradation, proctor only | MTI | Borrow Pit #1 |
| 242-S | Sandy loam, sandy clay loam, sandy clay | MTI | Pit floor |
| **BP-4** | **Sand** | WFLHD | **Borrow #1 Hole #2 0-0.2 M** |
| **BP-6** | **Silt loam, clay, clay loam** | WFLHD | **Borrow #1 Hole #4 0.8-1.0M** |
| **BP-2** | **Silt loam, loam, clay loam, clay** | **MTI** | **Borrow Pit #1 Hole #1 0-0.2 M** |
| **BP-5** | **Sand** | **MTI** | **Borrow Pit #1 Hole #2 0.36-1.0 M** |
| **264-S** | **Silt loam, loam, clay loam, clay** | **MTI** | **North Area material** |
| **284-S** | **Sand** | **MTI** | **Camas Pit** |
| **286-S** | **Sand** | **MTI** | **Borrow Source #2** |

- Un-bolded items-material that meets Sandy loam definition established by USDA;
- **Bolded items-material that does not meet sandy loam definition established by USDA.**

The samples listed in the table above were classified based upon the percentages of sand and silt/clay. The percentage of clay and silt was not determined during the testing, therefore we can only work from the sand side of the USDA soil triangle. However, knowing the sand percentage allowed the material classification to be limited to several possibilities. Using this approach, the bolded items identified in the table do not fit into the sandy loam classification. If you have any further questions please feel free to contact me, (208) 376-4748.

Respectfully submitted,

Karl Languirand David Cram

Karl Languirand, P.G.
Staff Geologist

Reviewed by: David O. Cram, P.E.
General Manager

# Soil Texture Triangle

-Lab data needed

-Percent by weight of fine earth fraction




256

If I understand your February 22 report correctly, that is a soil that they would have expected to encounter?
A. I believe that is correct; yes.
Q. And working our way over to the right. Borrow Pit 1, Hole 2. This is classification A-2-4, silty sand.
This is something again they would have expected to encounter?
A. Yes.
Q. And, finally, Borrow Pit 1, Hole 4. A-64, silty clay.
Again, would this be a clayey material as referenced in the contract?
A. Yes.
Q. Let me ask you to turn to the second page. Now, I note that the report is submitted by MTI. And do I understand that you are the primary author and then it is reviewed by Mr. Cram?
A. Yes. With --
Q. Go ahead.
A. That's correct.
Q. And do you feel comfortable testifying to all of the opinions in the report?

A. There is some opinions that I did not make that were made by Mr. Cram regarding engineering issues of the material.

Q. Could you identify those for me, please?

A. One and two of the bulleted items.

Q. On page two?

A. On page two. Under the general observations.

Q. And are you going to give any -- or are you planning on giving any testimony at trial about points one and two?

A. No.

Q. Maybe I asked you the question using a wrong word. Let me ask it a slightly different way.

Would you be comfortable at trial giving any opinions as to points one and two? Or is that strictly Mr. Cram's role?

MR. LARKIN: I'm sorry, can I have the question again?

(Record read.)

MR. LARKIN: Object to form.

Q. (BY MR. LARKIN) You can answer.

A. No.

Q. All right. How would you describe the difference in the areas of expertise that you bring to the table versus Mr. Cram?

A. I bring soils knowledge. Mr. Cram also brings soils knowledge and an engineering background.

Q. So you would feel confident about testifying concerning point number three; correct?

A. Yes.

Q. All right. Let me ask a couple questions about that, then. You say, "Soil types found within these mandatory borrow sources were highly variable as the above table shows, thus making it extremely difficult for the contractor to select or reject the materials."

When you say "highly variable," could you give me some sense as to what you mean by that as compared to what the contractor may have expected from what was stated in the contract?

A. Yes. The contract states sandy loam underlaid by clayey materials. The material was interspersed -- the sandy loam was interspersed with clayey materials and it made it -- the silt and clay -- the soil types in the borrow source

tell the contractor?

A. At this point right now I think I would tell them it doesn't mean anything. It's a meaningless term to assume that it means 60 percent, 70 percent, 80 percent. It's pure speculation on my part.

Q. So once you get past your view that it is meaningless, what do you tell the contractor to do, though? Do you tell him to bid it as if it was 99-percent sandy loam? Or should he ask a question of the owner? Or perform an investigation? What would you do?

