Nos. 03-1502C, 03-2370C
(Judge Smith)

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

UNIVERSAL CONSTRUCTION, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

MICHAEL O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, DC 20530
Tele: (202) 307-0282
Fax: (202) 514-8624

September 6, 2005

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . ii

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . 2

II. Statement Of Facts . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . 2

A. The Standard . . . . . . . . . . 2

B. Summary Of Issues In Dispute . . . . . . . . . . 4

C. The Soil Conditions Encountered By Universal Were Consistent With Those Indicated In The Contract . . . . . . . . . . 5

1. There Was No Type I Differing Site Condition . . . . . . . . . . 6

2. There Was No Type II Differing Site Condition . . . . . . . . . . 9

D. There Was No Government Directed Change . . . . . . . . . . 11

E. Any Delays At The Beginning Of The Project Were Caused By Universal, Not FHWA . . . . . . . . . . 12

F. The Government Properly Terminated The Contract for Default . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . 17

## TABLE OF AUTHORITIES

### CASES

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Blue Cross & Blue Shield United of Wisconsin & Subsidiaries v. United States,
56 Fed. Cl. 697 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Board of Governors of Federal Reserve v. Agnew,
329 U.S. 441 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Cascade Pac. Int'l v. United States,
773 F.2d 287 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Comtrol, Inc. v. United States,
294 F.3d 1357 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Granite Constr. Co. v. United States,
962 F.2d 998 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Hannon Electric Co. v. United States,
31 Fed. Cl. 135 (1994), aff'd, 52 F.3d 343 (Fed. Cir. 1994) . . . . . . . . . . . . . 16, 17

Lisbon Contractors, Inc. v. United States,
828 F.2d 759 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Malone v. United States,
849 F.2d 1441 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Nuclear Research Corp. v. United States,
814 F.2d 647 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Perini Corp. v. United States,
381 F.2d 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Peters v. United States,
694 F.2d 687 (Fed. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Randa/Madison Joint Venture v. Dahlberg,
239 F.3d 1264 (Fed.Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

Schlesinger v. United States,
182 Ct. C 390 F.2d 702 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Shank-Artukovich v. United States,
13 Cl.Ct. 346, 350 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

State of Florida v. United States,
33 Fed. Cl. 188 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Three S. Constructors, Inc. v. United States,
13 Cl. Ct. 41, 45 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Wilner v. United States,
24 F.3d 1397 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**STATUTES**

**Federal Regulations**

41 U.S.C. § 601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

41 U.S.C. § 609(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

FAR § 52.236-2(a)(1) (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNIVERSAL CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-1502C |
| v. | ) | Consolidated with |
| | ) | No. 03-2370C |
| THE UNITED STATES, | ) | (Senior Judge Smith) |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the Court of Federal Claims (RCFC), defendant respectfully requests that the Court enter summary judgment in its favor upon both the money claims of plaintiff Universal Construction, Inc. (Universal), and Universal's appeal of its termination for default. In support of this motion, we rely upon the following brief, our proposed findings of uncontroverted fact, the expert reports submitted by Universal, the depositions of Universal's principal and experts, and various other documents contained in our appendix.

STATEMENT OF THE ISSUES

1. Whether Universal can meet its burden of proof with respect to a Type I or Type II differing site condition claim.

2. Whether the Government directed changes to Universal's performance of work through the "method specification" contract modification.

3. Whether the Government properly rejected Universal's submittals because those submittals failed to meet the requirements of the contract.

## STATEMENT OF THE CASE

### I. Nature Of The Case

Universal brings this action pursuant to the Contract Disputes Act, 41 U.S.C. § 601, et seq., for additional time and costs allegedly incurred in the performance of a contract for the Federal Highway Administration, Western Federal Lands Highway Division (FHWA). Universal further requests that the Court convert FHWA's termination for default to a termination for convenience.

The Government has filed a counterclaim seeking $125,120.15 in excess reprocurement costs and $152,000 in liquidated damages.

### II. Statement Of Facts

We respectfully refer the Court to defendant's proposed findings of uncontroverted fact which we are filing simultaneous with this motion.

