No. 03-1502C Consolidated With No. 03-2370C
Senior Judge Smith

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

UNIVERSAL CONSTRUCTION, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

John Spencer Stewart
STEWART SOKOL & GRAY, LLC
2300 S.W. First Avenue, Suite 200
Portland, Oregon 97201-5047
Telephone: (503) 221-0699
Fax: (503) 223-5706

November 4, 2005

Attorneys for Plaintiff

# TABLE OF CONTENTS


STATEMENT OF THE QUESTIONS INVOLVED . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . 2

A. Introduction . . . . . . . . . . 2

B. Factual Background . . . . . . . . . . 3

1. Due Diligence Prior to the Bid . . . . . . . . . . 5

2. The Tight Schedule Was Unnecessarily Delayed . . . . . . . . . . 6

3. Mandatory Borrow Materials Were Different Than Expected . . . . . . . . . . 8

4. Mandatory Borrow Materials Were Unsuitable Given the Requirements of the Project . . . . . . . . . . 9

5. FHWA Refused to Cooperate With UCI . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . 11

A. Standard for Summary Judgment . . . . . . . . . . 11

B. The Government Must Prove That the Termination of UCI for Default is Valid . . . . . . . . . . 12

1. The Government Bears the Burden of Proof That a Termination for Default Is Valid . . . . . . . . . . 12

2. FHWA Cannot Prove Its Termination for Default of UCI Was Valid . . . . . . . . . . 15

a. The Embankment Delays Were Caused By The FHWA . . . . . . . . . . 15

b. FHWA Hindered UCI's Performance Throughout the Camas Project . . . . . . . . . . 18

C. UCI is Entitled to Its Expended Costs as a Matter of Law Because It Encountered Changed Conditions In the Borrow Areas Mandated by FHWA . . . . . . . . . . 19

1. UCI Is Entitled to Judgment as a Matter of Law Because It Encountered a Type I Changed Conditions . . . . . . . . . . . . . . . . . . . . . . 20

a. Standard for a Type I Changed Condition . . . . . . . . . . . . . . . . . . 20

b. The Undisputed Facts Show the Soil in the Mandatory Borrow Area Was Materially Different Than What Was Represented in the FHWA Contract . . . . . . . . . . . . . . . . . . . . . . 22

c. "Primarily Sandy Loam" Was Not Intended to Represent the Condition of the Material in the Mandatory Borrow Areas. Even if it Was, the Soil in the Mandatory Borrow Areas Did Not Conform to "Primarily Sandy Loam" . . . . . . . . . 25

2.. UCI is Entitled to Judgment as a Matter of Law Because It Encountered a Type II Changed Condition . . . . . . . . . . . . . . . . . . . . . . . . 28

3. Under the Spearin Doctrine, UCI May Not Be Held Responsible When FHWA's Specifications Were Defective . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**TABLE OF AUTHORITIES**

**CASES:** **PAGE**

Air-Sea Forwarders, Inc. v. U.S., 166 F.3d 1170 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

All American Engineering Co., ASBCA 14917, 71-2 BCA 9065 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Appeal of Calvada, Inc., ASBCA 2062, 56-2 BCA 1033 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Appeal of Appeal of Spiritual Sky Scented Products, ASBCA 24,507, 82-2 BCA 15,948 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Blount Brothers Construction v. U.S.,
171 Cl. Ct. 478 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Board of Governors of the Federal Reserve System v. Agnew,
329 U.S. 441 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Brunswick Corp. v. U.S.,
951 F.2d 334 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23, 26

C. Sanchez & Sons, Inc. v. U.S.,
6 F.3d 1539 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CCM Corp. v. U.S.,
20 Cl. Ct. 649 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Charles J. Parker Construction Co. v. U.S.,
433 F.2d 771 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

CJP Contractors, Inc. v. U.S.,
45 Fed. Cl. 343 (Cl. Ct. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17, 18

Comtrol, Inc. v. Untied States,
294 F.3d 1357 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,
424 F.3d 1293 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

E.L. Hamm & Assocs. v. England,
379 F.3d 1334 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 30

Essex Electro Eng'rs, Inc. v. Danzig,
224 F.3d 1283 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Foster Constr. Co. v. U.S.,
435 F.2d 873 (Ct. Cl. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 24

Hardwick Bros. Co. v. U.S.,
36 Fed. Cl. 347 (Ct. Cl. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 27, 28

J.D. Hedin Constr. Co. v. U.S.,
408 F.2d 424 (Ct. Cl. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 16, 17

Lewis-Nicholson, Inc. v. U.S.,
550 F.2d 26 (Ct. Cl. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Lisbon Contractors, Inc. v. U.S.,
828 F.2d 759 (Fed Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 16, 17

McDonnell Douglas Corp. v. U.S.,
323 F.3d 1006 (Fed Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

Ortronix, Inc.,
ASBCA 12745, 72-2 BCA 9564 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

P.J. Maffei Bldg. Wrecking Corp. v. U.S.,
732 F.2d 913 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23, 26

Randa/Madison Joint Venture III v. Dahlberg,
239 F.3d 1264 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Riley & Ephriam Constr. Co. v. U.S.,
408 F.3d 1369 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Robert Hart,
IBCA—659-8-67, 68-1 BCA par. 6984,
1968 IBCA LEXIS 22 (April 10, 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 17

Servidone Constr. Corp. v. U.S.,
19 Cl. Ct. 346 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Sterling Millwrights, Inc. v. U.S.,
26 Cl. Ct. 49 (Cl. Ct. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

Stock & Grove, Inc. v. U.S.,
204 Ct. Cl. 103, 493 F.2d 629 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24

U.S. v. Spearin,
248 U.S. 132 (1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

W. E. Callahan Constr. Co. v. U.S.,
91 Ct. Cl. 538 (Ct. Cl. 1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

White v. Edsall Constr. Co.,
296 F.3d 1081 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Youngdale & Sons Constr. Co. v. U.S.,
27 Fed. Cl. 516 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24

**OTHER AUTHORITIES**

WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY (1996) . . . . . . . . . . . . . . . . . . . . . 26, 27

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), plaintiff, Universal Construction Incorporated ("UCI"), submits the following opposition to defendant's motion for partial summary judgment. In addition, pursuant to RCFC 56, UCI files this cross-motion for partial summary judgment. Universal believes that oral argument would assist the Court in ruling on these motions.

UCI relies upon the following memorandum, its responses to defendant's proposed findings of uncontroverted facts, its proposed findings of uncontroverted facts, the Affidavit of Thomas A. Larkin, and the attached appendix.

