IN THE UNITED STATES COURT OF FEDERAL CLAIMS

UNIVERSAL CONSTRUCTION, INC.,
Plaintiff,
vs. No. 03-1502C
No. 03-2370C

THE UNITED STATES,

Defendant.

---

DEPOSITION OF RICHARD PAPE
Taken on behalf of the Defendant
October 21, 2004
---

BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the deposition of Richard Pape was taken before Marta M. Rice, CCR No. 2050, CSR No. 722, Registered Professional Reporter, and a Notary Public for the State of Idaho, on October 21, 2004, commencing at the hour of 2:04 p.m., the proceedings being reported at MK Plaza IV, 800 Park Boulevard, Boise, Idaho.

CERTIFICATE

I, Marta M. Rice, do hereby certify that pursuant to the Rules of Civil Procedure, the witness named herein appeared before me at the time and place set forth in the caption herein; that at the said time and place, I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; and that the foregoing transcript pages constitute a full, true and correct record of such testimony adduced and oral proceeding had and of the whole thereof.

IN WITNESS HEREOF, I have hereunto set my hand this 15th day of November, 2004.

Marta M. Rice
Signature

2-16-06
Expiration Date

Page 65

first schedule, the August 30th schedule of the last page, I believe, it shows --
A. The one done -- okay. Which -- which exhibit are we looking at?
Q. Exhibit 3. I believe the last page shows the notice to proceed is the 10th.
A. Exhibit 3. Let me see if this is it. Okay. That one does show notice to proceed on the 10th of September. And if you look at the lower left-hand corner, that schedule was produced on the 29th of August of the year 2001. That's -- that schedule was produced way -- let's see.
We show -- that schedule was produced even prior to the preconstruction conference, let alone, notice to proceed. Now, I'd have to look at an actual to see what happened to it.
MR. O'CONNELL: Right.
BY MR. O'CONNELL:
Q. Which -- which exhibit are you looking at, Mr. Pape, that shows the notice to proceed on the 17th?
A. Oh. Exhibit 4 shows it on the 17th; Exhibit 5 shows it on the 17th. And another -- I got two Exhibit 5s here somehow. Somebody -- maybe the -- maybe it -- maybe it was behind something. I

Page 66

don't know. But here is another Exhibit 5 shows it on the 17th. So the -- both Exhibit 5s show it on the 17th.
Exhibit 4 shows it on the 17th. All of those, by the way, were produced on the 12th of September. Oh, I'm sorry. Strike that. I -- I can't -- you know -- I'll -- I'll blame it onto -- I'll blame it onto, you know, blindness, whatever.
MR. O'CONNELL: That's okay. That's okay.
THE WITNESS: I can't read my own schedule. Okay. If you notice, there's early start and there's -- there's two columns there. Early start and late start. I, unfortunately, was looking at late start. That's the 17th on all of these. Early start is the 10th of September.
It's been three years. I don't even remember the start date, but every -- consistently -- let's go on the record here directly. The early start of the notice to proceed is always the 10th of September. Sorry. Once in awhile even a remote genius screws up.
MR. O'CONNELL: Okay. Okay.
BY MR. O'CONNELL:
Q. So if -- if the notice to proceed is -- is September 10th --

Page 67

A. Yeah.
Q. -- and the quality control plan is submitted on September 10th, what -- what --
A. Wait a minute. I thought the quality control plan was going to be submitted at the precon.
MR. O'CONNELL: I think we -- if -- if -- why don't you take a look at -- let me just ask you to briefly take a look at what we marked as Exhibit 7 before.
THE WITNESS: Okay. You bet. September 11th. Okay. Subsection. Okay. So by the -- this -- Exhibit 7 shows September 10th, which is the notice to proceed date. Okay? And some qualifications on here, of which I really don't understand. Probably I'd have to study them for awhile.
MR. O'CONNELL: Okay.
THE WITNESS: So it -- it does show that the submittals were made at the notice to proceed.
MR. O'CONNELL: Okay.
BY MR. O'CONNELL:
Q. And how long would you factor into the schedule for the Government to review the QC plan?
A. One week.

Page 68

Q. One week?
A. Absolutely.
Q. Where do you come up with that?
A. Because this was a 90 -- I get it from experience and pragmatism.
Q. Um-hmm.
A. A 93-day construction schedule won't allow them to sit on it and hatch an egg for a month. Okay? They have to cooperate. They have an inherent obligation to cooperate with the contractor on a very tight schedule and get that thing approved and get it back to the contractor as rapidly as possible.
Q. Okay.
MR. O'CONNELL: All right. Okay. I have no further questions.
THE WITNESS: You're going to have to teach me how to read a schedule here. Just kidding.
MR. LARKIN: No questions. He'll read and sign.
(Whereupon, the deposition concluded at 3:52.)

WESTERN FEDERAL LANDS HIGHWAY DIVISION
610 EAST FIFTH STREET
VANCOUVER, WA 98661-3801

U.S. Department
of Transportation

Federal Highway
Administration

AUG 21 2001

In Reply Refer to:
HPA-17.32
Awdltr_Camas.doc

OVERNIGHT MAIL

Attn: Dick Standerfer, President
Universal Construction, Inc.
134 N. Washington Avenue
Emmett ID 83617

Dear Mr. Standerfer:

ID RRP CAMA 101(1)
Camas NWR Complex
Contract No. DTFH70-01-C-00034

Your offer of $436,282.94 for construction of the above project is accepted.

Contract No. DTFH70-01-C-00034 is assigned to this project. Future correspondence about the project should include the project number, name, and this contract number.

Copies of the SF 25 (Performance Bond) and the SF 25-A (Payment Bond) are enclosed. In accordance with the terms of your bid, executed copies of these forms (original and one copy) are to be returned to this office (ATTN: Contracts Section) within ten (10) calendar days. Please include the name and address of your bonding company's local agent on the bonds and furnish a current copy of the agent's Power of Attorney from the bonding company. Your Bid Bond will be returned to you upon receipt of the executed Performance and Payment Bonds.

We request that your Certificate of Insurance be submitted to the Contracts Section within the 10 calendar day limit. Insurance requirements are set forth in Subsection 107.05 of the *Standard Specifications for Construction of Roads and Bridges on Federal Highway Project, FP-96* and Special Contract Requirements. We also require the Cancellation portion of the Certificate of Insurance be worded as follows:

> "Should any of the above described policies be cancelled before the expiration date thereof, the issuing company will mail 30 days written notice to the certificate holder named to the left."

