IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNIVERSAL CONSTRUCTION, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-1502C, |
| | ) | No. 03-2370C |
| | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

---------------------------------

ORIGINAL

DEPOSITION OF JANE TRAFFALIS

Taken on behalf of the Plaintiff

November 2, 2004

Vancouver, Washington

CERTIFICATE

I, Frances M. Galisky, Certified Shorthand Reporter for Oregon, Certified Court Reporter for Washington, and a Registered Professional Reporter, do hereby certify that JANE TRAFFALIS appeared at the time and place set forth herein; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were transcribed using computer-aided transcription under my direction; and the foregoing transcript constitutes a full, true and accurate record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand and stamp at Portland, Oregon, this 15th day of November, 2004.

Frances M. Galisky
Oregon CSR No. 90-0014
Washington CCR No. GA-LI-SF-M471Q6

CERTIFIED SHORTHAND REPORTER
Oregon
CSR
90-0014
FRANCES M. GALISKY

Page 90

**A The next table I think is a schedule comparison based on their schedules, their August 29th, October 9th, and October 29th schedules. And I assume the numbers in there that aren't dates --**
Q Right.
**A -- are days, but I don't know that for sure.**
Q Okay. It looks like we're looking at the third table down. There are also some handwritten numbers in there.
**A Yes.**
Q Do you know what those represent?
**A No, I don't remember.**
Q Okay. The second table that's listed under the Auto Tour Route lists unclassified borrow at the 2,410 cubic meter number.
**A Mm-hmm.**
Q Are you aware that that quantity more than doubled by the time Desert Sage was finished with the project?
**A I remember that it changed. I don't remember how much.**
Q All right. The notes at the bottom, there's one that says, "3-4 hours in lift." Do

Page 91

you know what that means?
**A I don't know if this came from our -- I'm assuming it means compaction time, but I don't know for sure.**
Q All right. Then the next one, the next note over says, "600 meters," and there's an arrow to "4-5 hours and 8 inches", it looks like.
**A Yes.**
Q Do you know what that means?
**A I would have to compare that to Todd's diary entry. It might have been what Mark Standerfer told us.**
Q Okay. The next page, is that also your handwriting?
**A Yes.**
Q Okay. First entry says, "progress payment - accept when they give us as built, i.e. everything but completing on time." What do you mean by that?
**A I don't know.**
Q Okay.
**A I don't remember.**
Q You understand that this document, that you probably drafted this document after Universal had left the project site?

Page 92

**A No.**
Q You don't know?
**A I don't think so.**
Q Okay. The next entry on the second page says MOH, which -- is that materials on hand?
**A Yes.**
Q And as of the date you drafted this document, there were girders, deck, and aggregate as materials on hand at the project site?
**A Yes.**
Q Is that your understanding? And then the next entry is just a list of completed items. Do you see that?
**A Yes.**
Q And is that a list of items that Universal had completed on the project?
**A It appears to be a status report.**
Q Okay. Status report of items that Universal had completed on the Camas project?
**A Yes.**
Q Okay. Is it your understanding that Universal was never paid anything for its work on the Camas project?
**A I believe that's correct.**
Q Okay.

Page 93

(Exhibit No. 15 is marked for identification.)
BY MR. LARKIN:
Q Exhibit 15 is an e-mail from Elizabeth Firestone dated May 7, 2002 to you. It states, "Todd called." Do you understand that to refer to Todd Butikofer?
**A Yes.**
Q Okay. And Ms. Firestone says, "I told him what we were planning for tomorrow - briefly discussed the T for C versus T for D."
**A Mm-hmm.**
Q Do you know what she's talking about there?
**A No. I mean, she's saying briefly discussed termination for convenience versus termination for default, but I don't know the content of the conversation.**
Q Okay. In about May of 2002 what was the discussion within Federal Highway Administration regarding a T for C versus a T for D with respect to Universal?
**A I think the correspondence indicates that we wanted an answer from them and that we were, we would like to hear anything from them.**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNIVERSAL CONSTRUCTION, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-1502C, |
| | ) | No. 03-2370C |
| | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

---------------------------------

TELEPHONE DEPOSITION OF GERALD DEUTSCHER

Taken on behalf of the Plaintiff

ORIGINAL

November 3, 2004

Vancouver, Washington

CERTIFICATE

I, Frances M. Galisky, Certified Shorthand Reporter for Oregon, Certified Court Reporter for Washington, and a Registered Professional Reporter, do hereby certify that GERALD DEUTSCHER telephonically appeared at the time and place set forth herein; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were transcribed using computer-aided transcription under my direction; and the foregoing transcript constitutes a full, true and accurate record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand and stamp at Portland, Oregon, this 3rd day of November, 2004.

Frances M. Galisky
Oregon CSR No. 90-0014
Washington CCR No. GA-LI-SF-M471Q6

Page 10

Q Okay. Prior to the -- how did you first become involved with the, what I'll call the roadway project? And when I refer to the roadway project, I'm referring to the 2001-2002 project there at the Camas site. Is that fair enough?

**A Yes. And what do you mean "involved"? When we started planning and requesting funding for it or when we actually started doing some work on it?**

Q How did that project arise? Did you, did it arise out of your office?

**A Yes, it did. And I can't, I can't remember when it came about. You know, whenever federal, when the program became available, we on many refuges, and I on Camas then identified projects that I thought would fit the criteria for a public roads project.**

Q Okay. Why was there a need to do the Camas project?

**A Because of the visitor use on the, on the road, the road was in, the road and dike was deteriorating. It was, you know, it had been undermined by muskrats, it was narrow. And for the type of traffic we were receiving, we realized that we needed to widen the road in some areas and**

Page 11

**put a better gravel surface on it.**

Q Okay. Do you know, in approximately 2001 do you know how many vehicles per day the refuge was averaging during the weekdays?

**A No, I don't.**

Q Okay. You're familiar with the mandatory borrow sources that were utilized in connection with the Camas project?

**A Yes, I am.**

Q Okay. Can you describe how those borrow sources came to be characterized as mandatory borrow sources in connection with the Camas project?

**A Yes. In the planning process when we started planning for where the road would have to be placed and, and the widening, we applied to the Army Corps of Engineers for a Section 404 permit. And in that process and working with the Corps of Engineers it was identified that there would be some fill of wetlands adjacent to the existing dike and roadway.**

**To mitigate for that, we were required to construct wetlands to, as a, to mitigate for the loss of wetlands. In order to do that, we picked two sites, two upland sites that were**

Page 12

**adjacent to areas of wetlands where we could put water into wetlands and wet meadows. Wet meadows are also classed as wetlands. The borrow sites were selected so that when we borrowed the material, then they would then be flooded and make comparable habitat for what had been lost during the road widening project.**

Q Okay. Were you the one that selected the borrow source locations?

**A Yes.**

Q How did you go about selecting where the locations would be? What criteria did you use?

**A Again, basically looked for sites that were, you know, close to the project and that were upland sites that were not classified as wetland so that they could be cut down and then, and to create wetland acreage adjacent to existing wetlands.**

Q Okay. Did you yourself conduct any investigation into the borrow sources that you selected to determine the suitability of the soils in those borrow sources for fill?

**A No.**

Q Okay. And is my understanding correct that, as far as you're aware, the refuge had never

Page 13

used those particular borrow sources for roadway construction in the past?

**A That's correct.**

Q Okay. My understanding is that the reason a soils analysis was not conducted was because there was no money for it essentially. Is that correct?

**A I don't know that I can answer that. It was, it was not, it wasn't in my program to, my responsibility to, I guess, evaluate the borrow sites.**

Q Okay. Whose responsibility was it?

**A I don't know.**

Q Okay. During the design of the project I've heard testimony that Craig Sanders and Elizabeth Firestone were two people involved in the design process for the Camas project. Do you recall those two individuals?

