U. S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
WESTERN FEDERAL LANDS HIGHWAY DIVISION
P.O. Box 268
Roberts, Idaho 83444

September 17, 2001 UCI-006

Dick Standerfer, President
Universal Construction, Inc.
P.O. Box 187
Emmett, Idaho 83617

Subject: Revised Quality Control Plan

DTFH70-01-C-00034
Camas NWR Complex
ID RRP-CAMA 101(1)

Mr. Standerfer,

FHWA is in receipt of your revised Quality Control Plan, and it is rejected as submitted. **SECTION 153. – CONTRACTOR QUALITY** CONTROL requires you to have a Quality Control Plan for all phases of inspection; sampling and testing performed **both** onsite and offsite to ensure that work conforms to the contract requirements. As listed in letter UCI-002, dated September 11, 2001, this plan also lacks required information. The deficiencies are as follows:

1. Subsection **153.03 Quality Control Plan, (a) Personal Qualifications, (1).** Document the name, authority, relevant experience, and qualifications of the person with overall responsibility for the system. The requirements for the alternative will be the same as the designated manager.
2. Subsection **153.03 Quality Control Plan, (a) Personal Qualifications, (2).** Document the names and relevant experience of **all** other personnel involved in the system. **(i.e. Surveyors, Testers, and any involved office personnel)**
3. Subsection **153.03 Quality Control Plan, (b) Inspection/control procedures.** List the name and authority of personnel directly responsible for each phase of work.
4. Subsection **153.03 Quality Control Plan, (b) Inspection/control procedures,** second paragraph. Address <u>**HOW**</u> each of the following will be accomplished: **(1) Preparatory phase,** (a) thru (e), **(2) Start-up phase,** (a) thru (c), **(3) Production phase,** (a) thru (d). This subsection of the contract **does not** ask for the requirements to be reiterated back in the plan, but it requires you to show **how** the requirements of this subsection will be met in your plan.
5. Subsection **153.03 Quality Control Plan,** second paragraph. Explain how and who will be giving the required notification at least 48-hours in advance of beginning the start-up phase of all items of work.
6. Subsection **153.03 Quality Control Plan,** third paragraph. Include the work of all subcontractors in the quality control plan.

Date 10-21-04 Exhibit # 9
Case Universal Construction v. USA
Deponent Standerfer
Reporter MARTA RICE
Naegeli Reporting Corporation

7. Special consideration should be given to the required submittals for this contract, which fall into the Preparatory phase. Who will be going over them to assure they are correct before being submitted to FHWA for acceptance.
8. FHWA requires that all testing documentation is an original, done in ink, and supplied to the FHWA within the allowed reporting times of each item of work. Facsimiles and copies are not accepted.
9. FHWA requires that if materials are being produced, or placed on the roadway and acceptance is in place on the road, that a qualified testing person is present to obtain and run samples. Reporting times start when the sample is obtained at the point of acceptance. Prior notification of sample times or weights will not be given to the contractor or any of their representatives.

I am also enclosing an example copy of a quality control plan for your reference. Submission and acceptance of the Quality Control Plan is required before work will be allowed to start on this project

Please contact me if you have any questions.

Sincerely,

Todd Butikofer,
Project Engineer

cc: Jane Traffalis, COE
Mark Standerfer, Universal
files

# EXAMPLE OF QUALITY CONTROL PLAN

TOTEM CONSTRUCTION, INC.
P.O. Box 549
Rapid City, OR 97701

March 9, 1999

Federal Highway Administration
P.O. Box 8456
Boise, ID 87503

**ID PFH 55-2(3),RED BRANCH ROAD**
**DTFH70-99-C-000112**
**QUALITY CONTROL PLAN**

The following items comprise our Quality Control Plan (QCP) in accordance with Subsection 153.03 of the Contract.

1) All work will be performed in accordance with the contract requirements. Totem Construction, Inc. (TCI) will maintain an inspection system which assures compliance with these contract requirements. Any indication of system deficiencies, whether discovered as a result of Government or TCI checks or tests, will result in modifications to the system to correct these deficiencies.

.) This QCP does not endeavor to repeat or summarize contract requirements. It describes the process which TCI will use to assure compliance with those requirements. The QCP, documents broad categories of work in accordance with Subsection 153.03. Necessary details dealing with minor items, not included in the QCP, will be addressed informally between the Contractor Quality Control Manager (CQCM) and the Project Engineer (PE) as the work progresses and will be documented in writing on the Quality Control Report. The level of Quality Control (QC) accountability and control exercised by TCI on these items will be consistent with the details of the plan.

3) Ned Dixon will have the overall responsibility for quality control on the project and will be the CQC Manager. Mr Dixon has had similar positions and responsibilities on other Federal, State and County Projects. He is a NICET Level IV Construction Technician and is certified by Idaho Transportation Department (ITD) as a CQC Manager. He will be responsible for overseeing day-to-day construction operations from a QC standpoint. He will assure that all required tests and documentation are completed and that the results are furnished to the Government in the time frame required. Mr. Dixon is empowered to suspend any operation which he deems to be in noncompliance with the contract, and/or order corrective measures to assure compliance. Mr. Dixon will complete both the Construction Operations and the Quality Control reports in accordance with Subsection 153.05.

