exceeding 30 days in duration." That's pretty easy to do when you only have a 93-day schedule.
MR. O'CONNELL: Okay. Okay.
BY MR. O'CONNELL:
Q. When you did the schedule, did you -- how did you generate the schedule in terms of, did you input all the dates or just the durations and the dependencies?
A. I never input a date on a schedule, ever. That's not the major of a critical path method schedule. I input durations, logic, and I cal -- let the computer tell me what the dates are.
Q. I see.
A. Now, if the dates exceed the time frame of the job, then I do the old pound-to-fit routine.
Q. What is -- what is -- what's the old pound-to-fit routine?
A. Well, I look and I analyze where the critical path is, which extends beyond the contractual completion date. I look at those tasks. I either divide them into parallel tasks to -- in other words, distribute the work. Not -- and -- to have a sequential piece of work, but to develop it into two parallel pieces of work.
For example, two crews, two pieces of



equipment, whatever. Or I look at the possibility, if it's labor intensive, putting more men on the -- on the task or whatever -- whatever is necessary, and logically reduce the time frame to meet the contract requirements. Is that --
Q. I think I understand. So are -- are the tasks dependent on resource allocation limitations?
A. This is not a resource allocated schedule. This schedule was verbally resource allocated by the narrative. I depend on several things. You cannot calculate the duration of the task on any critical path method schedule, I would maintain, by simply taking the amount of resources allocated to it divide -- and dividing that by the resources available per day, and achieve the duration of a task. That's inadequate.
You also have to take into account experience, a lot of subjective things that a contractor experiences.
By the way -- maybe I should comment right here, through the -- through 40 years of doing this kind of work, I have one steadfast opinion on any schedule that I do for a contractor.
That contractor is the property of the con -- that schedule is the property of the



contractor. Okay? So I am totally -- I want to be totally in sync with the contractor when I do a schedule.
I refuse to do a schedule if the contractor's not there. If the project-level people are not there. I will not do a schedule. Is that --
Q. Yeah. Okay. Okay. Now -- and after this initial period when you came in at noon time and worked 'til the follow morning, could you just briefly describe to me what your involvement in the project was as -- as -- you know -- you know, time went on? The project started in September and so forth.
A. Oh, okay. Yeah. Oh, by the way, during that time between -- we did go for about an hour and have dinner.
Q. Okay. Okay.
A. I mean, we did eat while we were doing this exercise.
Q. Sure. Sure. I understand.
A. I'm not Superman. Neither is Dick.
Q. Well, neither am I. So --
A. Okay. Well -- okay. So what did I do after that? Well, I produced a bunch of paper for



Dick. Which, having done hundreds of jobs, I deemed it adequate submittal material. I left it up to Dick and his office to submit it to the -- to the owner by whatever means the project required.
So I go away. I go work on three or four more schedules on -- somewhere around the northwest here. Next thing I know, we're having all kinds of, what I would consider, nebulous schedule requirements. Picking on the schedule.
Now, one thing that was pointed out, which was covered -- you got to -- you got to -- let's -- let me put it this way.
A schedule can be represented in several forms. One of the forms that a schedule can be represented in is graphic. Now, graphic can be broken down into bar charts, time-scale logic diagrams, PERT diagrams, several graphical representations of a schedule.
You can also represent a schedule tab -- in a tabular form, which can -- both forms can also -- not only show the -- the date and time information, but they can also show the -- the logic and relationship information. Both of them can.
So, you know -- now, I'm going to have to go by memory here. At some point, Dick got ahold of

Mr. Pape, you mentioned before we broke for lunch that you had calculated certain length of delays concerning approval of certain of the submittals.
Do you remember that testimony?
A. Yes.
Q. Do you attribute any of the delay here to Universal? Or is it strictly and solely the fault of the government, in your view?
A. I did see some delay. What I would have to, in a formal analysis, concede was Universal delay within that period of the 50 days that I mentioned. Overt Universal delay. Now, the total delay comes down to whether it was Universal's fault. Or whether it was FHWA's fault. Okay? So that remains to be refereed. I don't want to get into that right now. What I would concede was delay by Universal. Which I would be willing to admit as delay. Which could subtract from the 50 days. I would have to analyze this further. So I don't know for sure right now. But I would have to analyze it further. It would be a few days that occurred during the week of October 1 to October 9 of the year 2001. And that was associated with the



period when they were stripping the borrow area. I had originally scheduled that for two days duration. But it had two days of float, basically.
Now, during that period from -- let me back up here. We would have to measure this delay in either calendar days or workdays. This gets increasingly difficult and complicated. But I can kind of summarize it here. The release of work happened with the approval of the QAQC submittal. And that approval was given on a Friday, I believe, of the 28th of September of the year 2001. Now, it so happens that Universal was working a four-day workweek, so there were no physical bodies present on the site on Friday the 28th of September. They had all gone home for a typical long weekend. So the first work that could even happen was on October 1. On a Monday, October 1, as I recall.
Now, they did go in and they did strip the borrow area. Prepare the borrow area. And they subsequently started hauling that material to a noncritical area on the job. Which was the entrance/parking lot. And did some work on that. Minimal. A day or two. Maybe one day. When



they encountered this compaction acceptability of borrow material problem.
So I have looked at that. And the delay that I see possibly attributable to Universal Construction has to do with that one or two days that they were working on a noncritical area, the parking lot, and entrance, when they -- and I'll use the word in quotes -- "should have" been working on closure one critical path area. But the result of that is that they found an acceptability of the compaction method in the material. So they never were able to get going on closure one critical embankment due to that fact. Okay? So I will give up possibly two calendar days. Or maybe four to five calendar days and two workdays. I would have to really fine-tune exactly where that falls with regard to their long weekends. Due to the fact that they proved that there was a problem with material and methodology, compaction methodology, on a noncritical area of the job.
So there is a minimal amount of time that I would attribute to Universal's delay. Direct, identifiable Universal delay.
Q. Taking into account any work you have



done since your last deposition, do you attribute all of the 12 days of delay that you described earlier relating to the QAQC plan to the government?
A. We are getting into an area here that I don't feel real qualified in addressing. Which has to do with the fairness and acceptability of holding up work on a job due to approval -- or lack of approval of what I call procedural submittals. So any answer that I give you on that has to do with my subjective opinion of whether or not it is fair to the contractor to hold up the work due to what I consider nebulous aspects of approval. Or whether or not I could argue -- I can argue from my experience that there is a thing called "approve as noted" or "approve noted resubmit" that allows a contractor -- it is common industry practice to allow the contractor to go to work or continue work while insignificant shortcomings of a submittal are corrected by that contractor. So from the view point of my experience working on hundreds of jobs, I view it as unfair to the contractor.
Q. Let me just see if I can frame your





