**MATERIALS TESTING & INSPECTION**

# MOISTURE DENSITY PROCTOR TEST REPORT

Environmental Services ❑ Geotechnical Engineering ❑ Construction Materials Testing ❑ Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| **Project:** | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| **Source:** | Borrow Pit 1 – Roadway Stockpile | | |
| **Date Obtained:** | October 10 2001 | | |
| **Sample ID:** | BP1 | | |
| **Atterberg Limits:** | | | |
| **ASHTO M145 Classification:** | A-2-4 Silty Sand | | |
| **Sample Prepared:** | Moist:<br>Dry: | Manual:<br>Mechanical: | |
| **Test Standard:** | AASHTO T 99:<br>ASTM D 698: | AASHTO T 180: X<br>ASTM D 1557: | Method<br>D |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 5.4 | 1728.4 | 1945.3 kg/m^3 | 11.2 % |
| | 2 | 8.6 | 1898.5 | ASTM D-4718, Correction | |
| | 3 | 11.7 | 1947.0 | for Oversize Particles | |
| | 4 | 16.0 | 1785.6 | 1945.3 kg/m^3 | |

| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | | |
| #8 | | |
| #10 | | |
| #16 | | |
| #20 | | |
| #30 | | |
| #40 | | |
| #50 | | |
| #60 | | |
| #80 | | |
| #100 | | |
| #200 | | |




Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Reviewed by: Dan King
Eastern Idaho Division Manager

RECEIVED
NOV 05 2001
BY PROJECT ENGINEER

MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT

PAGE # 1
REVISION DATE
OCTOBER 17, 2001

C:\ 2001_JOBS\E10059 CAMAS\PROCTOR BP2.DOC

Environmental Services ❑ Geotechnical Engineering ❑ Construction Materials Testing ❑ Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| **Project:** | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| **Source:** | Borrow Pit 1 – Hole # 1 0-0.2m | | |
| **Date Obtained:** | October 15, 2001 | | |
| **Sample ID:** | BP2 | | |
| **Atterberg Limits:** | Non-Plastic | | |
| **ASHTO M145 Classification:** | A-2-4 Silty Sand | | |
| **Sample Prepared:** | Moist:<br>Dry: | Manual:<br>Mechanical: | |
| **Test Standard:** | AASHTO T 99:<br>ASTM D 698: | AASHTO T 180: X<br>ASTM D 1557: | Method<br>D |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 8.9 | 1856.2 | 1905.9 kg/m^3 | 11.7 % |
| | 2 | 11.3 | 1901.5 | ASTM D-4718, Correction | |
| | 3 | 14.8 | 1853.0 | for Oversize Particles | |
| | 4 | 16.2 | 1781.2 | 1905.9 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | 100 | |
| #8 | 100 | |
| #10 | 100 | |
| #16 | 100 | |
| #20 | | |
| #30 | | |
| #40 | 94 | |
| #50 | 79 | |
| #60 | | |
| #80 | | |
| #100 | 37 | |
| #200 | 29.8 | |

Note:

Respectfully submitted,
**MATERIALS TESTING & INSPECTION INC.**

Reviewed by: Dan King
Eastern Idaho Division Manager

RECEIVED
OCT 24 2001
BY PROJECT ENGINEER

**MATERIALS TESTING & INSPECTION**

# MOISTURE DENSITY PROCTOR TEST REPORT



Environmental Services ❑ Geotechnical Engineering ❑ Construction Materials Testing ❑ Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | | |
|---|---|---|---|---|
| **Project:** | Camas NWR Complex ID RRP-CAMA 101(1) | | | |
| **Source:** | Borrow Pit 1 – Hole # 1 0.53-1m | | | |
| **Date Obtained:** | October 15, 2001 | | | |
| **Sample ID:** | BP3 | | | |
| **Atterberg Limits:** | Liquid Limit 20.2 | Plastic Limit 15.2 | Plastic Index 5.0 | |
| **ASHTO M145 Classification:** | A-4 Clayey Silt | | | |
| **Sample Prepared:** | Moist:<br>Dry: | | Manual:<br>Mechanical: | |
| **Test Standard:** | AASHTO T 99: X<br>ASTM D 698: | | AASHTO T 180:<br>ASTM D 1557: | **Method**<br>C |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 8.4 | 1718.2 | **1790.6 kg/m^3** | **13.4 %** |
| | 2 | 13.8 | 1786.5 | ASTM D-4718, Correction | |
| | 3 | 16.8 | 1758.7 | for Oversize Particles | |
| | 4 | 20.0 | 1655.3 | **1790.6 kg/m^3** | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | 100 | |
| #4 | 97 | |
| #8 | | |
| #10 | 94 | |
| #16 | 92 | |
| #20 | | |
| #30 | | |
| #40 | 86 | |
| #50 | 78 | |
| #60 | | |
| #80 | | |
| #100 | 59 | |
| #200 | 52.1 | |

RECEIVED
OCT 24 2001
BY PROJECT ENGINEER

Note:

Respectfully submitted,
**MATERIALS TESTING & INSPECTION INC.**

Reviewed by: Dan King
Eastern Idaho Division Manager

**MATERIALS TESTING & INSPECTION**

# MOISTURE DENSITY PROCTOR TEST REPORT

Environmental Services ❑ Geotechnical Engineering ❑ Construction Materials Testing ❑ Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| **Project:** | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| **Source:** | Borrow Pit 1 – Hole # 2 0-0.2m | | |
| **Date Obtained:** | October 15, 2001 | | |
| **Sample ID:** | BP4 | | |
| **Atterberg Limits:** | Non-Plastic | | |
| **ASHTO M145 Classification:** | A-2-4 Silty Sand | | |
| **Sample Prepared:** | Moist:<br>Dry: | Manual:<br>Mechanical: | |
| **Test Standard:** | AASHTO T 99:<br>ASTM D 698: | AASHTO T 180: X<br>ASTM D 1557: | **Method**<br>D |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 7.6 | 1708.4 | **1796.2 kg/m^3** | **10.8 %** |
| | 2 | 9.5 | 1774.6 | ASTM D-4718, Correction | |
| | 3 | 11.3 | 1799.6 | for Oversize Particles | |
| | 4 | 14.2 | 1690.0 | **1796.2 kg/m^3** | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | | |
| #8 | 99 | |
| #10 | 99 | |
| #16 | 99 | |
| #20 | | |
| #30 | | |
| #40 | 91 | |
| #50 | 66 | |
| #60 | | |
| #80 | | |
| #100 | 17 | |
| #200 | 11.7 | |

RECEIVED
OCT 24 2001
BY PROJECT ENGINEER

Note:

