Q Okay. What did you do in response to Mr. Butikofer's call, if anything?

**A I don't remember exactly what I did. Typically I look into the issue.**

Q Do you recall doing that in connection with the Camas project?

**A At some point, yes.**

Q Do you recall when?

**A When I did what?**

Q When you looked into the issue.

**A Probably would have been after I was first alerted to it.**

Q Do you recall what you did to look into the issue?

**A No.**

Q Do you recall going out to the Camas project at some point?

**A Yes.**

Q Did you go out to the Camas project because of the issue of difficulty with borrow source materials?

**A Yes.**

Q Why did you go out there?

**A Because of the issue with borrow source materials and to talk to the contractor.**



Q Okay. Tell me about that. First of all, tell me about the visit. What did you do on that visit?

**A Don't remember.**

Q Okay.

**A Had a meeting with the contractor, but I don't remember what happened at the site visit.**

Q Okay. Do you recall anything that the contractor said during your conversation with the contractor?

**A Yes.**

Q Okay. What do you recall that the contractor said?

**A One thing that stands out -- several things stand out. One is that Mr. Standerfer and his son seemed to disagree with each other on most every issue. One would say, Well, here's what's happening. Typically Mr. Standerfer would say, Here's what's happening. And Mark would say, No, no, no, Dad, that's not the way it's really happening. And there was a lot of disagreement among them, between them.**

**And the other thing that stands out is Mr. Standerfer said that he could have gotten material, borrow material from another source.**



**And I think the number was for another it would have cost another 16,000. I could be incorrect on that, but that's what sticks in my head. All it would have cost the government would have been another 16,000 and, more or less that we could have avoided this whole problem. That was gist of his statement.**

**And I was surprised that any contractor wouldn't put more thought into that; if he thought any problem, regardless of who was at fault, could be avoided for 16,000, why they wouldn't pursue that further.**

Q Okay. But you were aware as of the time of the meeting, were you not, that the borrow sources were mandatory borrow sources, right?

**A Yes.**

Q In other words, the contractor had no choice but to use those borrow sources?

**A That's what was required by the contract.**

Q Right. And did you expect that the contractor would comply with the contract?

**A The contract is modified and we expect them to comply with the contract and any modifications to the contract.**



Q Okay. I guess that doesn't answer my question, though. At the time you met with Universal, there was still a requirement that the contractor use those designated borrow sources, right?

**A The requirement was in the contract, yes.**

Q Okay. And so you expected that the contractor would use those borrow sources?

**A If the contractor wished to use something other than the borrow sources, they could have requested that in writing to us.**

Q Okay. Is there anyplace that you can think of in the contract documents that gave them that option?

**A Changes clause.**

Q Okay. And when Mr. Standerfer presented the option of using, of bringing in borrow material from an outside source during your meeting with him, did you do anything in response to that proposal? In other words, did you say, Dick, why don't you go ahead and pursue that proposal, or something like that?

**A I don't remember exactly what I said. But I think that when I asked him why he didn't**

Page 50

**pursue it, that the cost had now gone up from that**
**16,000. I, I would like to think that I did ask**
**him to put something in writing, but I don't**
**remember exactly if I did that.**
Q Do you recall anything you did in response to the proposal that Dick Standerfer made to bring in borrow material from the outside source?
**A He really didn't make that proposal at the meeting. He just said it was a thought he had. I don't believe it was a proposal any longer. He, he did not -- I don't remember him proposing it to us at the meeting.**
Q Okay. Did you direct Todd Butikofer to do anything with respect to the idea of bringing in borrow material from an outside source?
**A I don't remember.**
Q Do you know whether in fact anybody from the government did anything with respect to the idea of bringing in borrow material from an outside source?
**A I don't remember.**
**(Exhibit No. 8 is marked for identification.)**

Page 51

BY MR. LARKIN:
Q Exhibit 8 is dated November 1, 2001. It's a letter from Universal to Todd Butikofer. Do you recall getting a copy of this letter?
**A I may have, but I don't remember exactly.**
Q Okay. On the last page of the document, second to last paragraph, Universal states that it "deems it necessary to request a project meeting to ascertain FHWA's position on the above, prior to updating or establishing the construction schedule." Do you see that?
**A Yes.**
Q Do you know whether that was what gave rise to your meeting at the job site with the contractor?
**A I don't remember.**
Q Okay. You don't recall doing anything in response to this November 1, 2001 letter?
**A I would assume that if I received this letter prior to the meeting, I would have reviewed it.**
Q Do you recall doing anything to investigate what was stated in this November 1 letter?

