Page 149

contract modification database report.
A Uh-huh.
Q Did you input the information in this form?
A I would typically say yes. I don't -- I don't remember if I did, but I would -- that's part of my thing when I do a contract mod, yes.
Q So you would expect that you were the one --
A Yes.
Q -- that did this?
Let's just walk through here. For agreement by contractor to select one, you put unilateral, force account or no agreement?
A Correct.
Q The reason for the change you've put number thirteen, other, right?
A Yep.
Q And what was the reason for the change?
A It wasn't -- it didn't fit into any of the other categories, so it was other.
Q Okay. What would you say the reason for the change was?
A To allow them to use the method spec.
Q So it was --
A Yeah, to help them out so they didn't have to -- of worrying about how the consistent stuff that they had

Page 150

excavated out from below got introduced into it, and they could -- had a method spec that they could put so many passes over it, and we would be confident, and had there been known -- a known for them of what they had to put into to it to get to meet the requirements.
Q But the reason for the change was because of the compaction problems experienced with the embankment material?
A It was consistency, yeah, a consistency problem on their part.
Q Under -- there is a -- I'm sorry. Under -- about two thirds of the way down there's a heading that says clearing and then below that it says earthwork and this is under areas of work affected?
A Okay.
Q Do you see that?
A Clearing and then what?
Q It's under earthwork.
A Earthwork. Okay.
Q My question is about the data input there was unsuitable subexcavation and embankments, right?
A Three, embankments, and specification materials is what was put there. No, 03 is the first part, which is embankments. Two is specifications and materials.
Q Oh, I see. So your understanding is that two is

Page 151

referring to the left side of the --
A The two is --- if you look over where it says modifiers, they modify the first number. The first number was 03, embankments. Two is specifications materials.
Q Okay. So it affected the material specifications and embankments?
A Yes.
Q Okay. And then at the bottom you reference probable dispute or claim?
A I did.
Q And why did you put that?
A Because I had already received a letter from Universal, and this was being issued unilaterally, which usually -- that's the way it works out.
Q And why do you say that?
A Because that's -- in my experience, or being on this job, when a contract modification is issued unilaterally it's usually because they can't come to an agreement and there's going to be -- it's going to need to be settled some way else.
Q And then just at the top, contract time increase is zero days and the gross increase is zero dollars, right?
A Correct.
MR. LARKIN: I'm going to show you just one of these.

Page 152

Why don't you go ahead and mark it.
(Deposition Exhibit Number Thirty-four was marked for identification)
Q (By Mr. Larkin) Exhibit Thirty-four, can you tell me what that is?
A It's a pay note for construction schedule 15501.
Q All right. And who completes this document?
A It should be completed by the contractor.
Q Do you recognize your handwriting on this document itself?
A The one twenty-five, a hundred and twenty-five dollars is mine.
Q Okay. Is the twenty-five percent yours?
A It doesn't look like it, but it may be.
Just to clear this up, you know, twenty-five percent -- the way this is entered into our estimate program is a dollar amount and that's why I would have put the one twenty-five down there instead of the twenty-five percent.
Q Okay. You would agree that Universal performed work and completed work when they were on the project, right?
A Yes.
Q And they furnished materials for the project?
A They did.

Page 153

Q Can you tell me which materials they furnished fo the project?
A The embankment through the parking area and I believe there was even the -- I don't remember what -- the thing for the aggregate but the base course for the parking area. Concrete for the abutments. They did place some embankment in the sewer fields, a little bit of that. Steel fence was installed. Signs were installed. Barricades. There was delivery of girders, deck, I think the curbing, bearing plates, which I don't -- I don't think they were reused though.
Q That's what you can recall?
A Yes.
Q Okay. It's your understanding that Universal has never been paid a dime for this project?
A That's what I understand.
Q Let's take these one at a time. The embankment through the parking area, Universal completed that work?
A Yes.
Q And to your knowledge was that work used in the completion of the Camas project?
A Yes.
Q Base course for the parking area, was that work completed by Universal?
A I don't think it was completed a hundred percent.

Page 154

I think ninety-nine percent of the material, probably a hundred if we would have got it paved, would have been there, but I don't know if they had to add to it when they finished the contract.
Q To your knowledge, whatever Universal did do with respect to the base course for the parking area, was that utilized in the completion of the Camas project?
A Yes, it was, as far as I'm aware.
Q Okay. The same question for the concrete for the abutment, was that work completed by Universal when they were on the project?
A It wasn't completed, the finished concrete work wasn't -- it wasn't completed, but --
Q What remained to be done, do you know?
A I don't even think they got the forms stripped. They hadn't finished the concrete. There's a finishing specification.
Q Okay. To your knowledge, to the extent Universal did work on the concrete for the abutments, was that utilized in the completion of the Camas project?
A Yes, I believe it was.
Q Okay. How about the work they did on and completed on the sliver fills?
A I don't know about that, I honestly don't know.
Q And your testimony is they completed some, not

Page 155

all, of the sliver fill work?
A I don't think there was an actual length that was completed to the top, it was stuff partially done.
Q Okay. Do you know what particular problems they were having with the sliver fill work they were doing?
A Getting densities, getting a process so they cold get the densities.
Q Do you know whether they tried the method spec?
A We did.
Q And do you know whether they were having problems with that?
A We actually -- one day with Dick and Mark on the job, they used their hoe-pac in an area and we did the method spec with the small roller, and when it was all said and done the roller did a better job than the hoe-pac, and from my looking at it actually saved time.
Q Was it still slow going then?
A I didn't think it was going to be -- I mean it wasn't that slow going. I mean it was faster than their hoe-pac that they was going to use to do, and we blocked out a given length end to end from each other and did it.
Q Did you ever do and conduct an analysis of how long it would take Universal to complete the sliver fill work using the method spec?
A I think -- I think I did with -- Jane Traffalis

Page 156

and I, and myself, both sat down and did some calculations on that.
Q Okay. What calculations, what results did you come up with?
A I don't exact -- know exact numbers, or anything like that, but my recollection of it is -- what it come up with is it would have been -- it would be quickerm much quicker, to do the method spec than to use a hoe-ram to do a given area two foot wide by three foot and then move to the next, just based off of the little test section that we did.
Q Do you recall what the rate of progress was in linear feet?
A I don't.
Q Let's keep working down through here. Universal completed silt fence work?
A Parts.
Q Parts of it?
A Parts of it.
Q To the extent they did work on the silt fence, do you know whether that was utilized in the completion of the Camas project?
A I have no idea.
Q Okay. How about signs and barricades, did they complete that work?
A I believe all signs and all traffic control

Page 157

devices were delivered to the project and set up where they needed to be for the -- at the time, yes.

