IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| UNIVERSAL CONSTRUCTION, INC., Plaintiff, vs. THE UNITED STATES, Defendant. | No. 03-1502C No. 03-2370C |

DEPOSITION OF DAVID O. CRAM, P.E.
JULY 12, 2005

REPORTED BY:

MONICA M. ARCHULETA, CSR NO. 471

NOTARY PUBLIC



THE DEPOSITION OF DAVID O. CRAM, P.E., was taken on behalf of the Defendant at the U.S. Attorney's Office, 800 Park Boulevard, Suite 600, Boise, Idaho, commencing at 1:45 p.m. on July 12, 2005, before Monica M. Archuleta, Certified Shorthand Reporter and Notary Public within and for the State of Idaho, in the above-entitled matter.

APPEARANCES:

For the Plaintiff:
STEWART SOKOL & GRAY, LLC
BY: MR. THOMAS A. LARKIN
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047

For the Defendant:
CIVIL DIVISION, DEPARTMENT OF JUSTICE
BY: MR. MICHAEL N. O'CONNELL
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, DC 20530

ALSO PRESENT: Timothy J. Binder
Michael F. Houlihan, P.E.
Lloyd Steenblik



INDEX


| TESTIMONY OF DAVID O. CRAM, P.E.: | PAGE |
|---|---|
| Examination by Mr. O'Connell | 4 |


EXHIBITS

N-O-N-E



DAVID O. CRAM, P.E.,
first duly sworn to tell the truth relating to said cause, testified as follows:

EXAMINATION

QUESTIONS BY MR. O'CONNELL:

Q. Could you state your name and spell it for the record, please,?

A. David Cram, C-r-a-m.

Q. What is your address, Mr. Cram?

A. It's 7361 South Five Mile Road. And that's Boise, Idaho 83709.

Q. Is that your residential address?

A. That's correct.

Q. And what is your business address?

A. It is Materials Testing & Inspection. 7446 West Lemhi Street, Boise, Idaho 83709.

Q. Have you ever testified as an expert before, Mr. Cram?

A. I have.

Q. Could you tell me how many times?

A. Three times.

Q. What were you qualified as an expert in?

A. Geotechnical engineering

Page 53

Mr. Butikofer got off to a bad start because he rejected your schedules and your QC plan?
A. Yeah. I -- I don't say a bad start. We -- we just saw we had a personality that was going to be very picky about what went in. And we didn't agree with some of the things that he necessarily picked on.
Q. Okay. And as the job went along, did you find that your relationship with Mr. Butikofer got better? Or did it deteriorate? How -- how did it go?
A. I -- I would have to say, as far as my -- it's my personal opinion, it -- it had to deteriorate a little bit.
Q. Why is that?
A. Just be -- because you lose respect for the person.
Q. I see. And why did you lose respect for him?
A. Because he was just being overly stringent, I felt.
Q. I see. Towards the end of the job, did you, in fact, one day lose your temper with him and threaten to beat him up?
A. I think you're probably making reference

Page 54

to a phone call.
Q. Um-hmm.
A. This was at the end of the project. We had, I believe, called Mr. Butikofer, told him we were coming over to discuss winter shut-down and what was to happen to the project. And Mr. Butikofer indicated to me that he had other plans and he was leaving.
And so we said -- well, we gave him a time that we'd be there. You know, 2 o'clock in the afternoon or whatever it was. We were running a little bit late and had called him again in the afternoon saying, we were running a little late, but we gave him our location, American Falls or wherever we were at. It was still another hour or something up to the job.
He indicated again that he was leaving; he'd made plans, he couldn't be there to make this discussion. I reminded him it was very important for him to be there so we could talk about this, because, you know, this -- this is the end of the job. It's foul weather, snow on the ground; it's cold. You know, we need somebody to talk to about, what do we do from here? What -- what kind of plan are we going to make?

