IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNIVERSAL CONSTRUCTION, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 03-1502C<br>Consolidated With<br>No. 03-2370C<br>(Senior Judge Smith) |

# PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims, plaintiff respectfully responds to defendant's proposed findings of uncontroverted fact.

1. The Camas National Wildlife Refuge (Refuge) is an approximately 10,000 acre site located in Hamer, Idaho. The Refuge consists of lakes, ponds, marshlands, grasslands, and farm fields that provide habitat for indigenous and migrating waterfowl and other species. An extensive system of canals, dikes, wells, ponds, and water control structures is used to manipulate water for the benefit of wildlife. An approximately 9.36 kilometer unpaved road (the auto-tour route) provides access to the site for visitors. The Refuge receives approximately 2,500 visitors per year. Thus, the auto tour route receives light usage. **Defendant's** Appendix (App.) 1-3.

**Plaintiff's response** – Agrees.

///

///

2. The project at issue, Federal Highway Administration, Western Federal Lands Highway Division (FHWA) contract no. DTFH70-01-C-00034, called for the contractor to use soil material at the site taken from locations known as "borrow source no. 1" and "borrow source no. 2" to widen the auto-tour route, build a new parking lot and road which would tie into the auto tour route, and then to construct wetlands in the borrow sources. App. 7.

**Plaintiff's response** – Agrees, however defendant's exhibit does not support the proposed finding.

3. On August 21, 2001, FHWA awarded the contract to Universal Construction, Inc. ("Universal") at a price of $436,282.94. App. 8. Desert Sage Contractors, Inc. ("Desert Sage"), which ultimately became the completion contractor after FHWA terminated Universal's contract for default, was the second low bidder at $527,465.30, approximately 21-percent higher than Universal. The government's estimate for the project was $606,523.50. Id. Four other companies also bid upon the project.

**Plaintiff's response** – Agrees.

4. The bid schedule for the project included a line item for 4,000 cubic meters of "unclassified borrow" which referred to the material in the borrow sources that the contractor would excavate and use to widen the auto tour route and construct the new parking lot and road. App. 10. Universal's bid price for the unclassified borrow was $5.55 per cubic meter. The engineer's estimate was $10.00 per cubic meter.

**Plaintiff's response** – Agrees.

5. The contract incorporated various Federal Acquisition Regulation ("FAR") clauses including 52.236-2, Differing Site Conditions (Apr 1984), 52.236-3, Site Investigations and Conditions Affecting the Work (Apr 1984), and 52.236-13, Accident Prevention (Nov 1991) Alternate 1 (Nov 1991). App. 17-19.

**Plaintiff's response** – Agrees, however defendant's referenced exhibits do not fully support the proposed finding.

6. The contract also incorporated the FHWA Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, known as the "FP-96," as modified by the special contract requirements ("SCR").

**Plaintiff's response** – Agrees, though defendant fails to reference support for the proposed finding.

Contract Provisions Relating To The Borrow Sources

7. With respect to the Government provided borrow sources, the contract provided:

> The quality of material in provided sources is acceptable in general, but may contain layers or pockets of unacceptable material. It is not feasible to ascertain from samples the quality of material for an entire deposit and variations may be expected. Determine the quantity and type of equipment and work necessary to select and produce acceptable material.

App. 20.

**Plaintiff's response** – Agrees.

8. The contract further required the contractor to "[f]urnish granular material free of excess moisture, muck, frozen lumps, roots, sod, or other deleterious material . . ." App. 21.

**Plaintiff's response** – Disagrees, because the proposed finding is not the complete version of the relevant provisions contained in FP-96 subsection 704.06. UCI proposes that the finding be read as follows:

> Under FP-96 section 704.06, unclassified borrow, the contractor is required to furnish granular material free of excess moisture, muck, frozen lumps, roots, sod, or other deleterious material conforming to the following: (a) Maximum dimension – 600mm, and (b) Soil classifications, AASHTO M 145 – A-1, A-3, or A-2-4. Pl. App. p. 90.

9. FHWA did not perform a geotechnical investigation of the site. However, based upon information FHWA obtained from the Department of Agriculture's ("USDA") Natural Resources Conservation Service, the contract stated that the borrow sources would be "primarily sandy loam which may be underlain with layers of clayey soils." App. 22.

