NO. 03-1502, 03-2307C
(Senior Judge Margolis)

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

UNIVERSAL CONSTRUCTION, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

MICHAEL O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, DC 20530
Tele: (202) 307-0282
Fax: (202) 514-8624
Attorneys for Defendant

December 5, 2005

# TABLE OF CONTENTS


TABLE OF CONTENTS . . . . . i

TABLE OF AUTHORITIES . . . . . iii

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT . . . . . 1

ARGUMENT . . . . . 1

I. Universal Misstates The Burden Of Proof For A Default Termination . . . . . 1

II. Universal Has Failed To Carry Its Burden Of Proving That An Allegedly Differing Site Condition Excused Its Failure To Perform On Time . . . . . 4

A. Universal Fails To Demonstrate That Its Expert's Finding That The Majority Of The Soil Samples Were Sandy Loam Is Incorrect . . . . . 8

B. The Contract Provided That The Road Could Be Constructed Out Of Materials Classified As A-1 Through A-7 . . . . . 11

C. Even If The Court Were To Adopt Universal's Contract Interpretation, The Government Would Still Be Entitled To Judgment . . . . . 16

D. The Inspector's Testimony Does Not Support Universal's Case . . . . . 19

E. Universal Cites No Cases Which Support Its Position . . . . . 20

III. Universal Fails To Carry Its Burden On Submittal Delays . . . . . 21

IV. Universal's Reliance Upon Desert Sage's Performance Is Misplaced . . . . . 24

1. Desert Sage's Description Of The Fill Material Is Completely Different From Universal's . . . . . 24

2. Universal Does Not Bolster Its Case With Its Clearing Limit Allegations . . . . . 26

3. Desert Sage Was Not "Allowed" To Vary The Embankment Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

4. Desert Sage Was Not Late In Completing The Work . . . . . . . 27

5. Desert Sage's Work Was Not Over Budget . . . . . . . . . . . . . . . 28

## TABLE OF AUTHORITIES

### CASES


Abraham v. Rockwell Intern. Corp.,
326 F.3d 1242 (Fed.Cir. 2003) . . . . . . . . . . 13

Appeal of Hart,
1968 WL 256 68-1 BCA P 6984 . . . . . . . . . . 3, 4

Argus Inc. v. Eastman Kodak Co.,
801 F.2d 38 (2nd Cir. 1986) . . . . . . . . . . 16

Board of Governors of Federal Reserve v. Agnew,
329 U.S. 441 (1946) . . . . . . . . . . 10, 11

Brunswick Bank & Trust Co. v. U.S.,
707 F.2d 1355 (Fed.Cir. 1983) . . . . . . . . . . 2, 3

CCM Corp. v. United States,
20 Cl.Ct. 649 (1990) . . . . . . . . . . 25

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 20

Copeland v. Veneman,
350 F.3d 1230 (Fed.Cir. 2003) . . . . . . . . . . 2, 3

DCX, Inc. v. United States,
79 F.3d 132 (Fed.Cir. 1996) . . . . . . . . . . 2, 3

DeVito v. United States,
188 Ct. C 413 F.2d 1147 (1969) . . . . . . . . . . 2

Foster Constr. Co. v. United States,
435 F. 2d 873 (Ct.Cl. 1970) . . . . . . . . . . 25

Granite Constr. Co. v. United States,
962 F.2d 998 (Fed. Cir. 1992) . . . . . . . . . . 21

J.D. Hedin Constr. Co. v. United States,
187 Ct.Cl. 45, 408 F.2d 424 (1969) . . . . . . . . . . 3

Lisbon Contractors, Inc. v. United States,
828 F.2d 759 (Fed.Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3

Lockheed Martin IR Imaging Systems, Inc. v. West,
108 F.3d 319 (Fed.Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Penguin Industries, Inc. v. United States,
209 Ct.Cl. 121, 530 F.2d 934 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Randa/Madison Joint Venture v. Dahlberg,
239 F.3d 1264 (Fed.Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

Shank-Artukovich v. United States,
13 Cl.Ct. 346, 350 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

W.E. Callahan Constr. Co. v. U.S.,
91 Ct.Cl. 538, 634 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNIVERSAL CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-1502C |
| v. | ) | Consolidated with |
| | ) | No. 03-2370C |
| THE UNITED STATES, | ) | (Senior Judge Margolis) |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the Court of Federal Claims, defendant respectfully submits this reply to plaintiff's opposition to defendant's motion for summary judgment and opposition to plaintiff's cross motion for summary judgment.

## ARGUMENT

### I. Universal Misstates The Burden Of Proof For A Default Termination

At page 13 of its brief, Universal states that the Government bears the burden of proof, not only for the default termination by demonstrating that there was a delay, but also must "prove that the delay was not justified." Universal Opposition/Cross Motion (hereinafter "Opp.") at 13 (citing Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 763, 765 (Fed.Cir. 1987)). Universal attributes its failure to complete the project on time to an alleged differing site condition and alleged delays in the submittal review process. These issues are also the substance of Universal's claim for $641,950.15. Requiring the Government to prove that the differing site condition and submittal review delays were not justified would effectively shift the burden of proof to the Government to disprove Universal's claims for additional monies. This is not the standard.

While it is true that in Lisbon the Federal Circuit stated that "the government bears the burden of proof on the issue of default," the court of appeals did not hold that the Government must disprove claims of excusable delay by the contractor. Lisbon, 828 F.2d at 763. In fact, the court of appeals stated that "[i]t must be noted that the contractor here asserted no affirmative defense, such as excusable delay. Our opinion does not encompass such matters." Lisbon, 828 F.2d at 765, n. 9. Of course, the burden of proof for an affirmative defense rests with the party asserting that defense. E.g., Brunswick Bank & Trust Co. v. U.S., 707 F.2d 1355, 1360 (Fed.Cir. 1983). Moreover, Federal Circuit precedent issued subsequent to Lisbon makes it clear that it is the terminated contractor's burden to prove that the delay which resulted in the default termination was excusable. E.g., DCX, Inc. v. United States, 79 F.3d 132, 134 (Fed.Cir. 1996) ("we agree with the Board that DCX failed to meet its burden of showing that the DPAS regulations excused its failure to perform the testing requirements of the contract."); Copeland v. Veneman, 350 F.3d 1230, 1234 (Fed.Cir. 2003) ("the appellant had the burden of showing that his delay was excusable in light of the Forest Service's withholdings . . .").

