IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNIVERSAL CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-1502C |
| v. | ) | Consolidated with |
| | ) | No. 03-2370C |
| THE UNITED STATES, | ) | (Senior Judge Margolis) |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S SUPPLEMENTAL APPENDIX


| Document | Pages |
|---|---|
| Declaration of Michael Houlihan | 1-3 |
| June 10, 2002 letter from John Spencer Stewart | 4-13 |
| FP-96 Section 104.04 | 14 |
| FP-96 Section 204.01-05 | 15-16 |
| Desert Sage Contract Section 156.06 | 17 |
| Daily Report September 9, 2002 | 18 |
| Daily Report October 11, 2002 | 19 |
| Deposition Excerpt Rance Bare | 20-21 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNIVERSAL CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-1502C |
| v. | ) | Consolidated with |
| | ) | No. 03-2370C |
| THE UNITED STATES, | ) | (Senior Judge Margolis) |
| | ) | |
| Defendant. | ) | |

DECLARATION OF MICHAEL HOULIHAN

I, Michael F. Houlihan, P.E., swear and declare under penalty of perjury as follows:

1. I am a geotechnical engineer and a principal in the engineering consulting firm GeoSyntec Consultants. I have been retained by the Government to act as an expert witness in this matter.

2. I have 19 years experience in geotechnical engineering. I have a Bachelor of Science in civil engineering from Georgia Institute of Technology in 1985 and a Master of Science in geotechnical engineering from Georgia Institute of Technology in 1987. I am a licensed professional engineer in several states.

3. Through my work as a geotechnical engineer, I am familiar with, and have worked with both the American Association of State Highway and Transportation Officials ("AASHTO") and the Department of Agriculture ("USDA") systems of classifying soils.

4. The AASHTO system employs a series of tests to classify soils as A-1, A-2, A-3, A-4, A-5, A-6, A-7, or A-8. Some of these classification groups also have

subgroups. For example, the subgroups under A-2 are A-2-4, A-2-5, A-2-6, and A-2-7.

5. To determine the AASHTO classification of a soil sample, a sieve analysis is performed first which determines the size of the soil particles based on the percentage of the material that will pass through various size sieves. The smallest of the sieves, the no. 200, contains openings which are only 0.075 millimeters in size.

6. The percentage of materials passing through the no. 200 sieve determines whether the material is classified as "granular" or a "silt-clay" material. Granular materials are A-1, A-2, and A-3. Granular materials include stone fragments, gravel, and sand. Silt-clay materials are A-4, A-5, A-5, and A-7, and contain silts and clays. Additional tests, that is, liquid limit and plastic limit tests which involve adding water to the samples and heating and drying them to determine the consistency of the soil, allow the soils to be further classified into precise groups and subgroups.

7. My review of the records for the Camas project indicates that Universal Construction encountered the following soil types: A-2-4, A-3, A-4, and A-6.

8. A-2-4 soils contain 65 percent or more granular materials and no more than 35-percent materials that pass through the no. 200 sieve, that is, silts and clays.

9. A-3 materials are fine sands and contain no more than 10-percent silts and clays.

10. A-4 materials are silty soils having at least 36 percent of the material passing through the no. 200 sieve and having a liquid limit no greater than 40. A soil's liquid limit is the moisture content at which it acts more like a liquid than a solid. A

liquid limit of 40 means that the weight of the water divided by the weight of the soil particles is 0.4. That is, the weight of the liquid is 40-percent of the weight of the soils.

11. A-6 materials are clay soils having at least 36 percent of the material passing through the no. 200 sieve and having a liquid limit of 41 or greater.

12. Unlike the USDA system, a precise determination of the percentages of silt and clay are not needed to classify a sample under the AASHTO system. Only the combined percentage of silt and clay is needed for the AAASHTO system. Therefore, because the AASHTO system was used to classify soils for the Camas project, the specific percentages of silt and clay were not determined. Because the percentages of silt and clay are unknown, the USDA classifications of these samples cannot be determined. However, using the reported percentage of sand in the samples, the range of possible USDA classifications for each sample can be identified. This is how Materials Testing & Inspection determined the range of soil classifications identified on the table on page 2 of its expert report dated 18 February 2005.

