IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNIVERSAL CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-1502C |
| v. | ) | Consolidated with |
| | ) | No. 03-2370C |
| THE UNITED STATES, | ) | (Senior Judge Margolis) |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT

Pursuant to Rule 56(h)(2) of the Rules of the Court of Federal Claims, defendant respectfully submits this response to the proposed findings of uncontroverted fact filed by plaintiff Universal Construction, Inc. ("Universal").

1. Craig Sanders, the principle designer of the Camas Wildlife Refuge ("Camas") project for the Federal Highway Administration ("FHWA"), in describing the Camas project in the Design Narrative said:

> we are building a refuge road with little to no traffic. The words 'beat it to fit, paint it to match' was never more fitting.

Plaintiffs Appendix ("P1. App.") p. 3.

**Defendant's Response**

Agrees.

2. The project required the finished road to be 4.2 meters wide, which required very narrow "sliver fills" to be constructed. P1. App. p. 37.

**Defendant's Response**

Agrees, except states that sliver fills were required only at certain portions of the

road.

3. The project was surrounded by a sensitive wildlife habitat, including extensive wetlands. As such, FHWA sought and received a wetlands discharge permit pursuant to section 404 of the Clean Water Act. FHWA's application and supporting materials were appended to the Camas project contract beginning on page H-l. P1. App. pp. 7-32.

**Defendant's Response**

Agrees that the project was in a wildlife refuge that included wetlands and agrees that FHWA sought a permit to discharge fill material into wetlands. Disagrees that the FHWA application was appended to the contract. Rather, it was the permit, not the application, that was included in, not appended to, the contract.

4. Due to the surrounding wetlands and the northerly climate the project could only be constructed during the low water months of late summer and fall. P1. App. 97-98.

**Defendant's Response**

Agrees, but further states that the summer tourist season generally prevented construction during the summer months before Labor Day.

5. A key factor in the design of the Camas project was the use of the mandatory borrow areas as mitigation sites to compensate for the discharge of fill into the wetlands surrounding the wildlife viewing road. P1. App. p. 3. The borrow areas were not selected by FHWA for their geotechnical properties, rather, they were selected by the

Camas Refuge manager for their suitability as mitigation sites. P1. App. p. 88.

**Defendant's Response**

Agrees, except to the extent that Universal's wording implies that no thought was given to the suitability of the sites for roadway embankment. See Def. App. 3, 21. The Government was aware that the existing more than 10 kilometer road in the refuge was constructed from existing materials.

6. The provisions of the United States Department of Transportation Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, FP-96 ("FP-96") governed the Camas contract. P1. App. p. 291.

**Defendant's Response**

Agrees that the FP-96 applied to the contract, but does not understand what Universal means by "governed." The contract included, among other things, the FP-96, the plans, and the special contract requirements ("SCR"). FP-96 section 104.04 provided that these documents apply to the specifications in the following order of precedence: the SCR, the plans, the FP-096.

7. FP-96 section 704.06 relating to unclassified borrow materials incorporated into highway projects was not superseded by any Special Contract Requirements ("SCR"). P1. App. pp. 292-93. Section 704.06 mandates that unclassified borrow conforms to American Association of State Highway and Transportation Officials ("AASHTO") M 145 soil classifications of A-1, A-3, or A-2-4, with a maximum dimension no greater than

600mm. P1. App. p. 90.

**Defendant's Response**

Agrees that Universal cites to section 704.06 correctly, but states that the SCR and the permitting section of the contract informed the contractor that it should expect materials classified other than A-1, A-2-4, and A-3 and would be required to construct the embankment from them. The contract stated in the permitting section that the contractor would encounter primarily sandy loam which may be underlain with layers of clayey soils. Both the reference to sandy loam and the reference to clayey soils informed the contractor that it would be working with materials other than A-1, A-2-4, and A-3. In addition, the SCR also informed the contractor that it would be constructing the road with any materials from A-1 to A-7. Section 204 is the "Excavation and Embankment" section of the contract. The SCR "Compaction" provision, section 204.11 (c) provides:

> Classify the material according to AASHTO M 145. For material classified A-1 or A-2-4, determine the maximum density according to AASHTO T 180 Method D. For other material classifications, determine the optimum moisture content and maximum density according to AASHTO T 99 Method C.
>
> Adjust the moisture content of material classified A-1 through A-5 to a moisture content suitable for compaction. Adjust the moisture content of material classified A-6 and A-7 to within 2 percent of the optimum moisture content.

Def. App. 37.

8. FHWA performed no geotechnical testing on the borrow areas despite knowing the borrow areas were selected for their suitability for mitigation sites rather

than fill material. P1. App. p. 3.

**Defendant's Response**

Agrees in general but states that defendant was aware that the existing more than 10 kilometer road in the refuge was also constructed from existing materials.