A. In that instance I wouldn't bid it. My advice to a contractor would be that the specifications are poorly written and too vague.

Q. Do you have an understanding what the contract required Universal to build here?

A. Generally. I understand that there was this issue of sliver fills. And then there was some fill in the roadway.

Q. And do you have enough of an understanding as to what Universal was doing to express an opinion as to the degree of difficulty in working with the various types of soil that might be encountered?

A. I could express a general opinion. Again, I was not on-site during construction. And although I have had some conversations leading up to this with our on-site personnel as to what techniques were employed. Again, I was not out there to actually witness it.

Q. Did any of your previous projects involve the Camas site?

A. No.

Q. Do you have any knowledge as to how the refuge -- the soil at the refuge compares to, say, the geology in that region of Idaho in general?

A. Not untypical. I would consider it to be typical material that might be expected to be encountered.

Q. The material that Universal encountered here is typical to what is in this area?

A. That's correct.

Q. All right. I want to get back to what you testified to a moment before about -- and I don't want to misquote you here. But you may or may not have some disagreement with Mr. Languirand on working with the sandy loam. Do you have an opinion here as to how difficult

or not it would have been for Universal to work with sandy loam in terms of constructing this particular project?

A. I do.

Q. What is that opinion?

A. The sandy loam is a compactable material. It can be compacted. It's a function of the amount of effort or degree of care that would need to be taken. And I'm making that statement relative to other types of materials that might be used.

Q. As compared to what other types of material?

A. Like a road mix. A three-quarter-inch minus crushed material would be much easier to compact. Much more consistent. It is a process material. So, therefore, it is considered controlled. It could be a bank run sand gravel material, which is standard in the area. All of those materials would be much, much easier to compact.

Q. When you say three-quarters of an inch. You are talking particles three-quarter-inch in size?

A. That's correct.

Q. What about in terms of sandy loam versus, say, sand?

A. Sand would be easier material to compact. It would take less effort. Less control. No specialized equipment. You could go thicker lifts. Just overall -- all factors that go into compacting a soil. It would be much easier material to compact.

Q. Than sandy loam?

A. That's correct.

Q. And I think Mr. Languirand testified to this. Would you agree that if it was just a clay or a silty material that would be more difficulty?

A. Absolutely, yes.

Q. Do you have an understanding here as to what percentage of the material that Universal encountered in Borrow Source No. 1 was sandy materials versus silty or clayey materials?

A. I couldn't give you a percentage. It is my understanding that there was, what, out of five samples, there were at least two that were identified as being a non sand material. Its main classifications were of a silt or clay nature.

Q. Is that something that you looked at, though, independent of what Mr. Languirand was doing?

A. Well, it was off the data that Karl Languirand had summarized.

Q. I see. Jumping ahead to Exhibit 2 for a minute. Which I think you should have over there somewhere. It's a document marked Exhibit 2.

A. Yes.

Q. Do you agree with Mr. Languirand's testimony that of the 15 samples identified in Exhibit 2, that 12 of the 15 are either sandy loam or sandy soils?

A. Is that a statement he makes here in the letter? I apologize, I have not reviewed this letter recently.

Q. Maybe you weren't here. I thought he had testified that -- and you can take a look at it yourself and give me your own opinion. But my understanding of his testimony was that 12 of the 15 of the soils here are either sandy loam or sand. And if you look at the previous page in the report under point one. The last sentence indicates that the soils on top, the first eight,

are supposed to be sandy loam. And then the soils underneath that in the bold are not sandy loam.

A. Sure. I would agree that some did not meet the classification for sandy loam.

Q. So there is eight that are sandy loam; right?

A. That's correct.

Q. And then we've got four that are sand. Do you see that?

A. Sure.

Q. Now, based upon what you testified to a few minutes ago, would it be fair to say then that 12 of the 15 are either sandy loam or material that is easier to work with than sandy loam?

A. That would be a fair statement.

Q. Going back to Exhibit 1. Second page where you have the three numbered opinions. The first one is the material in question is not typically used in the structural section of a roadway. That opinion. I don't know if you were here. But towards the end of Mr. Languirand's testimony we talked briefly about -- there was some discussion of that in the expert report of

Geosyntec. The expert hired by the government. Were you here for that testimony?