## ARGUMENT

### A. The Standard

RCFC 56 is patterned upon Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c). A fact is material if it

will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. Blue Cross & Blue Shield United of Wisconsin & Subsidiaries v. United States, 56 Fed. Cl. 697, 702 (2003)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48(1986)). When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. Id. (citing Anderson v. Liberty Lobby, 477 U.S. at 249). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. Id. (citing Anderson v. Liberty Lobby, 477 U.S. at 250-52). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Id.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party makes such a showing, the burden

shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. Id.

B. Summary Of Issues In Dispute

In these consolidated cases, the issues before the Court, as framed in Universal's complaints, are whether Universal is entitled to more time and money under the contract due to: (1) a differing site condition; (2) Government directed changes; and (3) delays that were the responsibility of the Government, and whether the Government properly terminated the contract for default. Complaint No. 03-1502C; Complaint Case No 03-2370C, ¶ 5 and Prayer for Relief ¶ 2 . Universal is seeking $641,950.15 (an amount $205,667.21 more than Universal's total contract bid price) and an additional 181 calendar days time extension (an additional amount that would nearly triple the time allowed in the contract).

With respect to the money claim, we are baffled by Universal's request for $641,950.15. As we discuss in our proposed finding of uncontroverted fact (FF) 51, the only place in the record this number appears is in a portion of Universal's certified claim (and in related correspondence) in which Universal proposes alternate scenarios for completing the project. App. 181-82. The most expensive scenario involved Universal working through the Idaho winter, for which it requested the additional $641,950.15. Universal never performed this work, or either of the other two alternatives it proposed.

Instead, it left the project in early December and never returned. FF 52. FHWA later terminated the contract for default in June 2002. In addition to the unlikelihood of the claim amount being exactly the same as its proposal for working through the winter, we have seen no documents which support a claim at this amount. Universal is moribund and has produced only limited documents to evidence the amounts it spent on the project. The documents defendant's counsel has received indicate that Universal expended much less than $641,950.15 for its work upon the entire project.

We address each of Universal's claims as follows.

C. The Soil Conditions Encountered By Universal Were Consistent With Those Indicated In The Contract

Universal's primary complaint on the project was that the actual borrow source conditions differed from those specified in the contract. In its letter notifying FHWA of the alleged differing site condition, it alleged a "Type II" differing site condition. App. 170. In its certified claim and complaints, Universal does not specify whether it alleges a "Type I" or Type II differing site condition. The expert report of Universal's expert, Materials Testing and Inspection (MTI), focuses on the contract's "primarily sandy loam" language, which suggests a Type I differing site condition claim. In his final decision, the contracting officer considered Universal's claim under each type, and we do the same here.

1. There Was No Type I Differing Site Condition

A "Type I" differing site condition consists of "subsurface or latent physical conditions at the site which differ materially from those indicated in th[e] contract." Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002) (quoting FAR § 52.236-2(a)(1) (1994)). To establish entitlement to a Type I differing site condition, a contractor must prove, by preponderant evidence, that: (1) the conditions indicated in the contract differ materially from those actually encountered during performance; (2) the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; (3) the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and (4) the contractor was damaged as a result of the material variation between expected and encountered conditions. Id. Universal cannot meet its burden with respect to any portion of this test.

Universal retained MTI, an engineering consulting firm, to perform testing while it worked on the project and now to act as expert witnesses in this lawsuit. There are no material facts in dispute here because we rely strictly upon the expert reports of MTI, the deposition testimony of the MTI experts, and the contract.

We start with the plain language of the contract which stated that the borrow sources would be "primarily sandy loam which may be underlain with layers of clayey soils." App. 22. In light of the contractual language, the issue becomes: how much sandy loam could the contractor have reasonably expected based upon the phrase "primarily

sandy loam?" The Supreme Court has held that the word primarily in some cases means "first, chief, or principal" and thus means more than 50-percent. Board of Governors of Federal Reserve v. Agnew, 329 U.S. 441, 446 (1946). In other cases, the Supreme Court held that primarily can mean less than 50-percent as long it refers to something which is substantial. Id.