**STATEMENT OF THE QUESTIONS INVOLVED**

1. Whether Federal Highway Administration ("FHWA") can meet its burden of proving that its termination of UCI for default was valid.

2. Whether Universal Construction Incorporated ("UCI") can show it encountered a changed condition because the material in the government supplied mandatory borrow areas did not conform to representations and requirements in the contract.

3. Whether FHWA's motion for summary judgment fails because the following material facts, among others, are in dispute.

a) whether the material in the borrow areas was primarily sandy loam;

b) whether MTI soils samples BP-1, BP-1 (roadway), BP-3, and BP-8 indicated the tested material was sandy loam;

c) whether MTI soils samples 285-S, 242-S, BP-7, and BP-10 indicate sandy loam at all;

d) whether UCI's submittals were proper;

e) whether UCI's schedule represented a critical path plan such that payment to UCI was wrongly withheld.

## STATEMENT OF THE CASE

### A. Introduction

This action arises out of a contract to widen a gravel wildlife viewing road on the Camas Wildlife Refuge ("Camas") near Hamer, Idaho (the "project"). The FHWA designed and managed on behalf of the United States Fish and Wildlife Service ("F&WS"). Plaintiff in this case, UCI, was the original contractor on the project.[1] UCI seeks to recover the actual costs it expended working on the project. UCI also seeks judgment from the Court declaring that the FHWA termination for default should be converted to a termination of UCI for convenience and that the term of the contract be extended to account for the delays caused by the changed conditions UCI encountered. The defendant, FHWA, seeks to fashion a claim for liquidated damages and reprocurement costs stemming from its termination of UCI for default.

UCI is entitled to relief because the fill material mandated by the contract materially differed from what UCI actually encountered in the mandatory borrow areas and because FHWA was in breach for non-payment. The contract required that the material in the mandatory borrow areas conform to American Association of State Highway and Transportation Officials ("AASTO") classifications A-1, A-3, and A-2-4. However, in addition to those allowable soil

---

[1]FHWA did not pay UCI anything for the work it performed on the material it supplied on the project.

classifications, UCI encountered unacceptable and unworkable A-6 and A-4 classifications in the mandatory borrow areas. FHWA contends that the undisputedly variable soil UCI encountered actually conformed with a United States Department of Agriculture ("USDA") soil classification included in a description of the project work contained in its wet land mitigation permit, appended to the project contract. FHWA's assertion that it was justified in terminating UCI for the delays caused by unexpected and highly variable materials falls far short of the requisite proof required of a terminating agency.

FHWA has moved for summary judgment on all claims. However, its motion must fail because, at a minimum, there are disputes of material fact regarding whether the mandatory borrow material conformed to the contract. Conversely, partial summary judgment on UCI's cross-motion is appropriate because there is no factual dispute that there was a changed condition, that UCI did not reasonably foresee the encountered conditions when it bid the contract, and that UCI relied upon the representations made in the Camas contract.

**B. Factual Background**

The words of the project designer best illuminate the nature of the Camas project. In the Design Narrative circulated within FHWA, the principle designer said, "we are building a refuge road with little to no traffic. The words 'beat it to fit, paint it to match' was never more fitting." Plaintiff's Proposed Findings of Uncontroverted Fact ("PFF") ¶ 1.[2]

---

[2]Deposition excerpts and exhibits referenced to here are included with the Appendix.

The project included building a parking lot, a small bridge, and widening a gravel road that was on an embankment. Plaintiff's Appendix ("Pl. App.") pp. 1–4. The road was to be widened between 0.15 and 1.0 meters. PFF ¶ 2; Pl. App. pp. 10–11. Due to the highly sensitive nature of the surrounding wetlands, the embankment was not to be widened any more than absolutely necessary. PFF ¶ 3. The construction limits were set just beyond the foot of the slope of the embankment. Pl. App. p. 37. The effect of these constraints was that the fill added to the side of the embankment had to be placed in a very narrow strip. Pl. App. p. 38. The narrow strip is aptly named a "sliver fill." Because the project was to widen a road, the sliver fill had to be compacted to support the weight of vehicles.

Although the size of the project was small, the project had a very tight construction schedule. PFF ¶ 4; Pl. App. p. 58. UCI was the low bidder on the project and was awarded the job. Pl. App. pp. 59–60. UCI encountered problems from the beginning. FHWA caused UCI's start of construction to be delayed. Pl. App. p. 63. Then, shortly after commencing work, UCI encountered unsuitable fill material with which to widen the road embankment. Pl. App. pp. 66–67. Ultimately, FHWA terminated UCI. FHWA alleged delays in construction, and refused to pay UCI anything for work completed and accepted. PFF ¶ 9; Pl. App. pp. 68–69, 72–75. In 2002, Desert Sage Contractors ("Desert Sage"), the second lowest bidder, was retained to complete the project. Similar to UCI, Desert Sage had to contend with the unsuitable fill material. Pl. App. p. 78. But, unlike UCI, Desert Sage was permitted to put material beyond the clear limits in the areas where it was widening the road and vary the embankment and compaction procedure to complete the project, albeit late and over budget. PFF ¶ 20; Pl. App. pp. 79–82. UCI has not been paid a dime for its work on the project. PFF ¶ 19; Pl. App. p. 85.

**1. Due Diligence Prior to the Bid**

A pivotal aspect of the project was the mandatory use of local materials as fill to provide wetland mitigation. PFF ¶ 5; Pl. App. p. 3. In fact, the exact location of the mandatory borrow areas was delineated by the refuge manager. PFF ¶ 5; Pl. App. p. 88. Specifically, the borrow areas were chosen for suitability as wetland, not as a source of fill material. Pl. App. p. 88. Furthermore, the size and depth of the borrow sites were dictated by the Refuge to simulate shallow water habitat, without regard for geotechnical considerations. Pl. App. p. 88A. Despite having borrow areas imposed on it, FHWA did not perform any geotechnical testing to ensure that the material was suitable, because of the project's small scope and limited budget. PFF ¶ 8; Pl. App. p. 3. Instead, FHWA represented, via FP-96 section 704.06, that the material would conform to AASHTO M145 soil classifications of A-1, A-3, of A-2-4. PFF ¶ 7. Curiously, FHWA, in its motion for summary judgment, asserts that FHWA applied a broad agriculture classification instead of the much more relevant AASHTO highway construction standards to the mandatory borrow material while at the same time applying the AASHTO standards to all other provisions.