The enclosed Payment Information Form must also be completed and returned within the ten (10) calendar day limit. Payment under this contract cannot be processed prior to our receipt of this form. Should you have questions concerning payments, please contact Mary Hildreth at 360.696.7660.

Two copies of the executed contract are enclosed. Your Bid Bond will be returned to you upon receipt of the executed Performance and Payment Bonds.

The terms of this contract provide for completion of the contract by December 11, 2001. When work is to proceed, Jane Traffalis, the Construction Operations Engineer (COE), will issue a written notice to you. Ms. Traffalis can be reached at 360.696.7819.

The Contracting Administration Office is located at 610 East 5th Street, Vancouver, WA 98661-3801. A project office will also be established in the vicinity of the work.

Your prompt attention to the execution and return of the enclosed bond forms and proof of insurance **(including worker's comp)** is requested.

Sincerely yours,

Julee McTaggart
Contracting Officer

(4) Enclosures:
Payment Information Form
SF 25, Performance Bond
SF 25-A, Payment Bond
Executed Contract (2)

cc: J. Traffalis, w/contract
T. Butikofer, w/contract
T. Breneman, w/contract
N. Caldwell, US Fish & Wildlife, Portland, OR
G. Deutscher, US Fish & Wildlife, Camas NWR, Hammer, ID
D. Munoz, US Fish & Wildlife, SE ID Refuge Complex, Chubbuck, ID
S. Moreno, FHWA, Boise, ID

8/22/01

ec: R. Burnett
C. Sanders
M. Hildreth
B. Lale
P. Chun
S. Craven
H. Peifer
K. Sargeant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNIVERSAL CONSTRUCTION, INC., | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 03-1502C |
| THE UNITED STATES, | ) | No. 03-2370C |
| Defendant. | ) | VOLUME II |
| | ) | |

DEPOSITION OF RICHARD C. PAPE
JULY 13, 2005

REPORTED BY:

MONICA M. ARCHULETA, CSR NO. 471

NOTARY PUBLIC.

REPORTER'S CERTIFICATE

I, MONICA M. ARCHULETA, CSR No. 471, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 20th day of July, 2005.

MONICA ACHULETA NOTARY PUBLIC STATE OF IDAHO

MONICA M. ARCHULETA, CSR NO. 471
Notary Public
P.O. Box 2636
Boise, Idaho 83701-2636
My commission expires August 3, 2006

Page 5

Q. I think the first thing you said was something about quantifying adverse impacts on the schedule?

A. Yes.

Q. What did you mean by that?

A. That means that I ran a critical path analysis of that schedule. Imposed two date constraints. Among others. Two of them governed. One of them associated with the approval of the QAQC submittals. That was an adverse impact of 12 calendar days. Calculates to an adverse impact of 12 calendar days. Secondly, I analyzed another externally imposed constraint. Which was when the work could start. After the settlement -- or maybe I shouldn't say settlement. But after the reduction in the amount of bickering over soil compaction and acceptability. Which generally allowed work to start on the -- back on the critical path on closure number one on the 6th of November. That equates to an additional -- not concurrent, but an additional sequential impact of 38 calendar days. So taking those two impacts together, the total impact was 50 calendar days to the critical path on that schedule.

Page 6

Q. Anything else? Any other impacts?

A. Oh, yeah, there were a lot of impacts. There was an 11-day impact due to the requirement that work could not start on the project until the safety submittal was approved. That was an 11-day impact. But it was concurrent with the 12-day impact of the QAQC submittal approval. There was one other submittal. I would have to look at the record. But there was another submittal in there. What I call a procedural submittal. That had a minimal impact of -- its approval had a minimal impact of maybe four or five days. I don't recall exactly. I would have to look it up. That one was concurrent with the 12-day impact of the QAQC approval. So it diminished in importance.

Is that adequate?

Q. It's adequate if that is the extent of your knowledge. Is there anything else that you did in terms of quantifying adverse impacts on the schedule?

A. Well, I did go back and take a look at a couple of things. That schedule was done based on a five-day workweek. I did add to that schedule some constrained tasks to allow me to do

Page 7

day calculations on the schedule. I calculated the number of calendar days on that schedule. Which was 93 calendar days. I also added a task to calculate the number of five-day workdays on that schedule. Which I should look this up. But I'll take a guess right now that I calculated 65 five-day workweek days. I also added another task to calculate what transpired after they mobilized on the job. Which the contractor, through, I guess, some kind of an agreement with the Federal Highway Administration manager reverted to a four-day -- four ten-hour-day work week. So I calculated the duration of the job based on four ten-hour days.

Now, I might add that reversion to a four ten-hour day, from my experience, and exposure to scheduling, did not adversely impact the job. As a matter of fact, if anything, the tendency of four ten's would be to accelerate the job. Because you have one less daily mobilization per week when you work four ten-hour days.

Now, if work on a project exceeds 40 hours a week, then you do experience adverse and inefficiency impacts. So, in essence, I maintain

Page 8

that operating on a four ten-hour-day workweek, if anything, accelerated the job slightly, rather than slowed it down.

I don't know. I would have to think about other things that I studied about that schedule. But, yes, I did prepare for further analysis of that schedule.

Q. What was the purpose for doing that last analysis that you were just talking about? The analysis based on the five-day workweek? And the analysis based on the four-day workweek?

A. Well, when I analyze a schedule for adverse impact, I always make an effort to be fair about both parties. In other words, if there are concurrent delays by a contractor, or if the contractor voluntarily accelerates a schedule, I always try to look at that, too. As well as anything blamed on adversarial party regarding adverse delays. So I have learned to be fair about a schedule analysis.

Q. You had said you had read the report of -- I think you said the soils expert. Were you talking about the government soils expert?

A. Yes. And, frankly, when I say read it, I didn't spend a lot of time and thought on when

UNIVERSAL CONSTRUCTION, INC.,
Plaintiff,
vs. No. 03-1502C
No. 03-2370C

THE UNITED STATES,

Defendant.

---

DEPOSITION OF RICHARD STANDERFER
Taken on behalf of the Defendant
October 21, 2004

---

BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the deposition of Richard Standerfer was taken before Marta M. Rice, CCR No. 2050, CSR No. 722, Registered Professional Reporter, and a Notary Public for the State of Idaho, on October 21, 2004, commencing at the hour of 8:08 a.m., the proceedings being reported at MK Plaza IV, 800 Park Boulevard, Boise, Idaho.