**A I recall the names, yes.**

Q Do you recall any conversations with either of those two individuals concerning the borrow sources at the Camas site?

**A No, I don't.**

Q Do you recall any inquiries raised by either Mr. Sanders or Miss Firestone related to

the mandatory borrow sources at Camas?
**A I don't remember that, no.**
Q Would there be anything that would refresh your recollection such as a daily diary or anything that you maintain of that sort?
**A I do not have a daily diary.**
Q Okay. And you don't maintain one from 2000, 2001?
**A That's correct. I do not maintain, I did not maintain one then either.**
Q Okay.
**A Are you still there?**
Q I am. Yeah, I'm --
**A Okay. There's a lot of silence and I wasn't sure, certain.**
Q As far as the size of the borrow sources, were you the one that drew out the initial size of those sources or those sites?
**A Yes.**
Q Both as to surface area and then as far as the depth of those sites?
**A That's correct.**
Q Okay. Do you recall telling Craig Sanders, one of the designers of the project, that you could increase the size and possibly the depth



as needed to increase the borrow volume or surface area?
**A I don't recall saying that, no.**
Q Do you recall writing that to him?
**A No. I don't recall writing that either.**
Q Okay. As far as you were concerned, was there any problem with going below three feet in the designated borrow areas?
**A I'm, I -- can you ask that question again?**
Q Sure. As far as -- I've seen some initial drawings for the borrow areas that show that the initial average depth was three feet. As far as you were concerned, was there any problem with going below three-feet depth in the borrow sources?
**A Well, that would depend on the circumstances at the time. Of course, the reason for selecting a figure like three feet -- and I don't recall what figure I selected, but the idea was to recreate wetlands comparable to what was being destroyed. And those wetlands were shallow wetlands with the related plant community cattails and bulrushes that go along with that shallow wetland. And so rather than create a borrow area**



**that was much deeper that would then be a different wetland habitat, we were trying to replicate the same type of wetland condition.**
Q I see. So if the contractor were allowed to go below three feet in depth in the borrow sources, as long as the finished product was a wetlands comparable to the wetlands that was destroyed, that would satisfy your concerns anyway?
**A It probably would. As I say, you know, at any time that we do that, we would have to discuss it and make certain that, okay, yes, this is a reasonable replacement or reasonable approach to take. But as long as it was comparable, then that's what we were trying to do.**
Q Okay. What did the borrow areas look like on the surface before they were, before Universal ever got to the site?
**A They were vegetated primarily with upland grasses. And, of course, that's the main criteria that we were looking at to define an upland site, you know, a plant community that was there, upland plant community versus, you know, wetland plants. And so that's why we selected the site, because they were predominantly, you know,**



**upland grasses that were on the sites.**
Q I see. There's been some indication that the refuge in the past had done some of its own roadwork. Are you aware of anything like that?
**A Yes, I am.**
Q Okay. Can you describe what roadwork the refuge personnel themselves conducted in the past prior to the Camas project?
**A The most recent one that we had done prior to this road project was that we, we built, as I recall, about 1800 feet. Maybe I shouldn't even say. I can't remember specifically the feet, the linear distance. But right at the headquarters area we were trying to stop traffic coming through our maintenance compound, so we built a road around our headquarters complex there. And we built that with two of my refuge employees using refuge equipment.**
Q I see, okay. And for the fill material, where did the fill material come from?
**A It was borrow material that was taken right adjacent to the roadway and pushed up with a dozer right onto the roadway or with a small scraper that was used to take it right from**

# Section 704.–SOIL

**704.01 Foundation Fill.** Furnish granular material free of excess moisture, frozen lumps, roots, sod, or other deleterious material and conforming to the following:

| | |
|---|---|
| **(a)** Material passing 50-mm sieve | 100% |
| **(b)** Soil classification, AASHTO M 145 | A-1-a |
| **(c)** In wet environments, material passing 75-µm sieve, AASHTO T 27 and T 11 | 6% max. |

**704.02 Bedding Material.** Conform to the following:

**(a) Class A bedding material.** Furnish concrete conforming to Section 601.

**(b) Class B bedding material.** Furnish sand or selected sandy soil free of excess moisture, muck, frozen lumps, roots, sod, or other deleterious material and conforming to the following:

| | |
|---|---|
| **(1)** Material passing 9.5-mm sieve, AASHTO T 27 | 100% |
| **(2)** Material passing 75-µm sieve, AASHTO T 27 and T 11 | 10% max. |

**(c) Class C bedding material.** Furnish sand or fine granular material free of excess moisture, muck, frozen lumps, roots, sod, or other deleterious material. Remove all rock particles and hard earth clods larger than 38 millimeters.

**704.03 Backfill Material.** Furnish granular material or fine soil free of excess moisture, muck, frozen lumps, roots, sod, or other deleterious material. Remove all rock particles and hard earth clods larger than 75 millimeters in the longest dimension.

**704.04 Structural Backfill.** Furnish free draining granular material free of excess moisture, muck, frozen lumps, roots, sod, or other deleterious material conforming to the following:

| | |
|---|---|
| **(a)** Maximum dimension | 75 mm |
| **(b)** Material passing 75-µm sieve, AASHTO T 27 and T 11 | 15% max. |
| **(c)** Liquid limit, AASHTO T 89 | 30% max. |

**704.05 Topping.** Furnish a granular material free of excess moisture, muck, frozen lumps, roots, sod, or other deleterious material conforming to the following:

| | |
|---|---|
| **(a)** Maximum dimension | 100 mm |
| **(b)** Soil classification, AASHTO M 145 | A-1 or A-2-4 |

**704.06 Unclassified Borrow.** Furnish granular material free of excess moisture, muck, frozen lumps, roots, sod, or other deleterious material conforming to the following:

| | |
|---|---|
| **(a)** Maximum dimension | 600 mm |
| **(b)** Soil classification, AASHTO M 145 | A-1, A-3, or A-2-4 |

**704.07 Select Borrow.** Furnish granular material free of excess moisture, muck, frozen lumps, roots, sod, or other deleterious material conforming to the following:

| | |
|---|---|
| **(a)** Gradation | Table 704-1 |
| **(b)** Liquid limit, AASHTO T 89 | 30 max. |

**Table 704-1**
**Select Borrow Gradation**

| Sieve Size | Percent by Mass Passing Designated Sieve (AASHTO T 27) |
|---|---|
| 75 mm | 100 |
| 25.0 mm | 70-100 |
| 4.75 mm | 30-70 |
| 150 μm | 0-15 |

**704.08 Select Topping.** Furnish granular material free of excess moisture, muck, frozen lumps, roots, sod, or other deleterious material conforming to the following:

| | |
|---|---|
| **(a)** Gradation, uniform coarse to fine | Table 704-2 |
| **(b)** Liquid limit, AASHTO T 89 | 30 max. |

**Table 704-2**
**Select Topping Gradation**

| Sieve Size | Percent by Mass Passing Designated Sieve (AASHTO T 27 and T 11) |
|---|---|
| 75 mm | 100 |
| 75 $\mu$m | 0-15 |

**704.09 Bed Course.** Furnish porous, free-draining granular material free of excess moisture, muck, frozen lumps, roots, sod, or other deleterious material conforming to the following:

**(a)** Gradation, uniform coarse to fine — Table 704-3
**(b)** Liquid limit, AASHTO T 89 — 30 max.

**Table 704-3**
**Bed Course Gradation**

| Sieve Size | Percent by Mass Passing Designated Sieve (AASHTO T 27 and T 11) |
|---|---|
| 12.5 mm | 100 |
| 75 $\mu$m | 0 - 10 |

**704.10 Select Granular Backfill.** Furnish sound, durable, granular material free from organic matter or other deleterious material (such as shale or other soft particles with poor durability). Conform to the following:

**(a) Quality requirements.**

**(1)** Gradation — Table 704-4
**(2)** Shear angle of internal friction, AASHTO T 236 — 34° min.

**Note:** Compact samples for AASHTO T 236 to 95 percent of the maximum density determined according to AASHTO T 99 method C or D and corrected for oversized material according to AASHTO T 99, Note 7.