4) Nick Bates, TCI Project Engineer, has performed the duties of Quality Control Technician (QCT) for TCI the last three years and is designated as the alternate CQC Manager for this project in the absence of Mr. Dixon. He will report directly to Mr. Dixon. Mr. Bates is also a NICET Level IV Technician and tified by ITD and Nevada DOT as a QCT. Mr. Dixon is empowered to suspend any operation which he eems to be in noncompliance with the contract, and/or order corrective measures to assure compliance.

Materials Testing Technician (MTT), Mr. Bill Knox is certified by ITD and will perform all the required Aggregate Sampling and Testing.

All asphalt work, with the exception of aggregate production, will be performed by Miller Paving of Council, Idaho. Miller Paving's lab is certified by ITD. Bob Miller is the Lab Supervisor. He has NICET Level IV and ITD certification.

Miller Paving's QC/Mix Design Technician will be Clarence Sole. Mr. Sole has been in this field for the last 10 years and is certified as Asphalt Technician in Idaho and Oregon. Mr. Sole will be the contact for any technical discussions during the mix design approval process.

5) As the number of operations, or their dispersion on the project, starts to overextend Mr. Dixon, Quality Control responsibilities will be specifically assigned to TCI's supervisory personnel responsible for specific operations, or an assistant will be provided. In either case, the standards of application of the QCP will be the same. The names, experience and qualifications of any personnel assuming QCP responsibilities will be provided to the Government in advance.

6) TCI has an experienced and highly professional staff that has had the responsibilities entailed by the QC requirements. We therefore do not anticipate any personnel or training problems in complying with these requirements. If any such problems occur, TCI will take appropriate actions to correct them including retraining, providing additional supervision and or personnel, or removal of inadequate personnel.

7) <u>Grading/Subgrade</u> - Mr. Dixon will be responsible for the QC in the Preparatory and Startup Phases. The Grading Foreman will be responsible for the QC in the Production Phase. Both Mr. Dixon and the Grading Foreman have the authority to stop work and order corrective action.

Preparatory Phase -

Ned Dixon will review the Erosion Control Plan and requirements with the PE at least two weeks before the clearing operation starts.

Mr. Dixon will verify that slope stakes and clearing limits are properly set.

Mr. Dixon will review the slope limits and clearing limits with the PE and Grading Foreman.

Startup Phase -

TCI, Inc. personnel will install Erosion Control Devices as required.

Mr. Dixon will obtain materials for Moisture-Density Curves as soon as roadway cuts are opened up. Split samples will be provided to the PE. Completed Moisture-Density Curves and worksheets will be submitted to the PE within 48 hours.

The Grading Foreman's name will be provided to the PE prior to the start of Roadway excavation.

Mr. Dixon will review lift thickness and other contract requirements with the Grading Foreman, including the different requirements for rock versus common embankment construction.

Mr. Dixon will review the acceptable finishing standards and tolerances with the Grading Foreman and the PE.

Production Phase -

The Grading Foreman will be responsible for the continuous monitoring of the QC.
Mr. Dixon will periodically monitor the work and perform density tests every 2,500 $m^2$ for common material embankments and advise the Grading Foreman of the results.
Failing tests will be followed by appropriate corrective actions such as re-working, re-compacting and re-testing. If the rate of initial failing tests exceeds one out of five, Mr. Dixon and the Grading Foreman will meet to determine what corrective action is required. Corrective actions and the resolution of the problems related to the failed densities for the embankment construction process will be documented on the QC Report.
Mr. Dixon will plot the test results on control charts daily. The control chart will be located in the TCI project lab.
Mr. Dixon will review any potential subgrade finishing material problems with the Grading Foreman.
Mr. Dixon will perform subgrade acceptance density tests at the required frequency, to assure density requirements are being met. Density tests will be documented in tabular form on the QC Report showing date, time, location, offset, depth of lift and relative position below grade and test result.
Mr. Dixon will verify the quality of the work of each segment prior to requesting acceptance from the PE.

8) **Drainage** - Mr. Dixon will be responsible for the QC in the Preparatory and Startup Phases. The Pipe Foreman will be responsible for the QC in the Production Phase. Both Mr. Dixon and the Pipe Foreman have the authority to stop work and order corrective action.

Preparatory Phase -

The Pipe Foreman will be identified to the PE prior to start of the culvert installation work.
Mr. Dixon will review the culvert stakeout notes and design prior to submittal to the PE for approval.
Mr. Dixon will inspect the culvert material delivered to the project and obtain the required certifications.
Mr. Dixon will review the stakeout notes, design, construction requirements and bedding and backfill material acceptability at each site with the Pipe Foreman prior to culvert placement operations.
Mr. Dixon will identify a source and provide appropriate test results of suitable backfill material that could be used if the material at the site is unsuitable.

Startup Phase -

Mr. Dixon will work with the Pipe Foreman during the first installation to verify layout procedures, bedding preparation and assembly.
Mr. Dixon will review the proctor data, backfill requirements, maximum lift thickness and density monitoring procedures with the Pipe Foreman.