PAPE II

Page 17

Amica project?
A Yes, I was also -- finished out the Stillwater River Road, second phase of that, I was the project engineer. And then I also -- the project was called Deer Creek in Northeast Oregon, I was the project engineer. Hells Canyon Boat Watch in Oregon. And then -- I think that's it.
Q Okay. On any of the projects that you've worked on has -- excluding the Camas project --
A Yes.
Q -- has any of those contracts been terminated for default?
A No.
Q Had you ever worked with Universal Construction prior to the Camas project?
A Nope.
Q What's the current project you're working on?
A Grand Teton. All I know is I moved there yesterday and it's three bridges. That's all I know about it.
Q But you are the project engineer?
A No, I am just -- just there helping in construction inspection.
Q I see. Okay. Have you been a project engineer since the Camas --

Page 18

A Yes.
Q -- project?
Okay, name the projects?
A The next Spring I went to Atlanta Road just out of Boise and completed that project.
Q What was the name of that project?
A Atlanta Road.
Q Atlanta just like the --
A Just like Atlanta, Georgia.
Q Thanks.
A And then I went to -- well, that would have been -- I'm trying to get my years here. That would have been the Spring of 2002. And then mid -- late Spring or early Summer I went to West Fork of the Bitterroot River Road as project engineer, and -- out of Darby, Montana. And I was also last this past -- that job is -- construction is completed, we're just working on paperwork to get it completed, the West Fork job. And then in the last Summer I also -- or this past Summer, '04, I was also the -- classified different as -- than a project engineer, I was a project manager overseeing the -- a contractor doing construction at the contract administration on a job of ours that was called -- it was the Lakeside to Nelson --
Q Okay.
A -- out of Helena, Montana.

Page 19

Q How is project manager different than --
A Project engineer?
Q -- project engineer?
A Sorry.
I wasn't on the job every day. My job was to basically oversee a contractor doing what I typically would be doing on a job, not overseeing the construction itself.
Q Can you explain that a little bit better?
A We hired a contractor --
Q Uh-huh.
A -- to do construction management, --
Q I see.
A -- to oversee the construction contractor.
Q So there wasn't a project engineer on that project?
A Not from Federal Highways, no.
Q Do you think it's important for a project engineer to be on the project every day?
A Yes.
Q Why is it important?
A To know what's going on and how everything is going on --
Q Okay.
A -- and just to keep -- to be informed of what's going on.

Page 20

Q Can you tell me generally what the job responsibilities are of a project engineer in the Western Division?
A One more time, please.
MR. LARKIN: Could you read that back, please.
(The question was read by the reporter)
A Generally it would be to oversee and manage construction on the project.
Q (By Mr. Larkin) Okay. Do you believe it's your responsibility as a project engineer to coordinate requests for changes from the contractor?
A Yes.
Q Do you believe it's your responsibility as a project engineer to analyze claims in connection with the project?
A I would say typically no.
Q Whose responsibility is that?
A We have other people within the agency that usually oversee, or look at claims and judge, I mean if something comes in it gets passed on.
Q Have you ever analyzed claims made by a contractor in your role as a project engineer?
A No.
Q Just briefly back to your educational background, have you ever taken any courses in scheduling, construction

Page 21

scheduling?
A Formally in college, no.
Q Okay. How about informally?
A Yes.
Q Tell me about those courses?
A They're offered in-house in our Winter training program in Vancouver, and I believe I've been through two separate ones.
Q Okay. Tell me about what those two courses cover?
A CPM scheduling, critical path method scheduling, as far as how to schedule a project, how to, I guess, analyze a project that's been scheduled.
Q Okay. Anything else?
A No. I didn't have any, no.
Q When did you take those two courses, roughly?
A Probably -- the first one probably in '94, '95, the second one probably somewhere around 2000.
Q Were the courses taught by an in-house instructor, somebody who works for --
A No.
Q Who were they taught by?
A I don't know the exact people or the company but typically that kind of stuff is hired out, they bring them in, either a consulting firm or an individual that's --

Page 22

that's what they do, I guess.
Q Okay. Setting aside your formal education, have you taken any course work, informal course work, involving soils analysis?
A No.
Q Have you --
A Well, I take that back. You said setting aside the formal education, correct?
Q Right.
A In -- I've had a soils training -- soils testing training in our Vancouver office.
Q When did you receive that?
A Probably '94, '95.
Q Would you tell me briefly what that course involved?
A It's a forty hour training course that we do everything from doing densities on soils and aggegates to sieve analysis on soils and aggregates. At that time we were doing extractions on asphalts, concrete cylinders, air slump.
(Interruption by Mr. Larkin's cell phone)
THE LARKIN: Go ahead.
A I'd say that's pretty much most of it.
Q Okay. Have you received any formal or informal course work on claims, construction claims?

Page 23

A Yes.
Q Tell me about that?
A I don't remember a lot about it but it was some Winter training that we have also done in our Vancouver office, basic stuff. That would have been probably in the last -- probably somewhere around 2000.
Q Do you have any of the materials from these informal courses, the scheduling course, the soils testing course, or the claims course?
A Yes.
Q And you can access those?
A Yes. I usually carry them with me when I'm -- in a project office as mine.
MR. LARKIN: I'd like to request those, if I could.
Q (By Mr. Larkin) Have you taken any course work on -- formal or informal on differing site conditions?
A I think we've touched on it a little bit in some of our Winter training.
Q Do you recall who taught the course on claims in about 2000?
A The only thing I would -- no, I don't know.
Q How did you first get involved with the Camas project?
A I guess I heard that it was coming up, and knew

Page 24

where it was, and volunteered to be project manager.
Q Okay. Do you recall what month that was?
A No.
Q We'll go through some documents that might --
A Okay.
Q -- refresh your recollection. Does the Western Division post openings for project engineering, is that how you became aware of it?
A Every -- oh, about this time of the year usually something comes out showing upcoming jobs for the following year out to the field, and we usually, you know, get to show our interest of where we'd like to go, which project position we'd like to have.
Q When the Camas project -- before we get to these documents, the Camas project was eventually re-let to Desert Sage for completion, right, do you understand that?
A Before it was re-let to Desert Sage?
Q The project after Universal worked on the proper the project was re-let to Desert Sage for completion, do you understand that?
A Yes.
Q Why weren't you the project engineer on the completion phase?
A By that time I was -- like I said, by the next Spring I was finishing up a job that they wanted me -- they