Respectfully submitted,
**MATERIALS TESTING & INSPECTION INC.**

Reviewed by: Dan King
Eastern Idaho Division Manager

MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT



Environmental Services ❑ Geotechnical Engineering ❑ Construction Materials Testing ❑ Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| **Project:** | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| **Source:** | Borrow Pit 1 – Hole # 2 1.5-3m | | |
| **Date Obtained:** | October 15, 2001 | | |
| **Sample ID:** | BP5 | | |
| **Atterberg Limits:** | Non-Plastic | | |
| **ASHTO M145 Classification:** | A-3 Fine Sand | | |
| **Sample Prepared:** | Moist:<br>Dry: | Manual:<br>Mechanical: | |
| **Test Standard:** | AASHTO T 99: X<br>ASTM D 698: | AASHTO T 180:<br>ASTM D 1557: | **Method**<br>C |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 7.9 | 1560.1 | **1599.7 kg/m^3** | **14.5 %** |
| | 2 | 10.4 | 1585.3 | ASTM D-4718, Correction | |
| | 3 | 13.7 | 1598.8 | for Oversize Particles | |
| | 4 | 21.8 | 1550.0 | **1599.7 kg/m^3** | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | | |
| #8 | 99 | |
| #10 | 99 | |
| #16 | 99 | |
| #20 | 98 | |
| #30 | | |
| #40 | 93 | |
| #50 | 66 | |
| #60 | | |
| #80 | | |
| #100 | 6 | |
| #200 | 1.2 | |

RECEIVED
OCT 24 2001
BY PROJECT ENGINEER

Note:

Respectfully submitted,
**MATERIALS TESTING & INSPECTION INC.**

Reviewed by: **Dan King**
Eastern Idaho Division Manager

MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT



Environmental Services ❑ Geotechnical Engineering ❑ Construction Materials Testing ❑ Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

Corrected – Method C used

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | |
|---|---|
| **Project:** | Camas NWR Complex ID RRP-CAMA 101(1) |
| **Source:** | Borrow Pit 1 – Hole # 4 0.8-1m |
| **Date Obtained:** | October 15, 2001 |
| **Sample ID:** | BP6 |
| **Atterberg Limits:** | Liquid Limit 30.8 Plastic Limit 19.1 Plasticity Index 11.7 |
| **ASHTO M145 Classification:** | A-6 Silty Clay |
| **Sample Prepared:** | Moist: Manual:<br>Dry: Mechanical: |
| **Test Standard:** | AASHTO T 99: X AASHTO T 180: **Method**<br>ASTM D 698: ASTM D 1557: C |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 16.5 | 1455.8 | 1684.7 kg/m^3 | 19.5 % |
| | 2 | 20.6 | 1655.9 | ASTM D-4718, Correction | |
| | 3 | 21.1 | 1622.8 | for Oversize Particles | |
| | | | | 1684.7 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | | |
| #8 | 100 | |
| #10 | 99 | |
| #16 | 99 | |
| #20 | | |
| #30 | | |
| #40 | 96 | |
| #50 | 92 | |
| #60 | | |
| #80 | | |
| #100 | 83 | |
| #200 | 78.0 | |

RECEIVED
OCT 24 2001
BY PROJECT ENGINEER

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Reviewed by: Dan King
Eastern Idaho Division Manager

MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT

PAGE # 1
REVISION DATE
NOVEMBER 15, 2001

Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| Project: | Camas NWR Complex ID PRP-CAMA 101(1) | | |
| Source: | Borrow Pit 1 – 0-0.35m | | |
| Date Obtained: | October 17 2001 | | |
| Sample ID. | BP7 | | |
| Atterberg Limits: | | | |
| ASHTO M145 Classification: | A-2-4 Silty Sand | | |
| Sample Prepared: | Moist. X / Dry: | Manual: X / Mechanical: | |
| Test Standard: | AASHTO T 99 / ASTM D 698 | AASHTO T 180. X / ASTM D 1557 | Method D |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 1.7 | 1676.5 | 1792.2 kg/m^3 | 7.9 % |
| | 2 | 4.1 | 1751.8 | ASTM D-4718, Correction | |
| | 3 | 7.8 | 1782.7 | for Oversize Particles | |
| | 4 | 10.0 | 1732.0 | 1792.2 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | | |
| #8 | | |
| #10 | | |
| #16 | | |
| #20 | | |
| #30 | | |
| #40 | | |
| #50 | | |
| #60 | | |
| #80 | | |
| #100 | | |
| #200 | | |

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Comment [Hdb1]: If there is more than 30% retained (below 70% passing) on the 3/4" screen, please provide a note stating the following: "This proctor does not meet the criteria set forth in ASTM D-4718. There is more than 30 percent retained on the 3/4" screen."

Comment [Hdb2]: [illegible]

Reviewed by: Dan King
Eastern Idaho Division Manager

1230 North Skyline Drive, Ste. C, Idaho Falls, ID 83402 208 529-8242 Fax 208 529-8811

MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT

PAGE # 1
REVISION DATE
OCTOBER 23, 2001

[illegible]

Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| Project: | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| Source: | Borrow Pit 2 – Pit 1 0.3-1m | | |
| Date Obtained: | October 16, 2001 | | |
| Sample ID: | BPR | | |
| Atterberg Limits: | Liquid Limit 25.9 Plastic Limit 15.6 Plasticity Index 10.3 | | |
| ASHTO M145 Classification. | A-6 Clayey Silt | | |
| Sample Prepared: | Moist: Dry: | Manual: Mechanical: | |
| Test Standard: | AASHTO T 99: X ASTM D 698: | AASHTO T 180: ASTM D 1557: | Method B |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 14.4 | 1640.1 | 1694.9 kg/m^3 | 18.2 % |
| | 2 | 17.4 | 1683.0 | ASTM D-4718, Correction | |
| | 3 | 18.9 | 1702.5 | for Oversize Particles | |
| | 4 | 21.5 | 1648.0 | 1694.9 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | 100 | |
| #8 | 99 | |
| #10 | 99 | |
| #16 | 99 | |
| #20 | | |
| #30 | | |
| #40 | 96 | |
| #50 | 90 | |
| #60 | | |
| #80 | | |
| #100 | 57 | |
| #200 | 43.1 | |

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Reviewed by: Dan King
Eastern Idaho Division Manager

Comment [Babs1]: If there is more than 30% retained (below 70% passing) on the ¾" screen, please include a note stating the following: "This proctor does not meet the criteria as set forth in ASTM 4718. There is more than 30 percent retained on the ¾" screen."