Page 52

**A I remember doing some analysis, but I don't remember when.**
Q What analysis do you remember doing?
**A I don't remember.**
Q You just remember you did some analysis?
**A Three years and twenty projects ago.**
Q At some point there was a unilateral contract modification issued by the government --
**A Yes.**
Q -- concerning methods specification. Do you recall that?
**A Yes.**
Q Tell me about your involvement in that unilateral contract modification.
**A I would have reviewed the negotiation memos and viewed the contract mod and then I would have approved it. Todd would have prepared the memos.**
Q Okay. So you had the ultimate authority of approving that contract modification?
**A Yes.**
**(Exhibit No. 9 is marked for identification.)**
**BY MR. LARKIN:**
Q Exhibit 9 is another November 1, 2001

Page 53

letter to Todd Butikofer from Universal. Do you recall receiving a copy of this letter?
**A I don't remember. I probably did.**
Q Okay. Do you recall conducting any analysis or investigation in the early November time frame of 2001 regarding an allegation that there was a differing site condition on the Camas project?
**A I remember that I talked to our geotechnical engineer.**
Q Who was that?
**A Al Kilian.**
Q Al Kilian?
**A Yes.**
Q Okay. And what did you, what did Mr. Kilian say?
**A I believe he said the -- I don't remember exactly what he said. It's written in the memo.**
Q Okay. What in general did he say?
**A He said it's okay.**
Q That the material's okay?
**A It's okay.**
Q That the material's okay?
**A Yes, that the material was okay.**

Page 25

Traffalis?
A That is correct.
Q What was her response?
A As she said here, it would probably have to come from another source.
Q Eventually did you have to use more than four thousand cubic meters to build the embankment?
A No, we did not.
Q The next bullet says, Rance believes, that stability-wise, as soon as the material dries, it will flow under pressure.
Why was that a concern of yours?
A That concern was that the -- as a sandy material, if we couldn't keep moisture in it that it would actually be able to move on its own like a bowl of marbles. It turned out that there was enough of a binder in it that I don't think that was really true, but it was what we seen out there to start with before we have actually got into it.
Q All right. How was your -- strike that.
The next conversation is June 4th. The second bullet says, item 20403, unclassified borrow. His -- your original bid assumed that the borrow material is silty. He said that the revised bid is based on the material being blown sand.
Do you see that?

Page 26

A Yes.
Q How did that affect your bid for the completion of the project?
A In two ways, number one, it required much significantly more moisture to be added to it, and it required a different compactive effort to be used to get it to compaction.
Q Okay. It says later in that bullet, his revised bid is based on cutting about one half the existing bank out and then replacing it with the sand mix. No other way to do sliver fills with that material.
Is that what you told Ms. Traffalis?
A That was our original discussions, yes.
Q Okay.
A It is not the way we ended up building the job.
Q Right. The way you ended up building it was what we discussed earlier where you basically overbuilt the sliver fills?
A That is correct.
Q Okay. And then cut them back?
A Uh-huh.
Q That's a yes? Sorry.
A Yes. Yes.
Q The next page says, I asked about using other material instead of the material from the borrow source.

Page 27

Do you remember her talking about that?
A Yes, I do.
Q Okay. Well, tell me about that conversation or that discussion?
A Our discussion there was what would happen if we looked at an outside source, how far away would it be, what quality of material could we get, and would it be cost effective to import material that might have a lower water content, be easier to compact, and be ultimately a better material, and we, I think, talked about two or three different sources of that, and none of them were really economical, they were just -- they were sources.
Q Okay. Did she ask you to -- did Ms. Traffalis ask you to pursue any of those options as far as pricing them and preparing a proposal?
A We looked at some rough pricing. We never submitted an official proposal on them.
Q Okay. Initially you thought that that proposal of bringing material in from a different source would save about half, it states here. Do you see that?
A I see what it says there. I really don't remember the numbers to say whether that's right or wrong.
(Deposition Exhibit Number Seventy-seven was marked for identification)

Page 28

Q (By Mr. Larkin) Exhibit Seventy-seven is your letter to Ms. Traffalis dated May 23 of 2002.
A That is correct.
Q What is this document?
A Okay. This is a transmittal document for our proposal to complete the work.
Q Okay. Item D on the first -- or actually the second page of the exhibit says, material samples which we took from the existing aggregate surfacing material show a very wide range in the lower gradations, including the minus two hundred.
What were you finding from those material samples?
A I believe that this was a sample of material that we took from the crushed pile that Universal had in their pit.
Q You state that we have added cost to provide extra effort.
What were you referring to there?
A This was extra effort to actually maybe reprocess the material to take out some of the minus two hundred and to try to get it into a specification product.
Q Okay. Is this referring to the bid you made for the government furnished aggregate source?
A Correct.