Q Do you know whether those signs and barricades were used utilized in the completion?

A I do not.

Q How about delivery of the -- well, actually it's just the materials themselves, the girders, the deck, and the bearing plates, do you know whether any of those materials were used in the completion?

A I think everything but the bearing plates, because I don't -- I don't think they ended up being on the project when we did the completion, so I think they had to be re-purchased, but I'm pretty -- I'm positive that the girders, the deck, and the curbing was all used.

(Deposition Exhibit Number Thirty-five was marked for identification)

Q (By Mr. Larkin) Exhibit Thirty-five is a differing site condition notice dated November 1, 2001. You can take a minute to look at it, if you want.

A (Examining document) Okay.

Q What did you do in response to receiving this letter on November 2, 2001?

A Generally I imagine it got passed on to Jane Traffalis.

Page 158

Q Do you recall doing that?

A I don't recall doing it, but that's the route it would have went.

Q So, in other words, claims materials go to Jane Traffalis?

A She's my first point of contact with that, yes.

Q Okay. And I think we discussed it earlier, but in your job description it's not part of your job to analyze claims?

A Correct. I mean, yeah, that's basically it's not. We have people to help out with that that take care of some of that stuff.

Q Okay. So you can't recall anything you did specifically in response to this November 1st letter?

A No.

(Deposition Exhibit Number Thirty-six was marked for identification)

Q (By Mr. Larkin) Exhibit Thirty-six are your notes dated November 6, 2001?

A Okay.

Q The first question is on the first paragraph you state Dick Standerfer said there was only one problem and it was the borrow sources. Do you remember him saying that?

A (Examining document) Yeah, I have a recollection

Page 159

of that.

Q It goes on to say that -- and this is referring to Dick Standerfer -- said that this sandy material has the potential for lateral displacement, and poses a safety hazard. Do you recall him saying that?

A Yes.

Q Did you agree with his assessment?

A I -- no, not really.

Q Why not?

A If a -- it's been my experience if a fill is built correctly from the bottom up, you get your compaction into it, you're not going to have -- an also tilt it just a little bit to the inside, which was suggested to him, that that would not be a problem.

Q Did the plans and specifications show a tilt to the inside?

A There's no -- it doesn't show anything like that --

Q Okay.

A -- as far as looking at there, no, there's no indication of --

Q If you would turn back to Exhibit Seven, sheet C-2, --

A (Examining document) Nope.

Q -- is there any indication on the sliver fill

Page 160

schematic they could be tilted to the inside?

A There is no indication that it couldn't be, no.

Q Did you have any specific reason to disagree with Dick Standerfer's assessment that it could be a safety hazard?

A Yeah. In a way, yes. This small roller -- I don't remember if it was remote controlled, or whatever, but there would be no reason for anybody to be underneath it or behind it and, again, if the embankments were built properly, even if it was flat and it was compacted from the bottom up, you're not going to have a failure of that kind with -- and lose a thing.

Q Just so I understand it, when you're compacting material that's the purpose of running a roller on material, right, --

A Right.

Q -- because it's not compacted yet?

A That's correct.

Q Okay. So when you put a roller on uncompacted material it begs the question of whether it's compacted or not. My assumption would be it's not. Right?

A Well, we're building a six or eight inch lift.

Q Okay. And when you rolled the next lift that lift is not compacted yet when you do your first pass?

A When you do the first pass you are correct.

Page 42

this is a fax from Gerry to you?
A **Yes.**
Q Okay. And at the bottom of the first page he has some comments handwritten in. The second comment is, he says, "2nd page shows size and volume." Is it your understanding that he's referring to the borrow sources?
A **Yes.**
Q Okay. He goes on to say, "We can increase size and possibly depth as needed to increase borrow volume or surface area." Do you see that?
A **Yes.**
Q Okay. And was it your understanding that as of the time of this fax, which was January 29, 2001, as referenced on the third page of this fax, that the proposal at the time was that the proposed borrow would be to a depth of three feet?
A **Could you read that back, please?**
Q Sure. As of January 29, 2001, which is the date of this Exhibit 8, and I'm referring to the third page of the exhibit --
A **Right.**
Q -- was it your understanding that the

Page 43

proposed borrow area showed an excavation depth of about three feet?
A **Correct, according to this drawing.**
Q Okay. And is it also correct that the Wildlife, Fish & Wildlife was telling you that you could increase the size and possibly the depth as needed in that borrow source?
A **Referring back to the note on page 1?**
Q Right.
A **Yes.**
Q Okay. Now, looking at page 3 of this Exhibit 8, can you tell me in the top schematic -- there's an area that has hash marks with the words Proposed Fill and an arrow drawn to it. Can you tell me what that is referring to, the hash-marked area?
A **Fill.**
Q Is that referring to the sliver fill portions of the project?
A **No.**
Q Okay. What portions of the project is that referring to?
A **It's referring to a portion of the project that requires fill.**
Q Okay. But not the sliver fill areas, is