Page 55

So he said, well, he was going to leave --
Q. Um-hmm.
A. -- and I said, you mean you're not going to stick around and talk about this? And -- and he just indicated that he had places to go.
And I said, well -- I said, well, how about I put that in my diary? And -- and then he said something. I -- I forget how -- the comment that was made -- I said, maybe this is -- you know, we get together, this is going to turn into an ass-kicking contest.
Now, I didn't mean that as an ass-kicking contest to Mr. Butikofer. I just meant, over the whole realm of things that we had to discuss here, that, you know, it was going -- in -- turn into a -- kind of a shouting match --
Q. I see.
A. -- I was just saying, because he's -- he's not giving us any latitude of -- or direction as to what to do at the end of this project, which is significant to us. We've got equipment and people and things to do. And this was maybe -- I don't know -- just a few days before the last day of work.
Q. Okay.
A. I can't recall. It was right in the first

Page 56

part of December.
Q. So -- just so I understand this, your testimony is, you used the term "ass-kicking" but you didn't mean it literally?
A. It didn't -- it was "ass-kicking contest" --
Q. I see. Okay.
A. -- is all.
Q. I'm sorry. Are you finished?
A. Yeah.
MR. LARKIN: I'm not sure he answered the question. Did you mean it literally?
THE WITNESS: No. I -- I think I explained that.
MR. O'CONNELL: Okay. I see.
BY MR. O'CONNELL:
Q. Mr. -- Mr. Standerfer, did you also carry a firearm on the project?
A. Possibly, I did. Because I have a concealed weapons permit, and I do carry that in my pickup.
Q. I see. And is there any particular reason that you let Mr. Butikofer know that you were carrying a firearm in your pickup?
MR. LARKIN: Objection. This has no

MATERIALS
TESTING &
INSPECTION



Date February 18, 2005

Doc ID:
g:\boise\2005 reports\000-199\b50105e\e-mail 2-14-05 letter to larkin.doc

❑ Environmental Services ❑ Geotechnical Engineering ❑ Construction Materials Testing ❑ Special Inspections

**Thomas Larkin**
**STEWART SOKOL & GRAY, LLC**
**2300 SW First Avenue, Suite 200**
**Portland, Oregon 97201-5047**
**(503) 221-0699**
**(503) 223-5706**

Mr. Larkin,

This letter is in response to your e-mail dated 2-14-05 regarding your request to have MTI provide copies of MTI reports related to the RRP CAMA 101(1) Camas NWR Complex, FHWA contract number DTFH70-01-C-00034 (attached) and supplemental finding based upon a review of court records and depositions. Our supplemental finding are as follows:

1. MTI believes the crux of the issue is to determine if the soil type "sandy loam" that was stated in the original contract documents correlates to the soil type that was actually found at Borrow Pit #1 and used during construction. MTI reviewed our technical data as well as the data obtained from the WFLHD materials section. The WFLHD materials section data was based on split samples collected by MTI from borrow source #1. Using the USDA soil textural triangle, MTI identified possible soil types of the samples. The USDA soil textural triangle was used to identify if a soil could be a sandy loam based upon percentages of sand, silt, and clay. The USDA textural triangle is also attached to this e-mail. MTI collected fourteen samples from the borrow sources and one from the roadway stockpile. Of those fifteen samples, seven of them were not considered sandy loam as stated in the contract documents. Of the five samples analyzed by the WFLHD materials section, two did not meet the requirements of a sandy loam USDA classification. A summary of the soil types are also included in the following table. The bolded items in the table below are the samples <u>not</u> considered to be sandy loam.

2. A second point that has not been addressed as of yet but may be worthwhile pursuing is that the plans indicated unclassified borrow to be placed in the "sliver fills" on sheet C-1 and in specifications page E-5 *Sect 105. - Control of Material, (a) (1) government-provided mandatory sources* "obtain material for use as unclassified borrow from borrow source #1 and borrow source #2, as shown on the plans." Our point of contention is that unclassified borrow is defined as A-1, A-3, or A-2-4 in accordance with AASHTO Classification system. <u>Two of the five samples collected from borrow source #1 do not meet the definition of unclassified borrow, per the WFLHD materials section results</u>.