**Plaintiff's response** – Disagrees; the contract required the material from the mandatory borrow areas to conform to AASHTO M 145 soil classifications A-1, A-3, or A-2-4. As stated in detail in plaintiff's memorandum the specific provisions of section 704.06 of FP-96 were not superseded by any provision of the Special Contract Requirements of the Camas project and remained in full force and effect throughout UCI's performance. UCI agrees that FHWA did not perform any geotechnical investigation of the project site. UCI proposes that the finding be revised to read as follows:

> For the purpose of road construction and embankment, the contract requires the mandatory borrow material to conform to AASHTO M 145 soil classifications A-

1, A-3, or A-2-4. The soil description, "primarily sandy loam," contained in the mitigation plan of the wetlands discharge permit, has been appended to the contract in reference to the mitigation requirements under section 404 of the Clean Water Act. FHWA has not performed any geotechnical testing of the Camas project site. Pl. App. pp. 3, 7.

10. The USDA soil classification system utilizes a "soil texture triangle" which categorizes soil samples based upon the percentages of sand, silt, and clay, which are denoted on the three points of the triangle. App. 23-24.

**Plaintiff's response** – Agree.

11. "Sand" refers to soil particles that range in size from 0.05 to 2.0 millimeters. "Silt" refers to soil particles that range in size from 0.02 to 0.05 millimeters. "Clay" refers to soil particles that are smaller than 0.02 millimeters. App. 28. Particles larger than 2.0 millimeters, that is, gravel, are not classified in the soil texture triangle.

**Plaintiff's response** – Disagrees, silt may be as small as 0.002mm and clay particles are smaller than 0.002mm. UCI proposes the finding be revised to read as follows:

> Sand particles range in size from 2.0-0.05mm; silt from 0.05-0.002mm; and clay below 0.002mm. App. 33–34.

12. The soil texture triangle classifies soil into various types depending upon the percentages of sand, silt, and clay. Once the percentage of each type of soil is determined, the sample can be classified using the triangle.

**Plaintiff's response** – Agree.

///

13. A soil classification is determined by drawing lines on the soil texture triangle based upon the percentages of any two of the three soil types. The point of intersection of the lines is the soil classification. In the example in the appendix, a soil that is 30 percent sand, 30 percent clay, and 40 percent silt is classified as clay loam. App. 23-24.

**Plaintiff's response** – Agree.

14. Sandy loam is soil material that is at least 45 percent sand with a smaller percentage of silt and clay. App. 24.

**Plaintiff's response** – Disagrees, because sandy loam is a distinct soil type with defined percentage limits for each of the component grain sizes. UCI proposes that the finding be revised to read as follows:

> Sandy loam is a distinct soil type defined to contain between 45 and 85 percent sand and 55 and 15 percent silt and clay; with no more than 50 percent silt and no greater than 20 percent clay. App. 24.

15. "Clayey" soils include clay, sandy clay, or silty clay. "Clay," as classified by USDA, is soil that is 40 to 100 percent clay, with varying percentages of sand or silt. "Sandy clay" is soil that is between 35 and 55 percent clay, and 45 and 65 percent sand, with no more than 20 percent silt. "Silty clay" is soil that is 40 to 60 percent clay, 40 to 60 percent silt, and no more than 20 percent sand. App. 24, 31.

**Plaintiff's response** – Agrees.

///

///

16. The contract required the contractor to place the soil in the various portions of the road being constructed or widened, and to compact it. The contract contained a performance specification for the compaction of the placed borrow material in that it did not specify a method of compaction or a method of adjusting moisture content. Instead, the contract simply required the contractor to compact the material to at least 95-percent of maximum density. For most soils, the contract required the contractor to adjust the moisture content so that it would be "suitable for compaction." However, for fine grained materials, that is, those with a high percentage of silt or clay, the contract required the contractor to adjust the moisture content to within two percent of optimal compaction. App. 31.