In a termination for failure to deliver, the Government has the right to immediately terminate the contract for default pursuant to the provisions of the default clause when the delivery date passes and delivery has not been made. DeVito v. United States, 188 Ct. Cl. 979, 413 F.2d 1147, 1153-54 (1969). Here the Government has carried its burden of proof because it has demonstrated, and Universal agrees, that the contract completion date passed and Universal failed to complete the contract work. Plaintiff's response to defendant's proposed findings of fact ("Pl. Resp. P.F.F.") nos. 23 and 52. The burden of proof, therefore,

has shifted to Universal to prove that its failure to perform the contract work on time was excusable. As we demonstrate below, Universal has failed to do so.

Other default termination cases Universal cites are also unavailing. Universal cites J.D. Hedin Constr. Co. v. United States, 187 Ct.Cl. 45, 408 F.2d 424, 432 (1969) for the proposition that a contracting officer should consider whether the contractor was unavoidably delayed and that a default termination may be set aside if the contractor was unavoidably delayed. Here, the evidence shows that the contracting officer considered whether Universal had been delayed. Def. App. 184-196. It is Universal's burden to establish that the contracting officer incorrectly rejected its excuses for the delays. The Court of Claims decision in J.D. Hedin is not inconsistent with the Federal Circuit's later holdings in Lisbon, DCX, and Copeland that it is the contractor's burden of proving such delay. E.g., Copeland, 707 F.2d at 1360.

Universal also cites Appeal of Hart, 1968 WL 256 (I.B.C.A.), 68-1 BCA P 6984. Hart does not help Universal because it involved a Government termination for default for failure to make progress in which the Government terminated after only three days performance. In Hart, the board rested its decision in large part on the Government's issuance of the notice to proceed 48 days late, at which time the contractor was no longer prepared to perform the work and could not commence work for 17 days. Thus, Hart involved much different facts than the present case.

II. Universal Has Failed To Carry Its Burden Of Proving That An Allegedly Differing Site Condition Excused Its Failure To Perform On Time

In our opening brief, we established that the permitting section of the contract stated that the borrow sources would contain "primarily sandy loam which may be underlain with layers of clayey soils." Surprisingly, Universal does not even discuss this contract provision until page 25 of its brief. It does not dispute that the contract states as such, nor does it contend that the contract contains any other description of the borrow sources at the project site. Pl. Resp. P.F.F. no. 9. However, Universal downplays the significance of the language in the permitting section. Instead, it focuses upon language in the Federal Highway Administration's Standard Specifications For Construction of Roads and Bridges On Federal Highway Projects (known as the "FP-96") section 704.06 which requires unclassified borrow to be classified under the American Association of State Highway and Transportation Officials ("AASHTO") system as A-1, A-2-4, or A-3. However, Universal can point to nothing in the contract which states that the specified borrow sources contained only A-1, A-2-4, or A-3. As we discussed in our opening brief and below, the contract indicates to the contrary. Nevertheless, Universal posits that the contractor could ignore the "primarily sandy loam ... underlain with layers of clayey soils" language in the permitting section of the contract and assume that the material in the borrow sources would be A-1, A-2-4, or A-3. No reasonable interpretation of the contract can be based upon reading provisions and terms out of the contract.

The AASHTO system employs a series of tests to classify soils as A-1, A-2, A-3, A-4, A-5, A-6, or A-7.[1] Supplemental appendix ("Suppl. App.") 1-3. To determine the AASHTO classification of a soil sample, a sieve analysis is performed first which determines the size of the soil particles based on the percentage of the material that will pass through various size sieves. The smallest of the sieves, the no. 200, contains openings which are only 0.075 millimeters in size. The percentage of materials passing through this sieve determines whether the material is classified as "granular" or a "silt-clay" material. To be classified as a granular material, no more than 35-percent of the material may pass through the 0.075 mm sieve.[2] The sand particles are larger than the silts and clays and do not pass through this sieve. See Pl. Resp. P.F.F. no. 11. Granular materials are classified as A-1, A-2, and A-3 in the AASHTO system. To be classified as a silt-clay material, at least 36-percent of the material must pass through the sieve. Silt-clay materials are A-4, A-5, A-6, and A-7 in the AASHTO system. Further tests not relevant to this dispute refine the AASHTO classifications of the soil into precise groups and subgroups.[3]

As we set forth in our opening brief, "sandy loam" is a term used by the Department of Agriculture ("USDA") to describe a soil that contains 45 to 85 percent sand, with 15 to 55

---

[1] Some of these classification groups also have subgroups. The only one of which is relevant to this dispute is A-2-4. The subgroups under A-2 are A-2-4, A-2-5, A-2-6, and A-2-7.

[2] For an A-3 material the maximum is 10-percent.

[3] With respect to those materials encountered in the borrow sources, MTI used the following terminology to describe the AASHTO groupings: "silty sand" = A-2-4 (Def. App. 240); "fine sand" = A-3 (Def. App. 245); "clayey silt" = A-4 (Def. App. 243); and "silty clay" = A-6 (Def. App. 246).

percent silt and clay. Pl. Resp. P.F.F. 12-14. Using a "soil texture triangle" and the percentages of two of the three soil types (that is, sand, silt, and clay), a soil sample can be classified using the USDA triangle. Pl. Resp. P.F.F. 12-14. Unlike the USDA system, a precise determination of the percentages of silt and clay is not needed to classify a sample under the AASHTO system. Suppl. App. 3. Because the percentages of silt and clay are unknown, the USDA classifications of the AASHTO classified samples cannot be determined. However, using the reported percentage of sand in the samples, the range of possible USDA classifications for each sample can be identified. This is how Materials Testing & Inspection ("MTI") determined the range of soil classifications identified on the table on page 2 of its expert report dated 18 February 2005. Def. App. 255.