DECLARATION

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and accurate. Executed on December 1, 2005.

s/Michael F. Houlihan
Michael Houlihan

STEWART SOKOL & GRAY LLC
ATTORNEYS AT LAW

RECEIVED
FHWA-VANCOUVER
02 JUN 11 AM 11:46
MAIL ROOM

H. Lee Cook*
Arnold L. Gray †
Thomas A. Larkin*◊
Jan D. Sokol*†□
John Spencer Stewart*†◊□
Susan Z. Whitney*‡
Jeffrey B. Wilkinson*†

2300 SW FIRST AVENUE, SUITE 200
PORTLAND, OREGON 97201-5047
(503) 221-0699
FAX (503) 223-5706
www.lawssg.com

Robert B. Coleman
Jon M. Egan
Todd O. Foster*
Helen M. Kim
Angela M. Otto*
Matthew A. Wandt†

All Members of Oregon Bar
*Washington Bar
† District of Columbia Bar
◊ Alaska Bar
□ Idaho Bar
‡ Nevada Bar

**E-mail:** jstewart@lawssg.com
**Direct Fax:** (503) 227-5028

June 10, 2002

Mr. Timothy J. Binder
Attorney
United States Department of Transportation
Federal Highway Administration
Western Federal Lands Highway Division (WFLHD)
610 East Fifth Street
Vancouver, Washington 98661-3801

By Fax 1-360-619-7846
Original by Mail

Re: Insurance Company of the West/
Universal Construction, Inc./
Standerfer, Richard Lee and Joanne C.
Our File No. 7628-34948

**ID RRP CAMA 101(1)**
**Camas NWR Complex**
**Contract No. DTFH70-01-C-00034**

Dear Tim:

Thank your for your prompt response to my June 5, 2002 letter.

We believe it is the Government's obligation to issue a termination of the contract for convenience rather than default based upon:

1. the Government's failure to provide Universal with a constructible set of plans and specifications and acceptable resources to allow the project to be constructed as planned within the required contract period;

2. differing site conditions in the form of soils that did not meet the requirements of the specifications;

3. failure of the Government to provide adequate time extensions commensurate with delays incurred by Universal throughout the work including additional time required to utilize the defective soils and perform the compaction specified by the Government;

4. failure of the Government to administer the contract and cooperate with Universal to allow successful completion of the project within the tight contract time requirements; and

5. major breach of the contract by the Government for nonpayment of contract and extra work performed on the project by Universal.

**Defective Plans and Specifications**

The Government, as the project owner and designer, has the obligation to provide plans and specifications (design) for a project that allow a contractor to construct the project in accordance with the planned design. By providing plans and specifications the Government warrants, under the principle of implied warranty, that the contractor will be able to construct the project as designed within the contract duration if the contractor proceeds in accordance with the plans and specifications. Implied warranty is based on the premise that the plans and specifications are complete and free from defects which would adversely affect completion of the project design within the contract required time.

The Government failed to provide Universal with a constructible design because the Government mandated borrow source consisted of material "that is not typically used in the structural section of a roadway" nor did the material meet the gradation or durability requirements of the contract specified and generally accepted construction specifications, i.e. **FP-96** (*Standard Specifications For Construction of Roads and Bridges on Federal Highway Projects*) Section 105 – Control of Material or Section 703.05 – Aggregates, specifically Table 703-2 – Target Value Ranges for Subbase and Base Gradations.[1]

The Government has asserted that the specification quoted by MTI is incorrect and that the applicable section of the specifications is section 704 - Soils. However, the Government is incorrect that section 705 does not apply to the contract because both sections are applicable to the work covered under the contract not just section 704.

---

[1]November 20, 2001 report prepared by Materials Testing & Inspection (MTI) following a limited geotechnical analysis of the mandated borrow sources as requested by Universal.

The portion of section 704 that is most applicable to this project is section 704.06 - unclassified borrow. The requirement for unclassified borrow is:

> Granular material free of excess moisture, muck, frozen lumps, roots, sod, or other deleterious material conforming to the following:
>
> Maximum Dimension – 600mm
> Soil classification – AASHTO M 145, A-1, A-3, or A-2-4

The material identified in the limited soils study conducted by MTI clearly shows material that is not granular material and therefore is not suitable for use in roadway embankments, nor does it meet the requirements of the specifications.

Sections 703 and 704 require granular material, and there certainly is material in the borrow sources that is not granular material and as such does not meet the specifications. The reason the compaction requirements were changed is because the non complying material will not allow construction using the specified and reasonable means for placing the materials.

The Government asserts in its June 6, 2002 letter "the material was in all points what we anticipated." What the Government anticipated and what the specifications represented are two different issues. The issue is not what the Government anticipated, rather what could be reasonably relied upon by the contractor and what the contractor anticipated based on the specifications.