9. Materials Testing Inc. ("MTI") analyzed ten samples from the mandatory borrow areas, samples identified BP-1 (roadway sample) through BP-10. P1. App. pp. 225-34. The FHWA lab in Vancouver, Washington analyzed five samples from the mandatory borrow areas. P1. App. pp. 235-39.

**Defendant's Response**

Agrees.

10. The FHWA lab received the Camas project samples on November 7, 2001. P1. App. pp. 235-39. Those samples were tested on November 19th and 20th. Id.

**Defendant's Response**

Agrees.

11. The mandatory borrow areas contained materials that were unacceptable under the contract. The mandatory borrow areas contained ASSHTO M 145 soil classifications A-6, A-4, A-3, A-2-4, and A-1. P1. App. pp. 225-34.

**Defendant's Response**

Disagrees because the contract provided for the construction of the road from any materials classified from A-1 to A-7. Further disagrees because none of the test reports

indicate that A-1 materials were present.

12. Optimum moisture content, a key factor in material performance, differs by AASHTO M 145 soil classification. P1. App. pp. 225-34.

**Defendant's Response**

Disagrees because the phrase "a key factor in material performance" is undefined. Agrees that the contract provided that the contractor had to:

> Adjust the moisture content of material classified A-1 through A-5 to a moisture content suitable for compaction. Adjust the moisture content of material classified A-6 and A-7 to within 2 percent of the optimum moisture content.

Def. App. 37.

13. The optimum moisture content of the samples analyzed by MTI varied from a low of 7.9 percent for an A-2-4 sample to a high of 19.5 percent for an A-6 sample. P1. App. pp. 225-34.

**Defendant's Response**

Agrees. Further states that the optimal moisture level for the A-2-4 soil, the predominate soil, ranged from 7.9 percent to 12.3 percent. Pl. App. 225, 226, 228, 231, 233, 234, 235, 239. The optimal moisture level for the A-3 soil ranged from 12.9 percent to 14.5 percent. Pl. App. 229, 237. The optimal moisture level for the A-4 soil ranged from 13.4 percent to 13.8 percent. Pl. App. 227, 236. The optimal moisture level for the A-6 soil ranged from 16 percent to 19.5 percent. Pl. App. 230, 232, 238.

14. The average optimum moisture content of the conforming soil samples

taken by MTI was approximately 11.2 percent. P1. App. pp. 225-34. The average optimum moisture content of the non-conforming soil samples was approximately 17.4 percent, or 50 percent higher than the conforming samples.

**Defendant's Response**

Disagrees because all of the soil samples conformed to the contract.

15. Thirty percent of the samples from the mandatory borrow areas analyzed by MTI did not conform to FP-96 section 704.06. P1. App. pp. 225-34.

**Defendant's Response**

Agrees that some of the samples were not classified as A-1, A-2-4, or A-3. Disagrees that these samples did not conform to the contract. Both the SCR and the permitting section of the contract informed the contractor that it should expect materials classified other than A-1, A-2-4, and A-3. The contract stated in the permitting section that the contractor would encounter primarily sandy loam which may be underlain with layers of clayey soils. Both the reference to sandy loam and the reference to clayey soils informed the contractor that it would be working with materials other than A-1, A-2-4, and A-3. In addition, the SCR also informed the contractor that it would be constructing the road from any materials from A-1 to A-7. Section 204 is the "Excavation and Embankment" section of the contract. The SCR "Compaction" provision, section 204.11 (c) provides:

> Classify the material according to AASHTO M 145. For material classified A-1 or A-2-4, determine the maximum density according to AASHTO T

> 180 Method D. For other material classifications, determine the optimum moisture content and maximum density according to AASHTO T 99 Method C.
>
> Adjust the moisture content of material classified A-1 through A-5 to a moisture content suitable for compaction. Adjust the moisture content of material classified A-6 and A-7 to within 2 percent of the optimum moisture content.

Def. App. 37.

16. Forty percent of the samples from the mandatory borrow areas analyzed by FHWA did not conform to FP-96 section 704.06. P1. App. pp. 235-239.

**Defendant's Response**

Agrees that some of the samples were not classified as A-1, A-2-4, or A-3. Disagrees that these samples did not conform to the contract. Both the SCR and the permitting section of the contract informed the contractor that it should expect materials classified other than A-1, A-2-4, and A-3. The contract stated in the permitting section that the contractor would encounter primarily sandy loam which may be underlain with layers of clayey soils. Both the reference to sandy loam and the reference to clayey soils informed the contractor that it would be working with materials other than A-1, A-2-4, and A-3. In addition, the SCR also informed the contractor that it would be constructing the road from any materials from A-1 to A-7. Section 204 is the "Excavation and Embankment" section of the contract. The SCR "Compaction" provision, section 204.11 (c) provides:

> Classify the material according to AASHTO M 145. For material classified

> A-1 or A-2-4, determine the maximum density according to AASHTO T 180 Method D. For other material classifications, determine the optimum moisture content and maximum density according to AASHTO T 99 Method C.
>
> Adjust the moisture content of material classified A-1 through A-5 to a moisture content suitable for compaction. Adjust the moisture content of material classified A-6 and A-7 to within 2 percent of the optimum moisture content.