A. I was.

Q. Now, have you read that portion of the GeoSyntec report?

A. I just was perusing it while we were in here with Karl Languirand.

Q. And do you, based upon just your look at it today, do you agree or disagree with that section of the report?

A. I would disagree with it. Definitely.

Q. Let me just grab that. Mr. Houlihan's report says, "Because the material in the borrow pit was predominantly sandy, it likely would have had an AASHTO classification that is typical of that used in structural sections of roadways if it had been mixed and processed as required in the contract."

Do you disagree with that?

A. I disagree with that.

Q. Why is that?

A. Almost all materials have some kind of AASHTO classification. Just because you can classify it using an AASHTO classification system doesn't mean that it is structurally sound in a

when you say that, "FHWA directed UCI's constructions means and methods," what did you mean by that?
A. In -- in accordance with that change order?
Q. Yes.
A. Well, it -- it's my understanding that where we had -- or -- or were going to use the plate compaction --
Q. Um-hmm.
A. -- the plate compaction is a big issue to us.
Q. Um-hmm.
A. Because that's the way we had perceived the project. They would not apply this contract modification to plate compaction. It was only to rolling.
Q. Um-hmm.
A. And the only way you were going to roll that was with small rollers.
Q. Um-hmm.
A. And we didn't agree with that. They said -- well, that's -- that's what they wanted it (sic) done if we were going to use a method specification. I -- I call that redirection.

And so we worked on some resolvement of that problem and that's where it came out where we did rolling versus plate compaction. There was very little difference.

Q. There was very little difference in terms of what?

A. Compaction.

Q. I see. I see.

A. So you -- the effort put into it, you could have achieved either way. But it didn't seem like anybody listened to that and that just went off into space and never heard about it again.

Q. Sure. Did you understand that performing the work the way it was originally spelled out in the contract was no longer an option?

A. No. I think you could have done it either way.

Q. Okay.

A. You -- you could have continued to get compaction using density, or you could use a method spec.

Q. Okay. So if you could continue to do it the way it was spelled out in the contract originally, why do you say that -- that the change order was not optional and that, "Federal Highway

directed Universal's means and methods?"

A. Well, we were trying to comply to the plate wacker. That was our method.

Q. Um-hmm.

A. We weren't achieving compaction because you have a bad soil source. So coming in with that contract modification didn't solve anything for the sliver fills. Didn't solve one darn thing.

And they failed to see our point we were trying to make with the plate compaction. We said, "Hey, it -- it'll do every bit as good."

In other words, if you're going to accept this method spec, then our plate compaction very nearly meets this. There was one point difference in between taking densities on them.

Went down there with a small roller, rolled it, rolled it, rolled it. Went in and compacted a different section with a plate wacker, there's one point difference between the two.

So everybody's guessing by God on a method spec anyway. They're doing what satisfies them. We were just trying to satisfy them that they could get it with either method.

It just, for whatever reason, wasn't acceptable to them. They just said, well, gee,

what you told her, simply just to take care of it? Or did you -- was -- was there any direction from you beyond that -- beyond that?

A. Not -- not that I remember.

Q. Okay. Did you do any kind of review yourself to kind of go back to the contract and say, "Well, Mr. Butikofer's telling me that I need to have the work of all the subcontractors in the quality control plan."

Did you go back yourself and take a look at the contract and -- to see if Mr. Butikofer was doing something he wasn't supposed to be doing or --

A. Not to my knowledge, no.

Q. Okay. When you -- when you got this letter -- well -- well -- well, let -- let me withdraw that for the moment.

With respect to the submissions of the quality control plan and the Government's review of the quality control plan, did Universal take any issue with respect to how long a period of time there would be between the submission of the quality control plan and the review of the quality -- I'm -- the submission of the quality control plan in the time that you actually got a response back from the Government?

A. Did we make an allowance for that, are -- are you saying?
Q. No, no. I'm sorry if I -- if I didn't phrase that pretty well. I guess the question is -- is, does Universal have any complaint or take issue with the period of time -- throughout -- throughout this quality control submission process, does Universal have any complaint or take any issue with how long it took from the time it submitted the quality control plan, until it got a response back from the Government?
A. I have no problem with their response time.
Q. Okay.
A. It's just because nothing was ever accepted, but it was responded very timely.
Q. Okay. So when you say that you have no -- no problem with their response time, is that just on the quality control plan? Or is that submissions in general?
A. I'd say generally in submissions. In other words, if -- in their opinion the submission wasn't correct, they were timely in notifying us of that.
Q. They were. Okay.