Using the latter definition, the borrow sources could be "primarily sandy loam" if there was more sandy loam than other soils, but still less than 50-percent sandy loam. However, the Court need not dwell upon the issue of whether primarily means more than 50-percent sandy loam or merely a substantial amount of sandy loam since the higher standard is met. According to MTI's report, 8 of the 15 soil samples taken at the Refuge during the course of the project were sandy loam. App. 255. The result is the same if the inquiry is limited to borrow source no. 1, the only borrow source Universal ever used. MTI's report lists 10 samples from borrow source no. 1, six of which it identifies as sandy loam. App. 255. Thus, the contract accurately reflects the conditions that Universal encountered during performance.

Moreover, even this point somewhat understates the absence of a Type I differing site condition. The Type I test requires the contractor to establish that it suffered damages as a result of the differing site condition. Implicitly, this would require that the soil which is "different" from the soil specified be more difficult for the contractor to use than the soil indicated in the contract. That is not the case here.

In addition to the eight samples which indicated sandy loam, MTI's expert report indicates that the next most common material in the borrow sources was sand, which comprised 4 of the 15 samples. App. 255. According to David Cram, the MTI expert with expertise in geotechnical engineering and the design and construction of roads, on this project sand would actually be easier for the contractor to work with than sandy loam. He testified that:

> Sand would be easier material [than sandy loam] to compact. It would take less effort. Less control. No specialized equipment. You could go thicker lifts. Just overall -- all factors that go into compacting a soil. It would be much easier material to compact.

App. 262. Thus, Mr. Cram agreed that 12 of the 15 samples cited in MTI's report are either the sandy loam indicated in the contract or a material easier to use than sandy loam. App. 264.

If, once again, we limit the inquiry to borrow source no. 1, six of the 10 ten samples are sandy loam, and two are sand. Thus, regardless of whether one looks at borrow source no.1 or the area around borrow source no. 1 as well, 80-percent of the soil was sandy loam or a material easier to work with than sandy loam.

Nor should Universal have been surprised by what it encountered because the soil was consistent with the types of soil common in this area of Idaho, as well as what could be seen from a site visit. With respect to how the soil in the borrow sources compared with this area of Idaho, Mr. Cram, an engineer who lives and practices in Idaho, testified that the material encountered was typical for this area. App. 260A.

Finally, Universal visited the site prior to bid and saw that the materials at the site were sandy. Universal's president, Dick Standerfer and his son, Mark, who had overall responsibility for Universal's work in the field, visited the project site pre-bid with Dan King, another soils expert with MTI. App. 147 . At the site, they spoke with some employees of the Refuge who told them that the soil was "pretty sandy." App. 147. Mr. King, who was familiar with the area, informed Universal that the soil appeared to be a "sandy-type material." App. 148.

Universal cannot establish that the material in the borrow sources differed from that indicated in the contract, cannot establish that the conditions were unforeseeable, cannot establish that it has reasonably interpreted the contract documents, and cannot show that it was harmed. Thus, its Type I differing site condition claim fails as a matter of law.

2. There Was No Type II Differing Site Condition

Universal originally alleged a Type II differing site condition. App. 170. A Type II differing site condition is defined as "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." Randa/Madison Joint Venture v. Dahlberg, 239 F.3d 1264, 1276 (Fed.Cir. 2001) (quoting FAR § 52.236-2 (2000)). In order to qualify as a Type II differing site condition, "the unknown physical condition must be one that could not be reasonably anticipated by the

contractor from his study of the contract documents, his inspection of the site, and his general experience[,] if any, as a contractor in the area." Id. (quoting Perini Corp. v. United States, 381 F.2d 403, 410). Proving a Type II differing site condition is more difficult than proving a Type I differing site condition, involving a heavier burden of proof and a stiffer test. Id. at 1277. A Type II differing site conditions clause applies only when the contract does not contain specifications concerning the expected conditions. Shank-Artukovich v. United States, 13 Cl.Ct. 346, 350 (1987).

To the extent that Universal is still pursuing a Type II differing site condition claim, its claim fails because the contract specified that the borrow source would be "primarily sandy loam which may be underlain with layers of clayey soils." App. 22. The contract further warned bidders that the material may contain layers or pockets of unacceptable material. FF 7. Because the contract specified what types of soil would be encountered, a Type II differing site condition claim is not appropriate. Shank-Artukovich, 13 Cl.Ct. at 350.