Prior to bidding, UCI attempted to assess the suitability of the fill material. UCI toured the project site and visually inspected the designated borrow areas. Pl. App. p. 94. After inspecting the borrow sites, UCI inquired about the general suitability of the fill material by talking to individuals most likely to be familiar with it, the refuge maintenance personnel and the refuge manager. Id. Through these individuals, UCI learned that one of the refuge roads had been built from the local materials. Id. Also, since the borrow areas were mandatory, UCI believed FHWA would furnish suitable fill based on Richard Standerer's experience with prior owners.

Pl. App. p. 94A. Even FHWA acknowledges this implied warranty. When FHWA mandates a specific borrow area, FHWA assumes the risk when the material does not turn out as expected. Pl. App. p. 95. UCI was not alone in its presumption that the fill material would be adequate as represented by FHWA; Desert Sage also did not perform any pre-bid geotechnical analysis. Pl. App. p. 96.

### 2. The Tight Schedule Was Unnecessarily Delayed

While the overall scope of the project was small, the time frame for completion was quite tight because the project could only be built in the late summer and early fall. PFF ¶ 4; Pl. App. pp. 97–98. The schedule was dictated by high water in the refuge during the spring and summer, and harsh weather in the winter. Id. Therefore, the contract provided only three months to complete all of the work. Pl. App. pp. 99–106.

Despite the very tight schedule, FHWA did not allow any work on the project from the "notice to proceed" issued on Monday, September 10, until Friday, September 28. FHWA barred any work pending its approval of UCI's Quality Control ("QC") plan. Pl. App. p. 107. Over the course of the three weeks, FHWA rejected the QC plan for missing personal information, missing the name of responsible person, and for having extra information on contractor qualifications. Pl. App. pp. 108–201 (R. Standerfer Dep. Ex. 9, 11). The FHWA approach was contrary to the common practice of "approve as noted," or approving a submittal while insignificant shortcomings are corrected in order to get the contractor on the job. Pl. App. p. 208A. The delay was all the more disruptive because UCI's project timeline depended on the QC plan to be "established and executed" concurrently with the commencement of construction. Pl.

App. pp. 99–106 (R. Standerfer Dep. Ex. 3). In all, the project was delayed three weeks, or 20 percent of the allowable time for the contract performance, by FHWA's rejections of the QC plan.

FHWA did not promptly respond during the project. It took 12 days for the Project Engineer to respond to UCI's accident prevention plan, 12 days to reject UCI's construction schedule, 14 days to respond to a re-submitted construction schedule, and 12 days to respond to the health and safety program. Pl. App. pp. 204–05, 207. Each delay by the FHWA ran counter to the owner's obligation to cooperate with UCI given the project's very tight schedule. Pl. App. p. 58.

Not only were the rejections not timely, but in the case of the rejections of the construction schedule, they were not proper. A critical path method ("CPM") schedule can be output in many formats and still be a CPM schedule. Pl. App. p. 208. On the Camas project, the project engineer, Todd Butikofer, was responsible for approving UCI's construction schedule. However, he was only informally trained in scheduling. Pl. App. pp. 209–210. Butikofer rejected UCI's schedule as not being a CPM. Pl. App. pp. 205–06. Yet, Butikofer's supervisor recognized the same schedule as a CPM. Pl. App. p. 211. The submitted schedule clearly communicated that it was a CPM. Pl. App. p. 212. When questioned on the subject, Traffalis could not say why the schedule would have been rejected. Pl. App. p. 211.

Unlike UCI, Desert Sage was allowed to commence construction in a timely manner. Pl. App. p. 213.

### 3. Mandatory Borrow Materials Were Different Than Expected

The FHWA contract specified that the borrow areas would conform to AASHTO classifications A-1, A-3, and A-2-4. PFF ¶ 7. Contrary to the contract representation, UCI encountered several different distinct soil types in the mandatory borrow areas. PFF ¶ 9; Pl. App. pp. 214–15. This fact is uncontested. Pl. App. pp. 216, 219–20. The multiple soil types were confirmed by the FHWA lab's own tests of samples taken from the borrow areas, as well as by UCI's consultant, Materials Testing Inc.'s ("MTI") tests. PFF ¶ 9; Pl. App. pp. 225–39. The testing revealed that A-6, A-4, A-3, A-2-4, and A-1 soils were present in the mandatory borrow areas. PFF ¶ 11. Each classification was distinct and had different characteristics, some being plastic, or sticky, while others non-plastic. Pl. App. pp. 222–24. The testing showed each type had a different optimal moisture level for compaction. PFF ¶ 12; Pl. App. pp. 225–39. The differing material caused significant delays because UCI spent an inordinate amount of time blending the differing materials and working in water to try to get compaction. Pl. App. pp. 219–20. Moreover, since the borrow areas were too small for the amount of fill required in the project, all of the material had to be used and UCI could not work around any bad areas. Pl. App. pp. 242-43. As such, all of the borrow areas would have to conform to the contract for UCI to properly perform. Id.

FHWA knew during the design phase that it would be taking a risk that the borrow areas would not be suitable when it chose not to perform geotechnical testing. Pl. App. p. 246. In the design narrative, the project designer noted, "the material taken from the borrow sources will have to be visually monitored closely for quality" to ensure there were not any bad materials used on the project. Pl. App. pp. 246, 246A.

**4. Mandatory Borrow Materials Were Unsuitable Given the Requirements of the Project**

Generally, it can be expected that a contractor will be able to use mandatory fill material directly, without any processing at all. Pl. App. p. 249. However, to use the mandated borrow material, UCI had to constantly vary its mixing and placement procedures. The difficulty with the material was exacerbated by the constraints of the project prescribed by FHWA. UCI could not effectively get compaction with the hoe pack, UCI's chosen method, or a small roller, the method specification unilaterally imposed by FHWA. Pl. App. p. 66. Recognizing the problems with the fill material, UCI suggested using material from a known, good source during an October meeting with FHWA. Pl. App. p. 67. UCI's suggestion was not adopted. However, the construction operations engineer, Jane Traffalis, was nonetheless critical of UCI for not pursuing the use of different materials. Pl. App. pp. 250–51.