CERTIFICATE

I, Marta M. Rice, do hereby certify that pursuant to the Rules of Civil Procedure, the witness named herein appeared before me at the time and place set forth in the caption herein; that at the said time and place, I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; and that the foregoing transcript pages constitute a full, true and correct record of such testimony adduced and oral proceeding had and of the whole thereof.

IN WITNESS HEREOF, I have hereunto set my hand this 10th day of November, 2004.

Marta M. Rice
Signature

2-11-06
Expiration Date

Page 69

Q. You'd mentioned that you'd use a hoe pack on bridge -- on bridge jobs before. Right?
A. Right.
Q. And you can --
A. And you can do trench work and --
Q. Right. And you can use a -- you can use a hoe pack around bridge abutments, things like that?
A. Um-hmm.
Q. And would the reason you're using that hoe pack be, because you've got limited access to the site?
A. Because the site was narrow, yes.
Q. Narrow. Right.
A. Um-hmm.
Q. Okay. Well, did you ever use a hoe pack in sites that weren't narrow or there weren't restrictions like that at the site?
A. Let's -- let me answer it this way. If we had room to use a -- a normal sized roller, that would be our preference, other than a hoe pack. A hoe pack would generally be used in restricted areas.
Q. I see. And so what was -- what was stopping you -- when you did your bid, what was stopping you from using a roller rather than a hoe

Page 70

pack?
A. Due --
MR. LARKIN: In the sliver fill -- in the sliver fills?
MR. O'CONNELL: Sliver fills.
THE WITNESS: Yeah. Due to the width of the sliver fill, my opinion was to use the hoe pack. And -- and that was a safety concern because the sliver fill was not very wide. You know, approximately four feet. So -- and then, again, because it was narrow, even if you used a small roller, you know, you've reduced the weight of the roller. It's a vibratory process and its ability to compact, so the hoe pack was my choice.
MR. O'CONNELL: I see. Okay.
BY MR. O'CONNELL:
Q. Now, did you observe the hoe pack working at -- at the sliver fill areas?
A. Yes.
Q. What -- what -- what did you observe with respect to the success, or lack thereof, of compacting the material with respect to the hoe pack?
A. Well, there's two things there. Whether we used -- we -- we brought a small roller in to try

Page 71

to achieve compaction on the sliver fills and we used the hoe pack. Neither one would achieve the -- at that time, 95 percent that was required. Then, later on, we -- we actually said that we would do a test. We would do -- like, build 100 feet of sliver fill and just use the roller on it and build 100 feet of sliver fill and just use a compactor on it and, then, take the density test and make a comparison --
Q. I see.
A. -- so we did that.
Q. Okay. And so take me through your -- the -- when the work was actually performed at the project. How -- how was the --
A. They -- they would place material in the sliver fill --
Q. Right.
A. -- with a excavator and then there was another excavator there that had a -- a pretty good size hoe pack attachment to it and then he would pack it down into place.
Q. I see. And then I -- I take it that eventually you got results that said you hadn't reached the 95 percent compaction?
A. That's correct.

Page 72

Q. Okay. And --
A. Now, we -- we had these results before the sliver fills. We -- we'd lived with this problem in the parking area.
Q. I see. And do you know why Universal wasn't able to get the 95 percent compaction?
A. Well, all we know is -- is we tried every way we could to get it, so I assume it was the material.
Q. Which -- which ways did you try?
A. Well, we tried with just static fabritory (PHONETIC) rolling and then -- and then with the hoe packs --
Q. I see.
A. -- and then with the small rollers also on the sliver fills.
Q. I see. Did you have any conversations with anybody from Federal Highway, at this time, about the soil? When I say "this time," getting -- say the September/October 2001 time period?
A. Well, we'd -- Mr. Butikofer and I discussed this problem in a couple different instances. When we first experienced the problem, I -- I believe, Mr. Budicofer was off-site and so we -- we didn't give it much attention. We had

Page 73

contacted Hal, the inspector. I -- I think he made a phone call, they were supposed to send somebody to the site -- which, I guess, they did come down but they never contacted us in our construction office. They -- it was just kind of a drive-through and nothing came of it. He just said, yeah, they'd been here and they looked at it, no further information.
Eventually Mr. Butikofer returned around the middle of October, I guess, and then we discussed in earnest about this problem we'd had. We'd had a -- you know, a task that we thought was going to take two or three days and we'd been on it for three weeks.
And so at that point, I believe, we had a meeting with Jane Trafallis and Mr. Butikofer to discuss this situation.
Q. Okay. And what occurred at the meeting?
A. I don't know. We just -- we were still adamant that this material was no good. We -- I had made the decision to get a geotechnical report from MTI on the materials in that source, because at this point they were -- pretty much the whole source was exposed.
I can't recall, at that time, whether we had any information back at that time or not. I --

Page 74

I'd -- I'd have to, you know, go revisit the report and -- and correspondence and stuff dealing with that.
But, essentially, at that meeting we discussed the material. I believe it was Mr. Butikofer's opinion that -- he was adamant that the material could still be used, we were of the opinion that it was not good material.
I had told them that I felt they should -- time was getting late, time was of the essence at this project, that possibly we should get out of those sources and we would haul in material from our crushing source, which was a good proven material, and gave them a rough idea of what -- what I thought the cost would be.
I said there -- there would be some extra cost and, I believe, I -- I told them, at the time, that -- for around $30,000, this headache and problem will just go away. And they didn't seem to be too receptive of that, although, that -- that was about it at the meeting.
Q. I see. Okay. Let's step back a second. Let's talk about the excavation at the -- at the -- at borrow source number one.
Could you tell me, at the time of bid, how

Page 75

deep Universal expected to excavate at borrow source number one?
A. I believe they indicated one meter.
Q. And how deep did Universal actually excavate at borrow source number one?
A. I believe it got to four and a half or five feet.
Q. Can you tell me why Universal went to four and a half, to five feet?
A. Well, it -- we'd had talked to Mr. Butikofer about this. He had indicated to us that he didn't mind if we went a little deeper, as long as when the borrow sources were shaped up and abandoned that, you know, everything looked nice and neat on the --
Q. When you say -- why -- why did you want to go four -- deeper -- deeper than, say, a meter?
A. You know, I'm not real sure what -- what brought that up. I think that was an arrangement that was worked out between Mark Standerfer and Mr. Butikofer, but I -- I don't know what the subject matter lying behind it, why they asked to go deeper. Maybe they were a little better material or some material in some parts of it were worse than others and -- you'd -- you'd have to ask them about that.