(3) Sodium sulfate soundness loss (5 cycles), AASHTO T 104 — 15% max.
(4) Los Angeles abrasion, AASHTO T 96 — 50% max.
(5) Liquid limit, AASHTO T 89 — 30 max.

**(b) Electrochemical requirements.**

(1) Resistivity, AASHTO T 288 — 3000 Ω·cm min.
(2) pH, AASHTO T 289 — 5.0 to 10.0
(3) Sulfate content, AASHTO T 290 — 1000 ppm max.
(4) Chloride content, AASHTO T 291 — 200 ppm max.

**Note:** Tests for sulfate and chloride content are not required when pH is between 6.0 and 8.0 and the resistivity is greater than 5000 ohm centimeters.

**Table 704-4**
**Select Granular Backfill Gradation**

| Sieve Size | Percent by Mass Passing Designated Sieve (AASHTO T 27 and T 11) |
|---|---|
| 100 mm | 100 |
| 75 mm | 75 - 100 |
| 75 $\mu$m | 0 - 15 |

**704.11 Special Grout Backfill.** Furnish lean grout slurry composed of 3 parts portland cement and 8 parts fine aggregate by volume. Fly ash may be substituted for 2 of the 3 parts portland cement. Conform to the following:

(a) Water/cement ratio — 1.5
(b) Portland cement — Subsection 701.01
(c) Fly ash — AASHTO M 295 class C
(d) Fine aggregate — Subsection 703.01
(e) Water — Subsection 725.01

**704.12 Crib Wall Backfill.** Furnish material according to Subsection 704.10, except conform to the following:

(**a**) Gradation — Table 704-5
(**b**) Unit mass, AASHTO T 19M — 1900 kg/$m^3$ min.

**Table 704-5**
**Crib Wall Backfill Gradation**

| Sieve Size | Percent by Mass Passing Designated Sieve (AASHTO T 27 and T 11) |
|---|---|
| 75 mm | 100 |
| 4.75 mm | 25 - 70 |
| 300 µm | 5 - 20 |
| 75 µm | 0 - 5 |

Page 25

that's where we -- they picked it up and brought it to my attention.
Q. Okay. And were you the one who made the decision to bid on the Camas project?
A. I'd say yes.
Q. Who was involved in preparing the bid at Universal for the Camas project?
A. I'd say I pretty much prepared the bid. I had some assistance from Mark Standerfer, but I'd say the lion's share would -- I put it together.
Q. Okay. And could you tell me what -- what materials you relied on in calculating your bid?
MR. LARKIN: What? Written materials?
MR. O'CONNELL: Yes.
THE WITNESS: What --
MR. O'CONNELL: Written materials, yes.
THE WITNESS: Well, the -- the main thing you're looking at is the contract that you're going to perform.
MR. O'CONNELL: Okay.
BY MR. O'CONNELL:
Q. Besides looking at the contract, what else did you do? Did you visit the site? Or what?
A. Say that again?
Q. Did you visit the site?

Page 26

A. Yes, I visited the site.
Q. Okay. What else did you do?
A. I -- I don't refer to a visit as "materials," so --
Q. Right. It's a separate question. Did you visit the site?
A. Yeah.
Q. Okay. And did you do anything else?
A. We visited the site, we -- we talked to the people at the site, which, at the time, was just the park representatives. So we talked to the ranger, talked to -- I believe, there were two of his workmen that, I guess, facilitated repairs in the park or whatever.
And we had contacted our materials people in Idaho Falls. And, in fact, I -- I believe the initial visit to the site to look at the material sources and whatnot was with their -- their soils manager.
And -- so anyway, we -- we looked at the proposed borrow sources on that site and then we looked at the site that we were going to, you know, do our crushing out of.
Q. When you say -- you said "their soils manager," I'm not sure who you're referring to.

Page 27

A. That's -- would be -- well, M -- MTI, Materials Testing.
Q. Oh, I see. I see.
A. Yeah. Dan King was the fellow that was with them.
Q. And when you say "you looked at the borrow sources," what -- what -- what exactly did you do?
A. Well, when we initially got to the site the -- the ranger was gone and the facilities were locked, so there wasn't anybody to talk to. So we drove out. I believe they had signs staked in the ground that said, you know, source one, source two, or something to that effect.
And they were relatively small sources. You know, couple hundred feet square. And so we just kind of looked at it, talked to Dan a little bit about it, looked at both sources, and then drove back to the park facilities there.
The ranger was back; we talked to him. Asked him about materials, what they used, what he knew about it. He then, you know, said, go talk to his couple of guys there that he used for, I guess, road repair and whatever they did in the park.
And they didn't have a lot of input. Said they had a small source that they used to repair.

Page 28

They indicated to us that the existing road had been built out of all local materials there. Just kind of scooped up from the site and put in place and I assume that was a number of years earlier.
Probably, here again, the little -- less stringent construction activities were imposed on those people when that was constructed. But, you know, the main thing, they just said that, you know, pretty sandy material and didn't have a lot to offer other than that, so --
Q. So let me just clarify a couple of things. You mentioned talking to somebody named Dan. Who is Dan?
A. Dan King.
Q. And who is Dan King?
A. He's the -- kind of their materials manager for -- I actually forget the name of their company. MTI, Materials Testing of --
Q. Oh, MTI.
A. -- Idaho or something like that.
Q. Okay. And who told you that the material was sandy material?
A. That's pretty much what we gleaned from the park people.
Q. So you talked to the park people?

Page 29

A. Yes. The maintenance people. There was two maintenance people there and the park ranger.
Q. Okay.
A. I know none of their names.
Q. Were you aware, at the time, that the park people don't work for Federal Highway?
A. Absolutely. But they're -- to me it was important. They're there every day taking care of that road. I want to know what the materials are and the locality.
Q. Sure. You had mentioned that you had looked at the borrow sources. And can you just tell me what you did? You just sort of walked up to the borrow sources and looked at them?
A. Yeah. We just looked at them. We didn't, you know, take a shovel and dig a hole or anything of that nature. We just looked at it, talked to -- Dan's familiar with the materials in that area, and he just said, well, this looks like it's going to be a sandy-type material.
Q. Okay.
A. We didn't make any more of it. The other part of it was, to -- in my thoughts, they were designated sources. And I felt, you know, probably there had been some investigation or something, and

Page 30

somebody was going to, you know, build the road out of it. I didn't think they were going to, you know, furnish something that was inferior.
Q. Okay. When you say that you -- you felt that there probably had been some investigation. Why did you -- why did you reach that conclusion?
A. I think it's normal for an owner, and an acceptable construction technique for them to do some investigation on their own. Now, whether that's, you know -- you know, attached to the contract or not, is solely up to the owner. I -- you know --
Q. Sure. Before you submitted your bid, did you ask the -- the Federal Highway people if there had been some kind of a geotechnical or -- any kind of investigation of the soils?
A. Yeah. I don't believe I specifically phoned and asked them. There wasn't anything attached to the documents. And there -- I -- I'm not sure now without going back, revisiting the contract, whether they said that -- they made the statement maybe there hadn't been any soil investigation. But, anyway, we didn't specifically --
Q. Okay.