Production Phase -

The Pipe Foreman will be responsible for all QC during culvert installations.
Mr. Dixon will be on site to verify the density tests required by the contract. The record of the density tests will be submitted to the PE with the QC Report.

9) Base Course/s - Mr. Dixon will be responsible for the QC in the Preparatory, Startup and Production Phases. Mr. Dixon has the authority to stop work and order corrective action.

Preparatory Phase -

The Base Course Aggregates will be produced from the source made available in the contract.

Mr. Dixon will coordinate with the Base Course Foreman and the Survey Crew as to how each course will be staked, controlled and finished

Mr. Dixon will review the required sampling frequencies with the Crushing Foreman.

Mr. Dixon will review the required tests, control charts and testing frequencies with Mr. Knox.

Mr. Dixon will develop the aggregate spread rates for the Base Course Foreman.

Startup Phase -

Mr. Knox will perform process control testing at the required frequencies, but not less than one per shift, and plot the results on the control chart.

Mr. Dixon will monitor the process control sampling and testing and control charts. Process control test results will be submitted with the QC Report. Split samples will be made available to the PE.

Mr. Dixon will document any corrective actions required during the production of the aggregates and submit these documents to the PE with the QC Report.

Mr. Dixon will review the acceptable standards and tolerances for setting the control hubs for each course with the Base Course Foreman, the Survey Crew and the PE.

Mr. Dixon will review the contract requirements for weighing, delivery, dumping, spreading, and compaction with the Base Course Foreman and the PE.

Mr. Dixon will assure that scales have been calibrated and the certification is submitted to the PE with the QC Report.

Mr. Dixon will submit the sample of aggregates, including Target Values, to be used to determine the Humphres Curve to the PE twenty days prior to the placement of each course.

Mr. Dixon will assure the pugmill is properly calibrated to provide an unsegregated material at the optimum moisture content.

Mr. Dixon and the Base Course Foreman will be responsible for obtaining the samples of each course from the grade for testing by Mr. Knox.

Production Phase -

Mr. Knox will continue to sample and perform process control test as well as perform acceptance sample testing for each grading of aggregate.

Mr. Dixon will monitor the acceptance sampling, testing and densities. All test results will be submitted to the PE with the QC Report.

Mr. Dixon will enter the test results in the QL-PAY program, furnished by the Government. In the event there are two or more consecutive test that are out of specification, or the QL-Pay indicates the material is less than 1.0 Pay Factor, Mr. Dixon will suspend operation until corrective actions have been taken and the material is within specifications. All problems and corrective actions will be documented on the QC Report.

The Base Course Foreman will be responsible for compiling the delivery and weight records, including tabulation of quantities, and submitting these reports to the PE with the Construction Operations Report .

The Base Course Foreman will perform depth checks daily to verify spread rates.

Mr. Dixon will verify the quality of the work of each segment and/or course prior to requesting acceptance from the PE.

10) <u>Asphalt Items</u> - Mr. Dixon will be responsible for the QC in the Preparatory, Startup and Production Phases. Mr. Dixon has the authority to stop work and order corrective action.

Preparatory Phase -

All asphalt work, with the exception of aggregate production, will be performed by Miller Paving of Council, Idaho.

Mr. Dixon will obtain the required mix design submittals from Miller Paving and samples from TCI stock piles. These will be delivered to the PE 30 days prior to scheduling the work. Mr. Sole will be the contact for any technical discussions during the mix design approval process.

Mr. Dixon will review the required sampling frequencies for aggregate process control, asphalt mix and density cores for acceptance with Mr. Knox and the Crushing Foreman.

Mr. Dixon will review the required tests, control charts and testing frequencies with Mr. Knox.

Mr. Dixon will develop the mix spread rates for the Paving Foreman.

Startup Phase -

Mr. Knox will be responsible for production startup procedures and will perform process control testing at the required frequencies, but not less than one per shift, and plot the results on the control charts.

Mr. Dixon will monitor the process control sampling and testing and control charts. Process control test results will be submitted with the QC Report. Split samples will be made available to the PE.

Mr. Dixon will document any corrective actions required during the production of the aggregates on the QC Report.

Mr. Dixon will review the acceptable standards and tolerances with the Paving Foreman and the PE.

Mr. Dixon will review requirements for weighing, delivery, dumping, spreading, compaction, sampling methods, reporting formats with the Paving Foreman and the PE.

Mr. Dixon will assure that the scales have been calibrated and the certification is submitted to the PE with the QC Report.

Production Phase -

Mr. Knox will continue to sample and provide process control test results for each grading of aggregate.

Mr. Dixon will monitor the acceptance sampling, testing and densities.

Mr. Dixon and the Paving Foreman will obtain acceptance mix samples and cores at the random locations provided by the PE. Acceptance samples will be delivered to Miler Paving's lab for testing. Test results will provided to Mr. Dixon and submitted with the QC Report.

Mr. Miller will obtain random Liquid Asphalt (AC) samples in accordance with the data furnished by the PE.

Mr. Dixon will enter the test results in the QL-PAY program, furnished by the Government. In the event there are two or more consecutive test that are out of specification, the QL-Pay

indicates the material is less than 1.0 Pay Factor, or quality problems are encountered, regardless of which process is responsible, will be dealt with under the direction of Mr. Dixon. Mr. Dixon will suspend operations until corrective actions have been taken and the material is within specifications. The problems and resolutions will be documented on the QC Report.