Page 38

**A My concept of partnering is to work with the contractor to get the project built.**
Q Okay. Turn to Exhibit 6 now. Exhibit 6 is a schedule that was submitted by Universal Construction in connection with the Camas project and, as you'll see on the bottom right of the first page, rejected by Todd Butikofer.
**A Mm-hmm.**
Q Did you have any involvement in reviewing schedules that were submitted by Universal Construction?
**A I don't remember what my level of involvement was.**
Q Okay. Looking at Exhibit 6, do you recognize that there's a CPM analysis presented here in Exhibit 6?
**A No. This isn't a CPM schedule.**
Q Okay. You're looking at the first page. You can take time to go through the exhibit if you'd like.
**A I take it back. It does show critical activities through the colored bars.**
Q Okay. And I'll represent to you that the original of this was actually a colored document. Can you tell me what your understanding

Page 39

is of the last page of this document, Exhibit 6?
**A Well, it's a schedule showing activity bars, predecessors, successors, time.**
Q Does this reflect a critical path set of activities?
**A I can't say that without, as it's presented.**
Q Okay. The bottom left has a key for what's reflected above.
**A Right.**
Q And you'll see that the solid line there reflects critical activities. Do you see that?
**A I do.**
Q And do you see those solid bars reflected on the above time scale logic diagram?
**A That's where I'm not sure which ones are solid and which ones are progress bars.**
Q Okay. To be fair you'd have to see a color --
**A Yes.**
Q -- copy? Okay. Sitting here today, obviously this schedule was rejected by Mr. Butikofer. Do you know what the basis was for his rejection of this schedule?
**A Why he actually rejected it? I don't**

Page 40

**know the specific reasons. I assume it didn't meet the contract requirements.**
Q Okay. And sitting here today you're not sure what those contract requirements were for the schedule?
**A I would have to see the contract to know what they were for this project.**
Q Okay. I've got a copy here if you'd like to take a look.
**A Okay.**
**MR. O'CONNELL: I think she'll need the FP if you want to have her look at the whole contract requirement, Tom.**
**BY MR. LARKIN:**
Q Are you familiar with the FP requirement for scheduling?
**A Yes.**
Q Okay. And what you're looking at is the special conditions that change or otherwise modify the FP. Is that correct?
**A Yes.**
Q You can take a minute to look at those. Again my question is whether you know the basis for why Mr. Butikofer rejected this Exhibit 6.
**A Again I don't know the basis unless I**

Page 41

**would read his rejection letter. I could make my own analysis.**
Q Why don't you make your own analysis.
**A A good analysis would take more time, probably an hour or two.**
Q Okay. What would be the things you'd be looking for?
**A The schedule requirements aren't in the special contract requirements.**
Q The schedule requirements are in the FPs, right?
**A Yes.**
Q Okay. But you're familiar with those schedule requirements?
**A Yes, but I don't remember every one of them.**
Q Okay. In order to evaluate Exhibit 6, though, you'd go through the FP-96, the section regarding scheduling, right?
**A Yes.**
Q Together with the specials to the contract?
**A Mm-hmm.**
Q Okay.
**A There are things that I can, I know**

Page 53

calculated by Dick Standerfer and his helpers outside of my control. Okay?
Q. Okay.
A. All I did was look at those compactive efforts and look at the -- what we would have had in good weather and extend the durations of the tasks accordingly. So I profited by information that an expert did. And I am not an expert on compactive effort.
Q. Sure.
A. Okay? So I have to depend on somebody else.
Q. Did you view any of the compaction? Or did you just strictly rely on what Mr. Standerfer told you?
A. Did I view any of the compaction?
Q. Yes.
A. No.
Q. And did you rely on anything else besides what Mr. Standerfer told you?
MR. LARKIN: About compaction?
MR. O'CONNELL: Yes.
BY MR. O'CONNELL:
Q. About -- about the compaction under the method spec?

Page 54

A. Seems to me like, at that time -- I might be a little confused about sequence of events here -- that Dick had either retained or asked a third-party dude to come in and do some work on helping him with that compactive effort. I do recall something about that.
So, I can't honestly say that -- that nobody but Dick was involved, because I do recall another guy doing some work on that. But I don't remember exactly when he did it.
Q. Okay. Did -- when you were working on the project, did you ever meet with or talk to any of the Federal Highway people?
A. During the project? That would be up through the 11th of December of the year 2001?
Q. Sure. Why -- why don't we take that as the first question.
A. No.
Q. Okay. And -- and did you meet some of the them afterwards?
A. Yes.
Q. When did you meet them?
A. You're getting me on memory, but I think it was about March of the year 2002. And that's when I first saw Tim here, was in March of the year

Page 55

2002. We had a meeting here in Boise at the Idaho Transportation Department.
Q. I see. Okay. Why don't we --
A. I was invited to the meeting. I wasn't calling the meeting; I was invited by the contractor.
Q. Okay. Other than that meeting, did you meet any of the Federal Highway people?
A. Oh, yeah. And Todd Butikofer. I didn't directly meet him, but he was at the meeting, too, in March. Other than that, my direct exposure, no.
Q. Okay.
MR. O'CONNELL: Let's take a break.
THE WITNESS: I was exposed through paper.
MR. O'CONNELL: Okay. Let's go off the record and take a break. I think we're almost done.
(Recess.)
MR. O'CONNELL: Back on the record. I just have a few more questions, Mr. Pape.
BY MR. O'CONNELL:
Q. I think you answered this question for Exhibit 4, but for Exhibit 5, does the Exhibit 5 schedule show the interdependency of activities?
A. Well, let's see. I'm getting old and far sighted and I'm trying to figure out what happened

Page 56

to my glasses. That goes to show you I can't hardly walk and chew gum at the same time. Okay. You said Exhibit 4?
Q. Five.
A. Five. Okay. Okay. And what do we want to talk about on Exhibit 5?
Q. Does Exhibit 5 show the interdependency of activities?
MR. LARKIN: Go through the whole exhibit too.
THE WITNESS: Again, it -- it does not show -- does not indicate on paper the predecessor/successor relationship, but it clearly communicates that this is a critical path method schedule.
MR. O'CONNELL: Okay.
BY MR. O'CONNELL:
Q. Do you -- do you find that an owner likes to see the interdependency of activities? Or is it simply enough for owners to know that the logic is embedded in the schedule?
A. Interesting question. Most owners that I've dealt with in $5 billion worth of work, do not like to see the -- the predecessors and successors in the inter-relationship of the activities, because