Comment [Babs2]:

MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT



Environmental Services ❑ Geotechnical Engineering ❑ Construction Materials Testing ❑ Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| Project: | Camas NWR Complex ID RRP-CAMA 101(1) | | |
| Source: | Borrow Pit 2 – 0.5-1m | | |
| Date Obtained: | October 16, 2001 | | |
| Sample ID: | BP9 | | |
| Atterberg Limits: | Non-Plastic | | |
| ASHTO M145 Classification: | A-2-4 Silty Sand | | |
| Sample Prepared: | Moist:<br>Dry: | Manual:<br>Mechanical: | |
| Test Standard: | AASHTO T 99:<br>ASTM D 698: | AASHTO T 180: X<br>ASTM D 1557: | Method<br>D |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 8.1 | 1710.1 | 1813.8 kg/m^3 | 12.3 % |
| | 2 | 10.3 | 1786.1 | ASTM D-4718, Correction | |
| | 3 | 13.2 | 1814.3 | for Oversize Particles | |
| | 4 | 14.6 | 1775.3 | 1813.8 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | 100 | |
| #8 | 99 | |
| #10 | 99 | |
| #16 | 98 | |
| #20 | | |
| #30 | | |
| #40 | 93 | |
| #50 | 85 | |
| #60 | | |
| #80 | | |
| #100 | 40 | |
| #200 | 18.1 | |

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Reviewed by: Dan King
Eastern Idaho Division Manager

RECEIVED
NOV 06 2001
BY PROJECT ENGINEER

MATERIALS TESTING & INSPECTION

# MOISTURE DENSITY PROCTOR TEST REPORT

PAGE # 1
REVISION DATE
OCTOBER 29, 2001

C:\DOCUMENTS AND SETTINGS\[illegible] SETTINGS\TEMPORARY INTERNET FILES\[illegible]\PROCTOR [illegible].DOC

Environmental Services | Geotechnical Engineering | Construction Materials Testing | Special Inspections

Universal Construction
P.O. Box 187
Emmett, ID 83617

As requested MTI has performed a proctor on the sample referenced below. The testing was performed in accordance with current AASHTO or ASTM standards. The results obtained in our laboratory were as follows:

| | | | |
|---|---|---|---|
| Project: | Camas NWR Campler ID RIU-CAMA 101(1) | | |
| Source: | Borrow Pit 1 | | |
| Date Obtained: | October 25, 2001 | | |
| Sample ID: | 6P10 | | |
| Atterberg Limits: | | | |
| AASHTO M145 Classification: | A-2-4 Silty Sand | | |
| Sample Prepared: | Moist X<br>Dry | Manual X<br>Mechanical | |
| Test Standard: | AASHTO T 99<br>ASTM D 698 | AASHTO T 180, X<br>ASTM D 1557 | Method<br>D |

| Assumed Sp. Gr. | Point Number | Percent Moisture | Dry Density | Maximum Dry Density | Optimum % Moisture |
|---|---|---|---|---|---|
| 2.60 | 1 | 5.6 | 1751.4 | 1950.8 kg/m^3 | 11.2 % |
| | 2 | 8.5 | 1889.9 | ASTM D-4718, Correction | |
| | 3 | 10.3 | 1959.9 | for Oversize Particles | |
| | 4 | 12.4 | 1936.1 | 1950.8 kg/m^3 | |




| Sieve Size | Percent Passing | Sample Specs |
|---|---|---|
| 3.0" | | |
| 1.5" | | |
| 1.25" | | |
| 1.0" | | |
| 7/8" | | |
| 3/4" | | |
| 5/8" | | |
| 1/2" | | |
| 3/8" | | |
| 1/4" | | |
| #4 | | |
| #8 | | |
| #10 | | |
| #16 | | |
| #20 | | |
| #30 | | |
| #40 | | |
| #50 | | |
| #60 | | |
| #80 | | |
| #100 | | |
| #200 | | |

Note:

Respectfully submitted,
MATERIALS TESTING & INSPECTION INC.

Reviewed by: Dan King
Eastern Idaho Division Manager

Comment [Bab1]: If there is more than 30% retained (below 70% passing) on the 3/4" screen, please include a note stating the following: "This proctor does not meet the criteria as set forth in ASTM 4718. There is more than 30 percent retained on the 3/4" screen."

Comment [Bab2]: [illegible]

1230 North Skyline Drive, Ste. C, Idaho Falls, ID 83402 208 529-8242 Fax 208 529-8911

DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
WESTERN FEDERAL LANDS HIGHWAY DIVISION
MATERIALS SECTION

REPORT OF TESTING
Nov 19, 2001
LABORATORY CONTROL NUMBER
W-01-1981-SO

PROJECT NAME: Camas NWR Complex
ACCT NO.: 419-17-16-52-4320-001M
SUBMITTED BY: Todd Butikofer
ADDRESS: 2874 East 650 North
PO Box 268
Roberts, ID 83444
PHONE: 208-228-2059
FAX: 208-228-2065

AGENCY: WFLHD
PROJECT NUMBER: ID RRP-CAMA 101(1)
DATE SAMPLED: 10/10/01
DATE SHIPPED: 10/17/01
DATE RECEIVED: 11/07/01

SAMPLE OF: Unclassified borrow
SAMPLED BY: MTI
SAMPLE NO.: Proctor-001
NO. SACKS: 1 bucket HOLE: DEPTH:
SOURCE NO.: - - QUANTITY REPRESENTED:
SOURCE NAME: Borrow Source #1
LOCATION: Roadway New alignment OWNER: Universal Construc
COUNTY: Jefferson STATE: ID INTENDED USE: Embankment
REMARKS:
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

SIEVE ANALYSIS
AS RECEIVED

| SIEVE SIZE | PERCENT PASSING |
|---|---|
| 19.0mm | 100.0 |
| 12.5mm | 100.0 |
| 9.5mm | 99.9 |
| 4.75mm | 99.8 |
| 2.00mm | 99.7 |
| 425µm | 95.9 |
| 75µm | 27.1 |
| 20µm | 14.7 |

SOIL CLASSIFICATION

AASHTO: A-2-4(0); GR-SI-SAND
UNIFIED: SM; Silty sand

RECEIVED
NOV 19 2001
BY PROJECT ENGINEER

ATTERBERG LIMITS

| | |
|---|---|
| LIQUID LIMIT | NP |
| PLASTICITY INDEX | NP |

SPECIFIC GRAVITY 2.64

COMPACTION AASHTO T-180 METHOD D
MAXIMUM DENSITY kg/m3 1986 PERCENT OPTIMUM MOISTURE 10.3

DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
WESTERN FEDERAL LANDS HIGHWAY DIVISION
MATERIALS SECTION

REPORT OF TESTING
Nov 19, 2001
LABORATORY CONTROL NUMBER
W-01-1982-SO

PROJECT NAME: Camas NWR Complex
ACCT NO.: 419-17-16-52-4320-001M
SUBMITTED BY: Todd Butikofer
ADDRESS: 2874 East 650 North
PO Box 268
Roberts, ID 83444
PHONE: 208-228-2059
FAX: 208-228-2065