Page 17

when the request was made for a new pricing. We went back to our subcontractor and supplier and secured their authorization or changes. I think there was just -- they authorized us to go ahead and use their numbers as had been before, I believe.

We actually went out and looked at the site to see what had been accomplished and what disturbances there were that we we had to overcome, what materials were there, particularly on the bridge there was a number of materials that were in place that had been secured and were there on site, we looked at those and did an inventory or a an approximate inventory, it was not in absolute detail but an approximate inventory of those materials.

I think we also spoke with Dan -- I can't remember his last name.

Q Christianson?

A Christianson or Christofferson?

Q Christianson.

A -- Christianson, who was the FHWA representative on the project at that point, regarding exactly what the status was of the work that had been done, how much of it was approved, how much of it had to be redone, and some inquiries of that nature.

Q Okay. Do you recall what Dan Christianson told you when you contacted him prior to submitting your second

Page 18

bid for the Camas project?

A Well, he showed us around the project, showed us where some of the stuff was. He talked to us about what work had been accomplished and was acceptable, which primarily the thing that we were concerned about was the sliver fill work that had been started and that there was approximately, oh, I think there was about seven or eight hundred yards of material on the north end of the road, the main roadway that had been done that was acceptable, and he kind of outlined to us the general framework of what still had to be -- remaining work to be done.

Q Okay. Why were you concerned about the sliver fill work in particular?

A We were concerned about that because if we had to take that out and redo it that represented a considerable amount of work to redo.

Q Okay. Did you have to take out and replace any of the sliver fill work that had been accomplished?

A There was a small amount that we did. I don't know the exact extent, but there was small amount just south of borrow pit number one that we had to rework.

Q What's your best approximation of how much you had to replace?

A Maybe two or three hundred feet.

Q Okay. Did you have any other concerns about the

Page 19

sliver fills -- of the sliver fill work, I should say?

A Our other concern was the extent that they would -- that they, being FHWA and the Refuge, would allow us to impact the existing dikes, you know, how much disturbance could we actually make on the existing dikes as we made the fills.

Q Okay.

A We needed to actually bridge those dikes to be able to put our fill in and keep it so it was keyed to the dike and not provide a slip plane along that existing surface.

Q And that was something that was not shown on the plans or specifications, the bridging of dikes?

A I believe the plans had -- or the specifications, one or the other, had some notation that the existing dikes were not to be disturbed.

Q Okay. And did you -- before you submitted your second bid did you get some understanding from the government, either the Refuge or FHWA, that the dikes -- that you could bridge the dikes and disturb the dikes to do the work?

A We did not actually bridge any dikes, what we did was we actually were able to go in and scarify the outside edge and use the scarification as the contact surface rather than just the existing surface.

Page 20

Q I see. Was there a -- are you aware of any contract modification that addressed that scarification?

A I'm not.

Q Okay. But you had received at least the verbal assurance that you could -- you could proceed in that fashion?

A Yes.

Q And that assurance came from who in particular?

A FHWA.

Q Do you know who in particular?

A I believe it was Dan.

Q Okay. Did anybody from the government, whether it be the Refuge or the FHWA, describe for you the problems that Universal was having in accomplishing its work prior to you submitting a bid for the completion work?

A I do not recall any specific conversations on what their problems were. After we were in construction we became aware of some problems that they had had in compaction and in their methodology for actually constructing the sliver fills, but we were able to provide a procedure to overcome what they were having problems with.

Q What procedure did you implement to overcome those problems?

A Well, the sliver fills we built we overbuilt the fills and then used a trackhoe to pull the excess material

Page 21

back off and move it on down the line. We didn't try to build a sliver fill, we built an overfill and cut it back to grade.

Q And that was something that was authorized by the government?