Page 44

that correct?
A **Correct.**
Q Okay.
(Exhibit No. 9 is marked for identification.)
BY MR. LARKIN:
Q Okay. I've marked the next exhibit or next document No. 9. It's a document entitled Idaho/Montana Team Quality Review Comments. Do you see that?
A **Yes.**
Q Okay. There's some handwriting on the responses for pages 1 and 2. Is that your handwriting in the response sections?
A **Yes.**
Q Okay. And then if you flip back, pages 4 and 5 also has, actually 6 and 7 as well, also have handwriting in the response columns. Is that your handwriting?
A **Yes.**
Q Okay. If you can turn to the next page, which is a document that's entitled Minute - Memo, from you to Brad Neitzke, do you have that?
A **Yes.**
Q Okay. You say in part, "the refuge

Page 45

manager." Is that referring to Gerry Deutscher?
A **Just a second. I'm just reading the message.**
Q Go ahead.
A **Okay, I've read it.**
Q Okay. The refuge manager that's, that you refer to is, are you referring to Gerry Deutscher?
A **Yes.**
Q And Mr. Deutscher assured you that the borrow source was decent stuff?
A **I don't think he used the word "decent stuff".**
Q So what you wrote to Mr. Neitzke, is that true or untrue?
A **No. It's true, but he didn't use the word "decent stuff".**
Q Okay. What did he, what terms did he use?
A **I, I don't exactly recall. He may have said -- I don't remember the words he used, but I think that "decent stuff" was my language.**
Q That was your interpretation of what Mr. Deutscher told you?
A **Correct.**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNIVERSAL CONSTRUCTION, INC., | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 03-1502C |
| THE UNITED STATES, | ) | No. 03-2370C |
| Defendant. | ) | |
| | ) | |

DEPOSITION OF KARL LANGUIRAND, P.G.
JULY 12, 2005

REPORTED BY:

MONICA M. ARCHULETA, CSR NO. 471

NOTARY PUBLIC

REPORTER'S CERTIFICATE

I, MONICA M. ARCHULETA, CSR No. 471, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction;

That the foregoing is a true and correct record of all testimony given, to the best of my ability;

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 20th day of July, 2005.

MONICA M. ARCHULETA, CSR NO. 471
Notary Public
P.O. Box 2636
Boise, Idaho 83701-2636
My commission expires August 3, 2006

MONICA ARCHULETA NOTARY PUBLIC STATE OF IDAHO

Q. All right. How would you describe the difference in the areas of expertise that you bring to the table versus Mr. Cram?
A. I bring soils knowledge. Mr. Cram also brings soils knowledge and an engineering background.
Q. So you would feel confident about testifying concerning point number three; correct?
A. Yes.
Q. All right. Let me ask a couple questions about that, then. You say, "Soil types found within these mandatory borrow sources were highly variable as the above table shows, thus making it extremely difficult for the contractor to select or reject the materials."
When you say "highly variable," could you give me some sense as to what you mean by that as compared to what the contractor may have expected from what was stated in the contract?
A. Yes. The contract states sandy loam underlaid by clayey materials. The material was interspersed -- the sandy loam was interspersed with clayey materials and it made it -- the silt and clay -- the soil types in the borrow source



contained many types of soil types. Thus, they were highly variable. And that differed than the one soil type that was described in the contract.
Q. I see. I guess where I'm not quite getting your opinion here is that -- I thought we had gone through that it says primarily sandy loam. And underlain with clay.
So I guess what I'm getting at is, how much variation would you have expected here going in?
MR. LARKIN: Based on what is in the contract?
MR. O'CONNELL: Yes.
THE WITNESS: Based on what was written in the contract I would have expected a higher percentage of sandy loam material than what is seen in the report.
Q. (BY MR. O'CONNELL) What percentage of sandy loam would you have expected?
A. Primarily would be 80 percent.
Q. Eighty percent you would have expected?
A. Yes.
Q. For the remaining 20 percent, that would be the clayey materials? Is that your interpretation?



A. That could be anything else.
Q. So only 20 percent of anything else? Besides the sandy loam?
A. Yes.
Q. What are you basing that on?
A. My background as a geologist. And the estimation of percentages, primarily. There is definitions of percentages of different words. What different words mean.
Q. I see. You had referenced in one of your earlier answers interspersion of materials. Do the borings or the tests show materials interspersed within the sandy loam?
A. No, that was gleaned from a interview with Mr. Posio. Troy Posio.
Q. I see. And he told you there was other materials interspersed within the sandy loam?
A. His words were the soil was flowing.
Q. And -- I'm sorry.
A. It was lenticular in nature.
Q. It was what?
A. Lenticular.
Q. Can you spell that word, please?
A. L-e-n-t-i-c-u-l-a-r.
Q. What does that word mean?



A. Lens formation. It a geologic term. It means to be like a lens.
Q. I see.
A. Lens shape.
Q. You were talking about the meaning to you of the word "primarily."
Does that have some kind of a definition in your industry that you are relying on?
A. My education. I don't know if it is in the industry.
Q. I see. Was the lens formations here unusual, in your view?
A. No.
Q. So that wouldn't be different than what a contractor would expect going in?
MR. LARKIN: Object to form.
THE WITNESS: It may be different than what the contractor exspected. Depending on what his knowledge of the area was.
Q. (BY MR. O'CONNELL) And do you know anything about this contractor's knowledge of this area?
A. No.
Q. So if it depends on the contractor's