Three main types of soil classification systems are available, with each used for a specific purpose. The USDA soil textural classification allows soil scientists to know the particle size of the material and better understand agricultural properties of the soil. The Unified Classification System is used in the engineering field to determine the engineering properties of soil and how that will affect building design. The AASHTO classification system is based upon gradation and particle size like the USDA system but is used by engineers for road building and engineering design.

7446 W. Lemhi St., Boise ID 83709 208 376-4748 Fax 208 322-6515
E-Mail mti@mti-id.com www.mti-id.com

MATERIALS
TESTING &
INSPECTION



❑ Environmental Services ❑ Geotechnical Engineering ❑ Construction Materials Testing ❑ Special Inspections

| Sample ID | USDA Class. | Lab | Identified Location |
|---|---|---|---|
| BP-1 | Loam sandy loam | WFLHD | Borrow #1 Hole #1 |
| BP-1 | loamy and, sandy loam, sandy clay loam | WFLHD | Borrow #1 Roadway Stockpile |
| 285-S | Sandy loam, loamy sand | WFLHD | Borrow #1 Center Pit |
| BP-3 | Sandy loam, sandy clay loam, sandy clay | MTI | Borrow Pit #1 Hole #1 0.53-1.0 M |
| BP-7 | Unknown no gradation, proctor only | MTI | Borrow Pit #1 0-0.35 M |
| BP-8 | Sandy loam, sandy clay loam, sandy clay | MTI | Borrow Pit #2 0.8-1.0 M |
| BP-10 | Unknown no gradation, proctor only | MTI | Borrow Pit #1 |
| 242-S | Sandy loam, sandy clay loam, sandy clay | MTI | Pit floor |
| **BP-4** | **Sand** | WFLHD | **Borrow #1 Hole #2 0-0.2 M** |
| **BP-6** | **Silt loam, clay, clay loam** | WFLHD | **Borrow #1 Hole #4 0.8-1.0M** |
| **BP-2** | **Silt loam, loam, clay loam, clay** | **MTI** | **Borrow Pit #1 Hole #1 0-0.2 M** |
| **BP-5** | **Sand** | **MTI** | **Borrow Pit #1 Hole #2 0.36-1.0 M** |
| **264-S** | **Silt loam, loam, clay loam, clay** | **MTI** | **North Area material** |
| **284-S** | **Sand** | **MTI** | **Camas Pit** |
| **286-S** | **Sand** | **MTI** | **Borrow Source #2** |

- Un-bolded items-material that meets Sandy loam definition established by USDA;
- **Bolded items-material that does not meet sandy loam definition established by USDA.**

The samples listed in the table above were classified based upon the percentages of sand and silt/clay. The percentage of clay and silt was not determined during the testing, therefore we can only work from the sand side of the USDA soil triangle. However, knowing the sand percentage allowed the material classification to be limited to several possibilities. Using this approach, the bolded items identified in the table do not fit into the sandy loam classification. If you have any further questions please feel free to contact me, **(208) 376-4748.**

Respectfully submitted,

Karl Languirand David Cram

Karl Languirand, P.G.
Staff Geologist

Reviewed by: David O. Cram, P.E.
General Manager

7446 W. Lemhi St., Boise ID 83709 208 376-4748 Fax 208 322-6515
E-Mail mti@mti-id.com www.mti-id.com

Page 29

So I did get involved in starting to do -- and I produced three scenarios based on things that were en -- encountered on the job. Varying site conditions, all kinds of other stuff. I did three schedules forecasting how to -- how to accomplish completion of the project, but it wouldn't be accomplished in the 93-day construction period. Okay --

I produced three of them. I gave them to Dick, and I -- and I understand he submitted them to the owner. Okay. That was my next involvement -- was pretty intensive deal on saying, you know, what is going to happen here? Because this is going to be -- this obviously is impossible to complete in 93 calendar days. Okay?