**Plaintiff's response** – Disagrees, because FP-96 subsection 204.03 requires that any material referenced in section 204 must conform to the specifications in section 704 or 725. Since subsection 204.03 has not been superseded by any SCR provision, the applicable material specifications from subsection 704.06 control as to which compaction specification apply. Under the Camas contract, subsection 704.06 allows only A-1, A-3, or A-2-4. Therefore, SCR subsection 204.11(c) applies, omitting any requirements related to A-4, A-5, A-6, and A-7. Pl. App. pp. 90, 278–79, 292–93. UCI proposes that the finding be revised to read as follows:

> Under section 204, the contract required the contractor to adjust the moisture content of the A-1, A-2-4, or A-3 material such that it is suitable for compaction and compact such material to at least 95 percent of the maximum density as measured according to AASHTO T 238, AASHTO T 239, or other approved test procedures.

Contract Provisions Relating To Submittals

17. The contract provided for the submission of a preliminary construction schedule, and a construction schedule. App. 44.

**Plaintiff's response** – Agrees.

18. The contract defined a preliminary construction schedule as "a written narrative with a detailed breakdown of all contract activities for the first 21 days after the "*Notice to Proceed*" is issued." App. 44 (emphasis in original). The contract required submission of the preliminary construction schedule at least seven days prior to the preconstruction conference. The contract barred the contractor from performing any work before the approval of the preliminary construction schedule except mobilization, traffic control, and section 637 work (installation of field offices and facilities). Id.

**Plaintiff's response** – Agrees.

19. The contract provided for the submission of a critical path method construction schedule within 15-days after the notice to proceed. The contract further provided that no progress payment would be made until a construction schedule had been submitted and accepted. App. 44. An updated construction schedule was required by the 15th of each month. Id.

**Plaintiff's response** – Agrees.

20. The contract required the submission and acceptance of a written quality control plan before the contractor could start work. The quality control plan was to include the work of all subcontractors, personnel qualifications, inspection/control procedures, and an explanation concerning how the preparatory, start-up, and production

phases of the project were to be performed. App. 46-47.

**Plaintiff's response** – Agrees.

21. The contract required the submission of a written accident prevention plan for implementing health and safety standards. App. 18.

**Plaintiff's response** – Agrees.

Issues Relating To The Submittals

22. On September 5, 2001, the parties met for the preconstruction conference. Discussions at the conference centered upon FHWA's "Preconstruction Conference Agenda Guideline." (The "agenda"). App. 49-63. Among many other things, the agenda reiterated the contract provision that no progress payment would be made until a construction schedule had been submitted to and accepted by the contracting officer. App. 53. It also restated the contract provision that no work could begin until Universal's quality control plan had been approved. App. 60. Dick Standerfer, Universal's President, signed the agenda, certifying that the agenda items had been discussed. App. 63.

**Plaintiff's response** – Agrees.

23. On September 7, 2001, FHWA issued a notice to proceed effective September 10, 2001. App. 64. The contract required Universal to complete the work by December 11, 2001. App 65-66.

**Plaintiff's response** – Disagrees, because the proposed finding does not include all relevant portions of the cited provision. UCI proposes that the finding be revised to read as follows:

> On September 7, 2001, FHWA issued a notice to proceed effective September 10, 2001. App. 64. The contract required Universal to complete the work by

December 11, 2001, subject to such extensions as may be authorized. App 65–66.

A. The Quality Control Plan

24. On September 10, 2001, Universal faxed FHWA its quality control plan. App. 67-77. On September 11, 2001, FHWA rejected the quality control plan because it failed to include the work of all subcontractors as required by SCR § 155.03, failed to document the names and relevant experience of all personnel involved in the system as required by SCR § 153.03(a)(2), failed to list the name and authority of personnel directly responsible for each phase of work, and failed to explain how the preparatory, startup, and production phases of the work would be accomplished as required by SCR § 153.03(b)(1, 2, & 3). App. 78.

**Plaintiff's response** – Agrees.

25. On September 17, 2001, FHWA received a revised quality control plan from Universal. App. 79-89. On that same day, FHWA rejected the quality control plan because it still lacked various provisions required by the contract. FHWA explained to Universal the various defects in the plan including the failure to include the name, authority, relevant experience and qualifications of the person with overall responsibility for the quality control system. App. 90-91. FHWA attached to its letter a copy of an acceptable quality control plan from another project that Universal could use for reference purposes in correcting the plan. App. 92-97.

**Plaintiff's response** – Disagrees, because the quality control plan referenced was faxed on September 13, 2001. App. 79.