One important point which stems from this comparison is that a sample classified as A-4 in the AASHTO system could be classified as sandy loam in the USDA system. For example, MTI's test report for sample BP3 classified the sample material as A-4. Def. App. 243; Pl. App. 227. The report contains a column entitled "Percent Passing" which lists the percentage of materials passing through various size sieves. It states that 52.1 percent passed through the no. 200 sieve, meaning that 47.1 percent of the material was sand. As Universal states in response to our proposed finding no. 14, sandy loam contains between 45 and 85 percent sand, which means that this sample classified as A-4 in the AASHTO system was consistent with the definition of sandy loam in the USDA system. In fact, on the chart in MTI's expert report in which it classifies sample BP3 using the USDA system, it classifies BP3 as consistent with sandy loam. Def. App. 255.

Regardless of which soils classification system is used, the Government prevails. If the USDA system is used, the majority of the samples were consistent with sandy loam. Def. App. 255. If the AASHTO system is used, 10 of the 15 samples were classified as A-2-4 or A-3. Pl. App. 225-239. Of the remaining five samples, three were classified as clayey materials (e.g., Def. app. 230), but the contract clearly instructed the contractor that it might encounter "layers of clayey soils." In either event, the MTI conclusions establish that, as a matter of undisputed fact, the soils that Universal encountered in the borrow locations consisted of the soils which were described in the contract. Thus, Universal cannot support any claim that it was misled by the contract, that the contract did not properly notify it of the site conditions, or that it could not perform in accordance with the contract. Indeed, in its response to our motion, Universal presents arguments which only unnecessarily confuse the soil descriptions rather than attempt to explain its difficulty in performing the earthwork that was correctly depicted in the contract.

In section A below, we establish that Universal's attempt to minimize the significance of the "primarily sandy loam ..." language is incorrect. In section B we establish that the contract required the contractor to construct the embankment out of any materials ranging from A-1 to A-7. Finally, we establish in section C below that Universal errs when it argues that the Court should disregard the contract's description of the material as "primarily sandy loam ...," but if the Court were to accept this argument, the contract would be devoid of any other description of the borrow sources and Universal would be faced with the difficult task of proving a Type II differing site condition, which it cannot do.

A. Universal Fails To Demonstrate That Its Expert's Finding That The Majority Of The Soil Samples Were Sandy Loam Is Incorrect

Universal has submitted an expert report from Materials Testing & Inspection ("MTI"). Def. App. 200-256. MTI's report aptly summarizes this dispute as follows: "MTI believes the crux of the issue is to determine if the soil type 'sandy loam' that was stated in the original contract documents correlates to the soil type that was actually found at Borrow Pit #1 and used during construction." Def. App. 254. MTI unequivocally answers that question yes. As we set forth at length in our opening brief, MTI classified eight of fifteen samples from the two borrow sources as consistent with sandy loam. MTI classified an additional four samples as sand. Def. App. 255. Mr. Cram of MTI testified at his deposition that sand would have been easier than sandy loam to construct this road. Def. App. at 262. The Court's inquiry can end there. As a matter of fact, the contract correctly described the soils upon which the work of the contract would be performed, and Universal failed to perform the work. Thus, as a matter of law, Universal cannot prove its default was excusable.

Universal recognizes that MTI's conclusions are entirely inconsistent with its arguments in this law suit and now attempts to ignore MTI's findings. Universal argues that the description in FP-96 section 704.06 of unclassified borrow as consisting of AASHTO types A-1, A-2-4, or A-3 conflicts with the "primarily sandy loam ..." language in the permitting section. Opp. at 25. It then cites W.E. Callahan Constr. Co. v. U.S., 91 Ct.Cl. 538, 634 (1940) for the proposition that "the clause which is specially directed to a particular

matter controls in respect thereto over a clause which is general in its terms." Universal's distorted application of this principle to this contract turns the rule on its head.

Universal alleges that the permitting section of the contract contains only a "general" description of the borrow sources. Opp. at 25. It further contends that the definition of unclassified borrow in the standard specifications is a "specific" description. This argument is completely without merit. The permitting section of the contract provides: "[i]mported material would be from the two proposed mitigation sites and is primarily sandy loam which may be underlain with layers of clayey soils." Def. App. 22. This "primarily sandy loam ..." language in the permitting section clearly describes the two borrow sources that the contractors used at this project site and are, thus, specific. By contrast, the definition of unclassified borrow in the standard specification is the standard language for all FHWA highway and bridge projects. FP-96 section 704.06 is clearly a general description that does not contain a specific description of this site, or any site at all. Thus, the description in the permitting section is the specific, and controlling, description of the borrow source material.

Universal then argues that even if the primarily sandy loam language has significance, the material in the borrow sources was not primarily sandy loam. Similar to its contract interpretation, this argument is premised upon ignoring undisputed facts. In making this argument, Universal ignores MTI's findings, and does not dispute MTI's finding that 12 of the fifteen samples were sand or sandy loam. MTI's undisputed evaluation is fatal to Universal's argument. Universal attempts to circumvent this fatal evidence by asserting that Universal encountered five soil types at the project site. Opp. at 27. To a certain extent, MTI's report confirms this assertion, finding that eight of the fifteen soil samples were

consistent with sandy loam, four were sand, and the remaining three samples were various clayey materials. Def. App. 255. Unfortunately for Universal, this argument proves too much. By establishing that there was sandy loam, sand, and clayey materials at the site, Universal establishes the correctness of the contract description of the materials. The contract clearly indicated that not all of the materials encountered would be sandy loam. As provided in the contract, and confirmed by MTI, the material was primarily sandy loam underlain with layers of clayey materials.