Not only did the Government acknowledge, by issuing unilateral contract modification No. 0001, that "the specified compaction requirements were not consistently obtainable with standard construction techniques" as stated in the MTI report using the mandated material source, the Government also acknowledged the material to be unsuitable for construction of this project in the **DRAFT CONTRACTING OFFICER'S DECISION** "this material [mandated borrow source] may not be of a quality suitable to use in a roadway embankment."

By specifying that the contractor use the mandated borrow source the Government warranted that the material met the requirements of the contract, which it generally did not, and that the material could be used to construct the project using the specified construction (compaction) methods, which again it could not. The Government's failure to provide a source of material is exacerbated by the fact that the Government failed to conduct a geotechnical evaluation of the mandated source to provide the bidders and the contractor with accurate information concerning the borrow source.

The Government also asserted in its June 6, 2002 letter that Universal excavated too deep and Universal did not anticipate and failed to perform reasonable moisture adjustment on the soil aggregate.

It is incorrect of the Government to assert that Universal did not anticipate the need for moisture adjustment on the borrow materials. Universal did anticipate and did perform soil processing including adjusting for water. However, Universal was unsuccessful in its processing because of the presence of unsuitable soils mixed in with the granular soils. The mixed soils caused Universal to be unable to adequately process the soils for compaction and therefore Universal could not achieve compaction using the specified methods.

The inability of Universal to construct the project using the specified compaction means and methods caused significant delays to the project and increased costs for which Universal is entitled to both an extension of time and increased costs. Universal's entitlement to adequate time extensions negates the Government's position that Universal is currently in default due to failure to complete the contract within the time allowed.

**Differing Site Conditions**

The Government has asserted in the Draft Contracting Officer's Decision that Universal has not met the requirements of proof of a Type 2 differing site condition. This finding is in error for the following reasons:

Element 1: The contractor must show that it did not know about the physical condition.

There is more to a differing site condition than the type of soils present including that the existing soils to be used in the construction meet the specification requirements.

Clearly Universal did not know that the soils in the mandated borrow area <u>did not meet specification requirements of sections 703 and 704</u> of the contract in spite of Universal conducting a visit to the site to view the area. Universal relied on the Government's implied warranty that the materials did meet the specification requirements by their inclusion in the specifications.

Element 2: The contractor must show that it could not have anticipated the condition from inspection or general experience.

Not only could Universal not have anticipated that the mandated soils did not meet the specification and that the specified compaction requirements were not

consistently obtainable with standard construction techniques, the Government did not anticipate the conditions either. This is clearly evident as a result of the Government's issuance of Contract Modification No. 0001 which changed the compaction means and methods after Universal had complained to the Government of its inability to comply with the specifications and achieve compaction with the materials from the borrow source.

Based on its previous experience Universal relied on the fact that the Government would provide a material source in compliance with the specifications (FP-96, Section 105.02 Local Material Sources "The quality of material in provided sources is acceptable in general..." and sections 703 and 704).

The Government did not do a geotechnical analysis of the site, did not provide any geotechnical information in the specifications, even though some limited information may have been available, and did not communicate to Universal during the prebid site visit inspection that the material may not be acceptable for use in an embankment.

Universal could not, and did not anticipate the condition that the material was not in compliance with the specification requirements and could not be used for construction using either the specified or reasonable construction methods.

Element 3: The contractor must show that the condition varied from the norm in similar contracting work.

The mandated material source clearly varied from the norm in similar contacting work. The norm is <u>never to have an unsuitable material specified for use</u> in an engineered fill embankment that is not suitable for the intended purposes as is the case with the mandated borrow sources on the project. The Government has acknowledged that the material was unsuitable. The Government issued a contract modification changing the compaction means and methods to try and alleviate some of the problems that Universal was encountering with the materials while constructing the roadway. If the material had not differed from the norm and the specifications, the Government would not have issued the change order.

**Differing Site Conditions Summary**

Contrary to the Contracting Officer's decision, Universal has met the requirements of proof for determination of not only a Type 2 differing site conditions claim but a Type 1 claim as well when all of the factors of the soils, not just the soil

type, are considered. The limited geotechnical analysis performed by Universal and its consultant identified five soil types of which only two, sandy loam, and clayey soils, are referenced in the specifications. A more detailed site investigation may find additional soil types as well.