Def. App. 37.

17. Desert Sage Contractors' ("Desert Sage"), the follow-on contractor on the Camas project, bid for unclassified borrow increased from $5.00 per cubic meter at the time of its initial bid to $20.00 per cubic meter upon reprocurement of the Camas contract. P1. App. p. 78. Desert Sage's bid increase took into account the problems with the mandatory borrow material. Id.

**Defendant's Response**

Agrees that Desert Sage's price increased from $5.00 to $18.00 per cubic meter. Pl. App. 80, transcr. p. 39 at 19-23. Disagrees that "Desert Sage's bid increase took into account the problems with the mandatory borrow material." To the extent that Universal alleges that the testimony of Rance Bare, president of Desert Sage, supports Universal's assertion that the borrow sources were highly variable, Mr. Bare testified to the contrary. In the testimony to which Universal refers, Mr. Bare testified that the materials in the borrow areas "was sand." Pl. App. 78, transcr. p. 43 at 11. Contrary to Universal's assertions of variability in the borrow sources, Mr. Bare's concern when he re-priced the

contract work was that the material was so sandy that it would be a problem:

> Q What was the material like that you observed out at the site?
>
> A Well, it was a very -- it was a sandy -- very much of a sand material and, again, it was not even blow sand . . .

Pl. App. 254 at transcr. p. 24.

18. Sandy loam is a distinct soil type defined to contain between 45 and 85 percent sand and 55 and 15 percent silt and clay; with no more than 50 percent silt and no greater than 20 percent clay. App. 24.

**Defendant's Response**

Agrees that sandy loam is defined as such in the USDA system.

19. UCI was never compensated for any of the work it performed or material it supplied on the project. P1. App. pp. 68-69, 72-75, 85.

**Defendant's Response**

Agrees, and further states that Universal was never entitled to be paid, nor is it entitled to be paid now.

20. Desert Sage was permitted to deposit materials beyond the clear limits and into the wetlands. P1. App. pp. 79-80.

**Defendant's Response**

Agrees that Mr. Bare did testify that "[c]leared material was placed on or beyond the clearing limits." Pl. App. 79-80, transcr. pp. 36-37. Agrees that both Desert Sage and Universal were permitted to move certain cleared material beyond the clearing limits.

The FP-96 required the contractors to conserve topsoil. "Conserved topsoil" is defined in the FP-96 as:

> Excavated material conserved from the roadway excavation and embankment foundation areas that is suitable for growth of grass, covered crops or native vegetation. A material reasonably free from hard soil, rock, clay, toxic substances, litter, or other deleterious material.

Suppl. App. 16. The FP-96 required the contractors to:

> Conserve topsoil from roadway excavation and embankment foundation areas. Stockpile conserved topsoil in low windrows immediately beyond the rounding limits of cut and embankment slopes or in other approved locations. Separate topsoil from other excavated material.

Id. (Emphasis added). Sheet C.2. of the contract drawings shows the rounding limits to extend to the clearing limits, thus allowing the contractors to place conserved topsoil past the clearing limits. Pl. App. 38 (See detail on sheet.). Disagrees that Desert Sage was permitted to place materials in wetlands.

21. Desert Sage encountered the same variable and unworkable material in the mandatory borrow areas. P1. App. p. 78. Had it not been permitted to build the fill areas wider than specified and then cut back the excess, Desert Sage's performance would have been significantly delayed. P1. App. p. 80.

**Defendant's Response**

Disagrees that Universal encountered unworkable materials or that Desert Sage "encountered the same variable and unworkable material" that Universal alleges that it encountered. There is no support for this assertion in the cited testimony by Mr. Bare. As

stated in our response to no. 17 above, Mr. Bare was concerned that the borrow sources were too sandy, and not highly variable. Disagrees with the second sentence because the means and methods of performance were the contractors' responsibility. Agrees that Mr. Bare testified that if he could not have used this method, his performance would have been delayed. However, Mr. Bare further testified that Desert Sage would have used lighter equipment that would have been cheaper to operate and he could not state what the overall effect on Desert Sage's work would have been. Pl. App. 80, transcr. p. 38 at 13-15.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Donald E. Kinner
DONALD E. KINNER
Assistant Director

s/Michael N. O'Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor,
1100 L St., N.W.
Washington, D.C. 20530
Tele: (202) 307-0282

December 5, 2005

CERTIFICATE OF SERVICE

______I hereby certify that on this 5th day of December 2005, a copy of the foregoing DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

John Spencer Stewart
Stewart Sokol & Gray, LLC
2300 SW First Avenue
Suite 200
Portland, OR 97201-5047

s/ Michael N. O'Connell