A. And -- and there might be one exception on one of the schedules. I think that there was quite a bit of time used on it.

Q. I see.

MR. O'CONNELL: All right. Can you mark this as 8, please.

(Whereupon, Exhibit-8 was marked for identification.)

MR. O'CONNELL: Okay.

BY MR. O'CONNELL:

Q. Have you seen Exhibit 8 before, Mr. Standerfer?

A. Yes, I have.

Q. Okay. And this is -- correct me if I'm wrong, but this was submitted by Universal on September 13th, 2001, which is two days after the Government's letter dated September 11th, 2001. Correct?

A. I guess that's correct, yes.

Q. Okay. And the fax cover sheet indicates that it's to Todd Butikofer from Dick Standerfer. And a moment ago, Mr. Standerfer, you had described to me what you had done upon receipt of the Government's September 11th letter.

Can you tell me -- I -- I take it -- well,

about the highs and lows of your relationship with
--
A. Um-hmm.
Q. -- Mr. Butikofer. Would you say that this was one of the highs that he sent you an example of how to do the quality control plan?
A. I have no opinion on that. I -- I don't even recall it.
Q. All right. Can you tell me what you, as the president of the company, do on September 17th? You -- you've got a contract that says you can't begin work until the quality control plan is accepted.
And now, on September 17th you've had the quality control plan rejected for the second time in the course of about a week, what -- what do you personally do when you -- when you encounter that situation?
MR. LARKIN: Objection. It's been asked and answered with respect to this situation.
MR. O'CONNELL: Well, I'm asking with respect to this particular exhibit, though. And I haven't asked him that before.
BY MR. O'CONNELL:
Q. Can you tell me what you did after you --

A. When we received this?
Q. Yes.
A. I -- I don't remember.
Q. You don't remember?
A. Not specifically, no.
Q. Okay. For -- we've seen in these two letters -- and, I think, you've answered part of this before -- but you've seen in these two letters the Government's listing particular areas in which the quality control plan is lacking.
Did you ever go back and look at the contract and say, "Hey, wait a minute, what Mr. Butikofer's requiring here is not in the contract," or "We shouldn't have to do that."
Did -- did that ever happen?
A. No. I don't think that ever happened.
Q. Okay. Did you feel like -- that these reviews of the quality control plan, that this was just nit-picking on the -- the part of the Government?
A. I -- I don't know. At this date? September 17th?
Q. Yes.
A. I -- I don't know that I had that opinion at that date, no.

Q. Did you, at some point, form the opinion that the Government was nit-picking with respect to its review of the quality control plans?
A. I -- I probably did at some point. I just have to review it. I -- I can't even give you the date it was finally accepted.
Q. Sure. Okay.
MR. O'CONNELL: We'll -- we'll get to it then. We won't get -- get too far ahead of you. Okay. Can we mark this as Exhibit 10?
(Whereupon, Exhibit-10 was marked for identification.)
(Discussion off the record.)
MR. O'CONNELL: Okay.
BY MR. O' CONNELL:
Q. Mr. Standerfer, have you seen the quality control plan, which is Exhibit 10, before?
A. Yes.
Q. And do you recall anything in particular with respect to your review of this particular quality control plan?
A. I don't recall any particular -- excuse me -- any particulars, no.
Q. The quality control plan -- or the letter is dated September 18th, 2001. And it was received

allowed to commence.

Q. Okay. Now, we -- we had a -- we've -- we've had several discussions today about the manner in which the Government was enforcing the requirements of the contract. And we've used the -- the term "nit-picking."

With respect to the quality control plan and the fact that it was approved, even though something had been omitted from the plan, would that indicate to you that, at least with respect to quality control plan, that the Government wasn't nit-picking?

A. You know, really to answer that question, I'd have to take all these submittals and compare them to each other to see what data was added or deleted or whatever. I know at some point that the plan became relatively complete. I don't believe we were still allowed to go to work, and at that point, I would consider that nit-picking.