Finally, even if this Court were to consider a Type II, the claim fails for reasons similar to its Type I claim. As stated above, the contract documents accurately indicated the types of soil that would be encountered, and, according to Universal's expert, Mr. Cram, the soils were consistent with those typically found in this area of Idaho. Thus, its Type II claim fails as a matter of law. Randa/Madison, 239 F.3d at 1276.

D. There Was No Government Directed Change

Universal alleges that the Government directed changes in the performance of the work. While Universal's complaints are no more specific than this statement, its certified claim alleges that FHWA's unilateral contract modification 001 "was not 'optional.'" App. 181. Universal alleged that FHWA, through this modification, "directed UCI's construction means and methods." Id. This argument is entirely devoid of merit.

Contract modification 001 allowed Universal to use methods for soil compaction in addition to those set forth in the contract to compact. The clear language of the modification defeats Universal's assertion that the modification was "not optional." It states in relevant part:

> As an alternative to classifying and determining the maximum density of the material, the contractor may use either or both of the following options. The choice to use either or both, or to use the method set forth in the solicitation package, is entirely the contractors option.

App. 169. (Emphasis added). There is simply no reasonable construction that could be given to this language which would indicate anything other than that the modification was optional.

In his deposition, Mr. Standerfer conceded that the modification was optional, not mandatory:

> Q. Did you understand that performing the work the way it was originally spelled out in the contract was no longer an option?
>
> A. No. I think you could have done it either way.

Q. Okay.

A. You -- you could have continued to get compaction using density, or you could use a method spec.

App. 266. Thus, it is not clear if Universal still intends to pursue this claim. However, both the modification and Mr. Standerfer's testimony demonstrate that this portion of the claim lacks merit.

E. Any Delays At The Beginning Of The Project Were Caused By Universal, Not FHWA

While the Complaint contains no specifics with respect to Universal's assertion that FHWA was responsible for delays on the project, its certified claim states that "front-end Project delays [were caused] by the FHWA in 'nit picking' submittal data." App. 181. The record indicates that there were three submittals at the start of the project that FHWA rejected initially. These were the preliminary construction schedule, the accident prevention plan, and the quality assurance/quality control (QA/QC) plan. Of these three submittals, the QA/QC plan was the last to be approved. See, FF 22-37.

There are several reasons why Universal's claim of Government delays lacks merit. First, the submittal issue appears to be a red herring because schedules that Universal submitted after all three of these items had been approved showed Universal completing the project on time without any adverse affect on project completion caused by the submittal review process. App. 119. Certainly, if the September submittal review

process had delayed the project, we would expect that this would have been evidenced in the October schedules. It was not.

Second, Universal has never alleged that the Government did not comply with the contract requirements with respect to the submittals, but has alleged that the Government "nit picked" the submittals. However, as a purchaser of supplies and services, the Government is entitled to the contractor's strict compliance with the contract specifications. Granite Constr. Co. v. United States, 962 F.2d 998, 1006-07 (Fed. Cir. 1992); Cascade Pac. Int'l v. United States, 773 F.2d 287, 291 (Fed. Cir. 1985); Peters v. United States, 694 F.2d 687, 695 (Fed. Cir. 1982). Strict compliance with the Government's specifications is important in order to insure that a contractor does not gain an advantage in the bidding process by the use of different products. Peters v. United States, 694 F.2d at 695.

______Universal is unable to identify any violation of the contract by the Government with respect to the submittals. With respect to timeliness of review, Mr. Standerfer agreed that FHWA's review was timely:

> Q: Okay. So when you say that you have no – no problem with their response time, is that just on the quality control plan? Or is that submissions in general?
>
> A: I'd say generally in submissions. In other words, if – in their opinion the submission wasn't correct, they were timely in notifying us of that.

App. 269.

Universal's chief complaint with respect to the Government review of the submittals appears to be that FHWA would not waive the requirements of the contract. During his deposition Mr. Standerfer was unable to state how FHWA's alleged "nitpicking" departed from the terms of the contract:

> Q. For -- we've seen in these two letters -- and, I think, you've answered part of this before -- but you've seen in these two letters the Government's listing particular areas in which the quality control plan is lacking. Did you ever go back and look at the contract and say, "Hey, wait a minute, what [Project Engineer Todd] Butikofer's requiring here is not in the contract,"or "We shouldn't have to do that." Did -- did that ever happen?
>
> A. No. I don't think that ever happened.
>
> Q. Okay. Did you feel like -- that these reviews of the quality control plan, that this was just nit-picking on the -- the part of the Government?
>
> A. I -- I don't know. At this date? September 17th?
>
> Q. Yes.
>
> A. I -- I don't know that I had that opinion at that date, no.