Desert Sage also found the material from the local borrow areas to be unsuitable. Pl. App. p. 78. The conditions were such that Desert Sage had to use a different compaction method than that specified in the contract because there was no way to build sliver fills with the local material. Pl. App. p. 252. Desert Sage was allowed to vary from the contract, without a change order, to employ a different construction method to embank the fill material. Pl. App. pp. 253-54. Instead of building the sliver fills directly, Desert Sage was permitted to overbuild the embankment, build and compact the embankment wider than specified, and cut back the excess as opposed to being required to compact the narrow sliver fill. Id. Additionally, Desert Sage was permitted to work beyond the construction clear limits, pushing material into the wetlands, which facilitated Desert Sage's ability to overbuild the embankment and get compaction. Pl. App. p. 78. The

changes were made to both improve compaction and overall workability on the project. Pl. App. 79-80. Had Desert Sage not been permitted to change the method of work, it would have faced the exact same situation as UCI, taking a significantly longer period to finish the project. Id. Moreover, when Desert Sage re-bid the project, after having observed the material problems that UCI encountered, Desert Sage's price for using the borrow material increased four-fold, from $5.00 per cubic meter to $20.00 per cubic meter. PFF ¶ 17; Pl. App. p. 78. This increase was due to the now evident need to add water to the soil, the poor workability of the material, and the extra handling to overbuild the embankments. Pl. App. p. 78. As it turned out, even with its increased bid Desert Sage required an extension and had to work six days per week for part of the time to complete the project. Pl. App. pp. 81–82.

**5. FHWA Refused to Cooperate With UCI**

Notwithstanding that the problems with the Camas project originated with FHWA, the government continued to blame UCI. On November 6, 2001, in a meeting between FHWA and UCI, FHWA threatened to terminate UCI for delay. Pl. App. pp. 259–62. Yet, at the time of the meeting, FHWA had not yet tested soil samples collected a month before to determine whether the borrow material was suitable or UCI's claims were justified. Id.; PFF ¶ 10; Pl. App. pp 235–39. Even when the geotechnical tests confirmed the multiple unacceptable and unworkable soil types in the mandatory borrow areas, FHWA issued a cure letter asserting that the soil was "precisely what could reasonably be anticipated." PFF ¶ 16; Pl. App. p. 263. UCI received absolutely no compensation for its work on the project, even though it provided materials and completed aspects of the project. PFF ¶ 19. Moreover, FHWA specifically acknowledged the

amount owing to UCI and affirmatively decided to not advance payment. Pl. App. pp. 72–75. The decision to not pay UCI was made despite internal FHWA suggestions to make a partial payment and before FHWA's own assessment of the validity of UCI's claims was complete. Id.

## ARGUMENT

### A. Standard for Summary Judgment

Summary judgment "shall be rendered forthwith if the pleadings [and supporting materials] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). A fact is material if it will affect the result of the case under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact presents a genuine issue if a reasonable jury viewing the evidence could return a verdict for the nonmoving party. Id. The inquiry performed at summary judgment is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. Id. at 250.

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Riley & Ephriam Constr. Co. v. U.S., 408 F.3d 1369, 1371-1372 (Fed. Cir. 2005) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-25 (1986)). Furthermore, all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party. Liberty Lobby, 477 U.S. at 255. In the case of cross-motions for summary judgment, "the court must evaluate each motion on its own merits, taking care in each instance to view the evidence in favor of the nonmoving party." Cross Med.

Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1302 (Fed. Cir. 2005). "The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other." Id.

To prevail on a motion for summary judgment, if the moving party bears the burden of persuasion on the issue at trial, it must also show that it is entitled to a directed verdict on the issue. Celotex, 477 U.S. at 325. If the moving party cannot do this, summary judgment is not appropriate. Conversely, a nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law. Id. at 323.

**B. The Government Must Prove That the Termination of UCI for Default is Valid**

To prevail in its motion for summary judgment, FHWA must carry the same burden that it has at trial. FHWA must prove that there are no disputed material facts and that termination of UCI for default was justified as a matter of law. In so doing, FHWA must prove that no extension of the contract term was appropriate. FHWA must also prove that the contract without change could have been performed through reasonable efforts.

**1. The Government Bears the Burden of Proof That a Termination for Default Is Valid**

It is well settled that the government bears the burden of proving that a termination for default is valid. Lisbon Contractors, Inc. v. U.S., 828 F.2d 759, 764–65 (Fed Cir. 1987); see also, McDonnell Douglas Corp. v. U.S., 323 F.3d 1006, 1013 (Fed Cir. 2003) (noting that when the

government is unable to show a termination for default to be valid, the contractor was entitled to recovery under a termination for convenience theory). A termination for default "is a drastic sanction which should be imposed only for good grounds and on solid evidence." Lisbon Contractors, Inc., 828 F.2d at 765 (citations omitted). As such, the government's case must rise above a high bar to justify such a harsh result. This has been held to mean that not only must the government prove that there was a delay but also that the government must prove that the delay was not justified. Id. at 763, 765 (rejecting the government's assertion that the contractor should bear the burden of proof to justify delay as this would impermissibly shift the burden of proof from the government, the terminating party, to the contractor). Moreover, the when the government created a situation that caused or contributed to the contractor's delay, the contractor cannot be required to "exceed reasonable efforts." Sterling Millwrights, Inc. v. U.S., 26 Cl. Ct. 49, 67 (Cl. Ct. 1992).

Under Lisbon, for the government to properly terminate for default there can be "no reasonable likelihood that the contractor could perform the entire contract . . . within the time remaining for contract performance." 828 F.2d at 765. In making its determination whether default is valid, the government must take into account any time extensions due the contractor for unforeseeable delays. J.D. Hedin Constr. Co. v. U.S., 408 F.2d 424, 432 (Ct. Cl. 1969). "A decision to terminate for default *must be based on a correct understanding* of the remaining work and the time left for completion." CJP Contractors, Inc. v. U.S., 45 Fed. Cl. 343, 371 (Cl. Ct. 1999) (emphasis added). "A decision to terminate for default that is based on upon materially erroneous information . . . cannot be said to be a reasonable exercise of discretion." Id. Moreover, termination for default is not justified when the opinion upon which the government relied is

questionable. Robert Hart, IBCA—659-8-67, 68-1 BCA par. 6984, 1968 IBCA LEXIS 22, at *10 (April 10, 1968).

In Lisbon, the U.S. Soil Conservation Service (SCS) contracted with the plaintiff to build a flood control channel and bridge. 828 F.2d at 716. The project was delayed, in part, due to a subcontractor's performance problem and Lisbon's allegedly faulty supervision. Id. At the point of termination, the government could not show how much time it should have taken for Lisbon to complete the project, nor did the government show how much time it would take for a reprocurement contractor to complete the project. Id. at 766. Since the SCS did not know how long the project should take given the situation Lisbon encountered, it could not judge whether Lisbon was diligently prosecuting the project. Regardless, the government decided to terminate for default. Id. The court held that without a basis against which to judge the contractor's performance as delinquent, the government did not meet its burden of proving the termination for default was justified. Id. at 766–67.