Page 76

Q. Okay. Did -- did you personally make -- did you personally make any observations with respect to the soil that was encountered down to three meters versus the soil that was encountered -- I'm sorry.
Did you observe the soil that was encountered down to one meter versus the soil that was encountered below one meter?
A. No. I didn't have any -- I -- any observations of it because it was all exposed. But I didn't make anything of it up -- up to the time that we went out and measured it all up and took photographs.
Q. I see. Did Universal encounter, like, a white clay material in borrow source number one at any point?
A. I can't remember.
Q. Okay. Now, if Universal had excavated below a meter in borrow source number one, I think you had mentioned in, a few answers ago, that your -- in your -- either your or Mark Standerfer's conversation with Mr. Butikofer, that you'd said words to the effect of -- that -- you know, at the end of the project everything had to be nice and neat.

U.S. Department of Transportation
Federal Highway Administration

WESTERN FEDERAL LANDS HIGHWAY DIVISION
610 EAST FIFTH STREET
VANCOUVER, WA 98661-3893
(360) 619-7700 FAX: (360) 619-7846

CERTIFIED MAIL – Return Receipt Requested

June 20, 2002

and

FAX [ (208) 365-1089 ]

Dick Standerfer, President
Universal Construction, Inc.
134 North Washington Avenue
Emmett, Idaho 83617

RE: Notice of Termination for Default
ID RRP CAMA 101(1)
Camas NWR Complex
Contract No. DTFH70-01-C-00034

Dear Mr. Standerfer:

You are hereby notified that your right to proceed under Contract Number DTFH70-10-C-00034 (hereafter referred to as "the contract"), dated August 21, 2001, is terminated for default under FAR Clause 52.249-10, Default (Fixed-Price Construction) (April 1984) due to your failure to complete the project by the contract fixed completion date or to propose an acceptable plan to complete the project.

A cure notice dated November 23, 2001 was provided to Universal Construction, Inc. (UCI) as a result of a failure to perform the work. UCI only completed approximately 20% of the work during the contract period of performance. UCI's November 30, 2001 reply to the cure notice provided no statement of willingness to perform the remaining contract work but contained a claim for three issues: a differing site condition encountered in the borrow sources, a change due to Government directed changes, and a delay by the Government during the start of the project.

UCI's claims and reasons for not performing have been analyzed and found to be without merit. The facts, analysis and decision are addressed in my Contracting Officer's Decision dated June 20, 2002.

UCI has provided no statement of willingness to perform the remaining work since November 2001, although our discussions and correspondence has offered UCI that opportunity in February, April and May 2002.

I find that your failure to perform the work by the fixed completion date is not excusable, and this notice constitutes my final decision. You have the right to appeal this decision as provided under FAR Clause 52.233-1, Disputes.

With this notice, you are informed that the Government will obtain another contractor to complete the project. By letter dated June 5, 2002, the surety has informed this office that they are unable to provide a follow-on completion contractor. Universal will be held liable for any excess costs. The Government reserves all rights and remedies provided by law or under the contract, in addition to charging excess costs.

This notice constitutes the final decision of the Contacting Officer. The decision may be appealed to the Department of Transportation Board of Contract Appeals, 400 Seventh Street SW, Washington, D.C. 20590. If you decide to make such an appeal, you must mail or otherwise furnish written notice to the Board of Contract Appeals within 90 days from the date you receive this decision. A copy of the notice shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, should reference this decision, and identify the contract by number. In lieu of appealing to the Board of Contract Appeals, you may bring action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

William L. Parsons
Contracting Officer
Western Federal Lands Highway Division
Federal Highway Administration

cc:
Insurance Company of the West, (Brian Sawyer), Phoenix, AZ [surety]
Insurance Company of the West, (Michael Z. English), Boise, ID [surety]
Arthur E. Hamilton, Prog. Mgr., Federal Lands Highway, HFL-1, USDOT, Wash. D.C.
Dir. Sean M. Moss, S-40, USDOT, Wash. D.C.
SBA, Seattle Reg. Office, 1200 Sixth Ave, Suite 1805, Seattle, WA 98101-1128
R. Carmichael, Division Engineer, WFL
T. Binder, Division Counsel, WFL
D. Heckman, CE, WFL
J. Traffalis, COE, WFL
T. Butikofer, PE, WFL
P. Flores, WFL (e-mail)
M. Hildreth, WFL (e-mail)
R. Lale, WFL (e-mail)
R. Munoz, USFWS
G. Deutscher, USFWS, Camas NWR Complex

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNIVERSAL CONSTRUCTION, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-1502C, |
| | ) | No. 03-2370C |
| | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

-------------------------------

ORIGINAL

DEPOSITION OF WILLIAM PARSONS

Taken on behalf of the Plaintiff

November 3, 2004

Vancouver, Washington

CERTIFICATE

I, Frances M. Galisky, Certified Shorthand Reporter for Oregon, Certified Court Reporter for Washington, and a Registered Professional Reporter, do hereby certify that WILLIAM PARSONS appeared at the time and place set forth herein; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were transcribed using computer-aided transcription under my direction; and the foregoing transcript constitutes a full, true and accurate record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand and stamp at Portland, Oregon, this 15th day of November, 2004.

Frances M. Galisky
Oregon CSR No. 90-0014
Washington CCR No. GA-LI-SF-M471Q6

CERTIFIED SHORTHAND REPORTER Oregon CSR 90-0014 FRANCES M. GALISKY

Page 34

**saw as the basis for those claims or that differing site claim. I think there was some test data they provided and some site inspection data.**
**Basically our analysis was there was the representation of what we saw the material in the contract, and to me it still appears that's what was encountered out there.**
Q Who did that analysis for the government?
**A Elizabeth was primarily involved.**
Q Okay. Is it your understanding, do you have an understanding of whether Universal's been paid anything in connection with the Camas project?
**A They have not.**
Q Okay. Do you have any understanding as to how much work Universal completed in connection with the Camas project?
**A I'm not recalling. Seems like I recall about 20 percent of the contract amount.**
**(Exhibit No. 4 is marked for identification.)**
**BY MR. LARKIN:**
Q Exhibit 4 is an e-mail from you to Todd Butikofer and Dave Heckman. What's Dave Heckman's