Page 31

A. -- ask the question.
Q. Is -- is there any reason you didn't ask the question?
A. No, no particular reason.
Q. Okay. If you had --
A. I -- well, I'll tell you -- let -- let me reframe that. You know, I looked at the work that was to be done. This is a little backwoods road, very little traffic; this certainly is not an interstate highway. It was originally built out of the local material. They are now widening this road.
We -- we felt this was, what I refer to, as a dumb project. It's a no-brainer to go out there and take some material and add it to this road to get the sufficient width that they wanted, and get it done and in place and relatively fast paced.
And I'm -- made the assumption that the sources that were provided, no skin off of my back, because they're designated specifically in the specials, and they're very adamant about using these sources. I figured, I'm going to rely on these sources.
And, you know, I'd seen that in the past, when the owners had done that. There's always

Page 32

language in the contract that if the sources don't work, to do something about it. Whatever that may be.
Q. I'm sorry. Can you repeat that last sentence?
A. Whatever that may be.
Q. Okay. Let me change the question a little bit. You said a couple minutes ago that when you went to the site and looked at the borrow sources you didn't take a shovel and look at the soil or anything like that. Why -- why didn't you do?
A. We normally never do that.
Q. Why's that?
A. Well, in this particular case, where it's a designated source and I know I've got to use it, it's either going to be good material or bad material.
And, here again, if it's good material, no problem. It goes into the job. If it's bad material, you're going to notify somebody of that and you're going to work it out someway.
Q. Wouldn't -- wouldn't --
A. You're either continuing the source or you're going to get an alternate source.
Q. Sure. Well, let me ask you another

Page 37

changed, are -- do you view those answers as consistent? Both that you assumed that some geotest -- geotechnical investigation had been done? And that the owner said that no geotechnical investigation was done?
A. Well, why don't we back up here --
Q. Sure.
A. -- and go back to those questions and maybe it's best I reanswer it.
Q. Sure. Go ahead.
A. What was the question?
Q. Well, the -- the -- the question that was pen -- well, let me see if I just got your testimony right. You said before, before we took a break, that you assumed that the owner had done some kind of an investigation on the soil. Correct?
A. Yeah. And -- yeah. And I made that statement just based on the fact of the design of the job. I -- I would just assume that some place, somebody would want to find out about what materials were available on the site.
Q. Okay. And so --
A. You know, that's my opinion.
Q. Okay. So is your testimony now that, you assumed that an owner would have done that, but you

Page 38

didn't make the assumption that Federal Highway did that here?
A. No. We -- we didn't know, and we didn't know at what degree they might have done it. We just visited the site and looked at it and said, yeah, looks sandy.
Q. Looks sandy. Okay. Now, since -- okay. So -- so, now, your testimony, that it's your understanding that the owner made no representations? Or -- or did no geotechnical investigation of the soil?
A. I don't believe there was any that I remember.
Q. Okay. So -- now, since there was no geotechnical investigation by the owner, wouldn't that make it prudent to do some of your own investigation?
A. Well, we would be limited as to any investigation we could do.
Q. I see. I see. And what -- what would you be limited to?
A. Well, I -- I think we'd have been limited just about to what we had done.
Q. Okay. And could -- would you have been prohibited from taking a shovel and looking at the

Page 39

soil? As you had mentioned before.
A. I don't think anybody would prohibit you from that.
Q. Okay. And given the absence of the investigation by the owner, what's the reason that you didn't do that?
A. No particular reason.
Q. Okay. Now, at -- at some point, did you -- and I'm talking about before you started work. At some point, did you become concerned about whether the soil at the site would be -- would, in fact, be usable?
A. No. I don't believe we were concerned about it.
Q. Okay.
A. I think we didn't have any concerns. We just knew it was sandy soil.
Q. Okay. Okay. Do you remember attending a preconstruction conference?
A. Yes.
Q. Okay. And did you -- do -- did either you or anybody from Universal express some concerns about the suitability of the soil at the preconstruction conference?
A. I don't believe we expressed concern. We

Page 40

asked a question at the preconstruction conference, if anyone there that attended that meeting knew what we would anticipate finding in those borrow sources.
Q. Okay. What was the answer that you received, if any?
A. The one answer that I can recall is -- the maintenance people attended that. One comment that was made was, what you see is what you get. I don't believe on the Federal Highway side -- I -- it's just my recollection that -- that nobody really knew, because I -- I made the statement at the meeting -- I said, well, it will be what it will be. And if it doesn't work out, there's language in the contract to take care of it.
Q. I see.
A. And that's just about verbatim, I think, of what I said.
Q. I see. And do you recall if -- at the preconstruction meeting, if Universal had some type of U.S. Geological Survey -- survey maps or plans or something?
A. I don't recall.
Q. Okay. Now, at -- you'd mentioned that you had the gentleman from MTI, Materials Testing and Inspection, with you when you went on the site

Page 18

Q Was it your understanding that, first of all, that there were government-designated borrow sources in connection with the Camas project?
**A Yes.**
Q Okay. Was it also your understanding that those borrow sources were mandatory borrow sources?
**A I believe they were identified that way in the contract.**
Q Okay. In other words, the contractor had no choice but to use those borrow sources?
**A If they were mandatory.**
Q Okay. And it was your understanding that they were mandatory, right?
**A Yes.**
Q Okay. In part at least the reason they were mandatory is because of a permit issue. Is that your understanding?
**A Yes.**
Q Okay. What's your understanding of the permit issue that required that those borrow sources be used?
**A The borrow sources when used would create wetlands for mitigation.**
Q I see. Do you know which permit

Page 19

required that?
**A No.**
Q Okay. At the time the plans and specifications went out to bid to contractors, what was your understanding of any investigation that had been done by the government in connection with the mandatory borrow sources?
**A What was the first part of the question? What was my...**
MR. LARKIN: Could you read it back, please.
THE REPORTER: At the time the plans and specifications went out to bid to contractors, what was your understanding of any investigation that had been done by the government in connection with the mandatory borrow sources?
THE WITNESS: What do you mean by my understanding?
BY MR. LARKIN:
Q Well, at the time the plans and specifications went out to bid, did you know of any investigation the government had conducted of the mandatory borrow sources?
**A No.**
Q Okay. As far as you knew, there wasn't

Page 20

any investigation?
**A I don't know if I knew one way or the other.**
Q Okay. Did Mr. Sanders make you aware of any statements that the Wildlife manager, Gerry Deutscher had made concerning those borrow sources?
**A I don't remember.**
Q Are you aware of any alterations or modifications of Section 704.06 of FP-96, and I can show you a copy here, that were made in connection with the Camas project?
**A I would have to look in the contract. I don't remember.**
Q Okay. Certainly if there were modifications, it would be right in the contract. Is that correct?
**A Yes.**
Q Turning back to Exhibit 1, Mr. Sanders -- we're looking at page 2 again.
**A Okay.**
Q States, "Unless the borrow material turns ugly, there will be no waste generated on this project." Do you have an understanding of what Mr. Sanders was referring to when he said,

Page 21

"unless the borrow material turn ugly"?
**A No.**
Q Okay. Has it been your experience in your work for the Federal Highway Administration that if the government designates mandatory borrow sources without conducting a geotechnical investigation, that the government assumes certain risks associated with what is found in the mandatory borrow sources?
**A If the question is do we assume risks, yes.**
Q What are those risks?
**A The FP identifies what the contractor can expect to do with government-provided material.**
Q And how does that translate into a risk?
**A I would have to read the FP.**
Q Okay. Certainly the government would assume the risk that the borrow material doesn't turn out to be what the government expected it to be. Is that correct?
**A Or what the contract -- it depends on what the contract says.**
Q But specifying a mandatory borrow source without conducting a geotechnical investigation,