The Paving Foreman will be responsible for compiling the delivery and weight records, including tabulation of quantities, and submitting these reports with the Construction Operations Report .

The Paving Foreman will perform depth checks daily to verify spread rates.

Mr. Dixon will verify the quality of the work of each segment prior to requesting acceptance from the PE.

Mr. Sole will submit all test results and document any corrective actions taken on the QC Report .

11) <u>**Miscellaneous Items**</u> - This covers items involving installation of manufactured item such as guardrail, delineators, fencing, etc. Mr. Dixon will be responsible for the QC in the Preparatory and Startup Phases. The respective Foreman will be responsible for the QC in the Production Phase. Both Mr. Dixon and the respective Foreman have the authority to stop work and order corrective action.

Preparatory Phase -

Mr. Dixon will verify all certification requirements, inspect materials upon delivery and obtain certifications and other required documentation..

Mr. Dixon will review stakeout requirements and resolve any potential problems with the Survey Crew and the PE.

Startup Phase -

Mr. Dixon will review the specification requirements and stake out data with the foreman responsible for the work.

Mr. Dixon will be available when any operation begins to resolve any conflicts with stakeout data and verify specification compliance. Conflicts and/or resolutions will be documented and submitted to the PE with the QC Report.

Production Phase -

The Foreman in charge of the particular work item will be responsible for the Quality Control during construction/production.

Mr. Dixon will monitor operations on a daily basis for QC compliance.

Mr. Dixon will perform required tests and furnish results with the QC Report.

Mr Dixon will notify the PE when segments of the work are ready for acceptance.

Please review the above plan and advise this office if there are any additions and/or supplements required to this plan.

Sincerely yours,

W. C. Howell
President

U. S. L_PARTMENT OF TRANSPORT TION
FEDERAL HIGHWAY ADMINISTRATION
WESTERN FEDERAL LANDS HIGHWAY DIVISION
P.O. Box 268
Roberts, Idaho 83444

September 11, 2001 UCI-002

Dick Standerfer, President
Universal Construction, Inc.
P.O. Box 187
Emmett, Idaho 83617

Subject: Quality Control Plan

DTFH70-01-C-00034
Camas NWR Complex
ID RRP-CAMA 101(1)

Mr. Standerfer,

On September 10, 2001, this office received a faxed copy of your Quality Control Plan. After initial review the Quality Control Plan is not approved. The submitted plan lacks several necessary required parts. Some of the deficiencies are as follows:

1. Subsection **153.03** – Include the work of **all** subcontractors in the quality control plan.
2. Subsection **153.03, (a), (2)** – Document the names and relevant experience of **all** other personnel involved in the system. Not just those involved in the materials testing. (i.e. Surveyors, ect.)
3. Subsection **153.03, (b)** – List the name and authority of personnel directly responsible for each phase of work. This may need to be broken out by individual items.
4. Do not just reiterate the requirements of subsections **153.03, (b), (1), (2),** and **(3),** please explain how each of the requirements will be accomplished as required.

Please contact me if you have any questions.

Sincerely,

Original Signed By

Todd Butikofer,
Project Engineer

cc: Jane Traffalis, COE
Mark Standerfer, Universal
files

U. S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
WESTERN FEDERAL LANDS HIGHWAY DIVISION
P.O. Box 268
Roberts, Idaho 83444

September 24, 2001 UCI-014

Dick Standerfer, President
Universal Construction, Inc.
P.O. Box 187
Emmett, Idaho 83617

Subject: Revised WFLHD – 28, Contractors Accident Prevention Plan

DTFH70-01-C-00034
Camas NWR Complex
ID RRP-CAMA 101(1)

Mr. Standerfer,

After review of your revised Accident Prevention Plan, the FHWA is still finding deficiencies with the plan. The following is a list of the deficiencies which was also included in letter UCI-003, dated September 17, 2001.

1. Section 1926.50 (d) – Again, name of person responsible.
2. Section 1926.200 (a) – Again, describe work areas or operations, be specific. (Crusher?)
3. Section 1926.401 – Again, describe methods, include crushing equipment. You state "There is no electrical mechanisms on Crushing units." So there will not be a generator on site running the crusher, screen decks, and conveyors?
4. 1926.550 – The project requires that steel girders be hoisted, lifted or flown into place, which will require had signals.
5. Section 1926.601 – Again, your response is not allowed by contract. (SCR107.08, second paragraph)
6. Section 1926.602 (a) (9) (ii) – Again, your response is not allowed by contract. (SCR 107.08, second paragraph)
7. Section 1926.700 (b) (2) – Again, what previsions will be made, be specific.

As in letter UCI-003, WFLHD-28 asks how you plan on handling very specific items of accident prevention, and requires that your responses be as specific and be a direct response to the questions asked. Please revise and resubmit the plan for approval.

Please contact me if you have any questions.

Sincerely,

Todd Butikofer,
Project Engineer

cc: Jane Traffalis, COE
Mark Standerfer, Universal
files

UNIVERSAL CONSTRUCTION, INC.