Page 45

Q Do you recall any problems or concerns with their work on the project?
A The only problem we had was sometimes timeliness of response for our need to have stakes.
Q Did they perform any cross sections of the borrow sources on the Camas project?
A I believe they did. I think we did cross section them when we were finished just to verify quantities.
Q Did you cross section them when you commenced work, them being the borrow sources?
A It's my recollection that they had already cross sectioned those as part of the work that they had done with Universal.
Q Okay. We've talked about Reliance Testing and Inspection. They were the testing outfit that Desert Sage utilized. Can you tell me how many or what the frequency was of Reliance conducting tests on the borrow materials during the course of Desert Sage's work on the project?
A I believe they ran three or four series of samples for us to classify the materials.
Q Okay. Do you know where those samples were taken from?
A From borrow one and borrow two but not specifically where at within the borrows.
Q Did anybody for Desert Sage or the government

Page 46

conduct tests on the sliver fills for compaction?
A Quality control on those fills was the responsibility of the FHWA. I cannot personally say how often they were tested, I'm not aware of that.
Q Are you aware of any testing on those sliver fills?
A I'm not aware of any testing at all in that respect. Only those who were on site know that.
Q And who was on site?
A Our superintendent on the job was J.R. Tupper.
Q Desert Sage used D. Blosch Crushing in connection with the Camas project?
A That is correct.
Q They're a reliable outfit?
A Yes.
(Deposition Exhibit Number Eighty-three was marked for identification)
Q (By Mr. Larkin) Exhibit Eight-three is a memoranda from Jane Traffalis to Bill Parsons and Julee McTaggart, the contracting officers at FHWA, which I assume you haven't seen before, is that correct?
A No, I have not seen this.
Q Okay. This is dated July 11, 2002 and it says, today, Scott Blower and I met with Rance Bare and Gerry

Page 47

Deutscher for the preconstruction conference at the Refuge office.
Do you recall a precon meeting approximately July 11, 2002 with the government and Refuge personnel?
A I do.
Q Okay. What took place at that precon meeting?
A We discussed the scope of work. We discussed the need for -- or the job assignments of various people. We talked about the methodology for submitting estimates for payment, the routing for communications, the general things you do just to get the administrative side of the contract put together before you go to work.
Q Okay. When did Desert Sage go to work on the project as far as actually doing physical work on the project?
A We actually went to work on the project twice.
Q Okay.
A There was a need to have the paving on the entry road completed early. We got an NTP, excuse me, a notice to proceed, on that work before we had work -- or the remaining work was noticed to us. I do not remember the exact dates that we were there, but there was two different notices to proceed.
Q Okay. The first notice to proceed you received shortly after the July preconstruction meeting?

Page 48

A I believe that is correct.
Q Okay. And as far as that first work that Desert Sage did on the Camas project that was involving the parking or the new entrance road area?
A That's right, the paving and the striping and signing on the new entrance road.
Q Okay. When Desert Sage came back the second time to complete the rest of the work was that when Dan Christianson was back from -- involved with the Camas project?
A Yes.
Q Okay. The first portion of this memorandum describes the linear grading item, and you can take a minute to look through this, and my question for you is whether this refreshes your recollection on why your bid quan -- or your bid item -- strike that -- your bid price per linear grading increased on the second bid?
A (Examining document) Okay. This does refresh my memory.
Q Okay. Do you recall now why that bid item increased?
A Yes. Because we were trying to remove the material completely from the work area to a disposal site, because of the narrow running surface, the dike surface itself, it was slow and mundane work. We were using a

Page 45

A. I -- would be my assumption.
Q. Okay. And so -- but Universal doesn't have them?
A. I don't believe we have -- we could have. I don't know.
Q. Okay.
MR. O'CONNELL: Because I will tell you that we didn't receive any of those documents in the records that you produced.
THE WITNESS: Um-hmm.
MR. O'CONNELL: Okay.
BY MR. O'CONNELL:
Q. Now, with respect to the -- the placement of the material, could you be a little bit more specific about what precisely Universal had planned on doing?
A. And where is this placement taking place? There's -- there's varying parts of the job.
Q. That -- at the --
A. And some can be worked one way --
Q. Sure.
A. -- some in another.
Q. Well, at the sliver fill areas?
A. I believe, they were going to haul that material out and, I believe, that was placed --

Page 46

dumped and placed with an excavator as I remember. I wasn't there all the time so -- but that was the way we'd anticipated and there was two excavators involved. I think, one placing, one compacting.
Q. Okay. And was there any -- was there any processing of the soil planned?
A. No.
Q. No. So you just going to, sort of, put it in with a backhoe?
A. Right.
Q. Okay.
A. But -- but that's acceptable construction technique. Normally, you just -- you don't handle material more than once. You -- you load it, haul it to the site, place it, and compact it.
Q. Okay. Do you know what proctors are?
A. Yes.
Q. Okay. What is a proctor?
A. Well, my definition is just a -- a sample of soil that's taken and, generally, added moisture to it and pound it out to get relative compaction data and, you know, at optimum moisture, at optimum density. And they use this to then control your compaction on the project.
Q. I see. Do you recall how many proctors

Page 47

Universal anticipated taking at the time of bid?
A. I -- I have no idea of that data.
Q. Okay. Do you recall how many Universal actually did on the project?
A. No.
Q. Who was responsible for actually doing the proctors?
A. MTI.
Q. MTI. I see. And -- okay. Strike that. Yeah. How often were you personally at the job site?
A. I -- I'd say in the 40 to 50 percent category.
Q. 40 per -- to 50 percent --
A. Of the total time that we were on the project.
Q. Okay. Did you personally observe the excavation at borrow area number one?
A. At times, I did.
Q. All right. And what did you -- what did you observe with respect to those exca -- excavations at borrow source number one?
MR. LARKIN: With respect to what?
MR. O'CONNELL: I'm just asking what he -- what he observed.

Page 48

THE WITNESS: I -- that's a --
MR. LARKIN: It's pretty general.
THE WITNESS: -- pretty general question. I mean, that's just --
BY MR. O'CONNELL:
Q. Well, what did you -- what did you --
A. The machinery, the workmen, the fact that --
Q. Well, what did you observe with respect to the soil?
A. Well, we had discussions on the soil, because I just didn't think it was very good. It just seemed to be -- just not a good, suitable soil to be putting in embankment. Okay? And I voiced my opinion on that.
Q. So what do you mean exactly by, "not a good, suitable soil?" What -- what, in particular, can you tell me that you observed?
A. Well, there -- there seemed to be different soil types, seemed to be extremely sandy. You know, just that that was my observation and said I -- I just didn't think it was good embankment.
Q. So your view is that the problem with the soil was that it was very sandy?
A. Well, I -- I thought it was sandy and --

Page 49

along with the -- it had, you know, some other features there. You -- you could see there was other different material in there.
Q. Such as?
A. I don't know. I'm -- I'm not a geologist or soil guru. I'm just making a personal observation, passing it on to my materials people which, generally, seemed to be in agreement with it. And talking to the Federal Highway people on board, that I didn't think it was good material.
Q. I see. And who did you -- who did you pass it on to, as you just said?
A. Generally, Todd Butikofer is the one I -- we'd had a couple discussions on that material.
Q. And what -- could you tell me what -- what your discussions with Mr. Butikofer were?
A. Just that I didn't think the material was suitable and he seemed to think it was. That's about the end of discussion.
Q. I see. Did he tell you why he thought it was suitable?
A. I don't believe he ever elaborated on it.
Q. I see. And did you -- did you express this opinion to anybody else at Federal Highway, besides Mr. Butikofer?