AGENCY: WFLHD
PROJECT NUMBER: ID RRP-CAMA 101(1)
DATE SAMPLED: 10/15/01
DATE SHIPPED: 10/17/01
DATE RECEIVED: 11/07/01

SAMPLE OF: Unclassified borrow
SAMPLED BY: MTI SAMPLE NO.: Proctor-002
NO. SACKS: 2 buckets HOLE: DEPTH:
SOURCE NO.: - - QUANTITY REPRESENTED:
SOURCE NAME: Borrow Source #1
LOCATION: HOLE #1, SW CORNER OF BORROW PIT #1 OWNER: Universal Construc
COUNTY: Jefferson STATE: ID INTENDED USE: Embankment
REMARKS:
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

SIEVE ANALYSIS
AS RECEIVED

| SIEVE SIZE | PERCENT PASSING |
|---|---|
| 19.0mm | 100.0 |
| 12.5mm | 99.9 |
| 9.5mm | 99.8 |
| 4.75mm | 98.3 |
| 2.00mm | 95.2 |
| 425μm | 90.0 |
| 75μm | 45.5 |
| 20μm | 29.4 |

RECEIVED
NOV 19 2001
BY PROJECT ENGINEER

SOIL CLASSIFICATION

AASHTO: A-4(1); GR-SI-SAND
UNIFIED: SC; Clayey sand

ATTERBERG LIMITS
LIQUID LIMIT 24
PLASTICITY INDEX 10

SPECIFIC GRAVITY 2.63

COMPACTION AASHTO T-99 METHOD C
MAXIMUM DENSITY kg/m3 1797 PERCENT OPTIMUM MOISTURE 13.8



NOV-19-01 MON 02:42 PM WFLHD/MATERIALS GEOTECH FAX:3609967845 PAGE 4
236

DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
WESTERN FEDERAL LANDS HIGHWAY DIVISION
MATERIALS SECTION

REPORT OF TESTING
Nov 19, 2001
LABORATORY CONTROL NUMBER
W-01-1983-SO

PROJECT NAME: Camas NWR Complex
ACCT NO.: 419-17-16-52-4320-001M
SUBMITTED BY: Todd Butikofer
ADDRESS: 2874 East 650 North
PO Box 268
Roberts, ID 83444
PHONE: 208-228-2059
FAX: 208-228-2065

AGENCY: WFLHD
PROJECT NUMBER: ID RRP-CAMA 101(1)
DATE SAMPLED: 10/15/01
DATE SHIPPED: 10/17/01
DATE RECEIVED: 11/07/01

SAMPLE OF: Unclassified borrow
SAMPLED BY: MTI SAMPLE NO.: Proctor-003
NO. SACKS: 2 buckets HOLE: DEPTH:
SOURCE NO.: - - QUANTITY REPRESENTED:
SOURCE NAME: Borrow Source #1
LOCATION: hole #2, west side of borrow pit #1 OWNER: Universal Construc
COUNTY: Jefferson STATE: ID INTENDED USE: Embankment
REMARKS:
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

SIEVE ANALYSIS
AS RECEIVED

| SIEVE SIZE | PERCENT PASSING |
|---|---|
| 12.5mm | 100.0 |
| 9.5mm | 100.0 |
| 4.75mm | 99.7 |
| 2.00mm | 99.2 |
| 425µm | 92.8 |
| 75µm | 9.35 |
| 20µm | 5.97 |

SOIL CLASSIFICATION

AASHTO: A-3(0); GR-SI-SAND
UNIFIED: SP-SM; Poorly graded sand with si

RECEIVED
NOV 19 2001
BY PROJECT ENGINEER

ATTERBERG LIMITS

| | |
|---|---|
| LIQUID LIMIT | NP |
| PLASTICITY INDEX | NP |

SPECIFIC GRAVITY 2.60

COMPACTION AASHTO T-99 METHOD C
MAXIMUM DENSITY kg/m3 1724 PERCENT OPTIMUM MOISTURE 12.9

DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
WESTERN FEDERAL LANDS HIGHWAY DIVISION
MATERIALS SECTION

REPORT OF TESTING
Nov 19, 2001
LABORATORY CONTROL NUMBER
W-01-1984-SO

PROJECT NAME: Camas NWR Complex
ACCT NO.: 419-17-16-52-4320-001M
SUBMITTED BY: Todd Butikofer
ADDRESS: 2874 East 650 North
PO Box 268
Roberts, ID 83444
PHONE: 208-228-2059
FAX: 208-228-2065

AGENCY: WFLHD
PROJECT NUMBER: ID RRP-CAMA 101(1)
DATE SAMPLED: 10/15/01
DATE SHIPPED: 10/17/01
DATE RECEIVED: 11/07/01

SAMPLE OF: Unclassified borrow
SAMPLED BY: MTI SAMPLE NO.: Proctor-004
NO. SACKS: 1 bucket HOLE: DEPTH:
SOURCE NO.: - - QUANTITY REPRESENTED:
SOURCE NAME: Borrow Source #1
LOCATION: hole #4, SE corner, borrow pit #1 OWNER: Universal Construc
COUNTY: Jefferson STATE: ID INTENDED USE: Embankment
REMARKS:
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

SIEVE ANALYSIS
AS RECEIVED

| SIEVE SIZE | PERCENT PASSING |
|---|---|
| 12.5mm | 100.0 |
| 9.5mm | 100.0 |
| 4.75mm | 99.8 |
| 2.00mm | 99.2 |
| 425µm | 96.0 |
| 75µm | 77.2 |
| 20µm | 49.6 |

SOIL CLASSIFICATION

AASHTO: A-6(8); GR-SA-CLAY
UNIFIED: CL; Lean clay with sand

ATTERBERG LIMITS
LIQUID LIMIT 28
PLASTICITY INDEX 13

RECEIVED
NOV 19 2001
BY PROJECT ENGINEER

SPECIFIC GRAVITY 2.59

COMPACTION AASHTO T-99 METHOD C
MAXIMUM DENSITY kg/m3 1792 PERCENT OPTIMUM MOISTURE 16.0

PAGE 1 OF 2 PAGES (W-01-1984-SO)