A Yes.

Q Who in particular in the government?

A Again, that was Dan.

Q My understanding, he was the project engineer on during the course of your work?

A That is correct.

Q And just to be clear, I also understand there was a gentlemen named Scott Blower, I think, who also acted as a project engineer for a limited period of time during your work, is that correct?

A There was a time that Dan was away from the job site. I do not recall the name of the person who replaced him.

Q Okay. And then Dan came back afterwards?

A Yes.

Q Looking at Exhibit Seventy-five again, this spreadsheet, and I just want to take an example, for the silt fence the original bid quantity was four hundred and fifty meters, and the revised bid quantity was two hundred and fifty meters. Is it your understanding that basically

Page 22

the government was saying that Universal had completed approximately two hundred meters of the silt fence?

A Well, they had either completed it or it was determined it was not required.

Q Right. Okay.

A Yeah.

Q And for unclassified borrow the revised bid quantity was twenty-four hundred cubic meters?

A That's correct.

(Deposition Exhibit Number Seventy-six was marked for identification)

Q (By Mr. Larkin) Exhibit Seventy-six you have probably never seen. You can take a minute to look at it, if you'd like. They were notes produced out of the government's files, just so you know.

A (Examining document)

Q I'll just be asking questions on the typewritten material, just so you know.

A (Examining document) Okay.

Q My understanding is that these notes were taken by Jane Traffalis. Would that be consistent with your recollection of a couple of conversations with Ms. Traffalis?

A It appears to be, yes, uh-huh.

Page 23

Q Are the notes, the typewritten notes that Ms. Traffalis has written about her conversations with you on May 14 and June 4, consistent with your recollection of those conversations?

A Having them in front of me, yes.

Q On the call of May 14 there's a second bullet saying -- that states, he thinks we need more than four thousand cubic meters to do bid schedule. He wants cross sections.

What was that referring to?

A That was referring to the unclassified borrow material, item 20403.

Q Okay. And why were you thinking that there would be a need for more than four thousand cubic meters at that time, at that point in time?

A I was looking at the stakes that were still in the field and looking at the fills, and just basically what I seen there seemed to me -- indicate to me that there was a lot more fill than what was indicated in the contract.

Q Okay. It also says you wanted cross sections. Is that cross sections of the borrow sources or something else?

A It would be cross sections of the roadway that would actually translate the stakes to a cross section I could actually evaluate.

Page 24

Q Okay. I see.

A Instead of guessing by just there in the field I would actually have something to work with.

Q Okay. The fourth bullet says, he said -- and I think he is meaning you, said the borrow material is, quote, nothing but blown sand.

Did you tell Ms. Traffalis that on May 14th?

A I remember discussing that with her, yes.

Q What was the material like that you observed out at the site?

A Well, it was a very -- it was a sandy -- very much of a sand material and, again, it was not even blow sand, as I said here, it was -- would need a high water content, like I say here, to make compaction, and there was a minimal amount of binder in it.

Q And her note here is that there is no binder whatsoever.

Is that consistent with what you observed at the site?

A I would say it's not no binder whatsoever, but a limited amount of binder was our observation.

Q Okay. The next bullet says, if it takes more than for thousand cubic meters to build embankment, where would we get the material from?

Is that a question that you posed to Ms.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

UNIVERSAL CONSTRUCTION, ) No. 03-1502C
INC.,
) No. 03-2370C
Plaintiff
) Deposition of:
vs
) DANIEL L. CHRISTIANSON
THE UNITED STATES,
)
Defendant.
)
---------------------------

Deposition of DANIEL L. CHRISTIANSON taken October 19, 2004, at 3:20 p.m., produced as a witness at the instance of the Plaintiff, before Dick Telford, Certified Court Reporter and Notary Public, at the Law Offices of Holden, Kidwell, Hahn, Crapo, 1000 Riverwalk Drive, Suite 200, Idaho Falls, Idaho.

REPORTER'S CERTIFICATE

STATE OF IDAHO, )
( SS
County of Bonneville )

I, Dick Telford, CSR, do hereby certify DANIEL L. CHRISTIANSON, 610 East 5th Street, Vancouver, Washington, 98661, was sworn to testify the truth in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was reported by myself, Notary Public and Certified Court Reporter; that the deposition is the record of the testimony given by the witness, as recorded on the foregoing 72 pages.