## Monday, October 15, 2001

This morning, I went to the project to see how work had progressed while, I was on leave. AL Stites had informed me this morning that UCI was having problems with densities on the borrow material. When I arrived on the project there was frost about 1" in the ground so I could not determine if the grade was soft or pumping. Al told me that the material they were placing was not representative of the proctor they took from the borrow area. Later while checking the grade after it had thawed, this was my conclusion as well. The material they had for the proctor was dark colored sand with a little silt or clay in it. The material I was digging out of the grade had a lot of clay in it and there were balls of a white clay or silt mixed in with it. When I looked at the borrow source I discovered that they had run into a white clay or silt pocket and it was being mixed in with the sand. It is of my opinion they don't have a density problem but a proctor problem. While in a phone conversation with Dick Standerfer while on the project, he was indicating to me that UCI is wanting FHWA to not use the borrow sources material for the project, because it was not uniform and it had organics in it. I told him if he thought there was too much organics in the material then by contract he was required to remove the organics. He said that it would cost FHWA for them to do that. It seems he has not read the requirements of the contract. UCI had their testing subcontractor bring out a sand cone to test the material, which was placed on the road. Because they believe that a few very small roots hair sized roots are affecting the density. They found that the sand cones were almost identical to densities they took with the nuclear gauge. When I went back out to the project after noon they still were not doing anything but stripping topsoil in the widened areas up to 1+840 of the Auto Tour Route. AL and I went to the aggregate source to see how it was going. They have been in the source for about three weeks and still do not have any material that meets spec. yet. They are currently running the P.I. material through the crusher to screen out the large rocks and clay balls. I had told Mark Standerfer earlier before I left, that if they were going to be running the large rocks in the P.I. material through the crusher with the Aggregate that they would have to have it tested to see if it would meet the durability specs. in the contract. UCI is hoping to be able to blend a little P.I. material with material that they have already crushed, which does not meet a specification to bring it into spec. with an Idaho spec. for their Roadway aggregate method I. While in UCI's office/test trailer this afternoon that the tester was pounding proctors on the floor of the test trailer. I asked him if this was a proper procedure according to AASHTO. He told me that it was not.

Todd Butikofer,
Project Engineer

Exhibit No. 26
Date: 10-18-04
Butikofer
T&T REPORTING

Page 9

A Civil and Geophysical.
Q Okay.
A It would have been '89 or '90.
Q Tell me just in layman's terms what that is?
A It's just surveying.
Q Just surveying?
A The geophysical was for working for seismic crew laying out jugs and just basically surveying straight lines just for the seismic crews to come out and run their -- set their instruments down and send the seismic rays down looking for either oil -- generally oil is what they were looking for.
Q As far as civil, it was just like it sounds, it was doing a little bit of construction surveying or laying out subdivisions, that type of stuff.
Q Did you take any course work on soils analysis in getting your associate's degree?
A Not in the associate's degree, no.
Q How about in obtaining your Bachelor of Science, did you take any courses in soils analysis?
A I took a couple in soils, yes.
Q Tell me about those courses, what did they involve?
A It was more or less based on agricultural for soils, I mean it wasn't -- we did take -- I did have to take

Page 10

geologic -- geology classes where we studied rocks, different types of rocks, make-up of rocks, hardness of rocks, that kind of stuff, and then we got into actually soils for growing things, different types of soils, you know, the humus, clays, silts, sands, gravels, just your basic classification, not really any --
Q Okay. So, in other words, you studied the classifications of various soils?
A Minor, yeah, I mean it was -- it was basically -- I mean it was -- the study of it was for agriculture, I mean it was for growing, but --
Q Okay. But you studied -- I'm sorry.
A Yes, I had soils classes.
Q Okay. And you studied the various classifications of soils?
A Yes.
Q Okay. Did you take any course work in any of your educational history relating to soils analysis in the context of construction?
A No.
Q And more specifically did you ever take any course work in connection with soils analysis and the ability to compact certain classifications of soils?
A No.
Q Why don't you take me through your work history

Page 11

beginning in 1999?
A Beginning in '99?
Q Right.
A In '99 I was working in Yellowstone National Park as a project engineer on Arnica Creek.
Q I'm sorry. Could you spell that?
A A-r-n-i-c-a.
Also East Entrance, Fishing Bridge, and from there I -- when did that one get done? The next job was also in Yellowstone National Park but I don't know exactly when it got done. It would have been in probably 2001, 2000 -- it would have been -- the next job was -- it was the same, I did it the same Summer I was out at Camas, which was -- what year was this?
Q 2001?
A 2001, okay, so the Spring of 2001.
The Arnica job ended the Fall of 2002, Winter of 2002 -- or 2000. 2001 in the Spring I did a haul contract, it was the Sylvan Pass haul phase two in the park, which we hauled -- we excavated rock from permafrost and washed it, screened it, and hauled it, stockpiled it.
Q And that was the Spring of 2000?
A That was the Spring of 2001 up through -- the job went through -- actually through September of 2001, along then.

Page 12

Q Okay.
A I was still tied in a little bit when Camas started.
Q I want to go back to basics here. Have you ever had your deposition taken before?
A Yes.
Q Okay. How many times?
A Once.
Q So you kind of understand the ground rules for a deposition?
A No, it's never been this formal. The last time it was over the phone.
MR. LARKIN: Okay. Obviously I'm asking the questions, you're providing the answers. Our court reporter here is taking down both the questions and answers, and you're doing a fine job so far. We're going to try not to talk over each other, --
THE WITNESS: Yes.
MR. LARKIN: -- which makes his job a lot easier.
And if you don't understand any of my questions please ask me to rephrase or clarify; otherwise, I'll just understand that you understand my question, --
THE WITNESS: Okay.
MR. LARKIN: -- or I'll assume that.
If you need to take a break just let me know --

U. S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
WESTERN FEDERAL LANDS HIGHWAY DIVISION
P.O. Box 268
Roberts, Idaho 83444

September 27, 2001 UCI-017

Dick Standerfer, President
Universal Construction, Inc.
P.O. Box 187
Emmett, Idaho 83617

Subject: Quality Control Plan

DTFH70-01-C-00034
Camas NWR Complex
ID RRP-CAMA 101(1)

Mr. Standerfer,

The Quality Control Plan (QCP), (76-019), dated September 18, 2001, and three other parts, received by this office September 27, 2001, is approaching what is expected of the QCP. The FHWA requests you to put the four individual parts of your plan together into one concise and organized plan. Also, please exclude unneeded information included in the two profiles, which do not pertain to this project. (Technical Blasting Experience, Inprogress/Completed Projects, Past Experience Subcontractors) All of the above information was conveyed to Mark Standerfer, Project Superintendent, in a phone conversation in the afternoon of September 25, 2001, after FHWA received a faxed copy of the above mentioned QCP and attachments. Please make the needed revisions and resubmit for approval.