And, then, my next involvement was, a fine -- a -- a final status of the job around mid-December of the year 2001, when the job was not complete but the contractor had, obviously, pulled off of the job because winter was there. Okay?

And he had -- he showed evidence to me that the owner would not accept frozen soil. Okay? So I did a -- I did a -- a statusing there and then subsequent to that, I was contacted by whoever, F.J. -- somehow -- and I don't recall all the

Page 30

particulars.

Somehow, the bonding company -- I got involved with the bonding company. I think it was through F.J. or -- or maybe they contacted me directly. I don't recall really, exactly how that happened. But somehow I got involved with the bonding company. So I did some possible scenarios for the bonding company.

MR. LARKIN: I think --

THE WITNESS: Is that good enough?

MR. LARKIN: We're going to assert our -- I think what he's getting into is privileged information that has been requested by counsel that -- that he perform. So we'll -- I'll stop him right there and ask him not to answer.

THE WITNESS: Okay.

MR. O'CONNELL: What's -- what's the privilege?

MR. LARKIN: Attorney-work product.

MR. O'CONNELL: I see. Okay. So you're going to instruct him not to answer?

MR. LARKIN: Well, he's already answered the question, I think.

THE WITNESS: I think I have, yeah. So you -- so you can tell that I've worked with this

Page 31

for several years.

MR. O'CONNELL: Okay. Just -- off the record for a second.

(Discussion off the record.)

MR. O'CONNELL: Okay. Mr. Pape, thank you for that previous answer. There was a lot of meat there.

THE WITNESS: Real boring.

MR. O'CONNELL: No.

THE WITNESS: But I get excited about scheduling. I've taught it for years. I like scheduling.

MR. O'CONNELL: I -- I can tell.

THE WITNESS: And I'm proud of it too.

MR. O'CONNELL: Let -- let me ask you a couple of questions.

BY MR. O'CONNELL:

Q. Very early in that response -- and I'm paraphrasing here because my memory -- this goes far back enough I can't remember exactly. But you said that there were requirements in the contract about having interdependencies, but I think you said something to the effect that you didn't worry about that because you felt that you had a --

A. No, that isn't what I said.

Page 32

Q. Okay. Let me just -- let me just --

A. There were requirements to express the interdependencies --

Q. Okay.

A. -- which I did in graphical form before the precon.

Q. Okay. But you said you didn't worry about something because you had a defensible schedule. What were you referring to? Do you -- do you remember saying that?

A. The capability of that scheduling system to -- to produce any form of output, tabular or graphical, time or logic, necessary by the project. It could meet any -- any requirement of the project.

Q. Okay.

A. And the schedule could too.

Q. Okay.

MR. O'CONNELL: Let me just take a minute and just -- we'll just have you go through some documents. I don't think it will be --

THE WITNESS: Okay.

MR. O'CONNELL: -- terribly much more time.

THE WITNESS: Okay. Sorry if I got kind of verbose there.

# ATTENTION

The following Special Contract Requirements (SCRs) are only a portion of the specifications for this project. These SCRs amend and supplement the Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, FP-96. The FP-96 is a separately published book. In order to understand the solicitation properly you need to have the FP-96 as well as this packet. Pay particular attention to the provisions of Subsection 104.04 in the FP-96. This Subsection explains how each of the many contract documents fit together.

If you do not have a copy of the FP-96, contact the Contracts Section of Western Federal Lands Highway Division, (360) 696-7520.