26. On approximately September 27, 2001, FHWA received a faxed copy of a revised quality control plan from Universal. App. 98. On this date, FHWA verbally requested Universal put the four individual parts of the plan into one concise and organized plan and to delete irrelevant information. FHWA confirmed these requests by letter to Universal dated September 27, 2001. App. 98.

**Plaintiff's response** – Agrees, but notes, the submittal was rejected only because it contained too much information and was unorganized. App. 98. Also, this rejection came 20 days after the notice to proceed was issued during which time UCI was being held off the project pending approval.

27. On September 28, 2001 Universal submitted a revised quality control plan by fax. App. 99. FHWA approved the plan on that date but required Universal to include miscellaneous items of work which had been omitted from this revision of the plan. App. 99. This approval allowed Universal to start work. Universal furnished the revised plan on October 4, 2001. FHWA approved the plan on October 15, 2001.

**Plaintiff's response** – Agrees.

B. The Schedules

28. On August 30, 2001 Universal submitted its preliminary schedule to FHWA. App. 100-107.

**Plaintiff's response** – Agrees.

29. On September 11, 2001, FHWA rejected Universal's preliminary construction schedule because it did not include the written narrative with a detailed breakdown of all activities for the first 21-days of the project as required by SCR §

155.02. Although the preliminary schedule had not been approved, FHWA allowed Universal to begin the surveying work to help expedite the preparatory work for the project. App. 108.

**Plaintiff's response** – Agrees.

30. On September 18, 2001, FHWA received the progress schedule narrative from Universal. FHWA approved the preliminary schedule the following day. App. 109.

**Plaintiff's response** – Agrees.

31. On September 17, 2001, Universal submitted its construction schedule to FHWA. App. 110-116. FHWA rejected the schedule by letter dated October 1, 2001 because actual progress of the work was two to three weeks behind the status reflected in the schedule. FHWA directed Universal to revise and resubmit the schedule by October 8, 2001. App. 117.

**Plaintiff's response** – Disagrees, because the submitted schedule was a critical path method ("CPM")schedule that properly reflected the project plan. Pl. App. p. 208.

32. On October 11, 2001, FHWA received a revised construction schedule from Universal. App. 118-124. According to this schedule, Universal would complete the work on time. On October 15, 2001, FHWA rejected the schedule because it failed to show the sequence and interdependence of activities as required by SCR § 155.04(a)(3), and failed to include the written narrative required by SCR § 155.04(c). App. 125.

**Plaintiff's response** – Disagrees, because the submitted schedule included interdependencies by the very nature of being CPM. Pl. App. p. 289.

///

33. On October 23, 2001, FHWA received a revised construction schedule from Universal. On October 25, 2001, FHWA rejected the schedule because it showed both critical and non-critical activities as being complete that had not yet started. FHWA directed Universal to revise the schedule and bring it up to date. App. 126.

**Plaintiff's response** – Agrees.

34. By letter dated November 20, 2001, FHWA informed Universal that FHWA would accept the schedule received on October 23, 2001 even though it did not meet the requirements of the contract "in an effort to expedite the execution of the contract." App. 127-28.

**Plaintiff's response** – Agrees.

C. Issues Relating To The Accident Prevention Plan

35. On September 5, 2001, Universal submitted its accident prevention plan. App. 128-39. By letter dated September 17, 2001, FHWA rejected the plan, listing 25 defects in the plan. App. 140-41.

**Plaintiff's response** – Agrees.

36. On September 18, 2001, Universal resubmitted its accident prevention plan. By letter dated September 24, 2001, FHWA rejected the revised plan because Universal did not correct seven of the defects noted in FHWA's September 17, 2001 letter. App. 142-43.

**Plaintiff's response** – Agrees.

///

///

37. Universal resubmitted the accident prevention plant on September 24, 2001. On September 27, 2001, FHWA approved the plan, with corrections noted in the letter. App. 144-45.

**Plaintiff's response** – Agrees.

Issues Relating To The Borrow Material

38. Prior to bid, Dick Standerfer and his son, Mark, who had overall responsibility for Universal's work in the field, visited the project site with Dan King, a soils expert with Materials Testing & Inspection. App. 147. At the site, they spoke with some employees of the Refuge who told them that the soil was "pretty sandy." App. 147. Mr. King, who was familiar with the area, informed Universal that the soil appeared to be a "sandy-type material." App. 148.