Despite this clear contract language, Universal argues at p. 27 of its brief that "[f]rom the vantage point of a reasonable and prudent contractor 'primarily sandy loam' means a source that consists mostly, if not completely, of sandy loam." Universal does not explain why a reasonable or prudent contractor would disregard the contractual reference to clayey materials or interpret "primarily" to mean "completely." The only argument that it offers on this point is an assertion that our reliance upon the Supreme Court's definition of "primarily" in Board of Governors of Federal Reserve v. Agnew, 329 U.S. 441, 446 (1946) is misplaced. In Agnew, the Supreme Court that, in some cases, primarily means "first, chief, or principal" and thus means more than 50-percent, while in other cases primarily can mean less than 50-percent as long it refers to something which is substantial. Id. Universal argues at p. 26, note 3 of its brief that the Supreme Court's definition of primarily in this context is inapposite because the Supreme Court was construing "primarily" as used in the Banking Act of 1933.

Universal's argument is incorrect. The Supreme Court was not using a unique definition of primarily as contained in a statute but rather relied upon definitions contained in the Oxford English Dictionary and Webster's New International Dictionary. Id. In either

event, Universal presents a meaningless argument. Universal's challenge to the application of Agnew is arguing a difference without any distinction. Universal argues that primarily means "essentially, mostly, chiefly." Id. Clearly, that definition has no meaningful distinction to the "first, chief, or principal" definition in Agnew. More importantly, the undisputed fact of MTI's conclusion that eight of fifteen samples were consistent with sandy clearly meets either definition of primarily. Universal's arguments are without merit.

B. The Contract Provided That The Road Could Be Constructed Out Of Materials Classified As A-1 Through A-7

As its formal title of "Standard Specifications" indicates, the FP-96 is the standard specification for Federal Highway Administration road and bridge projects. Presumably because there are myriad types of roads and bridges that could be constructed and that conditions for projects may vary,[4] the FP-96 recognizes that there will be special contract requirements ("SCR") issued for projects. Further, the FP-96 recognizes that it may not be consistent with the requirements for every project. Thus, the FP-96 includes an order of precedence for the various regulations and documents which may be included in a contract. This order of precedence provides that the special contract requirements govern over the FP-96. Suppl. App. 14.

At p. 22 of its brief, Universal alleges that no SCR provision is in conflict with FP-96 section 704.06. This is incorrect because the contract does contemplate the use of silt-clay materials in the construction of the road, and not simply A-1, A-2-4, and A-3.

---

[4] As the parties have agreed, the road at issue is unpaved and has minimal traffic. See, Pl. Resp. P.F.F. no. 1.

First, the permitting section of the contract informed the contractor that it may encounter AASHTO silt-clay materials. As discussed above, the term "sandy loam" encompasses materials which would be classified as a silt-clay material in the AASHTO system. Moreover, even if the contractor missed this reference, the permitting section further told the contractor to expect layers of clayey materials.

Second, section 204 is the "Excavation and Embankment" section of the contract. The SCR "Compaction" provision, section 204.11 (c) provides:

> Classify the material according to AASHTO M 145. For material classified A-1 or A-2-4, determine the maximum density according to AASHTO T 180 Method D. For other material classifications, determine the optimum moisture content and maximum density according to AASHTO T 99 Method C.
>
> Adjust the moisture content of material classified A-1 through A-5 to a moisture content suitable for compaction. Adjust the moisture content of material classified A-6 and A-7 to within 2 percent of the optimum moisture content.

Def. App. 37. Thus, the SCR clearly instructs the contractor that it may have to use materials classified as A-4 to A-7 to construct the road. It also informs the contractor how to determine the optimum moisture content of such materials and how close to optimum the moisture content must be.

Under general rules of contract law, a court must interpret provisions of a contract so as to make them consistent. Abraham v. Rockwell Intern. Corp., 326 F.3d 1242, 1251 (Fed.Cir. 2003). The various contract provisions must be read as part of an organic whole, according reasonable meaning to all of the contract terms. Lockheed Martin IR Imaging Systems, Inc. v. West, 108 F.3d 319, 322 (Fed.Cir. 1997). Such interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant. Id.

The Court is thus confronted with two interpretations of the contract. Universal's interpretation of the contract focuses solely upon FP-96 section 704.06. It ignores the FP-96 precedence clause, SCR 204.11(c), and the permitting section description of the soil as primarily sandy loam which may be underlain with layers of clayey soils. Both SCR 204.11(c) and the permitting section of the contract informed Universal that it might encounter and have to construct the road with silty or clayey materials. Universal now contends that it could ignore those provisions. However, such a contention violates the basic rules of contract interpretation cited above.

By contrast, the Government's interpretation gives meaning to all four contract provisions. SCR 204.11(c) informed a bidder that it may have to construct the roadway from materials ranging from A-1 to A-7 using the AASHTO system. The permitting section was more specific and informed bidders that the material would be primarily sandy loam which, as noted above, encompasses AASHTO silt-clay materials. The permitting section further informed the contractor that the sandy loam may be underlain with layers of clayey soils. FP-96 section 704.06 provides that unclassified borrow is, in the absence of other provisions, limited to A-1, A-2-4, and A-3. However, with the application of the precedence clause, and consideration of SCR 204.11(c) and the permitting section, the only reasonable conclusion is that the contractor may have to construct the road from any materials ranging from A-1 to A-7, but that the materials will primarily be a sandy material, sandy loam in the USDA system, which sandy materials may overlay clayey materials.