The Government's failure to conduct a geotechnical analysis, include a broad ranging soil type classification as the material source in the specifications, fail to take into consideration all of the requirements of the soils including compliance with the specifications and reasonable standards of construction, and then state that the contractor can not prove that the conditions are not different is not defensible.

The soils conditions and their unsuitability for use in this construction process are clearly different than either Universal or the Government anticipated and the changed conditions impacted Universal's operations, extended the project completion date, and severely impacted Universal's profitability and viability as a company.

**Time Extensions & Coordination**

Universal has repeatedly notified the Government of its entitlement to an extension of the contract completion date as a result of the increased time required to compact the defective soils, the delays caused by the Government, and extra work caused by the change in the compaction means and methods. Universal provided a detailed schedule analysis in its November 1, 2001 letter in which Universal requested a significant time extension which the Government has denied in the Draft Decision.

The contract required completion of the work within 93 calendar days from notice to proceed. Because of the critical nature of the project, it was incumbent on both of the parties to minimize potential delays to the project at every possibility. One of the most significant causes of project delay is administrative delay at the beginning of the project particularly as it relates to submittals and schedules. On a project with a tight schedule, it is imperative to mitigate the delay by coordination of the needs of the Government to get submittal information and the needs of the contractor to commence operations at the earliest possible date. In most instances this is accomplished by partnering or working agreements to allow staggered construction when a submittal is turned in by the contractor that may not be totally complete but in basically complies with the intent of the submittal to provide the Government with information in accordance with the contract requirements. The shorter the contract duration the more critical it is to cooperate.

The Government did not allow any deviation from the mandated requirements for submittals of the schedule and other submittals such as the QA/QC plan at least until such time as the delays had already become significant in late September to mid-

October because of the continuing denial by the Government and the need to resubmit information by Universal. Some of the denials were for administrative reasons that would not have had any impact on the project if the work were allowed to commence prior to the full submittal being approved by the Government. This was particularly true of the QA/QC submittal which was denied by the Government and subsequently approved in part in mid October.

The Government would not approve either the schedule and the QA/QC program through all of September and part of October. However, when it became more than critical, the Government approved the schedule without any changes that were previously unacceptable and waived the requirement to have a fully completed QA/QC plan and allowed work to commence with a partially completed plan.

The Government bears some responsibility for the delays in the submittal process. Had the on-site representatives been more amenable to cooperation, project commencement would not have been delayed to the extent that it was. Any Government responsibility for delay results in concurrent delay and Universal's entitlement to an extension of time for the concurrent period.

**Nonpayment – Breach of Contract**

The Government asserted in its June 6, 2002 letter that the simple reason the Government has not made a single progress payment on this project is because of "lack of progress by Universal placed completion in jeopardy." However, when this issue was discussed in the claim denial meeting, the Government asserted that the reason was not "lack of progress" but the failure of Universal to meet administrative requirements of the contract including providing a schedule and other submittal requirements.

Universal submitted three Progress Payment Estimates for work performed from Notice To Proceed on September 10, 2001 through November 30, 2001 in the amount of approximately $138,268.17 with additional work performed but not yet billed. The progress payment estimates were submitted in accordance with Section 109 – Measurement and Payment of the Special Contract Requirements (SCR's) section of the specifications. Each payment estimate was denied by the Government for administrative reasons ranging from sending the payment estimate in by fax (estimate 1) to not having an approved update project schedule (October payment estimate). The October payment estimate was denied in accordance with Section 155 of the SCR's – Schedules for Construction Contracts according to the project engineer "because it was behind schedule when submitted." (FHA November 12, 2001 letter)

The October schedule and the update process was in dispute between Universal and the Government because the Government wrongfully required Universal to update the schedule beyond the billing / schedule update in contravention of industry standard billing and scheduling practices. (UCI November 16, 2001 letter) The schedule was subsequently approved by the Government without change as previously required.

Additionally, the complete refusal to pay for work performed and submitted on an otherwise acceptable invoice is in conflict with Section 109(c) 8. of the SCR's that specifically provides for withholding retention for among other things "(a) failure to maintain acceptable progress." This section is designed to allow the Government to withhold portions of the billings to account for administrative and operational failures by contractors in accordance with reasonable and acceptable industry practices and Federal Acquisition Regulations.

The Government's withholding of all progress payments because the Government did not approve a schedule is unconscionable and punitive. It is very easy for a contracting officer or the authorized representative to disapprove every schedule, even for minor discrepancies, as happened on this project, and justify withholding payments to the contractor because technically it is allowable by the contract, thus causing the contractor serious financial harm and precluding the contractor's ability to successfully complete the project.