Q. And when you say -- when you refer to the plan being -- becoming relatively complete, is that something you need to sit down and go through all the submittals to be able to answer?

A. Analyze -- it -- it apparently looks to me, and even from the correspondence, at some point

it got kicked into pretty acceptable shape. And at that point I would say, not being allowed to go to work and working with -- you know, you're working with reasonable people with some assurance.

Even the track of the dates of the submittals show that we're always working on it, we're not dragging our feet. I know there were many, many inquiries, just telephone conversations, just trying to get this resolved. So at -- at some point I have to make the -- you know, my opinion that we're -- we're starting to nit-pick on things --

Q. Sure.

A. -- you know.

Q. Is there anything with respect to the quality control plan and the Government's review of them, is -- is there anything you could tell me that the Government did that was outside the contract? Or not in compliance with the contract?

A. No. I can't think of anything.

Q. Okay.

A. You know, the only thing I'd say there that -- uppermost, you know, the spirit of all these things should be met on a short-term project. It's -- it's not like we had years to build this. We --

we had a relatively few months. So --
Q. Okay. In terms of the -- and we've -- we've -- we've talked about this -- stringency, I think, is -- is the term you used at -- at one point.
How would you compare the stringency to which Federal Highway enforced the contract on this project versus the earlier ones that you'd worked on?
A. I -- I would say my general observation of those were -- not -- not that we didn't have some difficulties, but in most cases, they were all worked out.
Q. Um-hmm.
A. And a little more liberal at that time.
MR. LARKIN: Are you talking about other projects?
THE WITNESS: Other projects. Alaska projects. Those would all be Alaska projects.
BY MR. O'CONNELL:
Q. Just so I'm clear, you're talking about the Alaska Federal Highway projects?
A. Yes.
Q. I see. Okay.
MR. O'CONNELL: Okay. Could you mark this

RICHARD C. PAPE,

first duly sworn to tell the truth relating to said cause, testified as follows:

EXAMINATION

QUESTIONS BY MR. O'CONNELL:

Q. Thank you for being here. I just want to ask you a few follow-up questions from your deposition last time. And to ask you a few questions on your report. And I'm going to be as brief as I can and not repeat anything I did last time.

Why don't you start by telling me what you have done since I took your deposition with respect to this case?

A. I went back and I analyzed the schedule from the viewpoint of quantifying adverse impact to that schedule. I read the expert -- well, let's see. No, I hadn't done that. Because it hadn't even been produced when I was deposed. I read the expert reports of CPMI and the soils analysis company. I have read the deposition -- the expert witness deposition of Steven Weathers. Frankly, not a lot. It's a very small project. So I haven't spent a lot of time on it.

Q. I think the first thing you said was something about quantifying adverse impacts on the schedule?

A. Yes.

Q. What did you mean by that?

A. That means that I ran a critical path analysis of that schedule. Imposed two date constraints. Among others. Two of them governed. One of them associated with the approval of the QAQC submittals. That was an adverse impact of 12 calendar days. Calculates to an adverse impact of 12 calendar days. Secondly, I analyzed another externally imposed constraint. Which was when the work could start. After the settlement -- or maybe I shouldn't say settlement. But after the reduction in the amount of bickering over soil compaction and acceptability. Which generally allowed work to start on the -- back on the critical path on closure number one on the 6th of November. That equates to an additional -- not concurrent, but an additional sequential impact of 38 calendar days. So taking those two impacts together, the total impact was 50 calendar days to the critical path on that schedule.

Q. Anything else? Any other impacts?
A. Oh, yeah, there were a lot of impacts. There was an 11-day impact due to the requirement that work could not start on the project until the safety submittal was approved. That was an 11-day impact. But it was concurrent with the 12-day impact of the QAQC submittal approval. There was one other submittal. I would have to look at the record. But there was another submittal in there. What I call a procedural submittal. That had a minimal impact of -- its approval had a minimal impact of maybe four or five days. I don't recall exactly. I would have to look it up. That one was concurrent with the 12-day impact of the QAQC approval. So it diminished in importance.
Is that adequate?
Q. It's adequate if that is the extent of your knowledge. Is there anything else that you did in terms of quantifying adverse impacts on the schedule?
A. Well, I did go back and take a look at a couple of things. That schedule was done based on a five-day workweek. I did add to that schedule some constrained tasks to allow me to do