App. 272.

> Q. Is there anything with respect to the quality control plan and the Government's review of them, is -- is there anything you could tell me that the Government did that was outside the contract? Or not in compliance with the contract?
>
> A. No. I can't think of anything.
>
> Q. Okay.
>
> A. You know, the only thing I'd say there that -- uppermost, you know, the spirit of all these things should be met on a short-term project. It's -- it's not

> like we had years to build this. We – we had a relatively few months. So – [Answer ends].

App. 275-276.

Finally, even if there was a delay, it was relatively minor. In the complaints, Universal seeks a time extension of 181 days. During his deposition, Richard Pape, Universal's scheduler on the project and now its scheduling expert, testified that he attributed 12 days of delay to the submittal issue. App. 278. Thus, Universal attributes the overwhelming majority of the alleged delays to the borrow source issues.

This record does not support any argument that the delays at the start of the project were due to FHWA caused delay in the approval of submissions. Therefore, the Government is entitled to summary judgement on this portion of Universal's claim.

F. The Government Properly Terminated The Contract for Default

Having addressed each of Universal's claims, we turn to the termination for default. The contract required Universal to complete the work by December 11, 2001. FF 23. On November 23, 2001, FHWA sent a cure notice to Universal with respect to the then apparent inability of the Plaintiff to complete the project on time. App. 176. Universal responded to the cure notice by letter dated November 30, 2001 agreeing with FHWA that it could not complete on time, blaming the Government for the reasons addressed above for that failure, and stating that it would need, at a minimum 181 calendar day extension if work was to be continued through the winter, 120 calendar days if there was a winter suspension with remobilization in the spring, and 70 days if the

Government would accept a value engineering proposal. App. 180-83. More than six months after Universal was required to complete the project, FHWA terminated the contract for default.

A termination for default is considered an affirmative Government claim pursuant to the CDA. Malone v. United States, 849 F.2d 1441, 1443-45 (Fed. Cir. 1988). Judicial review of a contracting officer's termination of a contract for default is de novo. 41 U.S.C. § 609(a)(3); Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc). The Government bears the initial burden of proof to show that the contractor was in default at the time the contracting officer terminated the contract. Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 763 (Fed. Cir. 1987). However, once the Government has established a prima facie case that the contractor was in default, the contractor then bears the burden of proving that the default was excusable. Hannon Electric Co. v. United States, 31 Fed. Cl. 135, 143 (1994), aff'd, 52 F.3d 343 (Fed. Cir. 1994).

The decision to terminate a contract for default is a discretionary decision based upon the business judgment of the contracting officer. State of Florida v. United States, 33 Fed. Cl. 188, 196 (1995), citing John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts, 608 (2d ed. 1986). The contracting officer is required to exercise this discretion in order to ensure that the termination is in the "best interests of

the Government." Nuclear Research Corp. v. United States, 814 F.2d 647, 649 (Fed. Cir. 1987).

Although a default termination is not automatic, see Schlesinger v. United States, 182 Ct. Cl. 571, 581-82, 390 F.2d 702, 707-08 (1968), the contracting officer has substantial range in exercising the required discretion. It is well-established that, as long as the contracting officer's decision to terminate a contract for default was reasonable, a court or board reviewing that decision may not invalidate it even where the reviewing body, exercising its own business judgment, might have decided that a termination for convenience would have been more appropriate. Cf. Three S. Constructors, Inc. v. United States, 13 Cl. Ct. 41, 45 (1987) (Court, applying abuse of discretion standard to review of SBA size determination, reiterated general principal that Court was not free to invalidate agency decision simply because different result could be reached upon record).

Universal does not allege that it completed the project on time. Indeed, it is undisputed that Universal failed to complete the contract work. Thus, the prima facie case that Universal was in default is established.