In J.D. Hedin, the contractor retained to build a hospital building was terminated for default because the contractor overran the completion date, in part, because of a concrete shortage. Id. at 425. After termination, the contract was reprocured, and the replacement contractor took an additional year to complete the project. Id. The government alleged the shortage was not unforeseeable. The court, in applying the unforeseeable test looked at the reasonableness of the acts. Id. at 428. A contractor is not required to have prophetic insight or undertake extraordinary preventive actions. Id. When a contractor used the "usual and long-established methods" unforeseen delays must be excused. Id. at 429.

In Hart, an illuminating case, the Interior Board of Contract Appeals held that the government did not prove its termination of a tree planting contractor was valid. Hart, 68-1 BCA ¶ 6984. There, the contractor was required to plant 85,000 seedlings provided by the Department of the Interior over the span of one month. Id. at *2. The government terminated the contractor three days into the planting for lack of progress and defective performance. Id. at *3. The contract to plant the balance of the seedlings was reprocured, but the reprocurement contractor's rate of planting was slower still. Id. at *5, *7. The contractor appealed the termination asserting, inter alia, that the termination was unreasonable given the rocky terrain. Id. at *6. Importantly, whether the termination was proper turned on the qualifications of government personnel upon whose judgment the government relied in terminating the contract. Id. at *10.

### 2. FHWA Cannot Prove Its Termination for Default of UCI Was Valid

When all inferences are drawn in UCI's favor, genuine issues of material fact preclude summary judgment in favor of FHWA. Moreover, FHWA's actions were not justified as a matter of law.

#### a. The Embankment Delays Were Caused By FHWA

The project was simply unbuildable as designed and ultimately was not built as designed. The FHWA's mandatory fill material could not and did not work with the FHWA's prescribed embankment procedure because the fill material was highly variable and could not be readily brought to optimum moisture content. Given the very narrow embankment, it was not physically possible for UCI to bring sufficient compactive force to bear on the embanked material given the prescribed compaction methods to overcome the suboptimal materials it had to embank. Pl. App.

pp. 5-6. Moreover, UCI was not permitted to extend its work beyond the clear limits, thus it could not overbuild the embankments as Desert Sage was allowed to do. Pl. App. p. 78. Therefore, no amount of effort or diligence on the part of UCI could remedy this fateful combination.

As required by Lisbon, FHWA must prove its termination of UCI was justified. As required by J.D. Hedin, the termination decision must take into account the unforeseen delays caused by the highly variable soils in the mandatory borrow areas. Simply put, neither party foresaw that the material that UCI was required to use would be unsuitable for the very narrow fills being constructed, although adequacy of mandatory fill material is the responsibility of FHWA. E.L. Hamm & Assocs. v. England, 379 F.3d 1334, 1338–39 (Fed. Cir. 2004) (holding an owner responsible when the actual condition of the site is not as the owner has stated). The FHWA thought the mandatory fill would be “decent stuff.” Pl. App. p. 267. Yet, it is an uncontested fact that the borrow material was highly variable, as shown by MTI’s tests and confirmed by FHWA’s lab in Vancouver, Washington. PFF ¶¶ 11, 15–16; Pl. App. p. 270. The borrow areas contained distinct pockets of A-6, A-4, A-3, A-2-4, and A-1. PFF ¶ 11. Moreover, it is an uncontested fact that each of the different soil types required a different moisture content to achieve compaction. PFF ¶¶ 13–14; Pl. App. pp. 225–34. Since there were multiple soil types present in any given lift in the embankment, it was exceedingly difficult, if not impossible, to obtain optimal moisture content for every type of soil present. Therefore, as a direct consequence of the unforeseen problems with the fill material, UCI encountered significant delays as it tried to compact the fill material that was not at an optimal moisture content Despite the fact that FHWA inaccurately judged UCI’s performance, insisting it was a water problem and not a material

problem (Pl. App. p. 271) and not taking into account the unforeseen delays, FHWA held UCI in default. Therefore, FHWA's termination was directly contrary to Lisbon and J.D. Hedin, and was not justified.

Even though the borrow material was not suitable, UCI undertook extraordinary efforts to try to make the material work. UCI tried to work around material in the borrow areas, which took time not anticipated in the contract. Pl. App. pp. 220–21. UCI spent considerable effort mixing the different types of soils and adding water in a futile attempt to compact the material, again taking time not anticipated in the contract. Pl. App. pp. 219–20. Furthermore, UCI offered suggestions to remedy the problems with the borrow areas, none of which were accepted by FHWA. Pl. App. p. 67. As such, the delays should have been taken into account by the FHWA in its termination decision. They were not. In holding UCI liable for not making up for the deficiency in the supplied material, FHWA's action ran directly counter to Sterling Millwrights. FHWA's termination of UCI was not justified.

Contrary to CJP Contractors, FHWA based its decision to terminate UCI on erroneous information. FHWA, through its project manager, Butikofer, did not have a correct understanding of the nature of the problem encountered. Butikofer asserted the problem was not with the soil but, instead, a proctor problem (improper moisture content). Pl. App. p. 271. As noted above, indeed there was a moisture content problem, but the problem was a direct and inescapable consequence of the variable soils present in the mandatory borrow areas. Pl. App. pp. 225–34. Similar to the government personnel in Hart, Butikofer did not have a proper understanding of soils and was not qualified to properly judge the impact the material was having on UCI's performance. Pl. App. p. 272. Despite this, FHWA relied upon Butikofer's reports as

the basis of its determination to terminate UCI. Because FHWA's action directly conflicted with CJP Contractors, the termination was not justified and under McDonnell Douglas must be converted to a termination for convenience.

Additionally, FHWA never paid UCI for any work performed or materials it supplied on the Camas project. PFF ¶ 19. This constituted a breach of the contract by FHWA. Under Appeal of Spiritual Sky Scented Products, ASBCA 24,507, 82-2 BCA 15,948 (1982) (holding that the government's unexcused failure to make progress payments constitutes an excusable delay) FHWA's unexcused refusal to pay UCI excuses any delay on the part of UCI in returning in 2002.

**b. FHWA Hindered UCI's Performance Throughout the Camas Project**

The government has an implied obligation to refrain from hindering or delaying the performance of a contractor. Lewis-Nicholson, Inc. v. U.S., 550 F.2d 26, 32 (Ct. Cl. 1977); see also, C. Sanchez & Sons, Inc. v. U.S., 6 F.3d 1539, 1542 (Fed. Cir. 1993). "Indeed, not only must the Government refrain from hindering the contractor's performance, it must do whatever is necessary to enable the contractor to perform." Lewis-Nicholson, Inc., 550 F.2d at 26. In Lewis-Nicholson, the Bureau of Public Roads (BPR) interfered with the contractor's performance throughout the building of a mountain road. Id. at 26. The delays resulted in misunderstandings and hostility between the government and the contractor. Id. The court held the government breached its duty to not delay the contractor. Id. at 32.