Page 35

position?
**A He was the construction engineer, is now retired. So he would have been Jane Traffalis's supervisor.**
Q I see. In December of 2001?
**A Yes.**
Q Right, okay. You say, "Regarding the CAMA". That refers to the Camas project?
**A Yeah. It's our four-letter acronym for the Camas refuge road.**
Q "And issue of no partial payment yet extended towards any items - Dick Standerfer, Universal asked if FHWA would be advancing any payment soon," question mark. Do you see that?
**A Yes.**
Q Did Dick Standerfer call you and ask about payment?
**A It appears he did, yes.**
Q Do you recall anything about that conversation?
**A Not at this time.**
Q Okay. You go on to say, "I declined answering yes or no but want to respond later next week - after having a chance to quickly review Universal's submission of claim support." Do you

Page 36

see that?
**A Yes.**
Q Why did your review of Universal's claim support have anything to do with whether FHWA would be advancing any payment soon?
**A I don't recall other than we were anticipating that response. Let's see. Must have been thinking, knowing that claim response information may be forthcoming. Apparently thought it was prudent to look at it.**
Q Okay. Did you look at it?
**A I don't recall. I look at everything that comes in. I don't recall looking at this particularly. I'm not sure what all we got in the way of claim support.**
Q Ultimately, of course, you never cut out payment to Universal, right?
**A Correct.**
Q Or Universal Surety?
**A Correct.**
Q Okay. You go on to ask Dave and Todd in Jane's absence to figure out whether it was in FHWA's interest to make partial payment. Do you see that?
**A Yes.**

Page 37

Q What response did you get from Dave and Todd?
**A I don't recall what response I did get from them.**
Q Okay. You reference a, quote, no approved schedule, end quote, reason for no payment. Do you see that?
**A Yes.**
Q Did Mr. Butikofer inform you that he had not approved a Universal schedule?
**A I was aware there was the schedule problems from the start of the job. But I don't recall what was the situation there in December.**
Q Okay. Do you know or did you know as of December 2001 whether or not the government had approved schedule submissions by Universal?
**A I think schedules eventually became accepted, but I don't recall. I'm just thinking they were never, never approved. Or the, the third or fourth submittal was not approved.**
Q Okay. Are you familiar with the scheduling requirements in Federal Highway Administration contracts?
**A Superficially. I mean, we look for the major milestones of work. Consists of not only**

Page 38

**periods of time, but what equipment and forces are done as well as what major work is done by subcontractors. Have it on a critical path method type format.**
**(Exhibit No. 5 is marked for identification.)**
**BY MR. LARKIN:**
Q Exhibit 5, at the top at least, is another e-mail from you to Ricardo Suarez. Who is he?
**A Rick is, title is Director of Project Delivery. And so he has authority over both project development, meaning design, and the construction branch. So he would be Dave Heckman's supervisor.**
Q Okay. Does Bob Lale report to him?
**A He does now in that Bob is the construction engineer. Back in January of '02, I think Bob Lale reported to the other director, Daniel Donovan, and Bob was planning and programming engineer at that time.**
Q Okay. In any event, in January of 2002 did you report to Ricardo Suarez?
**A Wait. I stand corrected. I think if Heckman retired in January of '02, Lale did move**

Page 39

**into that construction engineer's job. So it could have been about this time.**
Q Okay.
**A This is January 22nd, so I'm not sure what was Lale's role at that time.**
Q As of January 2002 did you report to Ricardo Suarez?
**A No.**
Q Okay. Why were you writing this e-mail to Mr. Suarez?
**A Let me read it and see.**
**He had e-mailed me on the 18th this brief message that's also on this page. And he says, "Bill, I realize we...have concerns given the current status of the project - however Jane suggestion on some sort of partial payment is worthy of consideration."**
**So he asked me that question on the 18th and I responded on the 22nd.**
Q I see. The second paragraph of your, actually the first paragraph says that you discussed the issue of partial payment with Jane Traffalis, Todd Butikofer, and Tim Binder. I don't want to know about your conversations with Mr. Binder, but you can tell me about your

Page 40

conversations with Ms. Traffalis and Mr. Butikofer.
**A Mm-hmm.**
Q What did they, what did you talk about with them concerning the issue of a potential advance to Universal?
**A It was probably relaying to them that I was very much leaning toward not advancing any payment for the reason I discussed in the second paragraph.**
Q And that was because the potential for default is likely?
**A Mm-hmm.**
Q That's yes?
**A Yes.**
Q And that's the conclusion you reached as of January 22, 2002?
**A Yes.**
Q Now, you reached that conclusion even before Chuck Dissen and Elizabeth Firestone had reached completion of their assessment of Universal's claims. Is that correct?
**A The way it reads, that's correct, yes.**
Q Do you recall in the early 2002 time frame the discussions regarding a T for C versus a

Page 41

T for D, a default?
**A Discussions with either Universal or...**
Q With respect to Universal.
**A Well, with Universal? I mean, discussions with Universal?**
Q No, internally. Let's start there.
**A I don't recall any.**
Q Okay. You don't recall any discussions regarding certain advantages for terminating for convenience that the government might realize?
**A No.**
Q You just don't recall any discussions of that sort?
**A I don't recall, no.**
Q Okay. How about with discussions with Universal? What can you recall about any discussions with Universal concerning a potential termination for default or termination for convenience?
**A It seemed like later, later in '02 there was, there was a position of Universal's desiring a termination for convenience.**
Q Right.
**A I don't recall in January discussions on convenience.**

**From:** William L Parsons
**To:** Suarez, Ricardo
**Date:** 1/22/02 6:38PM
**Subject:** Re: Call from Camas NWR sub regarding payment

Consideration to advance Universal partial payment under the CAMA RRP project was discussed with Jane Traffalis, Todd Butikofer and Tim Binder this p.m.

At this time it would not be prudent to advance a partial payment. The potential for default is likely. Chuck Dissen / E. Firestone are nearing completion of assessment of 'claims' submitted by Universal is response to a December cure notice.

If default is likely - this being the result if no validity is found in the differing site claim - we should know this in a week+-.

Coupled to this is my expectation that the cost to the Govt. for reprocuring the remaining work could cost more than Universal's original contract amount of $436k. The second low bidder was at $527k while the IGE was at $606k. Other bids were: $795k, $801k, and $966k.

If there is validity to Universal's claim, we'll be talking with them about how we might proceed other than T/D and advancement of partial payment could again be considered then.

I also received today a letter from Insurance Company of the West, Universal's surety. ICW has received Miller Act claims against the payment bond and request that we withhold further payments from Universal. This request didn't figure into the earlier decision to not advance a partial payment, however.

>>> Ricardo Suarez 01/18/02 07:57AM >>>
Bill,

I realize we all have concerns given the current status of the project - however Jane suggestion on some sort of partial payment is worthy of consideration.