Page 9

A We are.
Q I'm sorry. You meaning Desert Sage?
A Yes, we are.
Q Which project is that?
A We're working on the Seedskadee, National Wildlife Refuge, S-e-e-d-s-k-a-d-e-e, and that's located over north of Green River, Wyoming.
Q What does that project involve?
A It involved the improvement of three point six miles of Refuge roads by placing crushed gravel mixed with a bentonite material. It involved some stabilization under a test section for testing various sealing materials on the surface of the roadway like, oh, there's sodium sulfonate, there's a couple of epox -- or not epoxies, a couple of -- well, there was six of them. I can't remember all the types right now, but there were six different types of sealers we used. It included signing, bollards for delineation and others -- some kiosk pads, concrete work, and that type of such -- just minor improvements.
Q That contract is not complete yet?
A It's about ninety-nine point nine percent. We have three more kiosk pads to -- or kiosks to install and then it will be a hundred percent finished.
Q Who's the project engineer on that project?
A The project engineer is Randy Everett with the

Page 10

Central Federal Lands.
Q I see. Okay. Since the Camas project that Desert Sage worked on what other Federal Highway Administration projects has Desert Sage performed work on?
A We have not had any other federal highway projects.
Q Okay. Setting aside the Camas project, has Desert Sage ever been asked by a government entity to complete work that another contractor did not complete?
A No.
Q Okay. Desert Sage originally submitted a bid when the procurement first came out for the Camas project, is that correct?
A That is correct.
Q How did you -- how did Desert Sage learn about the Camas project?
A I believe that we seen the announcement in one of the trade magazines and requested plans and specifications for it.
Q Okay. Do you recall whether anybody at Desert Sage, including yourself, contacted anybody at the Refuge related to the project before submitting a bid?
A I guess the term there, be contacted -- we actually went to the site, reviewed the project, and spoke with the Refuge manager, but we did not ask him for a bid

Page 11

tour, or anything of that nature, we just run into him on the site and talked with him.
Q What did you talk about?
A I don't recall the specifics.
Q Okay. Did the Refuge manager say anything about the borrow sources at the site when you were talking to him?
A Well, there were two borrow sources there and they were identified by some signs on site. We may have discussed them with him, I just do not recall, but I know that they were designated by signing on the site.
Q Okay. Do you recall at any time anybody from the Refuge telling you that the Refuge had used borrow material at the site to build a road?
A I do not recall that being discussed.
Q Besides visiting the site and talking to the -- running into the Refuge personnel and talking to the Refuge personnel did Desert Sage do any other due diligence as far as contacting, let's say, representatives from the Federal Highway Administration or anything else other than reviewing the plans and specifications and getting subcontractor quotes?
A I believe we made one inquiry regarding the aggregates that we had to prepare and use on the roadway and it was with someone in their material section, I do not recall who it was, and we inquired about the specification

Page 12

requirements on the aggregates themselves, the hardness and the wear characteristics, and confirmed just exactly what the specifications said. That's the only contact I believe we had with them.
Q Do you recall specifically what you were inquiring about and what the response was?
A I believe our inquiry was about the specification for the sodium sulfate soundness and LA wear, if there was any leeway in those. They were fairly stringent and, if I recall correctly, we were told that the spec was the spec, so that was -- there was no relief offered at that.
Q It basically said follow -- you need to follow the specification as written?
A That is correct.
Q Is there any other due diligence that you can think of that Desert Sage did before it submitted its initial bid?
A Well, we inquired of the State, Idaho Department of Transportation, regarding the available aggregate sources in the area. We actually secured a list of those. We went out and made a field review of all of them. We came back and picked up laboratory data on at least two of those that they gave us, and to make sure that they would actually meet the specification requirements, and utilized that information in preparation of our bid.

Page 82

**me that's how much time they would have to respond.**
Q Okay. We've already talked about the fact that you can't recall who you were talking to when you took these notes. In 2001 who would you typically consult if a claim was made on a project that you were involved with?
**A Who would I typically consult in, on this project or...**
Q No. On any project in 2001 if a claim were to arise.
**A Contracting officer, legal counsel are the primary people.**
Q And the contracting officer would have been Bill Parsons with respect to this project?
**A Yes.**
Q The back of page 2? Back of the next page.
**A Oh, I'm sorry.**
Q Let's go through here. First one says what? "Did I" --
**A "Did 1 proctor in each source."**
Q Okay.
**A Do you want me to keep --**
Q Yeah. Why don't you read through to the

Page 83

line.
**A "Did 1 proctor in each source. Didn't do correct proctor. Started in Borrow Source," number, something. "Went to Borrow Source #1, tried to embank, stopped, said was unsuitable."**
Q Okay. Do you recall who you were getting this information from?
**A I don't remember exactly.**
Q Okay. Go ahead and start reading after the line there.
**A "Todd said not a material problem. Is a proctor" -- can't read it. "Too deep in source." Universal took no -- no, "Universal took more proctors" -- of each source, I'm guessing. "To get things going, modify compaction spec."**
Q Okay. Do you recall Todd Butikofer ever telling you that he authorized Universal Construction to go as deep as they were in the Borrow Source #1?
**A I don't recall.**
Q Okay. Let's go on. It looks like "Elizabeth".
**A Mm-hmm.**
Q "Need USGS maps."
**A Yes.**

Page 84

Q Do you know whether she had those maps?
**A I don't know.**
Q "Didn't have any bidder's question. Didn't know what the refuge said." Okay. Why was it an issue with respect to what the refuge said?
**A I'm assuming, going back to Elizabeth's analysis, she was trying to determine what pre-bid information Universal would have had.**
Q Okay.
**A Because it says depending on the USGS map and what the refuge may have said in her analysis.**
Q Right. Then it could have possibly, one of the elements could have possibly been met? Is that what she was saying?
**A I don't know that without going through it and don't know if it would be right even if that's what she would have said.**
Q Okay. Do you know what determination was made with respect to what the refuge said to Universal. Did somebody look into what the refuge said to Universal?
**A I don't know.**
Q Okay. The next word is claim. Is that just a reference to the fact that Universal had

Page 85

made a claim?
**A I don't know.**
Q Okay. On the right-hand side it's, "15, 16, 17, 18 spent running proctors." What does that mean?
**A They appear to be dates, but I don't know for sure.**
Q Okay. And since -- well, strike that.
**A They appear to be dates in October.**
Q Okay. The next section is under Work. Can you read what it says there?
**A "Work - 1, 25 loads gravel, only on new road and new parking lot. Haven't completed any of closure 1. Usually have one operator working, sometimes two."**
Q And in the right-hand side there's a notation, "Can get bridge and parking lot done by December 11." Do you see that?
**A Yes.**
Q Is that in reference to Universal?
**A Yes. I don't know if it's a question or a statement.**
Q Okay. The bottom notation, can you read that starting with the word March?
**A "March, water in wetland, borrow sources**

Page 86

**will be under water, widening and fill areas will be under water."**
Q And why was that an issue?
**A I believe because the project couldn't be, the fills couldn't be built during this time period.**
Q So, in other words, the fills had to be built during the late summer, early fall time period?
**A It would be when they're not under water.**
Q What's your understanding about the wintertime conditions out at the project site in Camas?
**A Cold.**
Q Snowy?
**A I think so.**
Q Was that a consideration in setting the project, the original project schedule?
**A You'd have to ask the designer. I don't know.**
Q Okay. What was the volume of traffic like at the project site?
**A The plans would say what the average daily traffic.**

Page 87

**Average daily traffic was seven.**
Q How would you characterize that? Is that light traffic, extremely light, or heavy traffic?
**A Light.**
Q Okay. So was traffic control a major issue in connection with this Camas project?
**A What do you mean by "major issue"?**
Q Well, I anticipate with -- you have some projects that have a heavy traffic pattern of going through the project site.
**A Yes.**
Q Is that correct?
**A Yes.**
Q And I would assume that traffic control is more important in those types of projects than they would be in a Camas refuge type project. Is that correct?
**A The volume of traffic is higher on some projects, but the traffic control itself is always a major issue.**
Q Okay. So you would say that traffic control was a major issue in connection with this Camas project?
**A I would say on any project traffic**

Page 88

**control, traffic and safety is a major issue.**
Q Okay.
Do you want to take a break for lunch?
MR. O'CONNELL: Sure.
(A lunch recess is taken.)
BY MR. LARKIN:
Q I recall earlier today we saw some documents where Mr. Butikofer told you, and correct me if I'm wrong, but he told you that in his opinion Universal had a proctor problem, not a materials problem. Do you recall those, when we were looking at those documents?
**A I don't remember if it was on the notes.**
Q If you can look back at Exhibit 13, on the back of the second page.
**A Oh, "is a proctor". But I didn't know what else it said.**
Q Right.
**A "Is a proctor" something.**
Q Do you have, do you know how many proctors Universal was required to take under the terms of the contract?
**A I don't know if the contract specified the number.**
Q Do you want to take a quick look?