U.C.I.

PHONE
(208) 365-5750

FAX
(208) 365-4645

September 18, 2001

76-019

Federal Highway Administration
P.O. Box 268
Roberts, ID 83444

Attn: Todd Butikofer, P.E.

**ID RRP-CAMA 101(1)**
**CAMAS NWR COMPLEX**
**DTFH70-01-C-00034**

**QUALITY CONTROL PLAN**

The following items comprise our Quality Control Plan (QCP) in accordance with Subsection 153.03 of the Contract.

1. All work will be performed in accordance with the contract requirements. Universal Construction, Inc. (UCI) will maintain an inspection system which assures compliance with these contract requirements. Any indication of system deficiencies, whether discovered as a result of Government or UCI checks or tests, will result in modifications to the system to correct these defeciencies.

2. This QCP does not endeavor to repeat or summarize contract requirements. It describes the process which UCI will use to assure compliance with those requirements. The QCP, documents broad categories of work in accordance with Subsection 153.03. Necessary details dealing with minor items, not included in the QCP, will be addressed informally between the Contractor Quality Control Manager (CQCM) and the Project Engineer (PE) as the work progresses and will be documented in writing on the Quality Control Report (QCR). The level of Quality Control (QC) accountability and control exercised by UCI on these items will be consistent with the details of the plan.

3. Mark Standerfer will have the overall responsibility for quality control on the project and will be the CQC manager. Mark Standerfer has had similar

Not Approved
SD 9/27/01

RECEIVED
SEP 27 2001
BY PROJECT ENGINEER

10-21-04 Exhibit # 10
Case Universal Construction vs. USA
Deponent Standerfer
Reporter MARTA RICE
Naegeli Reporting Corporation
(800) 528-3335 FAX (503) 227-7123

positions and responsibilities on other Federal, State and County Projects. Please see attached Resume. Mark Standerfer will be responsible for overseeing day-to-day construction operations from a QC standpoint. He will assure that all required tests and documentation are completed and that the results are furnished to the Government in the time frame required. Mark Standerfer is empowered to suspend any operation, which he deems to be in noncompliance with the contract, and/or order corrective measures to assure compliance. Mark Standerfer will complete both the Construction Operations and the Quality Control reports in accordance with Subsection 153.05.

4. Dick Standerfer Owner/President of UCI, has performed similar duties of Quality Control requirements on other Federal, State and County Projects as well. Please see attached resume. Dick Standerfer will be designated as the alternate CQC Manager for this project in the absence of Mark Standerfer. Dick Standerfer is empowered to suspend any operation, which he deems to be in noncompliance with the contract, and/or order corrective measures to assure compliance.

5. Personnel from Materials Testing & Inspection (MTI), (see attached QCP submitted by MTI), will perform all the required Aggregate Sampling and Testing.

6. All asphalt work, with the exception of asphalt concrete production, will be performed by UCI, and appropriate mix design will be submitted by UCI's supplier Beco Construction, prior to any asphalt work being executed. Any testing of the asphalt concrete will be performed by MTI personnel.

7. As the number of operations, or their dispersion on the project, starts to overextend Mark Standerfer, Quality Control responsibilities may be specifically assigned to UCI supervisory personnel responsible for specific operations, or an assistant will be provided. In either case, the standards of application of the QCP will be the same. The names, experience and qualifications of any personnel assuming QCP responsibilities will be provided to the Government in advance.

8. UCI has an experienced and highly professional staff that has had the responsibilities entailed by the QC requirements. UCI therefore, does not anticipate any personnel or training problems in complying with these requirements. If any such problems occur, UCI will take appropriate actions to correct them including retraining, providing additional supervision and or personnel, or removal of inadequate personnel.

RECEIVED
SEP 27 2001

9. **ASPHALT ITEMS**

Mark Standerfer will be responsible for the QC in the Preparatory, Startup and Production Phases. Mark Standerfer has the authority to stop work and order corrective action.

Preparatory Phase –

All asphalt work, with the exception of supplying asphalt, will be performed by UCI.
Beco Construction (Roker Materials) will supply the asphalt material, UCI will obtain the mix design submittals from Beco Construction (Roker Materials), and deliver them to the PE for approval prior to proceeding with this item of work.
Mark Standerfer will be the contact for any technical discussions during the mix design approval process.
Mark Standerfer will co-ordinate with the survey crew as to required staking for service road and parking area for finished surface preparatory for placing of asphalt.

Startup Phase –

Mark Standerfer will review requirements for weighing, delivery, dumping, spreading, compaction and reporting formats, prior to proceeding with this item of work.
Mark Standerfer will review requirements for sampling methods with MTI personnel prior to proceeding with this item of work.
Mark Standerfer will review requirements for reporting formats with Beco Construction (Roker Materials), prior to proceeding with this item of work.

Production –

MTI personnel will obtain mix samples and cores at the random locations provided by the PE. Acceptance samples will be delivered to MTI for testing. Test results will be provided to Mark Standerfer and submitted with the QC Report.
Mark Standerfer will be responsible for compiling the delivery and weight records, including tabulation of quantities, and submitting these reports with the Construction Operations Report.