Page 50

A. Well, we were instructed -- no, I did not. But we were instructed, pretty much, by Federal Highway people that we weren't to get involved over at the Vancouver area. That everything was to be directed to Mr. Butikofer and he would handle it from there at --
Q. I see. Who direct -- who -- are you finished?
A. That was at the preconstruction conference. They were relatively adamant about that aspect of it.
Q. I see. And other than Mr. Butikofer, is there anybody else at Federal Highway that you dealt with at all?
A. Well, no. Other than in Mr. Butikofer's absence they had an inspector on the job. That was the only other person on the project that we had dealings with.
Q. Would that be Alfred Stites? Al Stites?
A. Yeah. I believe that was his name.
Q. Okay. And how did -- how did you find Mr. Stites to deal with?
A. He was okay to deal with. He just had limited, you know, responsibility or things that he could do on the job in the absence of --

Page 51

Q. I see. And how -- how would you describe your working relationship with Mr. Butikofer?
A. It had its ups and downs.
Q. I see. And what were some of the ups?
A. Well, it's like everybody. You know, he's -- at times they're congenial and going along. It's just hard to analyze. I -- you know, at times you don't have any problems with somebody. It's kind of like your wife.
Q. Okay.
MR. O'CONNELL: I'll let that pass.
BY MR. O'CONNELL:
Q. What -- what were some of the downs, though, in your relationship with Mr. Butikofer?
A. Well, I -- I guess I would just have to say, I -- I thought in regards to, let's say, the FP sometimes and interpretation is just nit-picky.
Q. I see. Can you give me any particular examples?
A. No. I just -- just over the course of the job we'd had several conversations on several different aspects of the project, and it seemed the interpretation was always the same. It just --
Q. I see. And -- I'm sorry.
A. Here again, I -- it's interpretation of

Page 52

the specification and, I -- I believe, I said it was -- wasn't in the spirit of the specification --
Q. I see.
A. -- it was in the literal sense --
Q. I see.
A. -- that we --
Q. And so -- so your problem with Mr. Butikofer was that you felt he was interpreting the contract literally?
A. Yeah. Over stringent I would say.
Q. Okay. And if -- if I asked you the question, did Mr. Butikofer require Universal to do anything that wasn't in the contract, would -- would there be anything that came to your mind?
A. There were a few of those instances that -- yeah. We had some -- some differences over some specifications.
Q. Okay. Which ones?
A. One that comes to mind was the concrete mix design, which, I felt that it -- way overboard on that. We -- we finally, I believe, reminded him that this was miscellaneous concrete, not regularly placed concrete. And (sic) finally agreed to that and then we got the mix design passed.
Q. Did you feel like your relationship with

Page 137

in borrow source number one were consistent layer by layer?
A There is no -- was not a real consistency with any of it because it's -- the way the deposition of it coming in, it's wind-blown materials, so I mean it varies in depth and consistency.
Q So they were all different?
A It's -- I can't -- I can't say that it is different from or the same from this foot to this foot, no.
Q But you would say that there were different materials as you worked down through the borrow source number one?
A There definitely is -- there was different material below, down in the bottom of borrow source number one.
Q Did you contact anybody at Federal Highway Administration about Dick Standerfer's what you call hint about bringing in borrow material from off-site?
A I believe I did contact Jane Traffalis.
Q Okay. What did she say about that?
A I don't -- I don't recall. I think that was -- I think that that's what prompted partially this meeting that we had in our office in Roberts with Dick and Mark and Jane and myself where we actually talked about them importing and Dick threw out roundabout costs, and Jane told him, well, get us -- get us a hard cost and we'll look at it; and we

Page 138

never did get it.
Q You don't think Jane ever got a hard cost for doing that?
A Not that I know of.
Q And to the best of your recollection you never got a hard cost for doing that?
A I have no idea.
MR. LARKIN: Let's go ahead and mark both of these. Is that Thirty and Thirty-one?
THE REPORTER: Yes.
(Deposition Exhibits Number Thirty and Thirty-one were marked for identification)
Q (By Mr. Larkin) Okay. Exhibit Thirty is the October 21, 2001 transmittal from Universal to you, it looks like it was received October 23?
A Yes.
Q And there's handwriting on Exhibit Thirty, that is your handwriting?
A Yes.
Q You write rejected 10/25/01, letter UCI-030?
A Correct.
Q Okay. Exhibit Thirty-one is what I believe was attached to Exhibit Thirty. Do you have any reason to disagree with that?

Page 139

A I don't see any reason to disagree, I guess.
Q Okay. Can you tell me what the basis was for your rejection of the schedule update that Universal submitted?
A Not offhand I don't.
Q And you can take as much time as you want to looking at Exhibit Thirty-one. Again my question is the same, can you tell me the basis for rejecting the schedule?
A Not without seeing the letter Thirty.
Q So sitting here today you don't have a basis for rejecting it.
A Nope.
Q Can you tell me what Exhibit Thirty-one is?
A It's a schedule. It looks like it says it's a time scale logic diagram. It's showing -- it is showing, it looks like, predecessor/successors.
Q And is this the type of document you were looking for earlier when you were rejecting the schedule submitted by Universal?
A It looks like it would fulfill at least some of the requirements.
Q Okay. Do you know, can you tell me what the basis was for your right to accept or reject schedule updates as submitted by Universal?
A Can you rephrase?