NOV-19-01 MON 07:43 PM WFLHD/MATERIALS GEOTE FAX:3606967845 PAGE 8

DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
WESTERN FEDERAL LANDS HIGHWAY DIVISION
MATERIALS SECTION

REPORT OF TESTING
Nov 20, 2001
LABORATORY CONTROL NUMBER
W-01-1985-SO

PROJECT NAME: Camas NWR Complex
ACCT NO.: 419-17-16-52-4320-001M
SUBMITTED BY: Todd Butikofer
ADDRESS: 2874 East 650 North
PO Box 268
Roberts, ID 83444
PHONE: 208-228-2059
FAX: 208-228-2065

AGENCY: WFLHD
PROJECT NUMBER: ID RRP-CAMA 101(1)
DATE SAMPLED: 10/01/01
DATE SHIPPED: 10/17/01
DATE RECEIVED: 11/07/01

SAMPLE OF: Unclassified borrow
SAMPLED BY: MTI SAMPLE NO.: Proctor-005
NO. SACKS: 1 bucket HOLE: DEPTH:
SOURCE NO.: - - QUANTITY REPRESENTED:
SOURCE NAME: Borrow Source #1
LOCATION: center of borrow area OWNER: Universal Construc
COUNTY: Jefferson STATE: ID INTENDED USE: Embankment
REMARKS:
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

SIEVE ANALYSIS
AS RECEIVED

| SIEVE SIZE | PERCENT PASSING |
|---|---|
| 9.5mm | 100.0 |
| 4.75mm | 100.0 |
| 2.00mm | 99.2 |
| 425µm | 96.7 |
| 75µm | 27.9 |
| 20µm | 21.3 |

SOIL CLASSIFICATION

AASHTO: A-2-4(0); GR-SI-SAND
UNIFIED: SC-SM; Silty, clayey sand

ATTERBERG LIMITS
LIQUID LIMIT 22
PLASTICITY INDEX 5

SPECIFIC GRAVITY 2.60

COMPACTION AASHTO T-180 METHOD D
MAXIMUM DENSITY kg/m3 1967 PERCENT OPTIMUM MOISTURE 11.5

RECEIVED
NOV 20 2001
BY PROJECT ENGINEER



NOV-20-01 TUE 08:44 AM WFLHD/MATERIALS GEOTECH FAX:3609967845 PAGE 2
239

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNIVERSAL CONSTRUCTION, INC., | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 03-1502C |
| THE UNITED STATES, | ) | No. 03-2370C |
| Defendant. | ) | |
| | ) | |

DEPOSITION OF LLOYD G. STEENBLIK
JULY 13, 2005

REPORTED BY:

MONICA M. ARCHULETA, CSR NO. 471

NOTARY PUBLIC

REPORTER'S CERTIFICATE

I, MONICA M. ARCHULETA, CSR No. 471, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 20th day of July, 2005.

MONICA ARCHULETA NOTARY PUBLIC STATE OF IDAHO

MONICA M. ARCHULETA, CSR NO. 471
Notary Public
P.O. Box 2636
Boise, Idaho 83701-2636
My commission expires August 3, 2006

results and relied on the information in the test results.

Q. Well, let me ask the question this way. You obviously have got a lot of impressive experience here. And I don't mean this to sound disrespectful. But it seems to me that you are a lot less qualified to opine on the soils than the MTI people, particularly where it's MTI's own work that is in question here.

Would you disagree with that statement?

MR. LARKIN: I'm going to object. It's argumentative.

Q. (BY MR. O'CONNELL) You can answer.

MR. LARKIN: He has listed out all of the materials he has reviewed.

MR. O'CONNELL: He can answer. You have stated your objection.

THE WITNESS: I'm sorry. Repeat the question.

Q. (BY MR. O'CONNELL) The question is, the MTI people seem to know and have a lot more experience, and education, and training in soils analysis than you do. And what I'm asking you is, wouldn't you agree with me that they are a lot more qualified to opine about their own work



on this project than you are?

A. I think that they are more qualified to talk about their work. But there is other issues with regards to this than there were. There is the issues about the contract. And they weren't a party to the contract. They were doing soils reports. You know, they did testing as a contractor to Universal. They weren't a party to the contract. Universal had the contract. So as a contractor, you know, I have some experience with soils. And what it takes to understand soils reports and their relation to the contract.

Q. You mentioned there's issues relating to the contract. Which issues relating to the contract are you talking about?

A. Well, for example, the issue about the mandatory borrow sources.

Q. What is the issue relating to the mandatory borrow sources?

A. Well, one of the issues in this case was that the government provided a mandatory borrow source and acquired Universal to use that mandatory borrow source in construction of roads and embankments.

Q. In your view is there an issue, though,



as to whether or not they were required to use the borrow source?

A. Whether or not they were required?

Q. Yes.

A. There is no issue. They were required to use that borrow source.

Q. And I agree with you. What is the issue relating to the borrow source?

A. Whether the borrow source material was the same as what the government said that that borrow material that they required the contractor to use was.

Q. I see. But wouldn't that again fall back into the range of expertise that would be more within MTI's realm?

A. I think MTI has testified or in their report has stated that the material is not the same as what the contract requires. And I agree with that.

Q. Did you want to say something?

A. Just that the contract specified that the material was going to be a sandy loam -- I'm sorry. Yes, a sandy loam material. And the material in the borrow pit was not a sandy loam material.



Q. So what do you have to say about the material in the borrow pit not being sandy loam that is different than what MTI said? Or additional to what MTI said?

A. What do I have to say that is different?

Q. Or additional.

A. Well, the government said that the soils in the borrow pit, number one, would be primarily sandy loam. And they didn't say that there would be any other soil in the borrow pit than sandy loam. They specified the dimensions of the borrow pit. And when they didn't specify any other material than sandy loam material in the borrow pit, that is what the contractor could expect to be in the borrow pit.