And I further certify that I am not related to any of the parties nor do I have any financial interest in the matter.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 25th day of October, 2004.

NOTARY PUBLIC STATE OF IDAHO

(Signed) Dick Telford

Dick Telford
Certified Court Reporter
Notary Public for Idaho
Commission expires 9/8/07

Q Why don't you take a minute to read that paragraph and then those numbers one through seven?
A (Examining document) Okay.
Q Does that accurately reflect how the embankment work was being done?
A Yes.
Q Did you make any modifications to the specifications with respect to how the embankment work was progressing, the method for doing the work?
A I don't recall.
Q You don't recall?
A No.
Q And, again, if there are any modifications to the contract we would expect to find them in the project documents?
A Yes.
(Deposition Exhibit Number Sixty-eight was marked for identification)
Q (By Mr. Larkin) I'd say that Exhibit Sixty-eight is an E-mail, or at least the bottom two thirds is an E-mail, from you to Jane Traffalis, dated September 16, 2002, right?
A It does.
Q Why don't you go ahead and take a minute to read



through it.
A (Examining document) Okay.
Q Okay. Two thirds of way down, question number one, are there any legal problems with respect to the default if the cross sections are changed, question mark?
Now, that was your question to Ms. Traffalis, right?
A Yes.
Q Okay. The default that you're talking about is the Universal -- involves Universal, right?
A Yes.
Q Okay. What are you referring to with respect to the cross sections changing?
A The paragraph above discusses about changing the cross section. That's what question number one references.
Q Okay. Why were you concerned about any legal problems with respect to the default if the cross sections are changed?
A It looks like I was just double-checking with Ms. Traffalis to make sure that that -- that if we did change anything that it was done properly.
Q You didn't want to jeopardize the government's position on the default, right?
A I just wanted to make sure that everything was done as it needed to be done out there.
Q Okay. Well, getting things done as they needed



to be done out on the site I assume doesn't have anything to do with whether a former contractor has been defaulted or not. Would you agree with that?
A Yeah -- yes.
Q Okay. So my question for you is why were you concerned with any legal problems with respect to the default when you're proposing to change cross sections?
A It looks like at the time I was concerned about quantity. I was concerned about quantity changes and whatnot, I just was.
Q Why, why were you concerned about that?
A Because -- because of the default.
Q And you didn't want to jeopardize the government's position on the default?
A Yeah, I -- that's why I ran that through Jane.
Q Okay. And her response was no problem whatsoever, the default centered around the type, slash, usability of the borrow material, I think is what she meant, right?
A Uh-huh.
Q Okay. So did you change the cross sections?
A I don't recall changing the cross sections, no, not what's discussed in the -- in this E-mail.
Q Okay. Do you recall making -- we've already talked about material being pushed over the side and into



the cattails, and my -- I don't want to put words in your mouth, but do you know whether that was authorized by the contract documents?
A I can't remember if that was authorized by the contract documents. The material into the cattails I don't believe was. The material over the side I can't remember what the exact specification was as far as that goes and/or the discussions I had with Gerry Deutscher on the project at the time.
Q As the project engineer for the FHWA project do you think -- do you belief one of your roles is to make sure that the project is constructed per the plans and specifications?
A Yes.
Q Okay. And would it be your expectation that if there is a change to the plans, a change so that the as-constructed project is different from the plans and specifications that that should be captured in a change document of some sort or a modification to the plans and specifications?
A Changes should be documented in CM's, yes.
Q But in this case, for instance, with the cattails and the material getting into the cattails, that was a change that wasn't documented in the contract modification?
A I would have to look and see if that was

## Project Engineer's Diary

Project: ID RRP-CAMA 101(2) Camas NWR Complex
Contract No. DTFH70-02-C-00025
Date: September 18, 2002
Weather: Cool/cloudy

In the morning, I went to aggregate source CL-77 and spoke to crusher owner Dave Blosch. Mr. Blosch said they should have everything ready to go this afternoon. He noted that it took the crew two days to build a hopper for adding bentonite clay to achieve the correct PI and 75 μm. Mr. Blosch expressed concern about achieving the specs for the PI, 75 μm, and 12.5 mm. He said that he currently has a 19mm screen in the crusher, but it might have to be changed to a 1" screen if the resultant percent passing the 12.5 mm is out of spec. I also spoke to tester Jon Kishiyama about the testing requirements for the aggregate.