Please contact me if you have any questions.

Sincerely,

Todd Butikofer,
Project Engineer

cc: Jane Traffalis, COE
Mark Standerfer, Universal
files

different systems?
A. ASTM is a standard classification system for work that we do in our field. And geotechnical analyses for structural components for fill. AASHTO is Federal Highway Administration. It is standard for roadways.
Q. Let me just ask you a few questions on these samples that were used here. Working our way from left to right. Borrow Pit 1, Hole 1.
A. Sure.
Q. Zero to 0.2 meters. And under the AASHTO system that is A-2-4, silty sand. Correct?
A. Correct.
Q. And that would be sandy loam; correct?
A. It may be. To determine sandy loam you have to use a USDA textural chart. So you have to know the percentage of silt, sand, and clay to determine the sandy loam. So ASTM, AASHTO, and USDA don't necessarily correlate together. You can determine which is which. But without -- I can't directly correlate silty sand from there to there. You would need other -- you would need the percentages.
Q. I see. Let me ask you a question a



different way. I think it is actually in the February 22, 2005 letter. You state that using the AASHTO system there would be various types of soil that one would expect to find out there. And I think you mentioned A-2-4 was one of them. Correct?
A. I do believe you are right.
Q. Moving on, then, to the next column. Borrow Pit 1, Hole 1. 0.53 to 1.0 meters. Do you know what was going on for the soil between 0.2 and 0.53?
A. No.
Q. Under the AASHTO system this is A-4. Which I think you said in your later report was not one of the soils that they would have expected to encounter. But under the AASHTO system you describe this as clayey silt.
A. Yes.
Q. Would clayey silt be consistent with the reference in the contract to clayey materials?
A. Yes.
Q. The next column over it is Borrow Pit 1, Hole 2. Zero to 0.2 meters. That's fine sand. Which is AASHTO classification A-3.



If I understand your February 22 report correctly, that is a soil that they would have expected to encounter?
A. I believe that is correct; yes.
Q. And working our way over to the right. Borrow Pit 1, Hole 2. This is classification A-2-4, silty sand.
This is something again they would have expected to encounter?
A. Yes.
Q. And, finally, Borrow Pit 1, Hole 4. A-64, silty clay.
Again, would this be a clayey material as referenced in the contract?
A. Yes.
Q. Let me ask you to turn to the second page. Now, I note that the report is submitted by MTI. And do I understand that you are the primary author and then it is reviewed by Mr. Cram?
A. Yes. With --
Q. Go ahead.
A. That's correct.
Q. And do you feel comfortable testifying to all of the opinions in the report?



A. There is some opinions that I did not make that were made by Mr. Cram regarding engineering issues of the material.
Q. Could you identify those for me, please?
A. One and two of the bulleted items.
Q. On page two?
A. On page two. Under the general observations.
Q. And are you going to give any -- or are you planning on giving any testimony at trial about points one and two?
A. No.
Q. Maybe I asked you the question using a wrong word. Let me ask it a slightly different way.
Would you be comfortable at trial giving any opinions as to points one and two? Or is that strictly Mr. Cram's role?
MR. LARKIN: I'm sorry, can I have the question again?
(Record read.)
MR. LARKIN: Object to form.
Q. (BY MR. LARKIN) You can answer.
A. No.

# INDEX OF CONTRACT CLAUSES

## 1. Clauses Incorporated by Reference

### 52.252-2 Clauses Incorporated by Reference (Feb 1998)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available; phone (360) 696-7520 and FAX (360) 696-7932. Also, you may access the full text of a clause electronically at this site: www.arnet.gov/far/.

52.202-1 Definitions (May 2001) - Alternate I (May 2001)
52.203-3 Gratuities (Apr 1984)
52.203-5 Covenant Against Contingent Fees (Apr 1984)
52.203-7 Anti-Kickback Procedures (Jul 1995)
52.203-8 Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity (Jan 1997)
52.203-10 Price or Fee Adjustment for Illegal or Improper Activity (Jan 1997)
52.203-12 Limitation on Payments to Influence Certain Federal Transactions (Jun 1997)
52.204-1 Approval of Contract (Dec 1989)
52.204-4 Printing/Copying Double-Sided on Recycled Paper (Aug 2000)
52.209-6 Protecting the Government's Interest When Subcontracting with Contractors Debarred, Suspended, or Proposed for Debarment (Jul 1995)
52.211-12 Liquidated Damages—Construction (Sep 2000)

**(a) If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of: <u>See Special Contract Requirements, Subsection 108.04</u> .**

52.211-18 Variation in Estimated Quantity (Apr 1984)
52.214-26 Audit and Records - Sealed Bidding (Oct 1997)
52.214-27 Price Reduction for Defective Cost or Pricing Data–Modifications–Sealed Bidding (Oct 1997)
52.214-28 Subcontractor Cost or Pricing Data–Modifications–Sealed Bidding (Oct 1997)
52.219-4 Notice of Price Evaluation Preference for HUBZone Small Business Concerns (Jan 1999)

**(c) *Waiver of evaluation preference.* A HUBZone small business concern may elect to waive the evaluation preference, in which case the factor will be added to its offer for evaluation purposes. The agreements in paragraph (d) of this clause do not apply if the offeror has waived the evaluation preference.**

**(___) Offeror elects to waive the evaluation preference.**

52.219-8 Utilization of Small Business Concerns (Oct 2000)
52.219-23 Notice of Price Evaluation Adjustment for Small Disadvantaged Business Concerns (May 2001) Alternate II (Oct 1998)