Contract file

# CONTRACT

Contract No. DTFH70-01-C-00034

Solicitation No. DTFH70-01-B-00017

Universal Construction Inc
PO Box 187
Emmett ID 83617

**ID RRP-CAMA 101(1)**
**Camas NWR Complex**

**Award:** AUG 21 2001

## QUICK INDEX


| Page | Item |
|---|---|
| A-3 | SF 1442, Solicitation, Offer and Award |
| A-7 | Bid Schedule |
| C-1 | Contract Clauses |
| D-1 | Davis-Bacon Wage Rates |
| E-1 | Special Contract Requirements |
| H-1 | Permits |


**A-1 Notice to Bidders**

**Solicitation, Offer & Award, Bid Schedule, Contract Clauses, Minimum Wage Schedule, Special Contract Requirements, and Plans**

This solicitation cites
***Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, FP-96***

**ISSUING OFFICE:**


U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
610 EAST FIFTH STREET
VANCOUVER, WA 98661-3801
Phone: (360) 696-7520 – FAX: (360) 696-7932
WebPage : www.wfl.fha.dot.gov/edi/
E-mail : contracts@wfl.fha.dot.gov

# SCR's TABLE OF CONTENTS

**SPECIAL CONTRACT REQUIREMENTS (SCRs)**
The following Special Contract Requirements amend and supplement the Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, FP-96, U.S. Department of Transportation, Federal Highway Administration.

**DIVISION 100** GENERAL REQUIREMENTS
Section 101 Terms, Format, and Definitions ..... E-1
Section 102 Bid, Award, and Execution of Contract ..... E-2
Section 103 Scope of Work ..... E-2
Section 104 Control of Work ..... E-3
Section 105 Control of Material ..... E-5
Section 106 Acceptance of Work ..... E-6
Section 107 Legal Relations and Responsibility to the Public ..... E-9
Section 108 Prosecution and Progress ..... E-10
Section 109 Measurement and Payment ..... E-12

**DIVISION 150** PROJECT REQUIREMENTS
Section 152 Construction Survey and Staking ..... E-18
Section 153 Contractor Quality Control ..... E-22
Section 154 Contractor Sampling and Testing ..... E-25
Section 155 Schedules for Construction Contracts ..... E-27
Section 156 Public Traffic ..... E-29

**DIVISION 200** EARTHWORK
Section 201 Clearing and Grubbing ..... F-1
Section 204 Excavation and Embankment ..... F-2
Section 212 Linear Grading ..... F-5

**DIVISION 300** AGGREGATE COURSES
Section 301 Untreated Aggregate Courses ..... F-6

**DIVISION 400** ASPHALT PAVEMENTS AND SURFACE TREATMENTS
Section 402 Minor Hot Asphalt Concrete ..... F-9

**DIVISION 550** BRIDGE CONSTRUCTION
Section 554 Reinforcing Steel ..... F-10
Section 555 Steel Structures ..... F-10
Section 557 Timber Structures ..... F-11

**Table of Contents (continued)**
**Page 2**

**DIVISION 600** INCIDENTAL CONSTRUCTION


Section 601 Minor Concrete Structures ........ F-13
Section 622 Rental Equipment ........ F-14
Section 623 General Labor ........ F-14
Section 633 Permanent Traffic Control ........ F-15
Section 635 Temporary Traffic Control ........ F-16


**DIVISION 700** MATERIAL


Section 701 Hydraulic Cement ........ G-1
Section 703 Aggregate ........ G-2
Section 709 Reinforcing Steel and Wire Rope ........ G-4
Section 711 Concrete Curing Material and Admixtures ........ G-5
Section 716 Material for Timber Structures ........ G-6
Section 717 Structural Metal ........ G-8

Permits ........ H-1

CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of November, 2005, a copy of the foregoing PLAINTIFF'S APPENDIX was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John Spencer Stewart
JOHN SPENCER STEWART
STEWART SOKOL & GRAY LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Tel: (503) 221-0699
Fax: (503) 223-5706

November 4, 2005