**Plaintiff's response** – Agrees.

39. Dick Standerfer believed that because the project was "a little backwoods road," had "very little traffic," and had originally been built out of local material, it was what he refers to as a "dumb project." App. 150. He believed that it would be a:

> no-brainer to go out there and take some material and add it to this road to get the sufficient width that they wanted, and get it done and in place and relatively fast paced. And I'm -- made the assumption that the sources that were provided, no skin off of my back, because they're designated specifically in the specials, and they're very adamant about using these sources. I figured, I'm going to rely on these sources.

App. 150.

**Plaintiff's response** – Agrees.

///

40. With respect to working the borrow sources, Dick Standerfer testified that Universal intended to excavate the soil with a front end loader or an excavator and that there would be "not much to working the source." App. 153. Universal assumed the material was usable in general so that "there was no further thinking on that part of any selection, mixing, processing, special equipment, or anything of that nature." App. 153.

**Plaintiff's response** – Agrees.

41. For his part, based upon the prebid site visit, Mark Standerfer thought that the borrow source material was "just sand" and would be of "uniform content. Just one type." App. 156.

**Plaintiff's response** – Agrees.

42. After Universal started work on the project following approval of the quality control plan, Universal began excavating in borrow source no. 1 and placing the material to construct the parking lot and then placing it to widen the auto-tour route. During its work on the project, Universal worked solely in borrow source no. 1. It did not use borrow source 2.

**Plaintiff's response** – Disagrees, because defendant does not cite any authority for its proposed finding.

43. Universal constructed the parking lot and began the work of widening the roadway. It tested the materials it placed for both compaction and moisture as required by the contract. Testing demonstrated that Universal failed to achieve the required 95percent compaction in 47 of 54 compaction tests. 158-60.

**Plaintiff's response** – Disagrees, UCI achieved the required 95 percent compaction in 15 tests resulting in 39 failing tests. App. 158–60.

44. By letter dated October 23, 2001, FHWA notified Universal that FHWA was "concerned that Universal Construction, Inc. may not complete the contract work" on time. App. 161-62. The letter stated that no work had been accomplished on the project during the first three weeks because of deficient submittals, and since then there had been days when little or no equipment had worked the project.

**Plaintiff's response** – Agrees, in so far as to the language of the letter.

45. Also by letter dated October 23, 2001, Universal notified FHWA that it had performed a geotechnical investigation of the site and found "several different soil types." Universal stated that it would be "impractical to continue use of these sources without a modification to acceptance procedures for density controls." App. 163-64. It further informed FHWA that it intended to request that FHWA pay for its additional costs.

**Plaintiff's response** – Agrees, in so far as to the language of the letter.

46. Because Universal was having such difficulty achieving proper compaction levels, FHWA issued a contract modification that allowed Universal to build the project without meeting the 95 percent compaction requirement. Instead, Universal could compact the soil by performing eight passes over each 200 millimeter layer with a double drum vibratory roller at least 91 centimeters wide. The parties referred to this contract modification as the "method specification." FHWA issued a draft of the method specification on October 29, 2001. App. 165-66. It issued a final version of it on November 19, 2001. App. 167-69.

**Plaintiff's response** – Agrees.

47. By letter dated November 1, 2001, Universal gave FHWA "formal notice" that it considered the borrow source to be a differing site condition. App. 170-71. Citing FAR § 52-236-2, Universal alleged that there was a Type II differing site condition because it had encountered "[u]nknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." Universal stated that it would submit a time and cost analysis.

**Plaintiff's response** – Agrees.

48. In a separate letter, Universal wrote to FHWA on November 1, 2001, informing FHWA that it would not complete the work on time unless: road closure policies were changed; FHWA accelerated review of submittals; the logic for the construction of certain work was changed; and Universal accelerated its work. App. 17275. However, Universal projected that the original contract duration of 93 days would need to be extended to 274 days. App. 175.

**Plaintiff's response** – Agrees.

49. By letter dated November 23, 2001, the contracting officer informed Universal that he considered Universal to be in jeopardy of failing to complete the contract on time. App. 176-79. He listed several examples of how Universal's progress on the project differed from its preliminary schedule. For example, the preliminary schedule showed the parking lot being paved on October 5 but this had not been accomplished as of November 23. The contracting officer stated: "[i]t appears that the

most significant factor affecting your progress on the project is the lack of diligence in performing the work." App. 177-78. The contracting officer stated the number of equipment operators present on the project each day during the week of November 12, 2001. On each day there was only one to two drivers and operators on the project. App. 178.