We also note that Universal's argument against the use of the A-4 or A-6 materials found in the borrow sources is not based upon engineering principles but strictly upon its

overly narrow reading of the contract. The materials in borrow sources 1 & 2 could be (and ultimately were) used to construct the Camas project. Pl. App. 79, transcr. 33 at 1-12. Although very reluctant to so admit, Universal's expert, Lloyd Steenblik, testified at his deposition as follows:

> Q. Do you have an opinion as to whether or not it's possible to have constructed this roadway out of A-4 material in the construction of this roadway?
>
> A. I have an opinion that A-4 was not an acceptable material for the contractor to use for unclassified borrow. It was prohibited by the specifications to be used as unclassified borrow.
>
> * * * * *
>
> Q. Setting aside the contract for a second. Just as an engineer, though, do you have an opinion as to whether or not A-4 material could be used to construct this particular roadway?
>
> MR. LARKIN: You mean in any other project other than the Camas project?
>
> Q. (BY MR. O'CONNELL) No, in this project. Could you have used A-4 material as a component of the soil that would be used to construct this road?
>
> MR. LARKIN: Setting aside the contract requirements?
>
> Q. (BY MR. O'CONNELL) I'm just asking you in your opinion as an engineer is that possible or not possible?
>
> A. Well, it wouldn't meet the contract requirements.
>
> Q. That's not what I'm asking you. I'm asking you, do you have an opinion as an engineer whether or not A-4 material could be used to construct this roadway?
>
> A. You can use any material you want to construct a roadway. In fact, the government said go out to this borrow area and use it to make the roadway. In fact, the government mandated that they do that.
>
> Q. So your opinion is that you can use any material to construct a roadway?

A. No.

Q. So what is your opinion?

A. With regards to A-4?

Q. Yes.

A. A-4 would not be as good a material as the A-2-4. Or an A-3 or an A-1.

Q. But you could use it?

A. It could be used.

Plaintiff's Appendix at 243 (transcript pp. 37-39). Thus, Universal's argument is unsupported by fact or law.

Lastly, Universal's current contract interpretation should be disregarded because it is not only unreasonable, but it conflicts with its position during performance of the contract. Universal can point to no document it submitted during the course of the project in which it contended that the contract barred the use of AASHTO system silt-clay materials such as the A-4 and A-6 material found in borrow source no. 1. Universal's first reference to A-1 to A-3 materials came six months after it left the project site in a June 10, 2002 letter from its attorney to FHWA. Suppl. App. 4-13. Even in that letter, however, Universal summarized its differing site condition claim as: "[t]he limited geotechnical analysis performed by Universal and its consultant identified five soil types of which only two, <u>sandy loam, and clayey soils, are referenced in the specification</u>." Suppl. App. 9 (Emphasis added). At least as of six months after it left the project site, Universal agreed that sandy loam and clayey soils were referenced in the specifications. Universal now seems to be claiming that sandy loam and clayey materials were not referenced in the contract. As the Second Circuit has

stated: "[t]he failure of a business' management to note at the time what is later claimed by its lawyers to have been a mortal commercial wound weighs heavily against such a claim." Argus Inc. v. Eastman Kodak Co., 801 F.2d 38, 42-43 (2nd Cir. 1986). Universal's only complaint during the project was that the material was variable. E.g., Def. App. 181. Shorn of its option of complaining that the material at the site was not primarily sandy loam underlain by clayey soils as a result of MTI's expert report and deposition testimony, Universal now recreates its claim to be that the contract provided that it would encounter only three soils types (that is, A-1, A-2-4, A-3) but it actually encountered four.[5] Even reconstituted, Universal's latest contract interpretation is without support and warrants no relief.

C. Even If The Court Were To Adopt Universal's Contract Interpretation, The Government Would Still Be Entitled To Judgment

If Universal is correct that the contract description of the borrow sources as containing primarily sandy loam which may be underlain with layers of clayey soils is without meaning, it only hastens the defeat of its claim. Other than this description, Universal identifies no other provision in the contract which describes the materials contained in the two borrow sources at the project. There is none. Thus, Universal must establish a Type II differing site condition claim. A Type II claim applies when the contract does not contain specifications concerning the expected conditions. Shank-Artukovich v. United States, 13 Cl.Ct. 346, 350

[5] Universal's brief and its proposed finding of fact no.11 state that it encountered five soil types: A-1, A-2-4, A-3, A-4, and A-6. In support of this proposed finding, Universal cites its appendix pages 225-234, which are the MTI soil test reports. However, none of these reports classified a sample as A-1. Nor is the Government aware of any A-1 material having been found in the borrow sources.

(1987). As we noted in our opening brief, this is more difficult than proving a Type I differing site condition, involving a heavier burden of proof and a stiffer test. Randa/Madison Joint Venture v. Dahlberg, 239 F.3d 1264, 1277 (Fed.Cir. 2001).

In our proposed finding no. 65, we set forth testimony from Universal's expert in which he agreed that the materials that Universal encountered in the borrow sources were typical of this area of Idaho. If the materials were typical, by definition they cannot meet the Type II requirement that they be "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." Id. at 1276.

Universal does not dispute the testimony of its expert. Rather, in its response to proposed finding no. 65, Universal disagrees with the finding because it "implies that geology of the region that is seen as typical to one qualified to testify as an expert in geotechnical engineering would also be typical to an ordinary contractor." In support of this statement, Universal cites only the first page of testimony from its expert in which he states that he is a geotechnical engineer. Universal does not elaborate on this contention in its brief. Universal may be unable to further this argument because it is meritless and certainly irrelevant. Its argument implies that a reasonable contractor performing road and embankment work would not have the competency, or even retain the services of someone with the knowledge, to understand the soil descriptions in the contract. A geotechnical engineer would have more knowledge of soils than "an ordinary contractor," but this is entirely irrelevant to the question of the presence of unusual materials at the contract site.

Hence, it is established that Universal encountered "typical" materials in its work. Def. App. 260A.