The Government has asserted that Universal is "in default of the contract for failure to complete the contract within the time allowed." However, Universal has a reason for its late completion of the contract, namely entitlement to extensions of time for changed conditions, administrative delays of the work by the Government, extra work required to build a project based on defective specifications, and changes to Universal's means and methods of compaction caused by non compliant and differing soils.

Conversely, the Government has no defense to nonpayment of work for administrative reasons. The Government has not complied with the most basic of contract requirements – <u>paying a contractor on a timely basis for work performed under the contract</u>. At the various times the Government withheld Universal's payments, Universal had not used all of the contract time nor had the Government provided Universal with appropriate and adequate time extensions.

The Government's failure to pay constitutes a material breach of the contract that predates Universal's potential default and precludes the Government from rightfully terminating Universal's contract for default.

A recent court decision supports this position. See Appeal of All-State Construction, Inc. ASBCA No. 50586 February 21, 2002, wherein the Board of Contract Appeals ruled that the Government's refusal to pay an invoice due to slow progress by the contractor, even though the reason for the slow progress was in dispute, violated the Federal Acquisition Regulations. The refusal to pay the invoice constituted a withholding an amount in excess of the FAR regulations for a maximum retention of 10 percent of the approved contract amount.

The Board ruled that the Federal Acquisition Regulations standard clause for "Payments under Fixed-Price Construction Contract," govern an agency's right to withhold payment due to unsatisfactory progress. Prior to substantial completion, the Government may retain, until satisfactory progress has been achieved, a maximum of 10 percent of the earned amount for completed work.[2] [emphasis added]

The Board also ruled that the contractor was justified in walking off the project due to the Government's actions in withholding payments for completed work and

> "Since the contractor's obligation to perform was discharged by the government's breach of its payment obligations the contractor was not in default thereafter either for delay in completing the work, or for stopping work, or for refusing to return to work."

The termination for default was converted to a termination for convenience of the Government.

In summary we believe the presence of materials that are not in conformance with the specifications, the Government's acknowledgment that the materials may not be suitable for use in a roadway embankment, the Government's implied warranty that the project could be constructed in a reasonable manner in accordance with the specifications, the Government's failure to provide appropriate time extensions, and the Government's failure to make progress payments for work performed provide sufficient reason for the Government to terminate the contract for convenience rather than default.

---

[2]When this case was brought to the Government's attention at the claim denial meeting and we were asked if, and we affirmatively replied, the case applied to lack of progress, the Government asserted that the reason for the refusal to pay was for administrative reasons and not progress. Yet the Government now asserts that the reason was for lack of progress which, in turn, makes the case applicable even if it was not previously.

The only soils investigation performed on the project was performed by a qualified geotechnical engineer at the request of Universal. It is the opinion of the engineer based on the soils testing evidence that the material in the mandated borrow source does not meet the specifications. The soils analysis has previously been provided to you. However, as requested in your June 6, 2002 letter we are providing an additional copy for your review.

Very truly yours,

STEWART SOKOL & GRAY LLC

John Spencer Stewart (kag)

John Spencer Stewart

JSS:kag
W:\WORK\KAG\INS-CO.WST\Universal Construction\Binder.002.wpd

Case 1:03-cv-01502-LSM Document 50-2 Filed 12/05/2005 Page 15 of 22



**(b) Specific requirements for concrete and miscellaneous structures.** Furnish drawings for cribs, cofferdams, falsework, erection, temporary support systems, formwork, detour structures, and other temporary work and methods of construction proposed. Furnish drawings bearing the seal and signature of a professional engineer proficient in the pertinent design field.

**104.04 Coordination of Contract Documents.** The FAR, TAR, special contract requirements, plans, supplemental specifications, and standard specifications are contract documents. A requirement in one document is binding as though occurring in all the contract documents. The contract documents are intended to be complementary and to describe and provide for a complete contract. In case of discrepancy, calculated and shown dimensions govern over scaled dimensions. The contract documents govern in the following order:

(a) Federal Acquisition Regulations
(b) Transportation Acquisition Regulations
(c) Special contract requirements
(d) Plans
(e) Supplemental specifications
(f) Standard specifications

**104.05 Load Restrictions.** FAR Clause 52.236-10 - Operations and Storage Areas, paragraph (c), is supplemented as follows.