Universal has alleged that the differing site condition, the Government change in compaction methods, and the Government's delay at the beginning of the project constitute the reasons why the Plaintiff could not finish on time. We addressed these claims above and established that they are without merit. Thus, Universal has failed to carry its burden that the default was excusable. Hannon Electric Co., 31 Fed. at 143.

## CONCLUSION

For the above reasons, the Government respectfully requests that the Court enter summary judgment in favor of the Government upon Universal's complaints, and the Government's counterclaim, and awarding the Government $125,120.15 in excess reprocurement costs, and liquidated damages of $152,000.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/Michael N. O'Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor,
1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0361

September 6, 2005

# INDEX TO APPENDIX


| Document | Page(s) |
|---|---|
| Description of Camas Wildlife Refuge | 1-2 |
| Field Trip Report | 3-6 |
| Project Agreement | 7 |
| Tabulation of Bids | 8-16 |
| FAR Clauses Incorporated In The Contract | 17-19 |
| Contract Provisions Relating To Borrow Sources | 20-22 |
| USDA Soil Textural Triangle | 23-35 |
| Contract Provision Re Compaction | 36-37 |
| Contract Provisions Re Schedules | 38-45 |
| Contract Provisions Re QA/QC Plans | 46-48 |
| Preconstruction Conference Agenda Guideline | 49-63 |
| Notice To Proceed | 64 |
| Contract Provision Re Contract Time | 65-66 |
| QC Plan | 67-77 |
| FHWA Letter Rejecting QC Plan September 11, 2001 | 78 |
| Revised QC Plan | 79-89 |
| FHWA Letter Rejecting QC Plan September 17, 2001 | 90-97 |
| FHWA Letter Re Revised QC Plan September 27, 2001 | 98 |
| FHWA Letter Re Revised QC Plan September 28, 2001 | 99 |

| | |
|---|---|
| Preliminary Schedule | 100-07 |
| FHWA Letter Rejecting Schedule September 11, 2001 | 108 |
| FHWA Letter Accepting Schedule September 19, 2001 | 109 |
| Construction Schedule | 110-116 |
| FHWA Letter Re Construction Schedule October 1, 2001 | 117 |
| Revised Construction Schedule | 118-124 |
| FHWA Letter Rejecting Schedule October 15, 2001 | 125 |
| FHWA Letter Rejecting Schedule October 25, 2001 | 126 |
| FHWA Letter Accepting Schedule November 20, 2001 | 127-28 |
| Accident Prevention Plan | 128A-39 |
| FHWA Letter Rejecting Accident Prevention Plan Sept. 17, 2001 | 140-41 |
| FHWA Letter Rejecting Accident Prevention Plan Sept. 24, 2001 | 142-43 |
| FHWA Letter Accepting Accident Prevention Plan Sept. 27, 2001 | 144-45 |
| Dick Standerfer Deposition Excerpts | 146-54 |
| Mark Standerfer Deposition Excerpts | 155-57 |
| Compaction Test Results | 158-60 |
| FHWA Letter to Universal October 23, 2001 | 161-62 |
| Universal Letter to FHWA October 23, 2001 | 163-64 |
| Draft Method Specification | 165-66 |
| Method Specification | 167-69 |

| | |
|---|---|
| Universal Letter to FHWA November 1, 2001 | 170-71 |
| Universal Letter to FHWA November 1, 2001 | 172-75 |
| FHWA Letter to Universal November 23, 2001 | 176-79 |
| Universal Letter to FHWA November 30, 2001 | 180-83 |
| Contracting Officer's Final Decision June 20, 2002 (Claims) | 184-94 |
| Contracting Officer's Final Decision June 20, 2002 (Termination) | 195-96 |
| Contracting Officer's Final Decision October 8, 2003 (Reprocurement) | 197-99 |
| MTI Expert Report | 200-256 |
| Languirand Deposition Excerpt | 257-259 |
| Cram Deposition Excerpt | 260-64 |
| Dick Standerfer Deposition Excerpt | 265-76 |
| Pape Deposition Excerpt | 277-79 |

CERTIFICATE OF SERVICE

______I hereby certify that on this 6th day of September 2005, a copy of the foregoing Motion for Summary Judgment was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

John Spencer Stewart
Stewart Sokol & Gray, LLC
2300 SW First Avenue
Suite 200
Portland, OR 97201-5047

s/ Michael N. O'Connell