Just as the BPR had a duty to refrain from hindering the contractor in Lewis-Nicholson, so to did FHWA have a duty to refrain from hindering UCI in the Camas project. Moreover,

given the time sensitive nature of the Camas project, FHWA's duty to enable UCI's performance was, if anything, heightened. However, FHWA actively hindered UCI's performance. For instance, even though UCI could not begin work until its QC plan was accepted, FHWA rejected UCI's submittal even though all the required information was included. Pl. App. p. 273. Fully 20 days after the notice to proceed was issued, the plan was rejected because it contained too much information and was not in "one concise and organized plan." Id. Other examples of hindering can be seen in the Project Engineer's response time on the submittals, taking 12 or more days to respond to accident prevention plan, construction schedules, and the health and safety program. Pl. App. pp. 204–05, 207. This capriciousness of the Government's field personnel stands in stark contrast to overall "beat it to fit, paint it to match" nature of the Camas project as expressed in the project Design Narrative. Pl. App. p. 3.

FHWA breached both its duty to refrain from hindering and its duty to enable UCI's performance. Accordingly, the FHWA must bear responsibility for its breach of the implied obligation to refrain from hindering performance—not UCI. Again, FHWA's termination of UCI was not justified and should be converted to a termination for convenience. Because FHWA cannot meet its burden of proof at trial, its motion for summary judgment must fail.

### C. UCI is Entitled to Its Expended Costs as a Matter of Law Because It Encountered Changed Conditions In the Borrow Areas Mandated by FHWA

In addition to being wrongly terminated for default, UCI is entitled to recover its expended costs because it encountered changed conditions in the mandatory borrow areas.

The purpose of the differing site conditions clause is that where subsurface conditions are indicated by the Government in the Invitation for Bids or otherwise, the bidder is expected to calculate its bid on that basis and not upon its own subsurface surveys. Appeal of Calvada, Inc., ASBCA 2062, 56-2 BCA 1033 (1956). The Government impliedly assures prospective contractors of the accuracy of its specifications when it affirmatively represents in the contract the conditions that the contractor can expect to meet. See Blount Brothers Construction v. U.S., 171 Cl. Ct. 478 (1965); Ortronix, Inc., ASBCA 12745, 72-2 BCA 9564 (1972); All American Engineering Co., ASBCA 14917, 71-2 BCA 9065 (1971). The contractor then has a right to rely on their accuracy. Should the specifications be erroneous and the contractor be put to added expense on that account, the Government agrees in the differing site conditions clause to compensate the contractor.

### 1. UCI Is Entitled to Judgment as a Matter of Law Because It Encountered a Type I Changed Condition

#### a. Standard for a Type I Changed Condition

To prevail in a Type I changed condition claim the contractor must show: 1) the conditions "indicated" in the contract differed materially from those encountered during performance; 2) the conditions actually encountered must have been reasonably unforeseeable based on all the information available to the contractor at the time of bidding; 3) the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and 4) the contractor was damaged as a result of the material variation between expected and encountered conditions. Comtrol, Inc. v. Untied States, 294 F.3d 1357, 1362 (Fed. Cir. 2002).

Under the first element, a discrepancy is material when what is indicated in the contract documents and what is encountered at the site caused unanticipated costs for which the government would be liable. Hardwick Bros. Co. v. U.S., 36 Fed. Cl. 347, 406 (Ct. Cl. 1996). To determine what was "indicated" in the contract, a court is to give the terms their "ordinary and commonly accepted meaning" from the vantage point of a "reasonable and prudent contractor." Brunswick Corp. v. U.S., 951 F.2d 334, 336 (Fed. Cir. 1991); P.J. Maffei Bldg. Wrecking Corp. v. U.S., 732 F.2d 913, 917 (Fed. Cir. 1984).

Under the second element of a Type I changed condition, a contractor's "reasonableness" is viewed from the perspective of a reasonable and prudent contractor acting under similar conditions. Youngdale & Sons Constr. Co. v. U.S., 27 Fed. Cl. 516, 533 (1993). "The well-established principle is . . . that a contractor is not required to discover hidden subsurface conditions or those beyond the limits of an inspection appropriate to the time available." Id. A contractor is not to be charged with the technical knowledge or expertise of a geologist and is therefore "not required to discover hidden subsurface conditions or those beyond the limits of an inspection appropriate to the time available." Stock & Grove, Inc. v. U.S., 204 Ct. Cl. 103, 119, 493 F.2d 629, 631-32 (1974).

Under the third element, a contractor has the right to rely government supplied data on subsurface conditions and "only where relatively simple inquiries might have revealed contrary conditions" is reliance not warranted. Foster Constr. Co. v. U.S., 435 F.2d 873, 888 (Ct. Cl. 1970). In Foster, the court held that the contractor's reliance on the government's drill hole data was reasonable because the data was put in the contract to advise the bidding contractors. Id.

Moreover, the duty of the bidders to investigate the site did not require them to conduct costly technical investigations given the constraints present at the time. Id. at 888–89.

In addition to the express representations in a contract, the contract's requirements can lead to an implication that the contractor should find conditions better than they are actually encountered. CCM Corp. v. U.S., 20 Cl. Ct. 649, 656 (1990). In CCM Corporation the contractor was awarded the job to replace a walkway located on the roof of a building at a Veterans Administration hospital. Id. at 650–51. The contract expressly required that the contractor use an asphalt based waterproofing system. Id. at 656. However, during demolition the contractor discovered the existing waterproofing was tar based and therefore incompatible with the required asphalt based waterproofing. Id. at 651–52. The court held that the contract requirement to use an asphalt based waterproofing material implicitly represented that the existing waterproofing would be compatible. Id. Because the actual condition was incompatible, the court found there was a Type I changed condition. Id.

**b The Undisputed Facts Show the Soil in the Mandatory Borrow Area Was Materially Different Than What Was Represented in the FHWA Contract**

The contract expressly represented, via the incorporated FP-96 section 704.06, that unclassified borrow material is to conform to American Association of State Highway and Transportation Officials ("AASHTO") M 145 soil classifications of A-1, A-3, or A-2-4. PFF ¶¶ 6–7. This provision of FP-96 was not superceded by any provision of the Special Contract Requirements of the Camas project and remained in full force and effect through UCI's performance. PFF ¶ 7. Under the first Comtrol elements, the terms shall be given their ordinary

and commonly accepted meaning from the perspective of a reasonable and prudent contractor per Brunswick and P.J. Maffei. The AASHTO system classifies soils according to those properties that affect roadway construction and maintenance and are common standards in the road construction industry. Pl. App. p. 274.