>>> Jane F Traffalis 01/17/02 09:06AM >>>
Bill and Todd,

I received a call today from Kurt Roland (208)356-9201 the surveying sub (Forsgren Associates) on the Camas project. He said they haven't been paid for any of the work performed. They are due about $38,000 to date. He billed Universal about two months ago.

He talked to Universal, and they said that he hasn't been paid because they haven't been paid. They suggested that he go after the bond, and he wanted to talk to us before he did that.

Also, he said that they only have about one day of work left on the contract, and then their contractual obligations will be met.

I told him that I'd inform the CO of this issue, and then Todd would get back with Mr. Roland. I also told him that FHWA has issued a cure notice and that Universal's contract could potentially be terminated.

**Bill, what do you think? Is there any way we could at least make a partial payment so that the subs could be paid?**

EXHIBIT
5
Parsons
11-3-04

Jane

**CC:** Binder, Timothy J; Butikofer, Todd; Donovan, Daniel; HECKMAN, David K; Traffalis, Jane F

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

UNIVERSAL CONSTRUCTION, ) No. 03-1502C
INC.,
) No. 03-2370C
Plaintiff
) Deposition of:
vs
) RANCE BARE
THE UNITED STATES,
)
Defendant.
)
---------------------------

Deposition of RANCE BARE, taken October 20, 2004, at 10:35 a.m., produced as a witness at the instance of the Plaintiff, before Dick Telford, Certified Court Reporter and Notary Public, at the Law Offices of Holden, Kidwell, Hahn, Crapo, 1000 Riverwalk Drive, Suite 200, Idaho Falls, Idaho.

Page 2

REPORTER'S CERTIFICATE

STATE OF IDAHO, )
( SS
County of Bonneville )

I, Dick Telford, CSR, do hereby certify RANCE BARE, 445 North Capital Avenue, Suite 5-C, Idaho Falls, Idaho, 83402, was sworn to testify the truth in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was reported by myself, Notary Public and Certified Court Reporter; that the deposition is the record of the testimony given by the witness, as recorded on the foregoing 66 pages.

And I further certify that I am not related to any of the parties nor do I have any financial interest in the matter.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 25th day of October, 2004.

NOTARY PUBLIC STATE OF IDAHO

(Signed) [signature]
Dick Telford
Certified Court Reporter
Notary Public for Idaho
Commission expires 9/8/07

Page 41

A Correct.
Q Can you show me on this picture how your work bridged the dikes or scarified the dikes, can you describe for me how that -- how that process worked?
A Okay. The sides of the existing dikes were cleaned with a trackhoe bucket. The cattails and the material on the side were pushed out with the bucket. The teeth of the bucket scarified the sides as it went out. As it came back we also moved it horizontally and scarified it that way also.
Q I see.
A So it was done with a trackhoe and the teeth on the bucket.
Q Okay. Is my understanding correct that to the right of the roadway on these two pictures there is a little hill that comes up. Is that the dike? Is that your understanding?
A I'm not sure that implies anything that was involved with our construction.
Q Where was -- what was the proximity of the dike to your construction, in other words was it -- how far out from the roadway were the dikes?
A Well, the roadway was on the dikes. In my terminology the roadway was on the dike.
Q Okay. And when you were describing pushing

Page 42

material out you were pushing material out into the Refuge area?
A It would be into the pond areas, yeah.
Q Okay. And you did that with the approval of Mr. Christianson?
A Yes. The material that was pushed out was subsequently pulled back in and covered the sliver fills to provide vegetation on the sides of them.
Q I see.
A Part of the reestablishment of the existing bio-flora system.
(Deposition Exhibit Number Eighty-two was marked for identification)
Q (By Mr. Larkin) Have you ever seen Exhibit Eighty-two before?
A I do not believe so.
Q Okay. My understanding is it was prepared by someone at the Federal Highway Administration. My question for you is -- and basically you can see the columns, there's the original bid quantity for the Camas project, a revised bid quantity, and then a comparison of your, Desert Sage's, original bid to Desert Sage's new proposal. Do you see that?
A Correct.

Page 43

Q Okay. The question for you is under unclassified borrow it looks like, at least on this spreadsheet, that the percentage change from Desert Sage's original bid to the new proposal was three hundred percent, in other words it went from five dollars per cubic meter to -- on the original bid to twenty dollars per cubic meter on the new proposal. Can you tell me why that was increased so substantially?
A There were probably three -- two or three things that influenced the price on this. Added moisture because of the type of materials, the workability of the material itself, which we now knew was sand and not a silty loam, and the fact that we had to overbuild the fill and then cut it back out, so a lot of the product had to be handled twice, maybe even three times, depending upon how much -- how big a sliver fill you had, how much you had to overfill, how much you cut back out and moved it down the line and reuse it, and sometimes some material may have been handled as much as three times before it finally got into its final resting place.
Q Okay. The linear grading pricing went from a unit price of one thousand two hundred dollars to a unit price of four thousand dollars. Can you tell me why that increased?
A I do not recall the specifics of that.
Q Okay. What about watering for dust control, the

Page 44

unit price doubled on that. What was that attributed to?
A Again, I do not recall the specifics of why it changed that much.
Q Okay. Under the alternates for aggregate surface course, do you see those two?
A Yes.
Q Okay. It looks like under the new proposal there's a unit price of seventeen dollars per ton for the aggregate surface course furnished by the contractor, and a unit price of thirteen dollars per ton for aggregate course furnished by the government. Is that your -- is that correct?
A Yes.
Q Okay. So and the extended price for the two alternates looks like the alternate for government furnished aggregates was lower than the contractor furnished aggregates surface course, right?
A Yes.
Q Okay. And I think you already said this, but the government chose to go with the contractor furnished aggregate source?
A Correct.
Q Okay. What work did Forsgren Associates do for Desert Sage on the Camas project?
A They provided surveying services for us.