Page 89

**A The contract says one per soil type.**
Q And what are you looking at?
**A Table 204.1 on page F-4.**
Q Okay. So under your interpretation, for each soil type that Universal encountered they would have to do a proctor?
**A That's what it says.**
**(Exhibit No. 14 is marked for identification.**
**BY MR. LARKIN:**
Q Do you recognize Exhibit 14?
**A Yes, I do.**
Q What is this?
**A Appears to be a schedule comparison.**
Q Okay. There's some typewritten information. Did you put the typewritten information in this document?
**A I think so, yes.**
Q Okay. And what were you trying to analyze? Maybe you can just walk us through this document and tell us what it means.
**A The first two tables appear to be just cut out of the contract, just summary of quantities.**
Q Okay.

| ID | Description | Dur | Comp | Start | Finish | Float | Float |
|---|---|---|---|---|---|---|---|
| **General Area** | | | | | | | |
| A0010 | GN- Award of Contract | 0 | 0 | 21AUG01 | | 5 | 0 |
| A0060 | GN-Dvlop & Submit Preliminary Construction Sched | 7 | 0 | 21AUG01 | 27AUG01 | 5 | 0 |
| A0050 | GN- Pre Construction Conference | 1 | 0 | 05SEP01 | 05SEP01 | 5 | 0 |
| A0190 | GN- Mobilize to Project Site | 7 | 0 | 06SEP01* | 14SEP01 | 0 | 0 |
| A0070 | GN- Review & Approve Preliminary Schedule | 7 | 0 | 06SEP01 | 12SEP01 | 5 | 4 |
| A0030 | GN- Contract Time (cal days) | 93* | 0 | 10SEP01 | 11DEC01 | 0 | 0 |
| A0460 | GN- Contractor Time (work days) | 65* | 0 | 10SEP01 | 11DEC01 | 0 | 0 |
| A0200 | GN- Initial Survey & Layout Staking | 2 | 0 | 10SEP01 | 11SEP01 | 5 | 0 |
| A0040 | GN- Notice to Proceed | 0 | 0 | 10SEP01* | | 7 | 0 |
| A0220 | GN- Establish & Execute Quality Control | 40 | 0 | 10SEP01 | 02NOV01 | 21 | 20 |
| A0080 | GN- Develop & Submit Construction Schedule | 15 | 0 | 10SEP01 | 24SEP01 | 64 | 0 |
| A0240 | GN- Dust Control Watering | 40 | 0 | 17SEP01 | 09NOV01 | 16 | 16 |
| A0090 | GN- Review & Approve Construction Schedule | 14 | 0 | 25SEP01 | 08OCT01 | 64 | 0 |
| A0100 | GN- Construction Schedule Complete | 0 | 0 | | 08OCT01 | 44 | 44 |
| A0550 | GN- Final Cleanup | 2 | 0 | 05DEC01 | 06DEC01 | 1 | 1 |
| A0120 | GN- Install Permanent Signage | 2 | 0 | 06DEC01 | 07DEC01 | 0 | 0 |
| A0560 | GN- Final Punch List | 2 | 0 | 10DEC01 | 11DEC01 | 0 | 0 |
| A0020 | GN- Completion of Project | 0 | 0 | | 11DEC01* | 0 | 0 |
| **Parking Lot & Entrance** | | | | | | | |
| A0450 | PK-Develop & Submit Concr, Asphalt & Misc Design | 2 | 0 | 21AUG01 | 22AUG01 | 83 | 7 |
| A0480 | PK- Review & Approve Asphalt & Misc Designs | 21 | 0 | 30AUG01 | 19SEP01 | 56 | 13 |
| A0607 | PK- Clear & Grub Parking Lot & Entrance | 1 | 0 | 17SEP01 | 17SEP01 | 46 | 0 |
| A0617 | PK- Place & Compact Fill Parking Lot & Entrance | 2 | 0 | 18SEP01 | 19SEP01 | 46 | 0 |
| A0627 | PK- Place Topsoil Around Edges Parking Lot & Ent | 1 | 0 | 20SEP01 | 20SEP01 | 46 | 6 |




RECEIVED
AUG 30 2001
BY PROJECT ENGINEER
Rejected 9/11/01

Date 10-21-04 Exhibit # 3
Universal Construction ...
Deponent Standerfer
Reporter MARTA RICE
Naegeli Reporting Corporation
(800) 528-3335 FAX (503) 227-7123

| | |
|---|---|
| Start Date | 21AUG01 |
| Finish Date | 11DEC01 |
| Data Date | 21AUG01 |
| Run Date | 29AUG01 01:29 |

© Primavera Systems, Inc.

Early Bar
Progress Bar
Critical Activity

D002

Sheet 1 of 5

**Universal Construction for USDOT-FHA**
**Camas NWR Complex Proj RRP-CAMA 101**
**Area & Early Start**
**Narrative Included**

Preliminary Construction Schedule

| Date | Revision | Checked | Approved |
|---|---|---|---|
| | | | |

K. Standerfer Ex. 3

| ID | Description | Dur | Comp | Start | Finish | Float | Float |
|---|---|---|---|---|---|---|---|
| A0847 | PK- Haul & Place Subbase Course H Prkg Lot & Ent | 2 | 0 | 01OCT01 | 02OCT01 | 40 | 0 |
| A0657 | PK- Haul & Place Base Course Roadway Ag Method 1 | 2 | 0 | 03OCT01 | 04OCT01 | 40 | 0 |
| A0580 | PK- Pave Parking Lot & Entrance | 1 | 0 | 05OCT01 | 05OCT01 | 40 | 0 |
| A0380 | PK- Install Pavement Markings | 1 | 0 | 08OCT01 | 08OCT01 | 40 | 40 |
| A0330 | PK- Install Precast Concr Wheelstops in Prkg Lot | 1 | 0 | 08OCT01 | 08OCT01 | 42 | 42 |
| **Borrow Pit** | | | | | | | |
| A0370 | BW- Develop Borrow Area 1 | 2 | 0 | 17SEP01 | 18SEP01 | 21 | 0 |
| A0380 | BW- Initially Crush Grading Course H Material | 10 | 0 | 17SEP01 | 28SEP01 | 17 | 0 |
| A0590 | BW- Develop Borrow Area 2 | 2 | 0 | 19SEP01 | 20SEP01 | 21 | 21 |
| A0570 | BW- Complete Crushg Grading Course H & Meth 1 Ma | 10 | 0 | 01OCT01 | 12OCT01 | 17 | 17 |
| **Bridge** | | | | | | | |
| A0530 | BR-Develop & Submit Concr, Asphalt & Misc Design | 7 | 0 | 21AUG01 | 25AUG01 | 28 | 0 |
| A0420 | BR- Develop & Submit Timber Details | 7 | 0 | 21AUG01 | 27AUG01 | 38 | 0 |
| A0390 | BR- Devlp & Subm Structural Steel & Reinf Detail | 7 | 0 | 21AUG01 | 27AUG01 | 42 | 0 |
| A0430 | BR- Review & Approve Timber Details | 30 | 0 | 28AUG01 | 28SEP01 | 38 | 0 |
| A0400 | BR- Review & Approve Structural Steel & Reinf | 30 | 0 | 28AUG01 | 28SEP01 | 42 | 0 |
| A0540 | BR- Review & Approve Concrete Mix Designs | 36 | 0 | 30AUG01 | 04OCT01 | 41 | 0 |
| A0310 | BR- Install Construction Signage | 1 | 0 | 12SEP01 | 12SEP01 | 43 | 2 |
| A0130 | BR- Structural Excavate for Bridge Abutments | 1 | 0 | 17SEP01 | 17SEP01 | 41 | 0 |
| A0470 | BR- Saw Cut & Remove Existing Center Piers | 1 | 0 | 18SEP01 | 18SEP01 | 41 | 12 |
| A0490 | BR-Saw Cut & Remove Existing Abutments to Design | 1 | 0 | 18SEP01 | 18SEP01 | 41 | 12 |
| A0440 | BR- Fabricate & Deliver Treated Timber | 30 | 0 | 27SEP01 | 28OCT01 | 38 | 2 |
| A0410 | BR- Fabricate & Deliver Structural Steel | 21 | 0 | 27SEP01 | 17OCT01 | 42 | 1 |
| A0140 | BR- Form, Reinf & Pour New Bridge Abutments | 3 | 0 | 05OCT01 | 09OCT01 | 29 | 0 |
| A0150 | BR- Cure Bridge Abutments | 7 | 0 | 10OCT01 | 16OCT01 | 41 | 0 |