RECEIVED
SEP 27 2001
BY PROJECT ENGINEER

The Screed Operator will perform depth checks randomly during paving to verify spread rates.
Mark Standerfer will verify the quality of the work for this item prior to requesting acceptance from the PE.
Mark Standerfer will submit all test results and document any corrective actions taken on the QC Report.

10. **LINEAR GRADING**

Mark Standerfer will be responsible for the QC in the Preparatory, Startup, and Production Phases. Mark Standerfer has the authority to stop work and order corrective action.

Preparatory Phase –

Mark Standerfer will co-ordinate with the survey crew on staking, stationing, and cross-fall transitions of the roadway grading.

Startup Phase –

Mark Standerfer will insure that proper cross-slope is provided by field verification of the grading process with leveling, sweding, and width measurement checks.

Production Phase –

Mark Standerfer will continue to monitor grading operations as linear grading proceeds through each closure phase, co-ordinating with the PE should any areas need field adjustments. Mark Standerfer will contact the PE for verification and acceptance as each section is completed.

11. **BASE COARSE** (aggregate surface coarse grading H, and roadway aggregate method I)

Mark Standerfer will be responsible for the QC in the Preparatory, Startup, and Production Phases. Mark Standerfer has the authority to stop work and order corrective action.

Preparatory –

RECEIVED
SEP 27 2001
BY PROJECT ENGINEER

The base coarse aggregates will be produced from off-site sources.
Placement of aggregates on roadway, widening, turnouts and pullouts will be developed on a yield basis and verified in the field after initial compaction for depth.
Required testing performed by MTI personnel will be reviewed for frequency and method as established by the contract.

Startup Phase –

Mark Standerfer will co-ordinate with MTI personnel – crushing startup plant calibration for production of aggregate.
Process control test results will be submitted with the QC report. Split samples will be made available to the PE.
Mark Standerfer will document any corrective actions required during the production of the aggregates and submit documentation with the QC reports to the PE.
Mark Standerfer will review the requirements for weighing, hauling, dumping, spreading and compaction with the PE.
Mark Standerfer will submit aggregate samples, including target values to the PE prior to placement.
Mark Standerfer will be responsible for co-ordinating sampling with MTI personnel on samples taken from the grade with test results furnished to the PE.

Production Phase –

Mark Standerfer will continue to co-ordinate the required sampling acceptance with MTI personnel.
Mark Standerfer will monitor acceptance sampling, testing and densities. All test results will be submitted to the PE.
Mark Standerfer will be responsible for compiling the delivery and weight records, including tabulation of quantities, and submitting these reports to the PE.
Mark Standerfer will perform daily depth checks to verify spread rates, compaction and general quality of work prior to requesting acceptance from the PE.

12. **BRIDGE ITEMS**

RECEIVED
SEP 27 2001
BY PROJECT ENGINEER

This covers items involving removal of existing structure, procurement and fabrication of materials for new structure such as: steel girders, timber decking, re-enforcing steel, concrete and miscellaneous steel. Mark Standerfer will be responsible for the QC in the Preparatory, Startup, and Production Phases. Mark Standerfer has the authority to stop work and order corrective action.

Preparatory Phase –

Mark Standerfer will verify all certification requirements, submit all shop drawings, inspect all materials upon delivery and any other documentation required for construction of the new bridge structure.
Mark Standerfer will also oversee demolition and removal of existing structure including saw cutting.

Startup Phase –

Mark Standerfer will review specifications and staking data with survey crew, including mark out for concrete sawing and structural excavation.
Conflicts and/or resolutions will be documented and submitted to PE with the QC report.

Production Phase –

Mark Standerfer will be in charge of all work items and will be responsible for QC during construction.
Mark Standerfer has authority to resolve and correct any contract abnormalities.
Mark Standerfer will co-ordinate all testing required and furnish copies to PE with the QC report.
Mark Standerfer will notify the PE when segments of work are ready for acceptance.

13. **MISCELLANEOUS ITEMS**

This covers items involving installation of manufactured items such as silt fence, construction signs, sign installation, etc. Mark Standerfer will be responsible for the QC in the Preparatory, Startup, and Production Phases. Mark Standerfer has the authority to stop work and order corrective action.

Preparatory Phase –

RECEIVED
SEP 27 2001
BY PROJECT ENGINEER

Mark Standerfer will verify all certification requirements, inspect materials upon delivery and obtain certification and other required documentation.
Mark Standerfer will review stakeout requirements and resolve any potential problems with the Survey personnel and the PE.

Startup Phase –

Mark Standerfer will review the specification requirements and stake out data with personnel responsible for executing the work.
Mark Standerfer will be available when any operation begins to resolve any conflicts with stakeout data and verify specification compliance. Conflicts and/or resolutions will be documented and submitted to the PE with the QC Report.

Production Phase –

Mark Standerfer will be responsible for the Quality Control during construction/production.
Mark Standerfer will monitor operations on a daily basis for QC compliance.
Mark Standerfer or MTI personnel will perform required tests and furnish results with the QC Report.
Mark Standerfer will notify the PE when segments of the work are ready for acceptance.

Please review the above plan and advise this office if there are any additions and/or supplements require to this plan.