Page 140

MR. LARSEN: Can you read back the question, please.
(The question was read by the court reporter)
A I think that's in my delegation of authority to accept or reject.
Q And what are you referring to, what delegation of authority?
A That's been delegated from the the contracting officer.
Q So that's something that Jane Traffalis would have or Bill Parsons would have done?
A Bill Parsons would have, yeah, and it's a delegation of authority down through the chain and that's sent out to the contractor as well.
Q Okay. Sitting here today can you think of anything in the contract documents themselves that would give you the right to accept or reject schedule updates?
A Other than I can -- the contract, the way the contract is, that I can approve or reject contract requirements or make sure that we're getting the contract the way it's required, and that's part of the requirements of the contract is that we get schedules or an updated schedule, and there's a certain criteria that it has to meet.
Q Okay So your understanding is that any

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

UNIVERSAL CONSTRUCTION, INC., )
Plaintiff, )
)
v. ) No. 03-1502C,
) No. 03-2370C
)
THE UNITED STATES, )
Defendant. )

---

ORIGINAL

TELEPHONE DEPOSITION OF ALFRED STITES

Taken on behalf of the Plaintiff

November 3, 2004

Vancouver, Washington

CERTIFICATE

I, Frances M. Galisky, Certified Shorthand Reporter for Oregon, Certified Court Reporter for Washington, and a Registered Professional Reporter, do hereby certify that ALFRED STITES telephonically appeared at the time and place set forth herein; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were transcribed using computer-aided transcription under my direction; and the foregoing transcript constitutes a full, true and accurate record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand and stamp at Portland, Oregon, this 15th day of November, 2004.

Frances M. Galisky

Frances M. Galisky
Oregon CSR No. 90-0014
Washington CCR No. GA-LI-SF-M471Q6

CERTIFIED SHORTHAND REPORTER Oregon CSR 90-0014 FRANCES M. GALISKY

Exhibit 2.
(Exhibit No. 2 is marked for identification.)
BY MR. LARKIN:
Q First of all, do you have in your possession any more, any documents associated with the Camas project?
**A No, I do not.**
Q At the conclusion of your work in connection with the Camas project, did you give to the government representatives your original diary?
**A Yes, I did.**
Q Did you do any work in connection with Desert Sage's performance on the Camas project?
**A I don't really understand that question. When you say other stages, what do you mean?**
Q When you were an inspector or had any involvement with the Camas project, was Universal Construction always the prime contractor?
**A Yes, they were.**
Q Okay. Let's look at a few different papers in this Exhibit 2, your diary.
**A Okay.**
Q First page is an excerpt from October 9,



2001.
**A Mm-hmm.**
Q It says that, "A new proctor was run on material being brought in from the borrow area because the material seems different than the original material tested from the borrow area."
It's about halfway down. Do you see that?
**A Yes, I do.**
Q What were you talking about there?
**A The original test on the borrow area was one hole that was dug out in the middle. And when you moved away a few feet or meters, whichever way you want to go there, the material changed so it wasn't the same, because all they did was dig one test pit. And so they I guess were assuming that the whole area, that whole borrow area would be that same material, and it was not.**
Q Okay. How did the material change?
**A What I saw on the original test pit was a sandy, kind of a sandy, silty material. And you get out away from that, you get into different clays and stuff like that.**
Q Okay. Did that cause you a concern?
**A It didn't to me other than in using this**



**material it appeared to me that it would have to be blended.**
Q I see. How typically, in your experience as a construction inspector, how typically does a contractor process fill material when it's laying it down in lifts for fill?
**A Most contractors will blend it back and forth across the road to make sure that it's all blended, you know, either with sometimes a scraper, sometimes a Patrol.**
Q Have you ever observed a contractor laying material, fill material in lifts and spraying the material with a water truck as it brings the lifts up?
**A Just this one.**
Q Just that one?
**A Yes.**
Q Okay. Down below on this October 9, 2001 diary note, you state that, "The contractor has not been able to meet the density requirements yet." Can you explain that a little bit further?
**A Okay. The -- what I observed on that was the material that they were laying down when they put the water on top, the water would not penetrate into it and they weren't working it in,**



**in my estimation, in my inspection of it. It wasn't getting worked in to where it was uniform throughout. So you would have, you might say, what you might call wet muddy spots and also dry spots.**
Q Okay.
**A And so in so doing, my, the densities would fail.**
Q I see. At any time were you aware of any specific contract requirement that would have required Universal to work in the water like you're describing?
**A No. There was no, nothing in the contract that I can remember that required that.**
Q Did you have a copy of the contract?
**A Yes, I did.**
Q The next page is from October 10, 2001.
**A Okay.**
Q At the bottom sentence, the last sentence says, "A lot of effort was put into watering, mixing, and compacting of the new entry road." What do you mean by that?
**A Okay. That particular day, because of having the problems the day before, they were putting out a lot more effort to blend this stuff**

Page 18

**all together to try and get the compaction that was required.**
Q Okay. And when you say "a lot more effort", what do you mean specifically?
**A Well, they were literally, I guess what I would say would be blading it back and forth across the road more to blend it together, you know, try to get the water more uniform through the material.**
Q Okay. And what success, if any, were they having?
**A It was better, let's put it that way. Nothing perfect as far as that goes, but this is not a perfect world.**
Q Okay. Well, when you say it was better, was it still bad material?
**A Well, I wouldn't say it was bad material. It just was that it wasn't, the densities were being hard to be met.**
Q And in your assessment why was that?
**A I've got to think on this just a minute because I'm not trying to be critical of anything or anybody. I think the material, if it had been blended together better out in the borrow area itself and brought in, because you would get one**

Page 19

**type and then you'd get a different type in there. And so that, it wasn't being blended in essence to where it was really, really uniform.**
Q Okay.
**A That's only my opinion.**
Q When you first went to the project site, did you have any expectation of whether the borrow source material would be uniform or not?
**A No, I did not.**
Q Did you have any reason to have that anticipation?
**A No. The only thing that I know at the time, there was no geotechnical report ever done on the borrow area, so it was just a, whatever you saw, that's what you got.**
Q Okay. Let's turn over to October 23, 2001. And looking at the second sentence --
**A Wait a minute. Okay.**
Q Okay? And it says, "Again the material is being spread, watered, and worked back and forth from one side of the road to the other to get the needed water mixed in prior to spreading and compacting." Do you see that?
**A Yes, sir.**
Q Okay. Does that accurately describe

Page 20

what Universal was doing?
**A Yes, sir, it was.**
Q Okay. And what was the result of those efforts? In other words, were they achieving the compaction densities after doing that process?
**A I don't see it on my report. Usually I'd put it on a report if it did meet the density and I don't see it on that report.**
Q So is it your assumption that if you did not put that on your report, that the densities were not met?
**A Yes.**
Q Okay. I'm looking at November 6, 2001 now.
**A Is that further on down there?**
Q It is. Yeah, it's several pages back.
**A Okay.**
Q Okay? The second paragraph, right near the end it says, "This material", and again I think it's talking about fill material, "was fine sand and the water was penetrating good."
**A Mm-hmm.**
Q Okay? In your opinion, what percentage of that Borrow Source #1 was fine sand.
**A Boy, that would just be a scientific**