Q. So it's your view that the contract said there would only be sandy loam in the borrow pit?

A. It's primarily sandy loam. But they didn't specify anything else that would be there.

Q. They didn't say anything else?

A. They didn't say that anything else would be in the borrow pit.

Q. Do you remember the contract using the

paragraph from the bottom. You say, "The government failed to conduct a geotechnical analysis."
When you say the government failed to conduct a geotechnical analysis, are you trying to say that there was an obligation on the part of the government to perform a geotechnical analysis?
A. No, I'm not saying that there was an obligation. But the government did -- the government is the one who said that the material at the pit would be sandy loam. And the government did not provide a geotechnical analysis. It was not referenced in the section of the spec where the contractor can send for information about the job site. And the government didn't provide a geotechnical analysis. They didn't provide any information about the borrow pit other than the material would be sandy loam underlain by clays.
Q. But what I'm trying to understand here. Are you saying that the government did something wrong by not doing a geotechnical analysis and then stating that the material would be primarily sandy loam, which may be underlain by clayey



materials?
MR. LARKIN: Objection; calls for a legal conclusion. You can answer.
THE WITNESS: No, I'm not saying that they did anything wrong. I'm just saying that had they done a geotechnical analysis they may have known that the material in the pit was something different than sandy loam as they represented.
Q. (BY MR. O'CONNELL) At the bottom of page four you say, "Borrow Pit 1 clearly contains materials which were not represented by the government to be present in the borrow pit." Which materials are you talking about?
A. Which materials are clearly not the same as what the government represented?
Q. Yes.
A. There are materials in MTI's report that clearly are not sandy loam materials. And they list in their report a couple of specific examples. The A-3 material, which was a sandy material, was not a sandy loam. And the A-4 material, and A-6 material, of the proctor tests that they took were not sandy loam.
Q. And, again, when you are expressing



this opinion, you are not telling us anything that is different than what is in the MTI reports; correct?
MR. O'CONNELL: Object to form.
THE WITNESS: I'm not telling you anything different than what is in the MTI report. That's correct.
Q. (BY MR. O'CONNELL) Do you have an opinion as to how much material in Borrow Source No. 1 was sandy loam?
A. How much was?
Q. Yes.
A. No, I don't have an opinion about how much was. But I know that all of it was not.
Q. So is your view that for the government to have performed its obligations in this contract that all of the material in Borrow Pit No. 1 would had to have been sandy loam?
MR. LARKIN: Object to form. Calls for a legal conclusion. You can answer.
THE WITNESS: I believe that primarily all of the material in the borrow pit needed to be sandy loam in order for it to be sandy loam.
Q. (BY MR. O'CONNELL) Were you here when Mr. Cram testified that he didn't know if



primarily sandy loam meant 51-percent sandy loam or 99-percent sandy loam?
A. That would be one of the things I would disagree with in his deposition.
Q. What about that do you disagree with?
A. I believe that we can determine from the contract as a whole what primarily sandy loam means. For example, if the limits of the borrow established by the government in the plans and specs don't provide enough material for there to be any waste, then all of the material could be expected to be sandy loam. And in this particular case that is the case. The amount of borrow specified by the government in the two borrow sources does not provide enough material when you account for stripping and the side slopes that were specified. The plans show about 3,400 cubic meters of borrow required. And there is like only 2,700 cubic meters of material available in the two borrow sources.
In order for the contractor to have material that was not sandy loam in the pit, then he would have had to have had some allowance for waste. And there was no allowance provided in the contract for waste.

Q. So in your view it would have to be 100-percent sandy loam, then?
A. I believe that there would need to be 100-percent sandy loam in order for the contract to be consistent with each other.
Q. Do you have an opinion as to whether or not it's possible to have constructed this roadway out of A-4 material in the construction of this roadway?
A. I have an opinion that A-4 was not an acceptable material for the contractor to use for unclassified borrow. It was prohibited by the specifications to be used as unclassified borrow.
Q. So your view is that the contract prohibited the use of any A-4 material for the construction of this roadway?
A. A-4 is not an acceptable material in accordance with the specifications, the way I read them.
Q. What about the specifications do you read that tells you that?
A. Section 704.06. Unclassified Borrow. It says, "Furnished granular material free of excess moisture, muck, frozen lumps, roots, sod or other deleterious material conforming to the



following. Maximum dimension, 600 millimeters. Soil classification, A-1, A-3 or A.2.4." And A-4 is not one of the acceptable materials.
Q. So your understanding of that provision then would be that the contractor couldn't use any A-4 material in constructing this road?
A. My view would be that A-4 would be an unacceptable material.
Q. Setting aside the contract for a second. Just as an engineer, though, do you have an opinion as to whether or not A-4 material could be used to construct this particular roadway?
MR. LARKIN: You mean in any other project other than the Camas project?
Q. (BY MR. O'CONNELL) No, in this project. Could you have used A-4 material as a component of the soil that would be used to construct this road?
MR. LARKIN: Setting aside the contract requirements?
Q. (BY MR. O'CONNELL) I'm just asking you in your opinion as an engineer is that possible or not possible?
A. Well, it wouldn't meet the contract



requirements.
Q. That's not what I'm asking you. I'm asking you, do you have an opinion as an engineer whether or not A-4 material could be used to construct this roadway?
A. You can use any material you want to construct a roadway. In fact, the government said go out to this borrow area and use it to make the roadway. In fact, the government mandated that they do that.
Q. So your opinion is that you can use any material to construct a roadway?
A. No.
Q. So what is your opinion?
A. With regards to A-4?
Q. Yes.
A. A-4 would not be as good a material as the A. 2.4. Or an A-.3 or an A 1.
Q. But you could use it?
A. It could be used.
Q. So your understanding of that specification section then would be -- also be, then, that you could use the A-3 sand material; correct?
A. A-3 is an acceptable material for



unclassified borrow. But it is not sandy loam.
Q. Let's move on to Opinion 2. Opinion 2 is based upon the soils reports from MTI. I don't want to keep asking you the same question. Will your answer always be the same if I asked you if your opinion was based on anything besides MTI's soils reports?
A. No. I mean, yes, my answer will always be the same. We didn't do any additional testing other than we relied on MTI's testing. And the testing done by the government.
MR. LARKIN: Review of the soils classification?
MR. O'CONNELL: Yes.
Q. (BY MR. O'CONNELL) Page six. The second paragraph. The underlying material you say, "That is not typically used in the structural section of a roadway. Nor did the material meet the gradation or durability requirements the contract specified and generally accepted construction specifications."
Are you just quoting MTI there, I take it?
A. Yes. That is a quote from MTI's report.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNIVERSAL CONSTRUCTION, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03-1502C, |
| | ) | No. 03-2370C |
| | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

--------------------------------

ORIGINAL

TELEPHONE DEPOSITION OF CRAIG SANDERS

Taken on behalf of the Plaintiff

November 2, 2004

Vancouver, Washington

CERTIFICATE

I, Frances M. Galisky, Certified Shorthand Reporter for Oregon, Certified Court Reporter for Washington, and a Registered Professional Reporter, do hereby certify that CRAIG SANDERS telephonically appeared at the time and place set forth herein; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were transcribed using computer-aided transcription under my direction; and the foregoing transcript constitutes a full, true and accurate record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand and stamp at Portland, Oregon, this 15th day of November, 2004.