When I arrived at the project site, the Cat 12G blade and Komatsu WA 380 loader were working on the turnout at 1+160 RT. The loader hauled material from borrow source one, while the blade shaped the turnout.

While talking to the slope stake crew, they pointed out that the surveyors had set the catch point at 1+800 RT 14.25 meters right of centerline. The cross section does not show a turnout in this location and it's clearly not the intention of the contract to fill to this catch point. The cross section clearly shows that disturbance in this location is limited to the existing width of the roadway. Later in the day, I spoke to the surveyors about this and they said they questioned the location of the stake when they put it in. The lead surveyor said that the notes indicate a 1:15 slope to the catch point, which places the stake 14.25 m from centerline. I reiterated that the cross section clearly shows that work in this area is limited to the existing top width of the road. The lead surveyor said that they would restake the location.

In the afternoon, I spoke to one of the excavator operators about the embankment. He said that it was going well until one of the end dumps broke down. This slowed production considerably. The current process for building the embankments is as follows:

Exhibit No. 67
Date: 10-19-04
Christianson
T&T REPORTING

1) The end dump loads at borrow source #1 and backs up to the embankment area.
2) The borrow material is dumped onto the roadway.
3) The Cat D5M dozer pushes the material over the edge of the roadway.
4) The 312C excavator shapes the material until the Cat CB214 roller can be utilized for compaction.
5) The roller compacts the material.
6) Steps 1 through 5 continue until the embankment is near grade. Initially, the embankment is slightly overbuilt (±1V:1.5H) to allow access for the roller.
7) Once near grade, the excavator pulls the excess material from the slope. This gives the slope its final shape (1V:2H) and the excess material is used to complete the embankment to the correct elevation.

approving it?
**A What do you mean by any other investigation?**
Q Just that, that you reviewed the memorandum from Mr. Butikofer and you attended a job site meeting on November 6th. Did you do any other investigation regarding this contract modification before you approved it?
**A Investigation as far as what?**
Q Do you recall doing anything other than reviewing the memo, this Exhibit 11, and attending the job site meeting on the 6th?
**A I assume I would have reviewed the contract modification.**
Q Do you recall doing that?
**A Vaguely.**
Q Okay. Do you recall doing anything else before you approved the contract modification?
**A I don't recall.**
Q Okay. On page 2 under Price, the first paragraph there says, Mr. Butikofer says, "By changing the compaction specification to allow the use of a method spec to compact the material, the contractor will not incur any additional costs for compacting the material." Do you see that?



**A Yes.**
Q Okay. Did you rely upon Mr. Butikofer in making that statement or did you independently investigate that statement?
**A I don't remember if I did anything independent of what the Standerfers told us in the meeting or what Todd did.**
Q Okay. What did the Standerfers tell you in the meeting?
**A They said that they could compact X many meters in so many hours and we compared that to the roller spec.**
Q Okay. What did Universal say about time or price during that meeting?
**A I don't remember.**
Q Okay. Do you recall any conversation with Universal Construction where they informed you that the price or time would escalate in connection with the method specification?
**A I believe they put it in writing, but I don't remember what they said verbally.**
Q Okay. But do you recall that the contract modification itself did not provide for any additional time or money in connection with compaction method?



**A Yes, you're correct, it didn't provide for time or money.**
**(Exhibit No. 12 is marked for identification.)**
**BY MR. LARKIN:**
Q Before we move on to Exhibit 12, you know, we've been talking about the meeting with Universal on November 6th.
**A Mm-hmm.**
Q And I'm just wondering if you can tell me what role the partnering process plays into, or that it played into the issues that arose during the meeting on November 6th.
**A What do you mean "what role"?**
Q Well, we read earlier that one of the goals for partnering, one of the primary objectives of partnering is the resolution of disputes in a timely, professional, and nonadversarial manner.
**A Yes.**
Q Okay. Do you think you accomplished that during the meeting of November 6th?
**A We didn't resolve the dispute.**
Q Okay.
**A I think we were professional.**



Q Right. Do you believe that bringing up the possibility of termination was an attempt to resolve disputes in a nonadversarial manner?
**A Yes. I think it was telling Mr. Standerfer what the government might have to do if they didn't diligently pursue the work as they had not been.**
Q Okay.
**A What the government had the right to do.**
Q And do you believe as of November 6th that the government had a right to terminate Universal Construction?
**A That would be a decision of the contracting officer.**
Q Right. But did you believe the government had a right to terminate on November 6th?
**A I can't say right now without analyzing their progress as of November 6, 2001 whether we did or didn't.**
Q Okay. As of November 6, as of the date of that meeting out there at the job site --
**A Mm-hmm.**
Q -- can you tell me anything that the government did to specifically analyze the soils