**(b) Evaluation adjustment. (1) The Contracting Officer will evaluate offers by adding a factor of 10 percent to the price of all offers, except--**

**(c) *Waiver of evaluation adjustment.* A small disadvantaged business concern may elect to waive the adjustment, in which case the factor will be added to its offer for evaluation purposes. The agreements in paragraph (d) of this clause do not apply to offers that waive the adjustment.**

**(___) Offeror elects to waive the adjustment.**

52.222-3 Convict Labor (Aug 1996)
52.222-4 Contract Work Hours and Safety Standards Act–Overtime Compensation (Sep 2000)

52.222-6 Davis-Bacon Act (Feb 1995)
52.222-7 Withholding of Funds (Feb 1988)
52.222-8 Payrolls and Basic Records (Feb 1988)
52.222-9 Apprentices and Trainees (Feb 1988)
52.222-10 Compliance with Copeland Act Requirements (Feb 1988)
52.222-11 Subcontracts (Labor Standards) (Feb 1988)
52.222-12 Contract Termination–Debarment (Feb 1988)
52.222-13 Compliance with Davis-Bacon and Related Act Regulations (Feb 1988)
52.222-14 Disputes Concerning Labor Standards (Feb 1988)
52.222-15 Certification of Eligibility (Feb 1988)
52.222-21 Prohibition of Segregated Facilities (Feb 1999)
52.222-26 Equal Opportunity (Feb 1999)
52.222-27 Affirmative Action Compliance Requirements for Construction (Feb 1999)
52.222-35 Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era (Apr 1998) [Deviation (Mar 1995)]
52.222-36 Affirmative Action for Workers with Disabilities (Jun 1998)
52.222-37 Employment Reports on Disabled Veterans and Veterans of the Vietnam Era (Jan 1999)
52.223-6 Drug-free Workplace (May 2001)
52.223-14 Toxic Chemical Release Reporting (Oct 2000)
52.225-13 Restrictions on Certain Foreign Purchases (Jul 2000)
52.227-1 Authorization and Consent (Jul 1995)
52.227-2 Notice and Assistance Regarding Patent and Copyright Infringement (Aug 1996)
52.227-4 Patent Indemnity–Construction Contracts (Apr 1984)
52.228-1 Bid Guarantee (Sep 1996)

**(c) The amount of the bid guarantee shall be 20 percent of the bid price or $3 million, whichever is less.**

**(d) ...furnish execute bonds within 10 days after receipt of the forms......**

52.228-2 Additional Bond Security (Oct 1997)
52.228-11 Pledges of Assets (Feb 1990)
52.228-12 Prospective Subcontractor Requests for Bonds (Oct 1995)
52.228-14 Irrevocable Letter of Credit (Dec 1999)
52.228-15 Performance and Payment Bonds–Construction (July 2000)
52.229-3 Federal, State, and Local Taxes (Jan 1991)
52.229-5 Taxes–Contracts Performed in U.S. Possessions or Puerto Rico (Apr 1984)
52.232-5 Payments under Fixed-Price Construction Contracts (May 1997)
52.232-17 Interest (Jun 1996)
52.232-23 Assignment of Claims (Jan 1986)
52.232-27 Prompt Payment for Construction Contracts (May 2001)
52.232-34 Payment by Electronic Funds Transfer–Other than Central Contractor Registration (May 1999)
52.233-1 Disputes (Dec 1998) - Alternate I (Dec 1991)
52.233-3 Protest after Award (Aug 1996)
52.236-1 Performance of Work by the Contractor (Apr 1984)

**The Contractor shall perform on the site, and with its own organization, work equivalent to at least fifty (50) percent of the total amount of work to be performed under the contract.**

52.236-2 Differing Site Conditions (Apr 1984)
52.236-3 Site Investigation and Conditions Affecting the Work (Apr 1984)
52.236-5 Material and Workmanship (Apr 1984)
52.236-6 Superintendence by the Contractor (Apr 1984)
52.236-7 Permits and Responsibilities (Nov 1991)
52.236-8 Other Contracts (Apr 1984)

| | |
|---|---|
| 52.236-9 | Protection of Existing Vegetation, Structures, Equipment, Utilities and Improvements (Apr 1984) |
| 52.236-10 | Operations and Storage Areas (Apr 1984) |
| 52.236-11 | Use and Possession Prior to Completion (Apr 1984) |
| 52.236-12 | Cleaning up (Apr 1984) |
| 52.236-13 | Accident Prevention (Nov 1991) - Alternate 1 (Nov 1991) |
| 52.236-15 | Schedules for Construction Contracts (Apr 1984) |
| 52.236-17 | Layout of Work (Apr 1984) |
| 52.236-21 | Specifications and Drawings for Construction (Feb 1997) |
| 52.236-26 | Preconstruction Conference (Feb 1995) |
| 52.242-13 | Bankruptcy (Jul 1995) |
| 52.242-14 | Suspension of Work (Apr 1984) |
| 52.243-4 | Changes (Aug 1987) |
| 52.244-2 | Subcontracts (Aug 1998) |
| 52.246-12 | Inspection of Construction (Aug 1996) |
| 52.247-64 | Preference for Privately Owned U.S. Flag Commercial Vessels (Jun 2000) |
| 52.248-3 | Value Engineering–Construction (Feb 2000)--- Alternate 1 (Apr 1984) |
| 52.249-2 | Termination for Convenience of the Government (Fixed Price) (Sep 1996)-- Alternate 1 (Sep 1996) |
| 52.249-10 | Default (Fixed-Price Construction) (Apr 1984) |
| 52.253-1 | Computer Generated Forms (Jan 1991) |
| 1252.211-71 | Index for Specifications (Oct 1996) |
| 1252.242-73 | Contracting Officer's Technical Representative (Oct 1994) |

## 2. Full Text Clauses

### 52.211-10 Commencement, Prosecution, and Completion of Work (Apr 1984) Alternate I (Apr 1984)

The Contractor shall be required to (a) commence work under this contract within 10 calendar days after the date the Contractor receives the notice to proceed, (b) prosecute the work diligently, and (c) complete the entire work ready for use not later than **December 11, 2001,** subject to such extensions as may be authorized. The time stated for completion shall include final cleanup of the premises.