**Plaintiff's response** – Agrees, in so far as to the language of the letter.

50. In this letter, the contracting officer requested Universal respond by November 30, 2004 with a detailed plan on how it proposed to finish the work on time. App. 179.

**Plaintiff's response** – Agrees.

51. Universal responded with a certified claim dated November 30, 2001 in which it stated that "the Project will not be completed within contract completion time." App. 180. Universal proposed three alternatives for completing the project. First, it proposed to work through the winter which would require a time extension of 181 days, and a change order for an additional $641,950.15. Second, it proposed to shut down work for the winter and resume in the spring, which would require 120 additional days and a change order for an additional $134,242.65. Third, it proposed to proceed as in option two but to use rejected crush material as a borrow source, which would require 70 additional days and a change order for an additional $83,923.70.

**Plaintiff's response** – Agrees.

///

///

52. Universal left the project site in early December 2001. It never returned.

**Plaintiff's response** – Agree, but notes that FHWA did not respond to the three proposals made by UCI in its letter of November 30, 2001, nor was the FHWA project engineer willing to discuss the impending shut-down for weather or work with UCI to plan for the continuation of the project. Pl. App. p. 286.

53. The contracting officer denied Universal's certified claim on June 20, 2002. App. 184-94. The contracting officer found that Universal failed to establish a type I differing site condition because the soils found at borrow source no. 1 did not materially differ from the contract description of primarily sandy loam which may be underlain with layers of clayey materials. He further found that Universal failed to establish a type II differing site condition because the soils found in the borrow source were consistent with what could be seen by visual observation of the site and were consistent with publicly available soils information for the county.

**Plaintiff's response** – Agrees, in so far as to the language of the letter. However, in making his decision, the CO relied on "primarily sandy loam" in error as is explained in detail in plaintiff's memorandum.

54. The contracting officer terminated the contract for default on June 20, 2003. App. 195-96. He stated that Universal's excuses for not performing the work in a timely manner had been addressed in his letter denying Universal's certified claim. The contracting officer noted that Universal had completed approximately 20 percent of the contract work in the contract time. He further stated that Universal had provided no statement of willingness to perform the remaining work although such opportunity had

been extended to Universal on several occasions.

**Plaintiff's response** – Agrees, to the extent of the actual language in the letter. However, disagrees with the contention that UCI was not willing to perform or that UCI ever repudiated the contract, a contention for which FHWA provides no support. UCI's letter of November 30, 2001 shows the opposite. App. 181. UCI indicated that it was prepared to work through winter to complete the project. Alternatively, UCI offered two other possible scenarios under which it would proceed with the work on the Camas project.

55. FHWA retained the second low bidder, Desert Sage Contractors to complete the contract work. Desert Sage thereafter performed the work in the summer and fall of 2002.

**Plaintiff's response** – Agrees.

56. On October 8, 2003, the contracting officer issued his final decision concerning reprocurement costs. App. 197-99. The contracting officer found that the total price to FHWA if Universal had completed the work would have been $444,980.35. The total price for Desert Sage's work was $570,100.50. The contracting officer found the amount paid to Desert Sage to be reasonable because the engineer's estimate for the project had been $606,523.50 and the average of the other bidders had been $722,215.55. The contracting officer, therefore, found that Universal was responsible for $125,120.15 in excess reprocurement costs.

**Plaintiff's response** – Agrees, to the extent of the language in the letter.

///

///

57. In this final decision, the contracting officer further found that the contract provided for liquidated damages in the amount of $500 per day in the event of late completion. The contracting officer found that the time period for the assessment of liquidated damages is from the date that the original contract was to be completed until the replacement contractor finished its work. This time period was 304 days, resulting in liquidated damages of $152,000.

**Plaintiff's response** – Agrees, to the extent of the language in the letter.

Universal's Analysis Of Borrow Source No. 1

58. Universal has retained Materials Testing and Inspection ("MTI"), an engineering consulting firm to act as expert witnesses in support of its assertion that the material in borrow source no. 1 differed from the contractual description as "primarily sandy loam which may be underlain with layers of clayey materials." It has submitted a report by two MTI employees, Karl Languirand, a professional geologist, and David Cram, a professional engineer with expertise in geotechnical engineering and the design and construction of roads. App. 200-256.