Nonetheless, at pages 28-29 of its brief, Universal gives cursory attention to arguing a Type II claim. It asserts that it meets the Type II criteria because the Refuge had built another road out of local materials, and, "[p]resumably, had the refuge personnel encountered anywhere near the problems UCI did, they would have been sure to make them known." Opp. at 29. This is unwarranted and unsupported speculation that provides no support for Universal's claim. There is nothing in the record which indicates when this road was built, who built it, or what problems may or may not have been encountered. The only support Universal cites for its speculation is four pages of deposition testimony from Universal's president. He testified concerning his pre-bid site visit:

> The ranger was back; we talked to him. Asked him about materials, what they used, what he knew about it. He then, you know, said, go talk to his couple of guys there that he used for, I guess, road repair and whatever they did in the park. And they didn't have a lot of input. Said they had a small source that they used to repair. They indicated to us that the existing road had been built out of all local materials there. Just kind of scooped up from the site and put in place and I assume that was a number of years earlier.

Pl. App. 94 at pp. 27-28. Thus, Universal's basis for these allegations is Mr. Standerfer's conversation with two unidentified employees of the Refuge, whose names, tenures, knowledge of the previous construction, and job descriptions are unidentified except to say they did "road repair and whatever they did in the park" and who otherwise "didn't have a lot of input." Moreover, there is no explanation how this speculation regarding prior road construction could be in any way probative of the kinds of materials in the borrow locations in this contract, the interpretation of this contract, or Universal's work on this contract.

As we stated above, Universal bears the burden of proof with respect to its Type II claim. When a party moving for summary judgment demonstrates that there is a lack of evidence which supports an essential element of proof for which the non-moving party bears the burden of proof, the moving party is entitled to judgment as a matter of law. E.g., Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986). Here, Universal has identified no evidence which would indicate that the material in the borrow sources were unusual. The testimony of its expert is to the contrary. Therefore, the Government is entitled to judgment.

D. The Inspector's Testimony Does Not Support Universal's Case

Throughout its brief, Universal attempts to portray itself as having made concerted efforts to work with difficult borrow source material, all to no avail. At page 8 of its brief it alleges that it "spent an inordinate amount of time blending the different materials and working in water to try to get compaction." At page 17, it asserts "[e]ven though the borrow source material was not suitable, Universal undertook extraordinary efforts to try to make the material work. UCI tried to work around material in the borrow areas, which took time not anticipated in the contract." In support of these assertions, Universal cites 12 pages of the deposition testimony of the contract inspector for the project, Alfred Stites. However, a review of these 12 pages and comparison with the compaction test results demonstrates that Universal is exaggerating the minimal extent to which Mr. Stites' testimony is favorable to it and omits harmful testimony.

Universal is correct that Mr. Stites testified that on one day, October 10, 2001, Universal put more effort into working the soil. However, this came only after failing to do so the previous day. Pl. App. 219, transcr. 16-17. Universal apparently continued some

minimal effort to process the soil as work progressed. As late as November 14, Mr. Stites testified that Universal was "just kind of skimming the top" in its processing efforts. Pl. App. 221, transcr. 23 at 4. The test results support Mr. Stites' testimony. On October 9, Universal failed all three compaction tests, but it passed two of three on October 10. Def. App. 158. After October 10, it failed 43 of 48 compaction tests. Def. App. 158-160.

Because there was some variability in the material, Mr. Stites testified that the material needed to be blended, which most contractors did by blending it back and forth across the road. Pl. App. 219, transcr. 16 at 1-10. When Universal's attorney described Universal's method of working the materials and asked Mr. Stites if he had ever observed another contractor attempt this method, Mr. Stites replied "[j]ust this one." Pl. App. 219, transcr. 16 at 11-16. This clearly suggests that Universal was not acting as a reasonable, prudent contractor in this work.

Finally, Mr. Stites also testified that Universal failed to work water into the soils and had areas that were wet and muddy and other areas that were dry. Pl. App. 219, transcr. 17 at 1-4. The test results also support Mr. Stites testimony on this point. In 47 of 54 tests, the test samples were below the optimal moisture content. Def. App. 158-160. This further supports a conclusion that the difficulties Universal encountered were of its own making.

E. Universal Cites No Cases Which Support Its Position

The cases Universal cites in support of its differing site condition claim state basic legal propositions but are not otherwise applicable to this dispute. For example, it cites Foster Constr. Co. v. United States, 435 F. 2d 873, 888 (Ct.Cl. 1970) in support of the proposition that the contractor is entitled to rely upon representations in the contract with

respect to site conditions and is required to perform only limited inquiries at the site. In Foster, the contract indicated that the contractor would encounter stable impermeable materials but it actually encountered unstable permeable materials. Id. at 878-79. This is the opposite of what happened here. Universal encountered what the contract provided - sandy and clayey materials.

Universal also cites CCM Corp. v. United States, 20 Cl.Ct. 649 (1990) in support of the proposition that a contract by implication may indicate that the conditions would be better than actually encountered. Unlike the present case, the Court held in CCM "that no express representations concerning subsurface conditions was made in the contract." Id. at 655. The Court went on to hold that the contract indicated that a tar based waterproofing system would not be encountered because the contract required materials that were incompatible with tar. Id. at 655-56. There is no need to perform such an analysis here because the contract explicitly states what the subsurface conditions would be.

## III. Universal Fails To Carry Its Burden On Submittal Delays

In our opening brief, we established that the submittal issue was a red herring because schedules Universal submitted after the alleged delays showed timely completion. In its brief, Universal does not contest this fact. We also established that Universal had not identified anything incorrect in the Government's review of the submittals. Instead, it has argued that the Government should have waived the requirements of the contract because the project was only three months in length. Universal's argument has no legal support.