Comply with all legal load restrictions when hauling material and equipment on public roads to and from the project. A special permit does not relieve the Contractor of liability for damage resulting from the moving of material or equipment.

Unless otherwise permitted, do not operate equipment or vehicles that exceed the legal load limits over new or existing structures within the project. Repair or replace in an acceptable manner all damages to project work resulting from the use of such equipment or vehicles at no cost to the Government.

On the portions of the project used to accommodate public travel, operate construction equipment and vehicles in a manner that does not conflict with traffic flow and minimizes delays to the traveling public.

## Section 204.— EXCAVATION AND EMBANKMENT

### Description

**204.01** This work consists of excavating material and constructing embankments. This includes furnishing, hauling, stockpiling, placing, disposing, sloping, shaping, compacting, and finishing earthen and rocky material.

**204.02 Definitions.**

(a) **Excavation.** Excavation consists of the following:

(1) **Roadway excavation.** All material excavated from within the right-of-way or easement areas, except subexcavation covered in (2) below and structure excavation covered in Sections 208 and 209. Roadway excavation includes all material encountered regardless of its nature or characteristics.

(2) **Subexcavation.** Material excavated from below subgrade elevation in cut sections or from below the original groundline in embankment sections. Subexcavation does not include the work required by Subsections 204.05, 204.06(b), and 204.06(c).

(3) **Borrow excavation.** Material used for embankment construction that is obtained from outside the roadway prism. Borrow excavation includes unclassified borrow, select borrow, and select topping.

(b) **Embankment construction.** Embankment construction consists of the placement and compaction of roadway or borrow excavation. This work includes:

(1) Preparing foundation for embankment
(2) Constructing roadway embankments
(3) Benching for side-hill embankments
(4) Constructing dikes, ramps, mounds, and berms
(5) Backfilling subexcavated areas, holes, pits, and other depressions

(c) **Embankment material.** Material for embankment construction are:

(1) **Rock.** Rock is material containing 25 percent or more, by volume, rock particles greater than 100 millimeters in diameter.

(2) **Earth.** Earth is material containing less than 25 percent, by volume, rock particles greater than 100 millimeters in diameter.

(d) **Conserved topsoil.** Excavated material conserved from the roadway excavation and embankment foundation areas that is suitable for growth of grass, cover crops, or native vegetation. A material reasonably free from hard soil, rock, clay, toxic substances, litter, or other deleterious material.

(e) **Waste.** Excess and unsuitable roadway excavation and subexcavation that cannot be used.

## Material

**204.03** Conform to the following Subsections:

| | |
|---|---|
| Backfill material | 704.03 |
| Select borrow | 704.07 |
| Select topping | 704.08 |
| Topping | 704.05 |
| Unclassified borrow | 704.06 |
| Water | 725.01 |

## Construction Requirements

**204.04 Preparation for Roadway Excavation and Embankment Construction.** Clear the area of vegetation and obstructions according to Sections 201 and 203.

**204.05 Conserved Topsoil.** Conserve topsoil from roadway excavation and embankment foundation areas. Stockpile conserved topsoil in low windrows immediately beyond the rounding limits of cut and embankment slopes or in other approved locations. Separate topsoil from other excavated material.

Place conserved topsoil on completed slopes according to Section 624.

# Section 156.— PUBLIC TRAFFIC

## Construction Requirements

**156.03 Accommodating Traffic During Work.** Add the following:

Sections of the Auto Tour route and Cut-Off Road may be closed to Public Traffic as shown on the plans. Only one closure may be used at one time. Maintain 24 hour access to residents in the closure three area.

**156.04 Maintaining Roadways During Work.** Delete the text of paragraph (c) and substitute the following:

(c) Snow removal to facilitate the work is the Contractor's responsibility. Snow removal to provide public access is the responsibility of the maintaining agency and will be performed at the maintaining agency's discretion. Allow the maintaining agency access to perform snow removal.

**156.05 Maintaining Roadways During Non-Work Periods.** Delete the second sentence and substitute the following:

Snow removal to provide public access is the responsibility of the maintaining agency.

**156.06 Limitations on Construction Operations.** Add the following:

**(k)** Do not perform construction operations which interfere with public travel on the roadway between 6 p.m. Friday and 6 a.m. the following Monday, unless otherwise authorized by the CO. All closure areas will be open to public traffic during this period.