The material in FHWA's mandatory borrow areas did not conform to the contract specifications. PFF ¶ 11. As cited by FHWA, the soil tests show that the mandatory borrow areas contained A-6, A-4, A-3, A-2-4, and A-1. Fully 30 percent of the samples tabulated by MTI were non-conforming. PFF ¶ 16. This relative percentage is confirmed by FHWA's own lab analysis where two of the five samples did not conform with the contract requirements. PFF ¶ 17. Therefore, it is undisputed that the unclassified borrow was materially different from the representations in the contract. As discussed above, the presence of the non-conforming soils prevented UCI from being able to reach optimum moisture content of embanked material. In particular, the non-conforming soil types required dramatically different optimum moisture. Per MTI's tests, the A-6 material required an moisture content as high as 19.5%. PFF ¶ 13; Pl. App. pp. 225–34. This is fully 8.3% higher than the 11.2% average of the materials that conformed to the contract. Pl. App. pp. 225–34. Said another way, had all the soil conformed to the contract the moisture content would have had a 6.6% range. Id. The presence of the non-conforming materials more than doubled this variation and directly led to the problems UCI and Desert Sage, encountered while embanking the material.

UCI can demonstrate the second element of a Type I changed conditions claim, i.e. that because the conditions actually encountered were reasonably unforeseeable based on all the information available to the contractor at the time of bidding. UCI's actions were reasonable

under the Youngdale standard because its actions were the same as those of other contractors bidding on the Camas project. UCI visually assessed the project site and the borrow areas. R. Standerfer Dep. p. 27. Similarly, Desert Sage, the reprocurement contractor, only performed a visual assessment of the project areas. Bare Dep. p. 10–11. UCI talked to the refuge maintenance personnel who informed UCI that the refuge had already built roads using the local materials. Pl. App. p. 94. UCI inquired during the pre-construction meeting as to the suitability of the local soils. Pl. App. p. 94B. In addition, FHWA judged the project to be too small to justify the cost of a geotechnical inquiry. Pl. App. p. 3. As such, per Stock & Grove, UCI should not be held to a higher standard to "discover hidden subsurface conditions" because its inspection was reasonable given the limitations of time and money.

UCI can also demonstrate the third element of a Type I changed conditions claim because it had a right to rely on FHWA representations. Just as in Foster, FHWA specified the fill material to inform the bidding contractors. PFF ¶ 7. Also, UCI made more than "simple inquiries" in an effort to understand the conditions of the borrow areas as noted above. Pl. App. p. 94. Moreover, identical to Foster, further geotechnical investigations would have been prohibitively expensive given the small scope of the project.

UCI's expectation of the conditions in the borrow areas is further bolstered when considered in light of the result in CCM Corporation. Just as the requirement to use an asphaltic waterproofing system implied the existing sub-base would be suitable in CCM Corporation, the FHWA requirement to build the narrow and difficult to compact embankment implied that the required material would be suitable. Thus, the presence of multiple and inseparable soil types that materially effected the performance of the contract constitutes a Type I changed condition.

**c. "Primarily Sandy Loam" Was Not Intended to Represent the Condition of the Material in the Mandatory Borrow Areas. Even If It Was, the Soil in the Mandatory Borrow Areas Did Not Conform to "Primarily Sandy Loam"**

Alternatively, FHWA argues that the contract represented there was "primarily sandy loam underlain with layers of clayey soils" in the borrow areas. This argument is incorrect. An agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony. Air-Sea Forwarders, Inc. v. U.S., 166 F.3d 1170, 1172 (Fed. Cir. 1999). Furthermore, as a long standing canon of contract construction, where two clauses in a contract conflict, "the clause which is specially directed to a particular matter controls in respect thereto over a clause which is general in its terms." W. E. Callahan Constr. Co. v. U.S., 91 Ct. Cl. 538, 634 (Ct. Cl. 1940).

This representation, which FHWA bases its entire argument upon, was a general description of work included in the "Mitigation Plan for Widening Wildlife Viewing Route at Camas National Wildlife Refuge" ("mitigation plan") submitted by FHWA to the Army Corps of Engineers that was appended to the contract SCRs in section H. See generally Pl. App. pp. 7–32. The inapplicability of this description to the actual work is manifest. FP-96 section 704.06 provides specific criteria that the material must meet to be incorporated in the project using road construction industry standard classifications. See generally Pl. App. pp. 89–93. Conversely, the mitigation plan was primarily concerned with the project's impact to the environment. Pl. App. p. 7. The general description of the material included as part item "3. Construction Plans" was included in the mitigation application to explain any impact the work may have to the vegetation. Pl. App. p. 21. As such, it is impermissible to construe the general wet-land mitigation provision to control over a specific and directly applicable material specification contained in the "Contract

Clauses" section of the contract that defined acceptable material in terms appropriate to road construction materials.

Assuming, for the sake of argument only, that the representation in the wet land permit controls, FHWA's argument fails because the material in the mandatory borrow areas were not "primarily sandy loam." Under Brunswick and P.J. Maffei the Court must give the terms the ordinary and commonly accepted meaning from the perspective of a reasonable and prudent contractor. This term consists of four elements, "primarily," "sandy loam," "underlain," and "clayey soils" that require closer examination. "Primarily" means "essentially, mostly, chiefly." WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1537 (1996).[3] "Sandy loam" is a distinct soil type. PFF ¶ p 18. USDA soil types are characterized by the ratio, or relative percentages of the different grain sizes in its composition and the physical characteristics that result from the particular combination of grain sizes. Defendant's Appendix ("Def. App.") pp. 23–24. Sandy loam consists of a mixture of three different grain sizes commonly referred to as sand, a small grain size measuring from 1mm–0.1mm; silt, a very small grain size measuring from 0.1mm–0.002mm; and clay, an extremely small grain size measuring below 0.002mm. Def. App. pp. 34–35. Sandy loam is a distinct soil type defined to contain between 45 and 85 percent sand and 55 and 15 percent silt and clay; with no more than 50 percent silt and no greater than 20

---

[3]FHWA's reliance on Board of Governors of the Federal Reserve System v. Agnew for the definition of "primarily" is misguided. The Court, in Agnew, was construing the word "primarily" as it was used in the Banking Act of 1933. 329 U.S. 441, 445-47 (1947). The Court felt Congress had intended regulate any firm that had more than unsubstantial interest securities underwriting to ensure separation of commercial from investment banking in the wake of the financial collapse of the Great Depression. Id. The context of Agnew is very unlike the context of a construction contract where the drafter is representing what a contractor should expect during performance.