Page 33

Q My understanding is that Desert Sage utilized the borrow sources at the Camas project?
A That is correct.
Q Did you utilize both borrow source number one and borrow source number two?
A We did.
Q Out of that utilization what percentage of utilization was in borrow source number one and what percentage was in borrow source number two?
A It's a guess on my part but I would say it was probably forty percent of our material came from borrow source one and sixty percent from borrow source two.
Q Rough numbers?
A Yeah.
Q How deep did you have to go in borrow source number one?
A I believe we were down four feet or so.
Q Okay.
A It was fairly shallow.
Q All right. And how about borrow source number two?
A The same, four to five feet maximum.
(Deposition Exhibit Number Seventy-nine was marked for identification)

Page 34

Q (By Mr. Larkin) Exhibit Seventy-nine is a set of plans. My understanding is that they were plans distributed for your work on the Camas project, which is designated 101(2). Is that your understanding as well?
A Yes.
Q These plans were approved June 13th, recommended by Jane Traffalis on June 12th.
Are these the plans from which Desert Sage prepared its second bid for the Camas project?
A (Examining document) This appears to be the set of plans, yes.
Q Okay. The third page, which is sheet C-1, typical section, at the top there's two line outs with the handwriting, work is complete.
Do you see that?
A Yes.
Q That's for the new entrance road?
A That is correct.
Q Did Desert Sage have to do any work on the new entrance road?
A We did two items of work. We went in and re-bladed and tightened the surface and then we came back and added some additional three quarter inch crushed aggregate to the top of and re-bladed and tightened the surface again.

Page 35

Q Okay.
A Then we actually paved it, which was -- is included in this typical section.
Q I see. In the schematic on either side of the the roadway there's a line that says clearing limit.
A Yes.
Q Okay. What's your understanding as to what that means?
A The clearing limit is the boundary, if you will, of the work area, and anything from clearing limit to clearing limit is -- any vegetation or growth between those is material that will have to be removed to facilitate the construction.
Q I see. Is it your understanding that construction activity was not to extend beyond the clearing limits?
A That is correct.
Q Okay. We deposed Dan Christianson yesterday and there was some discussion about material being placed into the cattails that he had knowledge of and authorized it. Did that take place during the project?
A In this particular area there are no cattails.
Q Okay. Where are the cattails, what portion of the project are the cattails located in?
A The cattails would have actually been involved in

Page 36

construction from one plus -- or 1000, where we begin the auto tour route, it's at various locations from there clear back to 10360 where -- the end of the auto tour route, it's various locations all through there, but this particular section we're looking at is the paved entrance road and there's no cattail construction there at all.
Q Okay. Why don't we flip to sheet C-2.
A (Examining document)
Q And on the left side there, C-2.
A Yes.
Q The top left, my understanding is that this represents the widened areas of the project, right?
A That is correct.
Q Okay. And in these areas there were requirements to build sliver fills?
A Correct.
Q And that's what's the arrow is pointing to on the left -- right-hand side of that schematic?
A Correct.
Q Okay. Were the cattails located in certain areas along the widened areas portion of the project?
A They were.
Q Okay. And so material was placed beyond the clearing limit in those areas?
A Cleared material was placed on or beyond the

Page 37

clearing limit, yes.
Q This schematic shows the sliver fills in its -- in their completed state. Is that your understanding?
A Correct.
Q Okay. Earlier you were describing how you overbuilt the sliver fills and then cut them back. Do you know what slope you overbuilt the sliver fills to?
A I cannot say definitively but they were probably in the neighborhood of one and a half to two -- excuse me, strike that -- one to one and a half to one to one.
Q Okay. And then when you cut them back that would be cut back to the one to two that's identified here in the plans?
A That is correct.
Q Okay. When you -- just so I understand, when you overbuilt the sliver fills did that also give you a greater surface area on the top of the sliver fills in order to compact the material?
A That is correct.
Q Is that one of the reasons that you overbuilt the sliver fill?
A Yes.
Q Is that the primary reason you overbuilt the sliver fill?
A Workability is the primary reason, just the

Page 38

ability to work the embankment with the equipment and everything. It's just not compaction, it's totality workability.
Q Okay. Had you not been allowed by the government to overbuild the sliver fills and then cut it back how would that have affected Desert Sage's cost for performing that work?
A It probably would have extended our time of performance significantly because we'd had to have used a much smaller type of equipment which would have been far less productive and would have extended the time frame.
Q Okay.
A So that would have had an effect. Smaller equipment is cheaper to operate but longer time. I don't know exactly what the total affect would have been.
Q On the right-hand sheet, D-1, in the plan quantities box on the right-hand side there are three items that are crossed out and a designation that work is complete. Is it your understanding that that work was complete when you arrived on the project?
A Yes.
Q Sheet J-1, which is the well number one bridge general notes. In the box there are designations of work complete and material being government furnished. Is that consistent with what you found when you went to perform the

Page 39

work on the Camas project?
A Yes, that's correct.
(Deposition Exhibit Number Eighty was marked for identification)
Q (By Mr. Larkin) Exhibit Eighty, although it doesn't bear a date, I believe is Desert Sage's bid on the -- for the completion work. This is designated project 101(2). Is that your understanding?
A (Examining document) Yes.
Q Okay. The number originally submitted by Desert Sage on the unclassified borrow work, we've already discussed it, was twenty dollars a cubic meter, right?
A Correct.
Q Was that pricing submitted with the understanding that Desert Sage could overbuild and then cut back the sliver fills?
A Yes.
Q Okay. Eventually there were some -- you had some conversations with Jane Traffalis during which Desert Sage agreed to lower its unit price on unclassified borrow to eighteen dollars per cubic meter, is that correct?
A That is correct.
(Deposition Exhibit Number Eighty-one was marked for identification)

Page 40

Q (By Mr. Larkin) Can you tell me what Exhibit Eighty-one is?
A This is special contract requirements for Section 204, Excavation and Embankment of the Camas project.
Q Okay. Is it your understanding that this is the method specification that was given to Desert Sage in connection with its work?
A Yes.
MR. LARKIN: Do you have Exhibit Five?
THE REPORTER: (Handing document)
Q (By Mr. Larkin) Exhibit Five, have you ever seen that before?
A (Examining document) I don't believe so.
Q Okay. My understanding is that the top two schematics are -- rough schematics, anyway, of the widened area that had sliver fills. Is that your understanding as well?
A It would be appear to be, yes.
Q Okay. On Exhibit Five there are two areas that are circled, you know, and I will just represent to you that Mr. Butikofer, the former project engineer on the project, circled those yesterday during his deposition to designate the sliver fills. You earlier were talking about working with or scarifying the dikes in connection with your work.