Chart timescale: AUG 13, 20, 27 · SEP 3, 10, 17, 24 · OCT 1, 8, 15, 22, 29 · NOV 5, 12, 19, 26 · DEC 3, 10, 17, 24, 31 · JAN 7

Chart notes:

- PK- Haul & Place Subbase Course H Prkg Lot & Ent: 150 mm thick; 6ea 15mt Trucks, 130 G motor grader, 84" Dynapak Roller, Water Truck; 2.5 loads per hr per truck - 20 loads per day/tk; Allow for watering, compacting & final shaping; 1300 mt per day plus 1 day final shaping; 1100 mt total volume
- PK- Haul & Place Base Course Roadway Ag Method 1: 1100 mt Placed with 1 day for final shaping & Bluetopping
- PK- Pave Parking Lot & Entrance: 450 mt Minor Hot Asphalt Concr
- PK- Install Pavement Markings: Pavement Markings - yellow, white & handicap
- PK- Install Precast Concr Wheelstops in Prkg Lot
- BW- Develop Borrow Area 1: Stockpile Topsoil at; John Deere 892 Excavator; 544 Front End Loader
- BW- Initially Crush Grading Course H Material: Use Jefferson County Pit; Equipment: Cedar Rapids 45" Cone with 6x20 Screen/Deck, Feeder, 50' Product Conveyor, 550 kw Generator Set with Switchgear; Estimated Production = 200 tph; Cat 995 Front End Loader; Fiat-Allis 21B Dozer
- BW- Develop Borrow Area 2: John Deere 892 Excavator; 544 Front End Loader
- BW- Complete Crushg Grading Course H & Meth 1 Ma

RECEIVED AUG 30 2001 BY PROJECT ENGINEER

| | | | |
|---|---|---|---|
| Start Date | 21AUG01 | Early Bar | D002 |
| Finish Date | 11DEC01 | Progress Bar | |
| Data Date | 21AUG01 | Critical Activity | |
| Run Date | 29AUG01 01:29 | | |

© Primavera Systems, Inc.

Sheet 2 of 5

**Universal Construction for USDOT-FHA**
**Camas NWR Complex Proj RRP-CAMA 101**
**Area & Early Start**
**Narrative Included**

Preliminary Construction Schedule

| Date | Revision | Checked | Approved |
|---|---|---|---|

| Activity ID | Activity Description | Orig Dur | % Comp | Early Start | Early Finish | Float | Float | Chart notes (AUG 13 – JAN 7) |
|---|---|---|---|---|---|---|---|---|
| A0280 | BR- Backfill & Compact Bridge Abutments | 2 | 0 | 17OCT01 | 18OCT01 | 27 | 0 | BR- Backfill & Compact Bridge Abutments |
| A0160 | BR- Install Steel Bridge Girders & Bearing Pads | 3 | 0 | 19OCT01 | 23OCT01 | 27 | 3 | BR- Install Steel Bridge Girders & Bearing Pads |
| A0170 | BR- Install GluLam Timber Bridge Deck | 3 | 0 | 29OCT01 | 31OCT01 | 24 | 0 | BR- Install GluLam Timber Bridge Deck |
| A0180 | BR- Install Treated Bridge Siderail Curb | 1 | 0 | 01NOV01 | 01NOV01 | 24 | 24 | BR- Install Treated Bridge Siderail Curb |
| **Closure 1 Road (3773 m)** | | | | | | | | |
| A0500 | C1- Construction Traffic Signing | 1 | 0 | 17SEP01 | 17SEP01 | 0 | 0 | C1- Construction Traffic Signing<br>Road Work Ahead, End Road Work & Road Closed<br>Pickup truck & rubber tired backhoe. |
| A0520 | C1- Total Closure Time (cal days) | 25* | 0 | 17SEP01 | 11OCT01 | 0 | 0 | C1- Total Closure Time (cal days) |
| A0810 | C1- Install Silt Fence | 1 | 0 | 18SEP01 | 18SEP01 | 0 | 0 | C1- Install Silt Fence<br>173 m in 3 locations<br>Drive posts with support mesh and geotextile type V-A attached. Place bottom of textile in 150mm x 150mm trench along base.<br>Backfill & compact trench to secure fabric.<br>Use a pickup, handtools & a crew of 3. |
| A0800 | C1- Clear & Grub | 2 | 0 | 19SEP01 | 20SEP01 | 0 | 0 | C1- Clear & Grub<br>13 locations<br>660 m per day<br>John Deere 892 Excavator, 2 12cy dump trucks<br>1318 m long widened areas |
| A0260 | C1- Place & Compact Fill to Widen Existing Road | 4 | 0 | 21SEP01 | 28SEP01 | 0 | 0 | C1- Place & Compact Fill to Widen Existing Road<br>13 locations - 1318 m Widening - 1318 cm<br>John Deere 892 2 buckets 1 to 3 CY<br>John Deere 590 Compactor<br>11 cm per truck load<br>350 cm per day<br>7 Turnouts T1 thru T7 & 3 Interpretive Pullouts (E1 thru E3)<br>2 Trucks |
| A0510 | C1- Place Topsoil | 2 | 0 | 27SEP01 | 28SEP01 | 0 | 0 | C1- Place Topsoil<br>1/3 cm per m estimated topsoil placement<br>3.46 cm per m at depth of 75mm<br>estimate .5 cm per m for 381 cm<br>381 cm total volume |
| A0270 | C1- Linear Grade Existing Road | 2 | 0 | 01OCT01 | 02OCT01 | 0 | 0 | C1- Linear Grade Existing Road<br>3673 m long - 3.673 km<br>Cat 130 G road grader<br>Non-widened areas to be stripped and moved to 7 turnouts, 3 pullouts, 13 normal widening<br>300 mm thick upper widened areas<br>3.673 km |
| A0290 | C1- Haul & Place Road Surface Course H | 7 | 0 | 03OCT01 | 11OCT01 | 0 | 0 | C1- Haul & Place Road Surface Course H<br>150 mm thick by 4.2m plus turnouts and pullouts<br>See 15mt Trucks, 130 G motor grader, 84" Dynapak Roller, Water Truck<br>2.5 loads per hr per truck - 20 loads per day/tk<br>Allow for watering, compacting & final shaping<br>1500 mt per day plus 2 days contingency<br>6791 mt total volume |
| **Closure 2 Road (5600 m)** | | | | | | | | |
| A0503 | C2- Construction Traffic Signing | 1 | 0 | 12OCT01 | 12OCT01 | 0 | 0 | C2- Construction Traffic Signing<br>Road Work Ahead, End Road Work & Road Closed<br>Pickup truck & rubber tired backhoe. |
| A0513 | C2- Total Closure Time (cal days) | 40* | 0 | 12OCT01 | 20NOV01 | 0 | 0 | C2- Total Closure Time (cal days) |