Sincerely,
UNIVERSAL CONSTRUCTION, INC.

Dick Standerfer

Dick Standerfer
President

clh

cc: Mark Standerfer, UCI

RECEIVED
SEP 27 2001
BY PROJECT ENGINEER

# PROFILE

MARK LEE STANDERFER
P.O. BOX 187
EMMETT, ID 83617
TELEPHONE: (208) 365-5750

## SUMMARY OF QUALIFICATIONS

*** More than twenty-two (22) years overall background in heavy civil construction.

*** Extensive background in construction operations including heavy equipment operation, superintendent, project manager

*** Experience as president and partial owner of construction company, current owner of a trucking company and current vice president of construction company

## AREAS OF EXPERIENCE

Project Superintendent
Estimating/Bidding
Personnel Administration:
Interviewing/Hiring/Training/Supervising
Management/Labor Relations
Contract Management

Purchasing
Project Scheduling
Equipment Operation
Heavy Equipment Repair
Hazardous Waste (various aspects)

## EDUCATION

| | | |
|---|---|---|
| 1979-82 | Graduated | Ketchikan High School, Ketchikan, Alaska. |
| 1982-83 | Attended | University of Alaska, Fairbanks, Alaska. General Studies. |
| 1986-87 | Attended | Yavapai Community College, Cottonwood, Arizona. General Studies. |
| 1996 | Certified | Hazardous Waste Training |

## PERSONAL DATA

Birthdate: 8/28/63
Ht. & Wt: 6', 300 lbs.
Marital: Married
Health: Good, no limitations

Citizenship: USA
Soc. Sec. No: 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
Bondable: Yes

RECEIVED
SEP 27 2001
BY PROJECT ENGINEER

## EMPLOYMENT HISTORY

July 1978 to 1989 — South Coast, Inc.
Position: Equipment Operator, Truck Driver, Executive Assistant — Ketchikan, Alaska

Duties: Operated all types of heavy equipment, drove all types of off-road trucks
Assigned to special accounts (computer software design, special insurance, Marine (tug/barge operations)).

April 1990 to Present — Universal Construction, Inc.
Position: Vice President — Emmett, Idaho

Duties: Assembled and formed a new construction company, management of Construction operations.

April 1994 to Present — Stiforp, Inc.
Position: Owner — Emmett, Idaho

Duties: Assembled and formed a new trucking company. Major focus of operations Hazardous material hauling.

## REFERENCES

Personal and professional references available on request.

## ATTACHEMENTS

A Technical Blasting Summary is included with this profile.

RECEIVED
SEP 27 2001
BY PROJECT ENGINEER

# TECHNICAL BLASTING EXPERIENCE
## Mark L. Standerfer

1983 U.S. Borax Project

A highly sensitive ecological project for U.S. Borax Co., carried out within the confines of Misty Fjords National Monument. Project was consistently monitored for 2 IPS vibration due to Fish and Game and U.S. Forest Service Contractual considerations.

The project was completed timely ( 6 months construction time) with all criteria having been met. Over 500,000 yards of rock was removed under controlled blasting procedures.

I assisted in drilling and shooting of numerous shots during the project.

1987- City of Ketchikan – Quinn Street Project.

New construction of a city street consisting of removal of approximately 30,000 C.Y. of rock adjacent to many existing private dwellings. Pre-blast survey and seismic monitoring were required.

Project was completed successfully without any major incidents.

I assisted in the loading and calculating powder for pre-splitting of the shots.

1991- Idaho Power Co. – Swan Falls Hydroelectric Project

The Swan Falls project was under direct supervision of Idaho Power. A blast plan was submitted for each blast, after approval. Inspectors watched and asked questions during the loading process. The blast vibration was measured by a seismograph

. Fly rock was minimized by blanketing the shot area with a blast mat or covering the area with sand.

All oversized boulders were broken down strategically, drilling holes to maximize breakage and minimize fly rock.

RECEIVED
SEP 27 2001
BY PROJECT ENGINEER

I worked directly with ICI explosives to develop the shot plan for this project. After development of the shot plan I was responsible for reviewing each individual shot for adherence to this plan. I also worked in the development scaled distance calculation for this project by taking the information from the seismographs and inputting the data in a scaled distance program.

1993- Idaho Transportation Department- Payette Bridges- Midvale Pit

Drilled an 8'X8' pattern. Each hole was loaded with a 2X8 power ditch primer and then loaded another 8 feet with ANFO leaving 4 ½ ft of stemming. Each hole was tied together with a 25 millisecond non-electric delay. The total shot consisted of 5,000 yards of material to be used as Rip Rap.

I personally drilled and loaded this shot.

1993- Idaho Transportation Department- Hammett Interchange

Drilled and blasted approx. 160,000 yards of vesicular basalt. I assisted in drilling, cataloging loads and detonating each shot. Each lift was approx. 30 ft drilling on a 10'X10' pattern using a 4 ½ inch bit. Loading of these holes were very tedious due to the voids in the basalt layers. Each hole had to be revised and cataloged and after the primer was lowered down the hole (2X16 NG Explosive) ANFO was measured and four feet of stemming was allowed to maximize breakage.