Page 21

**wild guess on my part. I couldn't accurately answer that.**
Q Okay. Do you have any idea how many different soil types, at least in your opinion, were in Borrow Source #1?
**A Well, there was clay, silt, sand. We even got into some stuff that looked like caliche.**
Q What's that?
**A It's, it's more of a -- well, it's kind of a hard, it's harder than clay, it's pretty hard material, usually white in color, light color. And it's pretty -- oh, I don't know how to really, how to really state it to you. But I guess the only thing I know is have to look it up in a book.**
Q What's your opinion as to the usefulness of that type of material?
**A Caliche?**
Q Yeah.
**A It is not good material.**
Q Okay. Do you know how much of that was encountered in the Borrow Source #1?
**A There wasn't too much of it. I would say less than 10 percent.**
Q Okay.
**A They pretty much stayed out of it when**

**they found out that they were getting into it. They circumvented it, went around it.**
Q Okay. Let's go to the next page, November 7, 2001.
**A Okay.**
Q Midway through you say, "It took approximately 1 hour and 45 minutes to do a lift from station 1+369 to 1+645." Do you see that?
**A Okay, yeah.**
Q Do you know why it was taking that long to do a lift for that distance?
**A I can't remember why it took that long.**
Q Okay. The next entry is November 14, 2001.
**A Okay.**
Q And you state, this is about halfway through, it says, "I informed the project manager." Would that be Todd Butikofer?
**A No. That would have been --**
Q Mark --
**A What's his name?**
Q Mark Standerfer?
**A Yeah.**
Q Okay, "that the material would have to be blended to full." What do you mean by that?



**A I should have, there should have been another word on there. To full depth.**
Q I see.
**A Because they were just kind of skimming the top. I can remember that, but in reading that I thought, whoops, I did not complete what I should have on that. But it would have been full depth.**
Q Full depth of the borrow source?
**A Lift.**
Q Of the lift, I see. The next sentence says, "At this point I was told they didn't need to if the compacted material met the density." Who told you that?
**A They did.**
Q "They" being Universal?
**A Yes.**
Q Okay. Did you agree with that or not?
**A I did not.**
Q Did you tell them that?
**A Yes.**
Q Okay. Now you can go on to the next sentence. What did you tell them?
**A I told them if the material showed dry material between 4 to 6 inches it was, that it**



**was, I was sure that the PE, which would have been Todd, would make them rework it regardless of the density if you run into dry pockets in there, which there was. I mean, you could just kick it up with your toe. And if you got a good density, good compaction on there, there's no way you're going to kick it up with your toe.**
Q Okay. So even if it met the density requirements, if there was any dry material between 4 inches and 6 inches, you were sure that Todd Butikofer would make Universal rework it?
**A Yes.**
Q Okay. The next page I think is November 30, 2001.
**A Okay.**
Q And about two-thirds of the way through you say, "Todd was also given a claim letter at this meeting which was not discussed except Todd told the contractor the original letter had to be mailed by them to the Federal Highway Vancouver office." What was the nature of this meeting that is referenced in November 30?
**A It was just discussion of how the work was progressing and all the difficulties that they was having and the weather itself and what was**



**expected.**
Q Okay. How often were you at the project site throughout the months of October and November?
**A Every day. Except when they weren't working, I wasn't there, naturally.**
Q Okay. Do you recall when your last day of work was on the project site?
**A I think it would be the 3rd or 4th, somewhere along in there. I don't remember exactly.**
Q December 3rd or 4th?
**A I believe.**
Q Okay.
**A I might be wrong on that. I'm just trying to go back in my memory now. Whatever -- I'm sure that you have all these records. And whatever last page, whatever that date is, that was my last day there.**
Q I see. I'm going to turn now, which should be two documents after your diary, and it's a Daily Record of Miscellaneous Items.
**A Okay.**
Q And we're going to mark it as Exhibit 3.
(Exhibit No. 3 is marked for

Page 173

A I don't know what that is.
Q The next page can you just tell me what the top and the bottom photographs are?
A I don't know what the top is or the bottom. There's footprints but I can't tell anything from that.
Q Okay. The next page it shows a water truck. Do you know, is that a Universal water truck?
A I would say yes.
Q Okay. And what is that a picture of?
A Them spraying water on top of their embankment.
Q Is that a sliver fill or that just a regular --
A I would -- I'd say yes, that is a sliver fill.
Q And the staking, I can see two little stakes there. Is that the edge of the clear area?
A I would say that's the slope stakes.
Q I see. Okay.
The next photograph is October 31, 2001 and is that an Universal water truck?
A Yes.
Q Can you tell whether those are sliver fills or regular embankments?
A That's a sliver fill.
Q Okay. The next photograph shows a hoe-pac. Do you know whether that's working on a sliver fill or not?
A That is a sliver fill.

Page 174

Q And we're alsmost done. The next photograph, October 30, is this the parking area?
A Yes.
Q And is that showing some of the mixing of water, and so forth?
A That shows the absolute saturation of the surrounding area of one dump of material placed in the middle of there.
Q Did you take the photograph?
A Either I or Al Stites.
Q And finally the last page, what is that?
A It's in the parking area, and just from the prior photo I would say it's just a different angle of the same spot.
Q Okay.
A The time, it's got the same time stamp on it, so I would assume that's exactly what it is.
THE REPORTER: Give me just a minute here, would you?
MR. LARKIN: Sure.
(Off the record)
MR. LARKIN: Are you all set?
THE REPORTER: Yes, sir. Thanks.
MR. LARKIN: We'll go for probably another half hour, and then we'll be done and take a little break.

Page 175

(Deposition Exhibit Number Forty-one was marked for identification)
Q (By Mr. Larkin) All right. Can you tell me what Exhibit Forty-one is?
A It is a -- it's called a report of testing, it's what I would get back from our materials lab in Vancouver on -- on specific -- on material that was sent in and what specific requirements of what tests they should perform on it.
Q And and who establishes what the testing requirements are?
A The contract.
Q Okay. About two-thirds of the way down -- first of all, this sample was -- consisted of two buckets from borrow source number one, right?
A Yes, that's what it says.
Q Okay. Taken -- sampled October 15, 2001?
A Yes.
Q And you were the one that -- it says submitted by Todd Butikofer. You're the one that submitted or transmitted the samples, what, to the Vancouver Office?
A I transmitted them, shipped them.
Q Shipped them.
A Yes.