Frances M. Galisky
Oregon CSR No. 90-0014
Washington CCR No. GA-LI-SF-M471Q6

CERTIFIED SHORTHAND REPORTER
Oregon
CSR
90-0014
FRANCES M. GALISKY

Page 26

**A No, I don't recall. I worked with a few geotechs and I don't remember which one was assigned to that project.**
Q Okay. Can you name the geotechs that you've worked with at Technical Services?
**A In regards to what?**
Q The time frame around 2000, 2001, the time frame of the Camas project.
**A Different, on different projects potentially, is that correct?**
Q Right. How many people are in the Technical Services department in the Western division?
**A I don't know.**
Q Do you know how many there were back in 2000?
**A No. I would just be making a guess.**
Q Okay. I've seen reference to a guy named Brad Neitzke. Do you recognize that name?
**A Brad Neitzke was the materials engineer.**
Q Was he in Technical Services?
**A Yes. I believe he is under Technical Services.**
Q Do you recall working with Brad in connection with the Camas project?

Page 27

**A I believe so.**
Q Do you recall whether you received the multiplication factors from Mr. Neitzke?
**A I don't recall. It would be doubtful, but I don't recall.**
Q Why do you say it would be doubtful?
**A Because he normally didn't deal with the fill. He was more of a pavement or roadway structure guy.**
Q Okay.
Let's mark this one 4.
(Exhibit No. 4 is marked for identification.)
BY MR. LARKIN:
Q I've just marked the next document, the design narrative, as Exhibit 4. It's a four-page document. Do you have it there?
**A Design Narrative, yes.**
Q Okay. You can take a minute to flip through it. It looks like you drafted this document. Is that correct?
**A Pardon me?**
Q Did you draft Exhibit 4?
**A Yes.**
Q All right. Page 3 of the Exhibit 4,

Page 28

second paragraph says, "We are building a refuge road with little to no traffic." Did you as the designer view traffic control as a major issue in connection with the Camas project?
**A No.**
Q The next sentence says, "The words, quote, beat it to fit, paint it to match, end quote, was never more fitting." What did you mean by that?
**A That was just a slang term to say that, using another slang term, that we weren't building a Swiss watch.**
Q Okay.
**A Do you understand?**
Q Yeah, I sure do.
**A Okay.**
Q Next paragraph says that, "Due to the amount of money available for PE" -- what does that mean, PE?
**A Oh, preliminary engineering.**
Q Okay. -- "which is related to the size of this project, it was decided that no geotechnical investigations should be done."
Did you, did that concern you at all as the designer of the project?

Page 29

**A Concern me how?**
Q Well, did you understand that the government would be taking some risk if it didn't conduct any geotechnical investigations in connection with the Camas project?
**A Yes. I understood there would be some risk.**
Q And what was that risk?
**A Well, what was that risk. The risk that if you do an investigation, actually take soil samples or any other form of geotechnical investigation, then you can, you know for sure, I guess, exactly what you're dealing with.**
Q Okay. And you're referencing specifically the material sources, right?
**A No. There are other issues. The structure, the pavement -- or not -- well, the pavement structure for the entrance road and the parking area and the gravel and the dike itself.**
Q Okay. The next sentence says, "The material taken from the borrow sources will have to be visually monitored closely for quality." Why did you say that?
**A Well, we want to make sure that the material that's coming out of the borrow source**

**is, isn't slop or maybe a clayey peat or something to that effect.**
Q Okay. At the time you designed the project and up until the time that the project went out to bid, are you aware of any geotechnical investigation, and I mean cross sections or digging test pits, that were undertaken at the mandatory borrow sources associated with the Camas project?
**A I don't recall. I would lean toward no.**
Q No, there weren't any is your recollection?
**A I can't say no for certain. I really honestly don't recall. I don't, I don't think so.**
Q Okay. Back to Exhibit 4, or, yeah, Exhibit 4. The next sentence says, "The locations for the borrow sources were given by the refuge manager." Who was that?
**A Gerry, I think Gerry -- I can't remember his last name.**
Q Deutscher?
**A Deutscher, yes.**
Q Okay. And, "he says he has used them in the past for that purpose. And that it was mostly good material." Is that exactly what



Mr. Deutscher told you?
**A I don't recall exactly what he told me.**
Q Okay. Do you have any reason to believe that what you write here is incorrect on Exhibit 4?
**A No.**
Q Okay. Would it be your expectation that what you wrote in this sentence we were just talking about is correct?
**A Yes.**
Q Okay. Under the section called Survey it says, "The survey was an open traverse, done on a shoestring budget." Do you know who did the survey?
**A Our survey crew from Western Federal Lands.**
Q What do you mean when you say it was done on a shoestring budget?
**A Well, they were actually heading up to another job in Yellowstone and stopped on the way. I hope I'm not getting this mixed up with another job, it's been a few years, but they stopped on the way to do survey at Camas on their way up there. And I believe they applied most of their travel cost to the Yellowstone job.**



Q I see. You say in the next sentence, "This means that there will probably be some errors in the control." Why do you say that?
**A I don't remember, unless they didn't -- I would be guessing why I put that in there now. I don't remember.**
Q Is it true that as of the date you wrote this design narrative that you believed that there might be some errors in the survey control?
**A Apparently so. I say a few centimeters, it looks like there, so...**
Q Okay.
(Exhibit No. 5 is marked for identification.)
BY MR. LARKIN:
Q I've just marked as Exhibit 5 the next document which on the back side says, Draft - Preliminary Purposes Only. Do you have that document?
**A I'm looking for it. I've got a, I've got an item sheet.**
Q Yeah. Look on the back side of that.
**A Okay. I've got it.**
Q Okay. Did you develop the estimate, the engineer's estimate for the Camas project?



**A Yes.**
Q And did you develop this Exhibit 5 that's entitled Draft - Preliminary Purposes Only?
**A I -- was this for the scoping report?**
Q I'm not sure. It looks like it was drafted in May of 2000.
**A I don't believe I drafted this, this estimate. I believe this was an estimate for the scoping report.**
Q Okay. Well, I'll just be brief then. There's an item here for unclassified borrow with a quantity of 25,300 cubic meters. Do you see that?
**A Yes.**
Q Do you know what that's referring to?
**A No, I don't.**
Q Okay.
**A I don't know how it was estimated either.**
Q I see. Was the -- on the far right-hand side it looks like that line item is designated as the tour route. Do you see that?
**A Yes.**
Q Do you know whether the tour route was constructed as part of the Camas project?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

UNIVERSAL CONSTRUCTION, INC., )
Plaintiff, )
vs. ) No. 03-1502C
THE UNITED STATES, ) No. 03-2370C
Defendant. )
)

DEPOSITION OF DAVID O. CRAM, P.E.
JULY 12, 2005

REPORTED BY:

MONICA M. ARCHULETA, CSR NO. 471

NOTARY PUBLIC

REPORTER'S CERTIFICATE

I, MONICA M. ARCHULETA, CSR No. 471, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 20th day of July, 2005.