Page 66

that were being obtained from the borrow sources?
**A I don't remember as of that date.**
Q Can you recall any independent testing that the government conducted to determine or to look into the complaints of Universal Construction?
**A I don't remember what we did.**
Q You don't recall that you did anything, right?
**A May have done something. I just don't recall if or what was done.**
Q You may have done nothing?
**A May have done nothing, I may have done a lot of things.**
Q Is there anything that would refresh your recollection?
**A This e-mail in front of me.**
Q Okay. Now we're looking at Exhibit 12. This e-mail's dated November 9 and it looks like you asked Mr. Butikofer to answer a series of questions. Is that correct?
**A Yes.**
Q Okay. And the attachment to this, my understanding is that these are the answers from Mr. Butikofer.

Page 67

**A Okay.**
Q So you sent Mr. Butikofer an e-mail, he's provided you with responses.
**A Mm-hmm.**
Q What did you do with, what was the purpose for asking these questions of Mr. Butikofer?
**A Basically it's exploring whether they were encountering a differing site condition to assess the government's position on the matter.**
Q Okay. Obviously Mr. Butikofer answered your questions. Did you ever direct Mr. Butikofer in approximately November of 2001 to hire a testing firm to go out and test to see what was being encountered?
**A I don't remember that.**
Q Okay. As of November 2001 you certainly understood that Mr. Butikofer himself was not a soils expert, right?
**A I wouldn't assume he's not an expert.**
Q Okay. Did you have any understanding with respect to Mr. Butikofer's training in soils analysis as of November 2001?
**A I have a general idea of what training Mr. Butikofer has had.**

Page 68

Q Okay. I'll move to strike as nonresponsive.
Do you -- as of November 2001 were you aware of any special training that Mr. Butikofer had in soils analysis?
**A Yes. I'm aware that Mr. Butikofer has taken, takes training each winter, some of which may have focused on soils analysis.**
Q Did you know for a fact that he had received training in soils analysis as of November 2001?
**A I don't know exactly what courses Mr. Butikofer has taken.**
Q Okay. So I think the answer is no, you didn't know of any specific soils analysis course he had taken as of November 2001?
**A I didn't know of a specific course by name.**
Q Did you know of any course he had taken in connection with soils analysis?
**A I know what courses our field people are required to take. And Mr. Butikofer is one of our field people, so I would have assumed that he has taken some soils class.**
Q But you don't know that for a fact?

Page 69

**A Not without checking his training history.**
Q Okay. You didn't do that in November of 2001, did you?
**A No.**
Q All right. Your first question is, "What are they encountering?" Mr. Butikofer responds, "They have to this point basically encountered a silty, sandy material, with small seams of clayey material." Do you see that?
**A Yes.**
Q And you relied upon Mr. Butikofer?
**A Yes.**
Q In making your assessment of what they were encountering?
**A Apparently.**
Q Okay. Obviously you're talking about Universal, what was Universal encountering?
**A Yes.**
Q Okay. Item b. says pictures of the pit will follow. Do you recall getting some pictures from Mr. Butikofer of the pit?
**A I'm sure I got them. I don't recall what they looked like.**
Q Okay. Do you recall doing anything with