The completion date is based on the assumption that the successful offeror will receive the notice to proceed **by September 10, 2001.** The completion date will be extended by the number of calendar days after the above date that the contractor receives the notice to proceed, except to the extent that the delay in issuance of the notice to proceed results from the failure of the contractor to execute the contract and give the required performance and payment bonds within the time specified in the offer.

### 52.225-9 Buy American Act—Balance of Payments Program—Construction Materials (Feb 2000)

(a) *Definitions.* As used in this clause--

"Component" means any article, material, or supply incorporated directly into construction materials.

"Construction material" means an article, material, or supply brought to the construction site by the Contractor or a subcontractor for incorporation into the building or work. The term also includes an item brought to the site preassembled from articles, materials, or supplies. However, emergency life safety systems, such as emergency lighting, fire alarm, and audio evacuation systems, that are discrete

# Section 204.–EXCAVATION AND EMBANKMENT

## Description

**204.01** This work consists of excavating material and constructing embankments. This includes furnishing, hauling, stockpiling, placing, disposing, sloping, shaping, compacting, and finishing earthen and rocky material.

**204.02 Definitions.**

(a) **Excavation.** Excavation consists of the following:

**(1) Roadway excavation.** All material excavated from within the right-of-way or easement areas, except subexcavation covered in (2) below and structure excavation covered in Sections 208 and 209. Roadway excavation includes all material encountered regardless of its nature or characteristics.

**(2) Subexcavation.** Material excavated from below subgrade elevation in cut sections or from below the original groundline in embankment sections. Subexcavation does not include the work required by Subsections 204.05, 204.06(b), and 204.06(c).

**(3) Borrow excavation.** Material used for embankment construction that is obtained from outside the roadway prism. Borrow excavation includes unclassified borrow, select borrow, and select topping.

**(b) Embankment construction.** Embankment construction consists of the placement and compaction of roadway or borrow excavation. This work includes:

(1) Preparing foundation for embankment
(2) Constructing roadway embankments
(3) Benching for side-hill embankments
(4) Constructing dikes, ramps, mounds, and berms
(5) Backfilling subexcavated areas, holes, pits, and other depressions

**(c) Embankment material.** Material for embankment construction are:

**(1) Rock.** Rock is material containing 25 percent or more, by volume, rock particles greater than 100 millimeters in diameter.

(2) **Earth.** Earth is material containing less than 25 percent, by volume, rock particles greater than 100 millimeters in diameter.

(d) **Conserved topsoil.** Excavated material conserved from the roadway excavation and embankment foundation areas that is suitable for growth of grass, cover crops, or native vegetation. A material reasonably free from hard soil, rock, clay, toxic substances, litter, or other deleterious material.

(e) **Waste.** Excess and unsuitable roadway excavation and subexcavation that cannot be used.

## Material

**204.03** Conform to the following Subsections:

| | |
|---|---|
| Backfill material | 704.03 |
| Select borrow | 704.07 |
| Select topping | 704.08 |
| Topping | 704.05 |
| Unclassified borrow | 704.06 |
| Water | 725.01 |

## Construction Requirements

**204.04 Preparation for Roadway Excavation and Embankment Construction.** Clear the area of vegetation and obstructions according to Sections 201 and 203.

**204.05 Conserved Topsoil.** Conserve topsoil from roadway excavation and embankment foundation areas. Stockpile conserved topsoil in low windrows immediately beyond the rounding limits of cut and embankment slopes or in other approved locations. Separate topsoil from other excavated material.

Place conserved topsoil on completed slopes according to Section 624.

**204.06 Roadway Excavation.** Excavate as follows:

**(a) General.** Do not disturb material and vegetation outside the construction limits.

Excavate material suitable for backfill, roadbed finishing, topping, or other purposes in a sequence that permits the placement of the excavation directly into its final position or in stockpiles for subsequent placing.

Incorporate only suitable material into embankments. Replace any shortage of suitable material caused by premature disposal of roadway excavation. Dispose of unsuitable or excess excavation material according to Subsection 204.14.

At the end of each day's operations, shape to drain and compact the work area to a uniform cross-section. Eliminate all ruts and low spots that could hold water.

**(b) Rock cuts.** Blast rock according to Section 205. Excavate rock cuts to 150 millimeters below subgrade within the roadbed limits. Backfill to subgrade with topping or with other suitable material. Compact the material according to Subsection 204.11.

**(c) Earth cuts.** Scarify earth cuts to 150 millimeters below subgrade within the roadbed limits. Compact the scarified material according to Subsection 204.11.

**204.07 Subexcavation.** Excavate material to the limits designated by the CO. Where applicable, survey cross-sections according to Section 152. Prevent unsuitable material from becoming mixed with the backfill. Dispose of unsuitable material according to Subsection 204.14. Backfill the subexcavation with topping, or other suitable material. Compact the material according to Subsection 204.11.

**204.08 Borrow Excavation.** Use all suitable roadway excavation in embankment construction. Do not use borrow excavation when it results in excess roadway excavation. Excess borrow excavation will be deducted from the appropriate borrow excavation quantity.

Obtain borrow source acceptance according to Subsection 105.02. Develop and restore borrow sources according to Subsection 105.03. Do not excavate beyond the established limits. When applicable, shape the borrow source to permit accurate measurements when excavation is complete.

**204.09 Preparing Foundation for Embankment Construction.** Prepare foundation for embankment construction as follows:

**(a) Embankment less than 1 meter high over natural ground.** Completely break up the cleared ground surface to a minimum depth of 150 millimeters by plowing or scarifying. Compact the ground surface according to Subsection 204.11.