**Plaintiff's response** – Agrees.

59. According to their report, eight of the fifteen soil samples taken at the Refuge during the course of the project were sandy loam. App. 255. Ten of the samples were actually taken in borrow pit no. 1. The other five were taken in borrow source no. 2 or elsewhere in the refuge. Six of the ten samples from borrow source no. 1 were sandy loam, according to MTI's report.

**Plaintiff's response** – Disagrees, because the proposed finding mischaracterizes the data and analysis in the report in that the individual percentages of silt and clay were not calculated, "the samples listed in the table above were classified based upon the percentages of sand and silt/clay. The percentage of clay and silt was not determined during the testing . . ." App. 255. Therefore, whether the material was "sandy loam" cannot be known as a matter of fact, and is in dispute.

60. Of the seven samples which MTI classifies as other than sandy loam, MTI classified four of the samples as sand, and the remaining three samples as silty or clayey materials. App. 255.

**Plaintiff's response** – Disagrees, because the proposed finding suggests eight samples are sandy loam when such a finding cannot be made given the limitation of the testing performed by MTI, as explained in response to finding 59. Agrees, that four samples were classified as sand.

61. During his deposition, Mr. Languirand deferred to Mr. Cram with respect to issues concerning the constructability of the road at issue here. E.g., App. 258. Mr. Cram testified that the road could have been built from sandy loam because sandy loam can be compacted. App. 261.

**Plaintiff's response** – Agrees.

62. Furthermore, Mr. Cram testified that, not only could the road be constructed from sandy loam, it would be easier to construct it with sand:

> Sand would be easier material [than sandy loam] to compact. It would take less effort. Less control. No specialized equipment. You could go thicker lifts. Just overall -- all factors that go into compacting a soil. It would be much easier material to compact.

App. 262.

**Plaintiff's response** – Disagrees, because the proposed finding is not applicable to the current dispute in that there was no pure sand in the mandatory borrow areas. Pl. App. p. 216.

63. Mr. Cram further testified that 12 of the 15 samples were either sandy loam or a material easier to work with than sandy loam:

> Q. So there is eight [of the 15 samples in the MTI report] that are sandy loam; right?
>
> A. That's correct.
>
> Q. And then we've got four that are sand. Do you see that?
>
> A. Sure.
>
> Q. Now, based upon what you testified to a few minutes ago, would it be fair to say then that 12 of the 15 are either sandy loam or material that is easier to work with than sandy loam?
>
> A. That would be a fair statement.

App. 264.

**Plaintiff's response** – Disagrees, because the proposed finding is not relevant in the context of the current dispute. It is the wide variation of the material found in the mandatory borrow areas that caused the delays, not that any individual type of material was unworkable alone. Pl. App. p. 216.

64. Of the ten samples listed in MTI's report as coming from borrow pit no. 1, six are sandy loam, and two are sand. App. 255.

**Plaintiff's response** – Disagrees, for the same reason explained in response to proposed finding 59.

///

///

65. Mr. Cram further agreed that the material Universal encountered in borrow source no. 1 is typical for this area of Idaho:

> Q. Do you have any knowledge as to how the refuge -- the soil at the refuge compares to, say, the geology in that region of Idaho in general?
>
> A. Not untypical. I would consider it to be typical material that might be expected to be encountered.
>
> Q. The material that Universal encountered here is typical to what is in this area?
>
> A. That's correct.

App. 260A.

**Plaintiff's response** – Disagrees, because the proposed finding implies that geology of the region that is seen as typical to one qualified to testify as an expert in geotechnical engineering would also be typical to an ordinary contractor. Pl. App. p. 285.

Respectfully submitted,

s/ John Spencer Stewart
JOHN SPENCER STEWART
STEWART SOKOL & GRAY LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Tel: (503) 221-0699
Fax: (503) 223-5706
Attorney for Plaintiff

November 4, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of November, 2005, a copy of the foregoing Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John Spencer Stewart
JOHN SPENCER STEWART
STEWART SOKOL & GRAY LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Tel: (503) 221-0699
Fax: (503) 223-5706

November 4, 2005