At page 6 of its brief, Universal argues that FHWA's rejections of its submittals was "contrary to the common practice of 'approve as noted' or approving a submittal while

insignificant shortcomings are corrected in order to get the contractor on the job." In support of this statement it cites neither precedent nor any legal doctrine. Rather it cites deposition testimony of its scheduling expert who prefaces his answer by stating "[w]e are getting into an area here where I don't feel real qualified in addressing." Pl. App. 208A, transcr. 24 at 5-6. Other than its expert's speculation about something he is not qualified to address, Universal offers nothing in response to our statement of the well settled rule that as a purchaser of supplies and services, the Government is entitled to the contractor's strict compliance with the contract specifications. Granite Constr. Co. v. United States, 962 F.2d 998, 1006-07 (Fed. Cir. 1992).

Even assuming a legal basis for Universal to expect the Government to waive strict compliance with the submittal requirements, which there is not, with the exception of the September 27 submission of the quality control ("QC") plan, Universal identifies no submittals which FHWA allegedly rejected with insignificant shortcomings. Thus, for example, it does not argue that it was wrong for FHWA to reject its September 10, 2001 QC plan where that plan failed to include subcontractors, failed to include the names and pertinent information with respect to employees responsible for the QC plan, and failed to explain how the plan would be carried out. Def. App. 78. Universal does claim that it was wrong for FHWA to reject its plan on September 27, 2001, even though the plan was submitted in four separate parts and contained information on how it would conduct blasting operations on a project where there was no blasting. Def. App. 98. Universal does not explain how this violated the contract or how it delayed the project when FHWA accepted the revised plan the following day. Pl. Resp. P.F.F. no. 27.

Universal also fails to explain why the Government should have accepted an accident prevention plan where FHWA listed 25 discrete defects in the submittal. Def. App. 140. At page 19 of its brief, Universal criticizes the Government for "taking 12 or more days" to review this plan. Unlike the QC plan where the contract prohibited work until it was approved (See Pl. Resp. P.F.F. 20) there was no similar provision with respect to the accident prevention plan. Thus, unlike the QC plan reviews which the Government always accomplished the same or next business day (Pl. Resp. P.F.F. nos. 24-27), there was no need for FHWA to review this submittal on an expedited basis. Universal identifies no contract provision which required FHWA to review this submittal sooner, and identifies no delay which occurred as a result of this submittal.

In the factual section of its brief at page 7, but not in its argument, Universal also states that FHWA improperly rejected Universal's construction schedule (without identifying the schedule submission to which it is referring) "as not being a CPM." In support of this assertion, it cites to eight pages of deposition testimony from FHWA's project engineer without identifying any particular page. It appears from the testimony cited that the project engineer was testifying concerning Universal's initial schedule. Pl. App. 205 at transcript p. 60. In its response to our proposed findings of fact, however, Universal has agreed that FHWA rejected this schedule because it did not contain a detailed narrative with a detailed breakdown of all activities for the first 21-days of the project as required by SCR § 155.02. Pl. Resp. P.F.F. no. 29. Thus, Universal's argument presents no support for its claim.

IV. Universal's Reliance Upon Desert Sage's Performance Is Misplaced

In our opening brief, we did not discuss at length the work of the completion contractor, Desert Sage, because Desert Sage's work is not directly relevant to the issue of whether or not Universal was in default. As it must, Universal has admitted that Desert Sage completed the contract work. E.g., Pl. Resp. P.F.F. no. 3. The very fact that Desert Sage was able to complete the project undermines Universal's repeated assertions that the borrow source material was "unworkable" (Opp. at 3) and that the "project was simply unbuildable as designed." Opp. at 15. Universal charges that "[s]imilar to UCI, Desert Sage had to contend with the unsuitable fill material" but "was permitted to put material beyond the clear limits in the areas where it was widening the road and vary the embankment and compaction procedure to complete the project, albeit late and over budget." Opp. at 4; Opp. at 9-10. A review of the record in these cross motions demonstrates that these charges are not supported. Moreover, Desert Sage's performance demonstrates that Universal's performance was wholly inadequate.

1. Desert Sage's Description Of The Fill Material Is Completely Different From Universal's

In an apparent attempt to buttress its claim that the borrow source materials were different than represented in the contract, Universal contends that Desert Sage had to contend with the same "unsuitable fill material" (Opp. at 4). This statement is obviously offered to support Universal's contention that the borrow source materials were so variable that Universal is entitled to recover on its differing site conditions claim and to have the termination for default set aside.

In support of this argument, Universal cites to four pages of deposition testimony from Rance Bare, Desert Sage's president. Pl. App. 78. An examination of Mr. Bare's testimony indicates that Mr. Bare's experience does not support Universal's position in this lawsuit. Rather, it undermines Universal's position.

First, although Universal does not state which testimony from the four pages at page 78 of its appendix it is relying upon, this testimony does contain Mr. Bare's description of the borrow areas. As opposed to Universal's description of the borrow sources as containing a "highly variable" mixture of materials (Opp. at 3), Mr. Bare testified that the material in the borrow areas "was sand." Pl. App. 78, transcr. 43 at 11. Contrary to Universal's assertions of variability, Mr. Bare's concern when he re-priced the contract work was that the material was so sandy that it would be a problem:

> Q What was the material like that you observed out at the site?
>
> A Well, it was a very -- it was a sandy -- very much of a sand material and, again, it was not even blow sand, as I said here, it was -- would need a high water content, like I say here, to make compaction, and there was a minimal amount of binder in it.

Pl. App. 254 at transcr. p. 24. Mr. Bare testified later that the material had enough binder in it that the sandy material was not a problem. Pl. App. 252, transcr. p 25, ll. 15-18. Universal identifies no testimony from Mr. Bare, and we are aware of none, in which he stated that the materials in the borrow sources were variable. Thus, Mr. Bare's testimony does not support Universal's assertion that the material was highly variable.