**(l)** Limit work on the Auto Tour Route and the Cut-off Road to between September 3 and October 11, 2002.

**Project Engineer's Diary**

Project: ID RRP-CAMA 101(2) Camas NWR Complex
Contract No. DTFH70-02-C-00025
Date: September 9, 2002
Weather: Clear/warm

At 10:00 a.m., I spoke to Desert Sage president Rance Bare about a variety of issues. While discussing the construction schedule, I learned that Desert Sage was at the limit for daily production rates and there wasn't enough time to complete the contract if they only worked 5 days per week. This brought about discussion about working 6 days per week. We also discussed the quality control plan and the few items that needed to be corrected for acceptance. I also noted that Desert Sage had not yet identified a TSS. Mr. Bare and I also discussed the requirement for a lighting plan for nighttime work. Mr. Bare also voiced concern that the amount of material available at the borrow sources was insufficient to complete the areas of embankment. Finally, we spoke about the topsoil and how it would be stored on site.

Later in the day, I spoke to Camas NWR manager Gerry Deutscher about the following issues: working on Saturdays, the amount of material in the borrow pits, and topsoil. Mr. Deutscher indicated that Saturday work would be permissible, except on September 28, 2002. The current sizes of the borrow pits are smaller than the areas permitted. If needed, the size of the pits could be increased to provide additional unclassified borrow material. Mr. Deutscher agreed that stockpiling the topsoil in a windrow, as per FP-96 Subsection 204.05, was acceptable.

Daniel L. Christianson
Project Engineer
9-11-02
Date

**Project Engineer's Diary**

Project: ID RRP-CAMA 101(2) Camas NWR Complex
Contract No. DTFH70-02-C-00025
Date: October 11, 2002
Weather: Cool/clear, mid 40's

The final review was conducted today. In attendance was Desert Sage president Rance Bare, project superintendent JR Tupper, Camas NWR manager Gerry Deutscher, FHWA ID/MT COE Jane Traffalis, and myself. Mr. Deutscher noted that some of the turnouts were not built to the size specified in the plans. These turnouts will be corrected. Other work includes general cleanup and additional work at the Well #1 bridge site. Additional material will be hauled in by the Refuge and Desert Sage will shape and compact the material at the approaches to the bridge. This additional work will be added to contract modification 0003.

When the test results for CVS tests 13 and 14 were entered into QL-Pay, the final pay factor came out at 0.95. This was controlled by the inconsistency of the amount passing the 425μm sieve. I showed this to Mr. Tupper and he said that he would give the information to Mr. Bare to look at.

Daniel L. Christianson
Project Engineer
10-12-02
Date

there any contract modification associated with that method of constructing the embankment areas?
A I do not remember any formal communications by the way of addendum or a change order, no.
Q I am going to show you Exhibit Sixty-seven, which is another of Mr. Christianson's daily diaries dated September 18, 2002, and my question for you is -- and you can take a minute to look through this document, but at the bottom of page one there's a procedure or process for building the embankments, and my question is whether this accurately reflects the procedure that Desert Sage was utilizing?
A (Examining document) Yes, that is the procedure.
(Deposition Exhibit Number Eighty-nine was marked for identification)
Q (By Mr. Larkin) Exhibit Eighty-nine, can you tell me what this is?
A This is a transmittal document on our estimate number two of our quantities that we believe were eligible.
Q Through September 16, 2002?
A Correct.
Q Okay. And the attachment to the letter are documents drafted by Desert Sage?
A Yes.



Q And it's your understanding that the quantities reflected on the attachments are correct quantities?
A They were estimated quantities at that time, yes.
(Deposition Exhibit Number Ninety was marked for identification)
Q (By Mr. Larkin) Is my understanding correct that Exhibit Ninety is Desert Sage's invoice for work completed between September 17 and October 16, 2002?
A Correct.
Q And on the attachment to Exhibit Ninety the estimated quantity for unclassified borrow that you state is five thousand one hundred and thirty-six cubic meters, is that correct?
A Correct.
Q And that is more than double the contract estimated quantity for unclassified borrow?
A Yes.
Q By this time, this time being October 24, 2002, had the staking been reset by Forsgren?
A Yes.
Q And so your understanding was that the fill that was reflected as required by the staking was the fill that was required by the contract plan's specification?
A Correct.