percent clay. PFF ¶18. With a mix of such grain sizes, sandy loam, by itself, is a decent material from which to build an embankment. Pl. App. p. 248A. This is because the smaller silt and clay grains fill the voids between the larger sand grains allowing the material to compact readily. "Underlain" is defined to mean "to lie under or beneath, be situated under." WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 2062 (1996). "Clayey soils" is defined as soils with 35% or more clay, or grains smaller than 0.002mm. Defendant's Proposed Findings of Uncontroverted Fact ("DFF") ¶ 15. From the vantage point of a reasonable and prudent contractor "primarily sandy loam" means a source that consists mostly, if not completely, of sandy loam. Therefore, through a careful examination of the ordinary and commonly accepted meanings a contractor advised to expect "primarily sandy loam" would expect to encounter mostly a distinct soil type made up of a set percentage of small to extremely small grain sizes that compacts readily.

UCI did not encounter primarily a distinct material with defined percentages of small to extremely small grain sizes. Instead, it encountered at least five, or more, different and distinct materials, each with its own characteristics. PFF ¶ 11; Pl. App. p. 270. According to the FHWA's own testing of samples taken from the borrow areas, there were four distinct soil types, none of which had the same compaction characteristics, and none of which had the same handling characteristics. Pl. App. pp. 222–24, 225–34. In short, even if the "primarily sandy loam" representation controls, it is undisputed that the material in the borrow pit was not sandy loam. Pl. App. p. 241A.

Each different soil type present in the borrow areas behaved differently and required UCI to constantly vary its placement procedures. Pl. App. p. 249. Under Hardwick Brothers, such a situation qualified as a material difference between the conditions represented and encountered.

Instead of being able to establish one method to handle the majority of the material to be embanked, UCI was forced to constantly adapt its handling procedures, which cost it time and money. UCI performed proctors to determine moisture content, which cost it additional time and money. Id. UCI ultimately embanked material that was not readily compatible, which cost it time to try to achieve compaction. Therefore, UCI met the first element of a Type I changed condition.

**2. UCI Is Entitled to Judgment as a Matter of Law Because It Encountered a Type II Changed Condition**

In the alternative, UCI is entitled to recover its expended costs because it encountered Type II changed conditions in the mandatory borrow areas. To prevail in a Type II changed condition claim the contractor must show: 1) the physical condition at the site was unknown; 2) was of an unusual nature; 3) which differed materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract. Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1276 (Fed. Cir. 2001). An unknown physical condition is "one that could not have been reasonably anticipated from a site visit and a review of the contract documents." Id. UCI clearly did not know of the highly variable material in the borrow area. UCI conducted a reasonable inquiry at the site via a visual assessment. Pl. App. p. 94. UCI conducted a reasonable inquiry by questioning the refuge maintenance personnel, the individuals most likely to know the conditions because they had actually used the local materials to build a road. Id. Moreover, since FHWA had not performed any geotechnical analysis of any sort on the borrow area material, under Charles J. Parker Construction Co. v. U.S., the government cannot be said to have known the physical condition of

the site. 433 F.2d 771, 778 (1970). As such, UCI could not be held to have reasonable anticipated the physical condition in the borrow area.

A condition is unusual if it is unique as compared to conditions encountered in projects of a similar nature undertaken nearby. Servidone Constr. Corp. v. U.S., 19 Cl. Ct. 346, 360–66 (1990). Here, the uniqueness of the borrow area conditions is shown by the difference between UCI's experience using the borrow area soils and the experience of the refuge personnel in building a different road also using local soils. Pl. App. p. 94. Presumably, had the refuge personnel encountered anywhere near the problems UCI did, they would have been sure to make them known, since ultimately the refuge would have to maintain the road UCI was to build. Seldom is there a better opportunity to gauge whether a condition is unique. In this instance there was very similar project, a road built from the local materials built very near by. Since the refuge built project did not encounter the variable soil conditions UCI did, it is evident that the conditions UCI encountered were unique. The same factual comparison satisfies the third element as well. Therefore, UCI satisfies the test for a Type II changed condition claim and is entitled to compensation.

**3. Under the Spearin Doctrine, UCI May Not Be Held Responsible When FHWA's Specifications Were Defective**

"If [a] contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." U.S. v. Spearin, 248 U.S. 132 (1918). Spearin established the now well-known principle of the implied warranty of plans and specifications prepared by or on behalf of an

owner. The Spearin doctrine has been refined to encompass two specific implied warranties. The first implied warranty is that the plans and specifications are accurate and the second is that they are suitable for their intended use. An owner breaches the first warranty when the actual condition of the site is not as the owner has stated. E.L. Hamm & Assocs., 379 F.3d at 1338–39. An owner breaches the second warranty when a contractor accurately follows the plans and specifications to completion, yet, even so, fails to produce a finished project suitable for its intended purpose or satisfactory to the owner. White v. Edsall Constr. Co., 296 F.3d 1081, 1084-1085 (Fed. Cir. 2002); see also, Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1289 (Fed. Cir. 2000).

As explained above, FHWA's contract specified the borrow areas contained A-1, A-2-4, and A-3 material. The plans required all the borrow area material be embanked in sliver fills, therefore, most, if not all, the borrow material had to conform to the specification. Under E.L. Hamm & Associates the actual conditions were not as stated. Because UCI was contractually bound to widen the refuge road using only the FHWA supplied borrow material embanked in sliver fills, UCI cannot be held responsible for the consequences of that requirement under Spearin. Accordingly, UCI is entitled to recover its expended costs associated with complying with the defective specifications.

///

///

///

///

## CONCLUSION

For the foregoing reasons, FHWA's motion for summary judgment should be denied. The Court should enter partial summary judgment in favor of UCI on the liability aspects of UCI's changed condition claim.

Respectfully submitted,

s/ John Spencer Stewart

JOHN SPENCER STEWART
STEWART SOKOL & GRAY LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Tel: (503) 221-0699
Fax: (503) 223-5706
Attorney for Plaintiff

November 4, 2005

W:\WORK\Clients G-J\Ins Co of West\Universal Construction\SDS\Pleadings\Opp MSJ - cover-TOA-memo-final.wpd

CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of November, 2005, a copy of the foregoing PLAINTIFF'S OPPOSITION TO DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John Spencer Stewart
JOHN SPENCER STEWART
STEWART SOKOL & GRAY LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Tel: (503) 221-0699
Fax: (503) 223-5706

November 4, 2005