paddle wheel scraper -- proposed to use a paddle wheel scraper to remove it and were going to haul a long haul distance, so it was a -- not a very time effective work, but we felt like the material was going to be removed and taken off-site, so that's where the additional cost came from.
Q Okay. Was that also the assumption that Desert Sage used in putting together it's original bid?
A No. No, the original bid we were not aware that we were going have to take that material away.
Q So your awareness that you'd have to take the material away arose during your discussions with Ms. Traffalis in preparing the second bid?
A Yes.
Q We've talked a little bit about how Desert Sage was to scarify the dikes. My question for you is how did that assist Desert Sage's work, what was the practical effect of that?
A Well, the practical effect of that is that's there's not a slip plane between the new material that was being brought in and put on the oval slope. It was just standard construction procedure to eliminate that slip plane between the two different materials.
Q Okay. And so that assisted in constructing the sliver fills?
A I don't think it's an issue of constructing the



sliver fills as much as it is guaranteeing stability in the future.
Q Okay. At the bottom of the page one of Exhibit Eighty-three it says, the only remaining unresolved issue is the unclassified borrow.
Do you recall what the issue was on or about the date of the preconstruction meeting?
A I believe the issue there again was still quantities.
Q Okay. And as of the preconstruction meeting it was still your belief that there would be a need for additional quantities of unclassified borrow?
A That's correct, uh-huh, yes.
Q Do you recall what, if any, direction Desert Sage obtained from the government in drafting up its quality control plan?
A I don't believe we received any direction.
Q Okay. Do you recall any concerns that the government had on the quality control plan that Desert Sage submitted, concerns or exceptions?
A I do not recall anything.
(Deposition Exhibit Number Eighty-Four was marked for identification)
Q (By Mr. Larkin) Exhibit Eighty-four attaches a



letter to you from Julee McTaggart. Was she the contracting office during your course of work?
A Yes.
Q Okay. Attached there is a contract modification 0001. Do you recall receiving and signing off on that contract modification?
A Yes.
Q Do you know whether there were any other contract modifications executed during Desert Sage's course of work?
A I believe there were two others. We had an asphalt sidewalk that we installed adjacent to the entrance road or connecting to the entrance road, and we had an additional modification at the bridge to supply some minor pieces of equipment and do some cleanup and some other -- I think we put some gravel on the approach, and some other minor work at the bridge.
Q Do you know who brought in the gravel for the approach to the bridge?
A It seems to me like that we, Desert Sage, supplied the gravel, and the Refuge actually delivered it to the bridge, I believe.
Q Okay. This document on the first page of the modification under item 108.10(D) revises the -- I think it's the completion date from August 30 to October 11.
Do you see that?



A Yes.
Q Okay. Is it your recollection that the completion date was further extended to October 14 in connection with your work?
A It was extended. I don't remember the exact date. That sounds about right though.
Q Okay. On the back side of that same page there's a reference to an amount negotiated of five hundred thousand six hundred and ninety ninety dollars and ninety cents and below that is incentives of fifteen thousand nine hundred and one dollars.
Do you see that?
A Yes.
Q Do you know what that incentives refers to?
A Normally under the FHWA contracts there is an incentive for quality of your aggregates, and if you get your aggregates to a certain quality level they will pay you additional funds. I believe that's what that's for.
Q Okay. Do you know whether Desert Sage received any incentives?
A I don't believe we did.
Q Okay. And why is that?
A We probably did not prepare within the formula sufficient to rate an incentive.
MR. LARKIN: I see. Okay.

Page 57

there was still about the same traffic using other areas.
Q All right. Comparing this project with other projects that Desert Sage conducts this, I understand, would be a relatively low traffic type project?
A Absolutely.
Q The traffic control, at least in Desert Sage's opinion, was not a major concern?
A No.
(Deposition Exhibit Number Eighty-seven was marked for identification)
Q (By Mr. Larkin) Exhibit Eighty-seven is a Desert Sage quality control plan that was rejected by Dan Christianson, and my question for you is on the third page of this exhibit, under unclassified borrow there is a statement that compaction of unclassified borrow will not be performed as to the amended specification.
Why did Desert Sage put that in there?
A I do not know the answer to that question.
Q Okay. Could it be because Desert Sage's procedures involved overbuilding and cutting back, which was not specifically per the specification?
A I -- I'm at a loss to answer the question. I don't know.
Q Okay. Under earth embankment, the third

Page 58

paragraph under that heading says, compaction of earth embankment will not be be performed as to the amended specification.
Do you know why that's in there?
A I do not.
Q Okay. And under topic subgrade compaction it says compaction top of subgrade will not be performed as to the amended specification.
Do you know why that's in there?
A I do not.
Q Do you recall that those three statements were circled by Mr. Christianson and returned to Desert Sage?
A I do not recall this.
Q Okay. Do you know why Mr. Christianson rejected the quality control plan submitted by Desert Sage?
A I do not at this point.
(Deposition Exhibit Number Eighty-eight was marked for identification)
Q (By Mr. Larkin) Exhibit Eighty-eight is another one of Mr. Christianson's daily diaries and he states, in part, that he learned Desert Sage was at the limit for daily production rates and there wasn't enough time to complete the contract if they only worked five days a week.
Is that consistent with what was going on in

Page 59

early September of 2002?
A Correct.
Q Okay. What was the -- did Desert Sage eventually start working six days a week?
A We did.
Q When did that commence?
A I think it commenced shortly after this discussion.
Q Okay. It says that you and Mr. Christianson also discussed the quality control plan and a few items that needed to be corrected.
Again, do you recall what items those were?
A I do not.
Q All right. At the bottom of that paragraph it says, Mr. Bare also voiced concern about the amount of material available at the borrow sources was insufficient to complete the areas of embankment.
Does that accurately reflect your concern?
A I'm sure it does, yes.
Q Okay. Was there any discussion with Mr. Christianson about the possibility that if there was not enough borrow material in the borrow sources where additional borrow material would come from?
A We discussed the possibility of enlarging borrow sites one and two, but needed to know whether or not they

Page 60

had been cleared from the environmental standpoint of actually being larger than they were originally designated. I do not remember what our determination was at that point.
Q Did the borrow sources eventually need to be enlarged in order to complete your scope of work?
A I believe borrow source one stayed at its proposed size and that borrow source two was actually increased just a little bit.
MR. LARKIN: Go off the record for a minute.
(Off the record)
Q (By Mr. Larkin) I am going to show you Exhibit Number Sixty-three, which is Desert Sage's construction narrative as accepted by Mr. Christianson, and my question for you is -- on the third page of the exhibit Desert Sage states, due to the narrow nature of the majority of the embankment areas, in parentheses, sliver fills, in parentheses, it will be necessary to overbuild the fills and then cut them back to grade, with the surplus material being hauled to the next embankment location.
Do you see that?
A Yes.
Q And that was a procedure that was approved by Mr. Christianson?
A Correct.
Q Okay. Was there any -- to your knowledge, was