RECEIVED AUG 30 2001 PROJECT ENGINEER

| | | | |
|---|---|---|---|
| Start Date | 21AUG01 | Early Bar | P002 |
| Finish Date | 11DEC01 | Progress Bar | |
| Data Date | 21AUG01 | Critical Activity | |
| Run Date | 29AUG01 01:29 | | |

Sheet 3 of 5

**Universal Construction for USDOT-FHA**
**Camas NWR Complex Proj RRP-CAMA 101**
**Area & Early Start**
**Narrative Included**

Preliminary Construction Schedule

| Date | Revision | Checked | Approved |
|---|---|---|---|

© Primavera Systems, Inc.

| ID | Description | Dur | Comp | Start | Finish | Float | Float | Notes |
|---|---|---|---|---|---|---|---|---|
| A0523 | C2- Install Silt Fence | 2 | 0 | 15OCT01 | 16OCT01 | 0 | 0 | 248 m in 7 locations. Drive posts with support mesh and geotextile type V-A attached. Place bottom of textile in 150mm x 150mm trench along base. Backfill & compact trench to secure fabric. Use a pickup, handtools & a crew of 3. — C2- Install Silt Fence |
| A0533 | C2- Clear & Grub | 3 | 0 | 17OCT01 | 19OCT01 | 0 | 0 | 15 locations. 900 m per day. John Deere 892 Excavator, 3 12cy dump trucks. 2798 m long widened areas — C2- Clear & Grub |
| A0543 | C2- Place & Compact Fill to Widen Existing Road | 6 | 0 | 22OCT01 | 29OCT01 | 0 | 0 | 15 locations - 2798 m Widening - 2612 cm. John Deere 892 2 buckets 1 to 3 CY. John Deere 590 Compactor. 11 cm per truck load. 435 cm per day. 8 Turnouts T8 thru T1 & 4 Interpretive Pullouts (E5 thru E8). 3 Trucks — C2- Place & Compact Fill to Widen Existing Road |
| A0553 | C2- Place Topsoil | 3 | 0 | 30OCT01 | 01NOV01 | 0 | 0 | 1/3 cm per m estimated topsoil placement. 3.46 sm per m at depth of 75mm. estimate .8 cm per m for 822 cm — C2- Place Topsoil |
| A0563 | C2- Linear Grade Existing Road | 3 | 0 | 02NOV01 | 05NOV01 | 0 | 0 | 5000 m long - 5.0 km. Cat 130 G road grader. Non-widened areas to be stripped and moved to 8 turnouts, 4 pullouts, 15 normal widening. 300 mm thick upper widened areas. [illegible] — C2- Linear Grade Existing Road |
| A0573 | C2- Haul & Place Road Surface Course H | 10 | 0 | 07NOV01 | 20NOV01 | 0 | 0 | 150 mm thick by 4.2m plus turnouts and pullouts. See 15mt Trucks, 130 G motor grader, 84"Dynapak Roller, Water Truck. 2.5 loads per hr per truck - 20 loads per day. Allow for watering, compacting & final shaping. 1200 ml per day plus 2 days contingency. 9245 ml total volume — C2- Haul & Place Road Surface Co[urse] |
| **Closure 3 Road (1360 m)** | | | | | | | | |
| A0506 | C3- Construction Traffic Signing | 1 | 0 | 21NOV01 | 21NOV01 | 0 | 0 | Road Work Ahead, End Road Work & Road Closed. Pickuptruck & rubber tired backhoe. — C3- Construction |
| A0516 | C3- Total Closure Time (cal days) | 15* | 0 | 21NOV01 | 05DEC01 | 0 | 0 | C3- Total Closure Time (cal days) |
| A0536 | C3- Clear & Grub | 2 | 0 | 26NOV01 | 27NOV01 | 0 | 0 | 3 locations. 900 m per day. John Deere 892 Excavator, 2 12cy dump trucks. 72 m long widened areas — C3- Clear & G[rub] |
| A0546 | C3- Place & Compact Fill to Widen Existing Road | 1 | 0 | 28NOV01 | 28NOV01 | 0 | 0 | 3 locations - 72 m Widening - 70 cm. John Deere 892 2 buckets 1 to 3 CY. John Deere 590 Compactor. 11 cm per truck load. 350 cm per day. 2 Turnouts T16 - T17 & 1 Interpretive Pullout (E9) — C3- Place & C[ompact] |
| A0556 | C3- Place Topsoil | 1 | 0 | 28NOV01 | 28NOV01 | 0 | 0 | 1/3 cm per m estimated topsoil placement. 3.46 sm per m at depth of 75mm. estimate .6 cm per m for 503 cm — C3- Place T[opsoil] |
| A0586 | C3- Linear Grade Existing Road | 1 | 0 | 29NOV01 | 29NOV01 | 0 | 0 | 1360 m long - 1.36 km. Cat 130 G road grader. Non-widened areas to be stripped and moved to widened areas. 300 mm thick upper widened areas — C3- Linea[r] |

Timeline: [illegible] 13 20 27 3 10 17 24 1 8 15 22 29 5 12 19 26 3 10 17 24 31 7

RECEIVED AUG 30 2001 BY PROJECT ENGINEER

| | | |
|---|---|---|
| Start Date | 21AUG01 | Early Bar |
| Finish Date | 11DEC01 | Progress Bar |
| Data Date | 21AUG01 | Critical Activity |
| Run Date | 29AUG01 01:29 | |

0002 Sheet 4 of 5

**Universal Construction for USDOT-FHA**
**Camas NWR Complex Proj RRP-CAMA 101**
**Area & Early Start**
**Narrative Included**

Preliminary Construction Schedule

| Date | Revision | Checked | Approved |
|---|---|---|---|

© Primavera Systems, Inc.

| Activity ID | Activity Description | Orig Dur | % Comp | Early Start | Early Finish | Total Float | Free Float |
|---|---|---|---|---|---|---|---|
| A0576 | C3- Haul & Place Road Surface Course H | 3 | 0 | 30NOV01 | 04DEC01 | 0 | 0 |
| A0586 | C3- Gather & Demob Construction Traffic Signing | 1 | 0 | 05DEC01 | 05DEC01 | 0 | 0 |

2001: AUG 13, 20, 27 | SEP 3, 10, 17, 24 | OCT 1, 8, 15, 22, 29 | NOV 5, 12, 19, 26 | DEC 3, 10, 17, 24, 31 | 2002 JAN 7

C3- H

150mm thick by 4.2m plus turnouts and pullouts
4ea 15mt Trucks, 130 G motor grader, 84" Dynapak Roller, Water Truck
2.5 loads per hr per truck - 20 loads per day
Allow for watering, compacting & final shaping
1260 mt per day plus 1 day contingency
2515 mt total volume

C3- Gather & Demob Construction Traffic Si

RECEIVED
AUG 30 2001
BY PROJECT ENGINEER

| | |
|---|---|
| Start Date | 21AUG01 |
| Finish Date | 11DEC01 |
| Data Date | 21AUG01 |
| Run Date | 29AUG01 01:29 |

Early Bar
Progress Bar
Critical Activity

© Primavera Systems, Inc.

C002

Sheet 5 of 5

**Universal Construction for USDOT-FHA**
**Camas NWR Complex Proj RRP-CAMA 101**
**Area & Early Start**
**Narrative Included**

Preliminary Construction Schedule

| Date | Revision | Checked | Approved |
|---|---|---|---|
| | | | |