Detonators were non-electric and bunch blast methods were utilized.

Oversized material due to the large amount of voids in the basalt layers. I personally drilled and detonated 100 plus boulders to fit into a 30"X40" rock crusher.

1993- Universal Construction, Inc.- 6" Minus Stockpile

Drilled a 15'X15' pattern. Each 13 ft hole was loaded with 2X8 powerditch and one stick of 2X16 apex emulsion. Explosives were tied together with non-electric 25 millisecond delay. Total material shot was approx. 2,000 yards to be used as Rip Rap.

I personally reviewed and approved the shot plan for this shot.

1993- Bureau of Reclamation- Wildrose Park

RECEIVED
SEP 27 2001
BY PROJECT ENGINEER

During excavation of roadway, directly beneath Black Canyon Dam, a hard knob was uncovered which had to be drilled and shot. Six holes were drilled 7'5" deep each hole was loaded with .42 lbs of explosives. Shot was successful with no fly rock.

I personally reviewed and approved shot plan.

1996- Ada County Highway District- Black Cat Road

Roadway developed several rock peaks that had to be drilled, loaded and shot. Approx. 100 holes from 4'-8' deep drilled, each holed was loaded with .42 lbs to 1.5 lbs of explosives. Due to the shot being in a residential area the shot was covered with a 2' layer of sand. The explosives were tied together with 25 millisecond delays, shot was wired to pull all rock to the center of the blast.

I was responsible for drilling pattern layout, loading and delaying of shot.

1997- Washington County Highway District- Pressley Bridge

Drilled a 5'X5' pattern to pull 3,000 yards of material to a preexisting face. During drilling a good portion of the holes developed water in the bottom 4 to 6 feet deep. These holes were loaded with an emulsion. The shot had a total of 121 holes, each hole was loaded with ANFO, four feet of stemming was used. Each hold was tied together with a 25 millisecond time delay. Shot resulted in good breakage with minimal fly rock.

I was responsible for drilling pattern layout and loading of shot.

1998- Idaho Transportation Department- Rock Creek Bridges

Project consisted of placing a concrete structure across an enviromentally sensitive creek located near the confluence with the Salmon River. The abutments for the bridge had to be blasted into solid rock which was located directly above the stream. Drilling and blasting was conducted so as to minimize any disturbance to the stream.

Project was successfully completed without any incidents to the satisfaction of the owner.

1999- Idaho Transportation Department- Rock Scaling

RECEIVED
SEP 27 2001
BY PROJECT ENGINEER

Project consisted of scaling approx. 40 miles of hwy rock slopes/removing hazardous under-mind boulders and loose rock (some drilling/blasting required). Project in near proximity of state hwy traffic.

Project successfully completed timely, without any incidents and to the satisfaction of the owner.

1999- Idaho Transportation Department – Hazardous Boulder Removal

Project consisted of removal of a 700 ton granite boulder that was in movement 200 feet above a scenic portion of Idaho State Hwy 55. Work consisted of placing strain gages and monitoring movement of boulder while drilling was in progress. All work was done at night for convenience of the public. Boulder had to be fragmented into small pieces so as not to damage the highway or enviromental surroundings.

Project was successfully completed in a timely manner without any incidents to the satisfaction of the owner.

1999- Bright Quarry- Bright Trucking

Project consisted of drilling and blasting diced basalt quarry in the amount of 5,000 C.Y.

Work was completed successfully and to the satisfaction of the owner.

SUMMARY

I have more than 16 years experience with class A explosives from handling (storage, transportation) to shot design and the application of various blasting techniques in many different site conditions effecting the shot planning and how different plans/designs will effect certain types of rock in different areas.

RECEIVED
SEP 27 2001
BY PROJECT ENGINEER

# PAST EXPERIENCE/PERFORMANCE

Idaho Transportation Department
P.O. Box 8028
Boise, ID 83707
Contact: David Kuisti (District 2) (208) 799-4247
Eric Shannon (District 3) (208) 334-8300
Bill Merritt (District 4) (208) 886-7850

Miscellaneous Bridge and Road Projects (see above project list for project size and type). Projects have been completed timely* and to the satisfaction of the owner. Working relationships with owner personnel have been excellent.
*Blaine Street – 9 days liquidated damages (not agreed with).
*East Boise River Footbridge- items in dispute.

ACHD (Ada County Highway District)
318 E. 37th Street
Boise, ID 83714
Contact: John Edney (208) 387-6290

Miscellaneous Bridge and Road Projects (see above project list for project size and type). Projects have been completed timely and to the satisfaction of the owner. Working relationships with owner personnel have been excellent.
Meridian Rd/Park Lane still in progress on time per schedule

AJC (Al Johnson Company) (prime contractor)
3209 W. 76th Street
Minneapolis, MN 55435
Contact: Joe McGowan (612) 831-8151

RECEIVED
SEP 27 2001
BY PROJECT ENGINEER

IP (Idaho Power) (owner)
1221 W. Idaho
Boise, ID 83702
Contact: Operations Manager (208) 388-2200

Drilling and Blasting area for new Hydroelectric Power Plant Structure (see above project list for project size and type). Project completed timely and to the satisfaction of the