Page 176

Q Okay. And so the actual report, this lab report, was run in Vancouver?
A Yes.
Q About two-thirds of the way down it says, characterizes the sample as poorly graded sand with silt and then there are Atterberg limits showing NP. Do you know what that means?
A Nonplastic.
Q What does that mean?
A That there's -- it's nonplastic, you can't -- you can't roll a -- I guess make it roll out, stick together, cling together, enough to --
Q Okay. And why did you write in -- is that your handwriting?
A That is.
Q -- this material has just been used a very little?
A Yes.
Q Why did you write that?
A I don't know.
Q Who were you writing that to?
A I don't even know that. Maybe to myself.
Q Did you write that after the report came back to you?
A Yes.

Page 177

Q Okay. And what was the basis for you concluding that this material, this sample that they took, had been used very little?
A Because -- I'm just going by what it looks -- it looks like hole number two, west side of the borrow pit, which would have been the back side of it from where it was, and we really didn't get into that much to get material out of there. That's a guess.
Q So just so I understand, the back side of borrow source number one was the west side?
A Correct.
Q It was within the boundary that you had staked out as borrow source number one then?
A Correct.
Q Okay. And you had taken out very little from that area?
A Correct.
Q How deep had you gone, just scratched the surface, or what?
A We probably was -- we was probably down close to that meter --
Q Okay.
A -- going up -- we were working to the west --
Q I see.
A -- down the -- actually down the north side to

Page 178

the west.
Q Was there a -- was there a slope to the borrow source number one at all, in other words was the east higher than the west side of the borrow source?
A No, it was kind of rounded from the north up and then kind of started back down again on the south side.
Q I see. Okay. But from east to west it was fairly consistent?
A Fairly flat consistent, yes.
Q The third page has some more handwriting. Again, is that your handwriting?
A That is my handwriting.
Q Okay. And you say -- there's a reference here to the source, the typewriting indicates between one point five and three meters -- you wrote in, I think, point one five meters to point three meters in depth?
A Yes.
Q And that's consistent with what you just told me?
A Yes.
(Deposition Exhibit Number Forty-two was marked for identification)
Q (By Mr. Larkin) All right. Exhibit Forty-two is another lab report. Again this looks like to be one that the government performed?

Page 179

A Yes, just to that page. This we didn't do. (Indicating)
Q I'm sorry. You're referring to the third page of Exhibit Forty-one?
A This is done by MTI.
Q Sure. Okay.
The front page of Exhibit Forty-two is prepared by the government?
A Yes, first page is.
Q Okay. And again it has your handwriting on it?
A Yes.
Q And this says, this material has not been used yet?
A Correct.
Q This material came from borrow source number one in the southwest corner of borrow pit number one, right?
A Correct, yeah.
Q The reference here is that it is clayey, c-l-a-y-e-y, sand, right?
A Yeah, that's what it says.
Q Okay. And that's what the test, the government test result confirmed?
A Yes.
Q And it has an Atterberg limit for liquid limit of twenty-four and a plasticity index of ten. Do you see that?

Page 180

A Yes.
Q Now, this material was taken, if you look at the third page, this is from hole number one, which is in borrow pit number one, --
A Uh-huh.
Q -- somewhere between a depth of point five three and one meters, right?
A Okay. Yeah.
Q Okay.
A Yes.
Q So this material was taken from borrow pit number one, right?
A Yes.
Q In an area of borrow pit number one that you agree Universal is authorized to take borrow source material?
A Yes.
Q And this shows that the material is clayey sand?
A Yes, that's what is says.
Q Okay. Now, you note that this material has not yet been used?
A That's correct.
Q Was the material to your knowledge ever used on the project?
A I don't think so.

Page 181

Q And why not?
A Well, this is -- had to have been after November 19th when I wrote that on there, and I know for a fact we didn't get into the southwest corner of the borrow source area.
Q Okay. Did you direct Universal in any fashion with respect to the findings on Exhibit Forty-two?
A Nope.
Q In other words, did you tell Universal, hey, you can't use material out of the southwest corner of borrow pit number one?
A No.
(Deposition Exhibit Number Forty-three was marked for identification)
Q (By Mr. Larkin) Exhibit Forty-three is another government test report dated November 19, 2001, and would you agree that this is a sample of the unclassified borrow from borrow source number one?
A Yes.
Q And the determination here is that the sample was silty sand?
A Yes.
Q And that the Atterberg limits are a liquid limit of NP?

Page 182

A Yes.
Q Which means, no plastic?
A Nonplastic.
Q Nonplastic.
And the plasticity index is also NP, right?
A Yes.
Q Okay. And would you agree that this sample was taken from borrow pit number one in the roadway stockpile?
A Yes, and the note I wrote on the front of the report says a dump truck had dumped it there.
Q Okay. And that sample was taken October 10, 2001?
A Yes.
(Deposition Exhibit Number Forty-four was marked for identification)
Q (By Mr. Larkin) Exhibit Forty-four is and E-mail from you to Elizabeth Firestone, and my question for you is on the third E-mail down, which again is an E-mail from you to Elizabeth, it looks like, November 15, 2001, you say that you don't have the USGS maps and you don't know where to find them either. Do you see that? It's about halfway down in the E-mail.
A Okay. (Examining document) Okay. I've got it here.

Page 183

Q Did you ever have the USGS maps in connection with the Camas project?
A I never did.
Q Why was Elizabeth looking for them at this point in time, November 15th?
A Because I -- I'd mentioned to her at the precon Universal had brought and had them, just had them there, they had soil maps, USGS soil maps.
Q Do you know whether the government had access to the USGS soil maps?
A I never had access to them.
Q Did you ever ask for them?
A I did not.
Q Why didn't you not ask for them?
A Because no one had me ask for them.
MR. LARKIN: Let's mark this.
(Deposition Exhibit Number Forty-five was marked for identification)
Q (By Mr. Larkin) Exhibit Forty-five is a November 20, 2001 government report on a testing of material of unclassified borrow from borrow source number one. Do you agree?
A Yes.
Q Okay. This report indicates that the sample was

Page 184

silty, comma, clayey, again c-l-a-y-e-y sand, correct?
A Yes.
Q And this has Atterberg limits of a liquid limit of twenty-two and a plasticity index of five?
A That's correct.
Q And apparently, according to your handwriting, this material was being used?
A Correct.
Q The third page references that -- this is in your handwriting -- the source was taken at a depth of about twelve to eighteen inches in borrow pit number one.
A That's correct.
Q Okay. So again this is material that was within the marked-out area of borrow pit number one?
A Yes.
Q That Universal was authorized to use?
A Yes.
Q And in fact directed to use?
A Yes.
Q Within borrow pit number one?
A Yes.
Q Can you tell me what the other handwriting is on that page?
A T-99 -- or AASHTO T-180, Method A. This procedure by MTI was done incorrectly, that's all that was