MONICA ARCHULETA NOTARY PUBLIC STATE OF IDAHO

MONICA M. ARCHULETA, CSR NO. 471
Notary Public
P.O. Box 2636
Boise, Idaho 83701-2636

My commission expires August 3, 2006

A. I could express a general opinion. Again, I was not on-site during construction. And although I have had some conversations leading up to this with our on-site personnel as to what techniques were employed. Again, I was not out there to actually witness it.
Q. Did any of your previous projects involve the Camas site?
A. No.
Q. Do you have any knowledge as to how the refuge -- the soil at the refuge compares to, say, the geology in that region of Idaho in general?
A. Not untypical. I would consider it to be typical material that might be expected to be encountered.
Q. The material that Universal encountered here is typical to what is in this area?
A. That's correct.
Q. All right. I want to get back to what you testified to a moment before about -- and I don't want to misquote you here. But you may or may not have some disagreement with Mr. Languirand on working with the sandy loam. Do you have an opinion here as to how difficult



or not it would have been for Universal to work with sandy loam in terms of constructing this particular project?
A. I do.
Q. What is that opinion?
A. The sandy loam is a compactable material. It can be compacted. It's a function of the amount of effort or degree of care that would need to be taken. And I'm making that statement relative to other types of materials that might be used.
Q. As compared to what other types of material?
A. Like a road mix. A three-quarter-inch minus crushed material would be much easier to compact. Much more consistent. It is a process material. So, therefore, it is considered controlled. It could be a bank run sand gravel material, which is standard in the area. All of those materials would be much, much easier to compact.
Q. When you say three-quarters of an inch. You are talking particles three-quarter-inch in size?
A. That's correct.



Q. What about in terms of sandy loam versus, say, sand?
A. Sand would be easier material to compact. It would take less effort. Less control. No specialized equipment. You could go thicker lifts. Just overall -- all factors that go into compacting a soil. It would be much easier material to compact.
Q. Than sandy loam?
A. That's correct.
Q. And I think Mr. Languirand testified to this. Would you agree that if it was just a clay or a silty material that would be more difficulty?
A. Absolutely, yes.
Q. Do you have an understanding here as to what percentage of the material that Universal encountered in Borrow Source No. 1 was sandy materials versus silty or clayey materials?
A. I couldn't give you a percentage. It is my understanding that there was, what, out of five samples, there were at least two that were identified as being a non sand material. Its main classifications were of a silt or clay nature.



Q. Is that something that you looked at, though, independent of what Mr. Languirand was doing?
A. Well, it was off the data that Karl Languirand had summarized.
Q. I see. Jumping ahead to Exhibit 2 for a minute. Which I think you should have over there somewhere. It's a document marked Exhibit 2.
A. Yes.
Q. Do you agree with Mr. Languirand's testimony that of the 15 samples identified in Exhibit 2, that 12 of the 15 are either sandy loam or sandy soils?
A. Is that a statement he makes here in the letter? I apologize, I have not reviewed this letter recently.
Q. Maybe you weren't here. I thought he had testified that -- and you can take a look at it yourself and give me your own opinion. But my understanding of his testimony was that 12 of the 15 of the soils here are either sandy loam or sand. And if you look at the previous page in the report under point one. The last sentence indicates that the soils on top, the first eight,





CRAM

design guide - 1993.
Q. What then is, in your view, the relevance of these sections to this particular road?
A. With regard to the sections we have quoted?
Q. Yes.
A. Other than to provide a basis for what is structural material. In fact, if you were to refer to those sections you would see they provide gradations of the materials, which the sandy loam would not meet any one of those sections that we have quoted as far as its gradation. It's too fine grained.
Q. Would it surprise you if I told you that the roadway through this refuge is a roadway that very few cars per day drive over?
A. No.
Q. Determining if a roadway is constructable, if you will, is there a difference in a roadway that takes a few cars a day versus a highway that is taking thousands and thousands of cars per day?
A. Yes, there is.
Q. So could it be that material that might



not be used in constructing a highway that is going to handle 100,000 cars a day might be okay if you were constructing a road that is going to take 20 cars a day?
A. That is possible.
Q. Going to opinion two. You state, "The specified percent compaction requirements were not consistently obtainable with standard construction techniques. This accounts for the change to a procedural specification for acceptance purposes."
What do you mean by standard construction techniques?
A. Standard construction techniques with process materials, or materials that don't vary significantly in gradation, you would develop a procedure on how you are going to place the material. And then you would carry that procedure throughout the placement. In this case the contractor was having to vary the procedures significantly than he was originally planning on doing.
Q. Do you have an opinion as to whether a contractor who is working with material from a borrow source would typically have to process the



material before using it?
A. Yes, I do.
Q. What is that opinion?
A. For most borrow sources there's a term that is used called pit run or bank run material. And it is not uncommon to not process the material. You haul it straight from the pit out to the roadway.
Q. And would it be not uncommon to have to process it?
A. If it's subbase material. At least for this area. And I'm speaking specifically for southern Idaho. It's not processed.
Q. How many proctors would you expect a contractor to doing a project such as this to have to take?
A. You know, I really can't answer that. I don't really know even the lineal footage of roadway that was constructed. If I had that number I might be able to venture a guess.
Q. Do you know what this contract required with respect to the number of proctors the contractor had to take?
A. I do not, no.
Q. If there was some variation in the soil



would you recommend to the contractor to process the site at the borrow source?
A. Maybe.
Q. What factors would you consider in making that determination?
A. The first issue is depending on the type of material and the amount of blending that need to occur if the material was conducive to blending. In this specific instance where clay soils are present, they are extremely difficult to process without using water or something that is known as a pug mill. So to blend sand with gravel is one thing. And that could be potentially easily done at a pit or a quarry. But to blend clayey materials with more sandy materials you'll have a tendency to get clay balls or it will tend to ball up in the process.
Q. Do you know if MTI ever had any discussions with Universal here as to whether or not the soil should be processed?
A. I do not know. Although, it's not uncommon for our technicians to make recommendations in the field on how to help get compaction. And that's an industry standard part of a -- a technician's job is to assist in that