36

## Tuesday, November 6, 2001

Jane Traffalis is on project today to meet with UCI. Jane and I drove through the project late in the morning. The only work was UCI had just started putting in silt fence, and A-Core concrete cutting was finishing up at the bridge site. We had a meeting set up at 2:00 pm, but UCI did not show up until about 2:30. Dick and Mark Standerfer were representing UCI. We let UCI tell us what they thought was the problems with the project. Dick Standerfer said that there was only one problem and it was the borrow sources. He said that UCI had written letters to indicate this. He said that this sandy material has the potential for lateral displacement, and poses a safety hazard. UCI does not want to use a small roller on the sliver fills because of what they say is a safety hazard.
UCI only used a roller on the sliver fills yesterday late in the morning on the bottom lift. They did do density checks of what the roller had done versus the hoe-pac and the only passing density was done by the roller. Dick Standerfer said that he did not see any significant difference in the test results between the hoe-pac and the roller. He also said that they did not do what he wanted them to do so it was not accurate.
We did ask UCI if they had kept track of the time spent compacting yesterday with the hoe-pac to use as a comparison. They told us that they had not.
Dick said that the material is so varying in borrow source #1 that it is impossible to get an accurate consistent blend from this source. He also said that they had dug several holes in borrow source #2 (after October 15) and it appears to be better but they have not used material from it yet.
Dick said that this material was also a poor material because it requires a lot of water for processing and compacting, and this is why the parking lot area has been taking so long. He also said that UCI had never anticipated having to add water to the material before placing and compacting the material. He also added that in his past experience that they have never had to add more then just a little water to borrow materials before placing and compacting.

Jane asked UCI how long it took them how long it took them to compact the first lift sliver fill material placed so far. Mark Standerfer said that it had taken them 4-5 hours to compact 600 +/- meters of material. Jane then said that if they had used the amended compaction spec., (which FHWA had changed to expedite the contract) that they would have only spent about 2-3 hours to compact this same material. Jane then told them that went we had drove through the project this morning that there was basically no work being done on the project by UCI, and asked why.

UCI did not have an answer other then they were waiting to see what was going come from this meeting.

EXHIBIT 10 Traffalis 11-2-04
PENGAD 800-631-6989

Jane told UCI that they need to get working and not just sit around waiting to see what was going to happen. She also said that FHWA did not want UCI to operate in unsafe operations. She then went on to say that they (UCI) had not presented that the roller operation was unsafe because they had not even tried to us it to see if it could be used. She told UCI that they have a responsibility to complete this project with in the contract time, and that if they did not get the project completed by the FCD that liquidated damages would be assessed and that termination was also a possibility.

Dick responded that he would welcome termination for convenience and that UCI would never pay liquidated damages in the end.

This was basically the end of the meeting, which ended at about 4:30 pm.



Todd Butikofer,
Project Engineer

U.S. Department of Transportation
Federal Highway Administration

WESTERN FEDERAL LANDS HIGHWAY DIVISION
610 EAST FIFTH STREET
VANCOUVER, WA 98661-3801
(360) 696-7700 FAX: (360) 696-7846

| CONCURRENCES |
| --- |
| SIGNATURE |
| DATE |
| SIGNATURE |
| DATE |
| SIGNATURE |
| DATE |
| SIGNATURE |
| DATE |
| SIGNATURE |
| DATE |

NOV 23 2001

Dick Standerfer, President
Universal Construction, Inc.
134 North Washington Avenue
Emmett, Idaho 83617

RE: CURE NOTICE
ID RRP CAMA 101(1)
Camas NWR Complex
Contract No. DTFH70-01-C-00034

Dear Mr. Standerfer:

The Government is hereby notifying you that it considers your progress on the project to be jeopardizing the timely completion of your contract. You are requested to respond by November 30, 2001 with a detailed plan on how you propose to finish the project within the time allotted by the contract.

The Government's concern is based on the following information. Your preliminary schedule, dated September 12, 2001, showed the parking lot being paved on October 5, 2001. At best, the parking lot might be paved within the next week. The schedule also showed the bridge abutments being formed, reinforced, and poured between October 5 and October 9. As of November 21, the existing abutments have been removed but the new abutments have not been formed, reinforced, or poured. The schedule also showed surface course aggregate placement as follows: Parking Lot and New Entrance road complete on October 4; Closure #1 area complete on October 11; Closure #2 area complete on November 2; and Closure #3 area complete on December 4. To date, only about 1000 tons of surface course aggregate have been placed on the Parking Lot and New Entrance road, which is 5.5 percent of the tons required for all areas. The project is to be completed by December 11, 2001.

In your November 1 letter to Mr. Butikofer, FHWA Project Engineer, you indicated that the initial start of project activities was delayed due to FHWA's submittal requirements. Specifically, you mentioned the preliminary construction schedule, the accident prevention plan, and the Contractor Quality Control Plan (QC Plan). As the QC Plan was the last one to be approved by FHWA, I will only discuss that submittal. My review of the submittal dates for the QC Plan revealed the following sequence. The first QC Plan was faxed to Mr. Butikofer on

OFFICIAL FILE COPY

EXHIBIT
2
Parsons
11-3-04