**(b) Embankment less than 0.5 meter high over an existing asphalt, concrete, or gravel road surface.** Scarify gravel roads to a minimum depth of 150 millimeters. Scarify or pulverize asphalt and concrete roads to 150 millimeters below the pavement. Reduce all particles to a maximum size of 150 millimeters and produce a uniform material. Compact the surface according to Subsection 204.11.

**(c) Embankment across ground not capable of supporting equipment.** Dump successive loads of embankment material in a uniformly distributed layer to construct the lower portion of the embankment. Limit the layer thickness to the minimum depth necessary to support the equipment.

**(d) Embankment on an existing slope steeper than 1:3 (1 unit vertical to 3 units horizontal).** Cut horizontal benches in the existing slope to a sufficient width to accommodate placement and compaction operations and equipment. Bench the slope as the embankment is placed and compacted in layers. Begin each bench at the intersection of the original ground and the vertical cut of the previous bench.

**204.10 Embankment Construction.** Incorporate only suitable roadway excavation material into the embankment. When the supply of suitable roadway excavation is exhausted, furnish unclassified borrow to complete the embankment. Construct embankments as follows:

**(a) General.** At the end of each day's operations, shape to drain and compact the embankment surface to a uniform cross-section. Eliminate all ruts and low spots that could hold water.

During all stages of construction, route and distribute hauling and leveling equipment over the width and length of each layer of material.

Compact embankment side slopes with a tamping type roller or by walking with a dozer. For slopes 1:1.75 or steeper, compact the slopes as construction of the embankment progresses.

**(b) Rock.** Place rock in horizontal layers not exceeding 300 millimeters in compacted thickness. Material composed predominantly of boulders or rock fragments too large for 300-millimeter layers may be placed in layers of up to 600 millimeters thick. Incorporate oversize boulders or rock fragments into a 600-millimeter layer by reducing them in size or placing them individually according to (c) below. Place rock layers with sufficient earth and smaller rocks to fill the voids. Compact each layer according to Subsection 204.11 before placing the next layer.

Construct the top 300 millimeters of the embankment with topping or other suitable material.

**(c) Individual rock fragments and boulders.** Place individual rock fragments and boulders greater than 600 millimeters in diameter as follows:

(1) Reduce rock to less than 1200 millimeters in the largest dimension.

(2) Distribute rock within the embankment to prevent nesting and fill the voids between them with finer material.

(3) Compact each layer according to Subsection 204.11.

**(d) Earth.** Place earth in horizontal layers not exceeding 300 millimeters in compacted thickness. Incorporate oversize boulders or rock fragments into the 300-millimeter layers by reducing them in size or placing them individually as required in (c) above.

Compact each layer according to Subsection 204.11 before placing the next layer.

**(e) Embankment outside of roadway prism.** Where placing embankment outside the staked roadway prism, place material in horizontal layers not exceeding 600 millimeters in compacted thickness. Compact each layer according to Subsection 204.11(a).

**(f) Other Embankments.** Where placing embankment on one side of abutments, wing walls, piers, or culvert headwalls, compact the material using methods that prevent excessive pressure against the structure.

Where placing embankment material on both sides of a concrete wall or box structure, conduct operations so compacted embankment material is at the same elevation on both sides of the structure.

Where structural pilings are placed in embankment locations, limit the maximum particle size to 100 millimeters.

**204.11 Compaction.** Compact as follows:

**(a) Rock embankment.** Adjust the moisture content of the material to a moisture content suitable for compaction. Compact each layer of material full width with one of the following:

(1) Four roller passes of a 45-metric ton compression-type roller
(2) Four roller passes of a vibratory roller having a minimum dynamic force of 180 kilonewtons impact per vibration and a minimum frequency of 16 hertz
(3) Eight roller passes of a 20-metric ton compression-type roller
(4) Eight roller passes of a vibratory roller having a minimum dynamic force of 130 kilonewtons impact per vibration and a minimum frequency of 16 hertz

Proportion the compactive effort for layers deeper than 300 millimeters as follows.

- For each additional 150 millimeters or fraction thereof, increase the number of roller passes in (1) and (2) above by four.
- For each additional 150 millimeters or fraction thereof, increase the number of roller passes in (3) and (4) above, by eight.

Operate compression-type rollers at speeds less than 2 meters per second and vibratory rollers at speeds less than 1 meter per second.

**(b) Earth embankment.** Classify the material according to AASHTO M 145. For material classified A-1 or A-2-4, determine the maximum density according to AASHTO T 180 method D. For other material classifications, determine the optimum moisture content and maximum density according to AASHTO T 99 method C.

Adjust the moisture content of material classified A-1 through A-5 to a moisture content suitable for compaction. Adjust the moisture content of material classified A-6 and A-7 to within 2 percent of the optimum moisture content.

Compact material placed in all embankment layers and the material scarified in cut sections to at least 95 percent of the maximum density. Determine the inplace density and moisture content according to AASHTO T 238 and AASHTO T 239 or other approved test procedures.

**204.12 Ditches.** Slope, grade, and shape ditches. Remove all projecting roots, stumps, rock, or similar matter. Maintain all ditches in an open condition and free from leaves, sticks, and other debris.

Form furrow ditches by plowing or using other acceptable methods to produce a continuous furrow. Place all excavated material on the downhill side so the bottom of the ditch is approximately 0.5 meter below the crest of the loose material. Clean the ditch using a hand shovel, ditcher, or other suitable method. Shape to provide drainage without overflow.

**204.13 Sloping, Shaping, and Finishing.** Complete slopes, ditches, culverts, riprap, and other underground minor structures before placing aggregate courses. Slope, shape, and finish as follows:

**(a) Sloping.** Leave all earth slopes with uniform roughened surfaces, except as described in (b) below, with no noticeable break as viewed from the road. Except in solid rock, round tops and bottoms of all slopes, including the slopes of drainage ditches. Round material overlaying solid rock to the extent practical. Scale all rock slopes.