2. Universal Does Not Bolster Its Case With Its Clearing Limit Allegations

Universal argues that Desert Sage had an advantage over Universal because Desert Sage was "permitted to put material beyond the clearing limits in the areas where it was widening the road." Opp. at 4. Universal cites 16 pages of Mr. Bare's deposition in support of this statement. In fact, Mr. Bare did testify that "[c]leared material was placed on or beyond the clearing limits." Pl. App. 79-80, transcr. pp. 36-37. Why Universal considers this testimony notable is unclear because the contract permitted contractors to place certain materials beyond the clear limits. The FP-96 required the contractors to conserve topsoil. "Conserved topsoil" is defined in the FP-96 as:

> Excavated material conserved from the roadway excavation and embankment foundation areas that is suitable for growth of grass, covered crops or native vegetation. A material reasonably free from hard soil, rock, clay, toxic substances, litter, or other deleterious material.

Suppl. App. 16. The FP-96 required the contractors to:

> Conserve topsoil from roadway excavation and embankment foundation areas. Stockpile conserved topsoil in low windrows immediately beyond the rounding limits of cut and embankment slopes or in other approved locations. Separate topsoil from other excavated material.

Id. (Emphasis added). Sheet C.2. of the contract drawings shows the rounding limits to extend to the clearing limits, thus allowing the contractors to place conserved topsoil past the clearing limits. Pl. App. 38 (See detail on sheet.). Since both Universal and Desert Sage were entitled to place such clearing material beyond the clearing limits, these assertions provide no support for Universal's case.

3. Desert Sage Was Not "Allowed" To Vary The Embankment Procedures

Universal also alleges that Desert Sage "was allowed to vary from the contract, without a change order, to employ a different construction method to embank the fill material." Opp. at 9. It is true that Desert Sage used a different method of constructing the embankment (overbuilding) than Universal. The problem with this argument is that, for the method utilized by Desert Sage to be a variation from the contract, the contract would have to contain a "construction method to embank the fill material." It does not. It neither requires nor prohibits overbuilding. In fact, the well settled law is that in a contract such as this the means and methods of construction are left up to the contractor. E.g., Penguin Industries, Inc. v. United States, 209 Ct.Cl. 121, 530 F.2d 934, 937 (1976) ("the contractor must assume responsibility for the means and methods selected to achieve the end result."). Thus, this argument lacks merit.

4. Desert Sage Was Not Late In Completing The Work

Universal also charges that Desert Sage completed the work late. Opp. at 4. It does not identify how many days Desert Sage was late or how it compares to Universal's performance. In fact, Desert Sage's performance time is more evidence which harms Universal's case.

The definitized contract between Desert Sage and FHWA provided for Desert Sage to perform the contract work between September 3 and October 11, 2002. Suppl. App. 17.[6] With the exception of the four days in July, Desert Sage started work at the project site on

[6] FHWA previously had issued a letter contract in July and allowed Desert Sage to work four days in July to complete a parking lot that Universal had started.

September 9. Suppl. App. 18. FHWA's final daily report for the project is Friday, October 11, 2002, and states that a "final review" was performed that day, although Desert Sage also worked on Monday October 14, 2002. Suppl. App. 19. Taking into account both the July performance period and the September-October period, Desert Sage completed the contract work in six weeks.

By contrast, Universal claimed to require much more time to complete the contract work. In its November 30, 2001 certified claim, Universal alleged that it would require at least an additional 120 days to complete the project if it continued to use the borrow sources. Pl. Resp. P.F.F. no. 51. It then left the project for good in early December. Pl. Resp. P.F.F. no. 52. Thus, Universal claimed that it required more than 17 weeks to do what Desert Sage was able to do in six weeks. These facts demonstrate in stark detail the disparate level of competence of the two contractors.

5. Desert Sage's Work Was Not Over Budget

Finally, Universal complains that Desert Sage's price for the borrow materials increased from $5.00 per cubic meter in its original bid to $18.00 on the completion contract. Opp. at 10 (incorrectly stating $20.00). Universal states that "[t]his increase was due to the now evident need to add water to the soil, the poor workability of the material, and the extra handling to build the embankments." Id.

Although Desert Sage's price increased, the increase is not material to this dispute. First, as set forth above, although it is true that Mr. Bare was concerned that the material was too sandy, had little binder in it, and would thus require a lot of water (Pl. App. 254, transcr. p. 24, ll. 11-15), he testified that his actual experience on the project was that the material had

enough binder so that it was not a problem. Pl. App. 252, transcr. 25 at 15-18. Second, Mr. Bare also testified that the rebid price was based upon a mistaken belief that Desert Sage would have to use construction techniques that it ultimately did not have to use. Pl. App. 252, transcr. 26 at 2-15.

Finally, Mr. Bare also testified that the increased price was based in part on the fact that Universal had performed the easy work, leaving only the more difficult work to be done. Thus, he testified:

> Q You testified concerning the increase in price of the unclassified borrow, correct?
>
> A Yes, correct.
>
> Q Okay. Now, when your company took over the project most of the work in the parking area had been performed by Universal, correct?
>
> A Yes.
>
> Q And was the work in the parking lot easier than some of the other work that remained on the project?
>
> A Yes.
>
> Q Okay. Did part of the increase in the price, was that caused by the fact that the easier work in the parking lot had already been done and the remaining work was more difficult?
>
> A That would have had an effect, yes.
>
> Q Okay. Do you know how much?
>
> A I can't honestly say how much.

Suppl. App. 21.

## CONCLUSION

For the foregoing reasons, and for the reasons set out in our opening brief, we respectfully request that the Court grant defendant's motion for summary judgment and deny Universal's cross motion.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/Michael N. O'Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor,
1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0282

December 5, 2005

CERTIFICATE OF SERVICE

______I hereby certify that on this 5th day of December 2005, a copy of the foregoing DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

John Spencer Stewart
Stewart Sokol & Gray, LLC
2300 SW First Avenue
Suite 200
Portland, OR 97201-5047

s/ Michael N. O'Connell