Q I'm going to show you Exhibit Seventy-three. You can take a minute to look at it.
A (Examining document)
Q What's your understanding of what this document reflects?
A Exhibit Seventy-three is a report on a quantity calculation coming from survey data provided by Forsgren and Associates for the unclassified borrow material. It shows the material -- total material moved from pit one. It shows the credit for Universal. It shows the credit for material hauled by the Fish and Wildlife Service, and the material we removed. And for pit number two the total material removed, grub, and the material that we removed then. And a total what we would have used.
Q Okay. What was the seventy-one cubic meters hauled by the U.S. Fish and Wildlife Service?
A I have no idea.
Q Is it your understanding that this document was drafted after Forsgren had completed their cross section following the completion of Desert Sage's work?
A Correct.
Q And so is it your understanding that the total cubic meters of unclassified borrow performed by Desert Sage was four thousand nine hundred and ninety-five cubic meters in connection with the Camas project?



A That is correct.
Q And is it your understanding that the government approved for payment, unclassified borrow, at the -- at Desert Sage's unit price based on four thousand nine hundred and ninety-five cubic meters?
A Based upon a notation on the estimate number three, yes.
Q Okay. You're looking at Exhibit Ninety?
A On Exhibit Ninety, correct.
Q Okay. Did Desert Sage submit any claims to the government in connection with the Camas project?
A No.
Q And has Desert Sage received any claims by the government in connection with the Camas project?
A No.
Q Have you been made aware of any concerns related to the roadway at the Camas project following the completion of Desert Sage's work?
A No.
MR. LARKIN: Thank you. Those are all of my questions.
MR. O'CONNELL: Could we just take a minute?
MR. LARKIN: Sure.
(Recess)
MR. O'CONNELL: Do you want to go back on the

Page 65

record.
Mr. Bare, I just have a couple of questions.

EXAMINATION BY MR. O'CONNELL

Q (By Mr. O'Connell) You testified concerning the increase in price of the unclassified borrow, correct?
A Yes, correct.
Q Okay. Now, when your company took over the project most of the work in the parking area had been performed by Universal, correct?
A Yes.
Q And was the work in the parking lot easier than some of the other work that remained on the project?
A Yes.
Q Okay. Did part of the increase in the price, was that caused by the fact that the easier work in the parking lot had already been done and the remaining work was more difficult?
A That would have had an effect, yes.
Q Okay. Do you know how much?
A I can't honestly say how much.
MR. O'CONNELL: Okay. No more questions.
MR. LARKIN: Thank you.
You have the right to read -- we should probably put this on the record.
MR. O'CONNELL: Yes.

Page 66

MR. LARKIN: You have the right to read and sign your deposition.
THE WITNESS: Uh-huh.
MR. LARKIN: Would you like to do that?
THE WITNESS: I would.
MR. LARKIN: Maybe you can give your address.
MR. O'CONNELL: Well, actually it's on the record.
MR. LARKIN: Yes, it's on the record, right.
Oh, very good. Well, thanks very much.
THE WITNESS: You betcha.
(Thereupon the deposition of RANCE BARE was adjourned at 12:25 p.m., October 20, 2004)

Page 67

VERIFICATION

STATE OF IDAHO )
( ss
County of Bonneville )

I, RANCE BARE, 445 North Capital Avenue, Suite 5-C, Idaho Falls, Idaho, 83402,say that I am the witness referred to in the foregoing deposition, consisting of the foregoing 66 pages, that I have read the same and know the contents thereof; that the same are true to my knowledge, or corrections, if any, as noted.

| Page | Line | Should Read | Reason |
|---|---|---|---|
| ____ | ____ | ____________ | ____________ |
| ____ | ____ | ____________ | ____________ |
| ____ | ____ | ____________ | ____________ |
| ____ | ____ | ____________ | ____________ |
| ____ | ____ | ____________ | ____________ |
| ____ | ____ | ____________ | ____________ |

____________________
Deponent

Subscribed and sworn to before me this ______ day of ______________, _________.

____________________
(Seal) Notary Public for ____________
Commission expires ___________

Page 68

REPORTER'S CERTIFICATE

STATE OF IDAHO, )
( ss
County of Bonneville )

I, Dick Telford, CSR, do hereby certify RANCE BARE, 445 North Capital Avenue, Suite 5-C, Idaho Falls, Idaho, 83402, was sworn to testify the truth in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was reported by myself, Notary Public and Certified Court Reporter; that the deposition is the record of the testimony given by the witness, as recorded on the foregoing 66 pages.

And I further certify that I am not related to any of the parties nor do I have any financial interest in the matter.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 25th day of October, 2004.

(Signed) ____________________
Dick Telford
Certified Court Reporter
Notary Public for Idaho



21