No. 03-1502C Consolidated With No. 03-2370C
Senior Judge Margolis

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

UNIVERSAL CONSTRUCTION, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

John Spencer Stewart
STEWART SOKOL & GRAY, LLC
2300 S.W. First Avenue, Suite 200
Portland, Oregon 97201-5047
Telephone: (503) 221-0699
Fax: (503) 223-5706

December 22, 2005

Attorneys for Plaintiff

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................ ii

I. INTRODUCTION ........................................................................................................ 1

II. DISCUSSION ............................................................................................................. 2

A. FHWA Must Prove Its Termination of UCI Was Justified Because UCI's Delays Were the Fault of Non-Conforming Government Furnished Materials ................ 3

B. FHWA's Recent Interpretation of the Camas Project Contract is in Conflict With the Plain Language of the Contract, FHWA's Cited Authority, and FHWA's Own Proposed Findings of Fact ........................................................................ 5

1. The Performance and Materials Specifications, Along With the Camas Project Plans Form the "Organic Whole" of the Camas Contract ............ 5

2. The Camas Project Plans Expressly Required the Sliver Fills to be Built With "Unclassified Borrow" Which is Defined in FP-96, Subsection 704.06 as Material Conforming to AASHTO A-1, A-3, or A-2-4 ............ 6

3. The Project Summary Contained in the Wet-Land Mitigation Plan Appended to the Clean Water Act Discharge Permit Is Independent and Irrelevant From the Camas Contract Materials Specifications and Project Plan Requirements ........................................................................ 8

4. SCR Subsection 204.11 Does Not Conflict with Subsection 704.06 Because Subsection 204.11 is a Performance Specification, While Subsection 704.06 is a Material Specification. The Two Subsections Are Complimentary ........................................................................ 10

5. FHWA, Not UCI, Has Adopted a Different Contract Interpretation for Litigation Than it Held During Performance ........................................ 12

C. MTI's Soil Analysis Conclusively Proves that the Mandatory Borrow Areas Did Not Conform to Subsection 704.06, But Cannot Show Sandy Loam Was Present 14

D. UCI Is Not Required to be Geotechnical Experts to Support Its Type II Claim, However, the Mandatory Borrow Area Conditions Were Unique Because They Differed From Conditions Encountered In Nearby Projects ............................... 16

E. FHWA's Rejections of UCI's Submittals Violated FHWA's Obligation to Refrain From Hindering UCI's Performance ........ 17

F. FHWA's Attempts to Distinguish Desert Sage's Performance Fail Because FHWA Ignores the Facts in the Case ........ 18

III. CONCLUSION ........ 19

## TABLE OF AUTHORITIES

**CASES:** **PAGE**

Abraham v. Rockwell International Corp. 326 F.3d 1242 (Fed. Cir. 2003) ........ 5, 9, 12

Copeland v. U.S., 350 F.3d 1230 (Fed. Cir. 2003) ........ 4

DCX Inc. v. Perry, 79 F.3d 132 (Fed. Cir. 1996) ........ 4, 5

DeVito v. U.S., 413 F.2d 1147 (Ct. Cl. 1969) ........ 4

E.L. Hamm & Assocs. v. England, 379 F.3d 1293 (Fed. Cir. 2004) ........ 8

J.D. Hedin v. U.S.,408 F.2d 424 (Ct. Cl 1969) ........ 3

Lewis-Nicholson, Inc. v. U.S., 550 F.2d 26 (Ct. Cl. 1977) ........ 17

Lisbon v. U.S., 828 F.2d 759 (Fed. Cir. 1987) ........ 3

Lockheed Martin IR Imaging Systems, Inc. v. West, 108 F.3d 319 (Fed. Cir. 1997) ........ 5, 9, 12

Malone v. U.S., 849 F.2d 1441 (Fed. Cir. 1988) ........ 17

P.J. Maffei Building Wrecking Corp. v. U.S., 732 F.2d 913 (Fed. Cir. 1984) ........ 8

Peter Kiewit Sons' Co. v. U.S., 151 F. Supp. 726 (Ct. Cl. 1957) ........ 17

Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264 (Fed. Cir. 2001) ........ 16

Short Bros., PLC v. U.S., 65 Fed. Cl. 695 (Ct. Cl. 2005) ........ 10

Thompson Ramo Woolridge Inc. v. U.S., 361 F.2d 222 (Ct. Cl. 1966) ........ 8, 10

## I. INTRODUCTION

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims plaintiff Universal Construction Inc. ("UCI") submits this reply memorandum in support of its cross-motion for partial summary judgment to convert the Federal Highway Administration's ("FHWA") termination for default into a termination for convenience and for UCI to recover its expended costs.

In its Reply and Response ("Def. Resp."), FHWA makes numerous assertions which are incorrect either as a matter of fact, or unfounded in law. For example: 1) FHWA wrongly asserts that its mere showing that the Camas National Wildlife Refuge project ("Camas project") extended beyond the contract completion date completely satisfies the Government's burden to prove that its termination for default was justified; 2) FHWA claims, without basis, that a paragraph from the wet-land discharge application, one using agricultural nomenclature and read out of context, should control over a materials specification that was integral to the contract; 3) FHWA maintains that the contract's instructions on how to compact an embankment dictated the fill materials, despite clear contrary requirements in the project plans and "materials" section of the contract; 4) FHWA asserts that the undisputedly variable soils of the mandatory borrow areas conformed to the contract (which they did not); 5) FHWA asserts that UCI's Type II claim is unsupported because UCI relied upon the existing refuge road to indicate the local materials were consistent, yet FHWA relies upon the very same evidence to support its position that the mandatory borrow pits were adequate; and 6) FHWA ignores its obligation to refrain from hindering UCI's performance with regard to UCI's submittals, and instead characterizes its behavior as reasonable. FHWA's contentions are incorrect—both factually and legally—and should be rejected.

## II. DISCUSSION

Fundamental material facts in this matter remain undisputed. It is undisputed that UCI has not been paid a single cent for its work on the Camas project despite the fact that FHWA acknowledged UCI completed at least 20 percent of the project. Pl. App. p. 72 (W. Parsons Dep. p. 34 lines 11–20). UCI has not been paid a cent despite the fact that FHWA had accepted UCI's production schedule, the item supposedly gating the release of payment. Def. App. p. 127. UCI has not been paid a cent despite FHWA's own internal urging that some partial payment be made. Pl. App. pp. 74–75.

It is undisputed that the soil in the mandatory borrow areas was highly variable, being classified as A-2-4, A-3, A-4, and A-6. Pl. App. pp. 225–34. Subsection 704.06 of the Camas project contract required unclassified borrow material to "conform to A-1, A-3, and A-2-4." Pl. App. p. 90. The government furnished materials (which included A-4 and A-6 material classifications) did not conform to A-1, A-3, and A-2-4. Pl. App. pp. 225–34.

It is undisputed that Desert Sage Contractors ("Desert Sage") overbuilt the sliver fill embankments, and doing so enabled Desert Sage to utilize the non-conforming mandatory borrow material. Pl. App. p. 80 (R. Bare Dep. p. 37 line 15 – p. 38 line 11). It is undisputed that overbuilding the embankments required Desert Sage to handle the fill material multiple times, driving up the cost of building the sliver fills. Pl. App. p. 78 (R. Bare Dep. p. 43 lines 14–19). It is further undisputed that Desert Sage, in its reprocurement bid, increased its bid for "unclassified borrow" four-fold from its initial estimate. Pl. App. p. 78 (R. Bare Dep. p. 43 lines 1–7). Nothing in FHWA's affidavits and opposition memorandum contradicts these fundamental points.

**A. FHWA Must Prove Its Termination of UCI Was Justified Because UCI's Delays Were the Fault of Non-Conforming Government Furnished Materials**

FHWA contends that a contractor must prove that any delay is excusable notwithstanding that the delay was caused by the government. This most harsh result is not supported by FHWA's cited authority, nor is it supported by the authority of the Federal Circuit. The Federal Circuit, in Lisbon v. U.S., 828 F.2d 759 (Fed. Cir. 1987), rejected the very position proffered by FHWA in this action when it rejected the government's assertion that "it should have had to prove only that there was a delay in performance, and the contractor should then have to establish that the delay was justified." Id. at 763, 765. The long standing, oft quoted starting place for every termination inquiry is the basic rule from J.D. Hedin v. U.S.,408 F.2d 424 (Ct. Cl 1969), that a "default-termination is a drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence." Id. at 431. In a termination case, it is the government, not the contractor, who took an affirmative step—the termination of a contract. Lisbon, 828 F.2d at 764. As the actor, the government "is only being made to bear the burden of proof on its own 'claim' of default." Id. To require otherwise "would mean that a contractor would have to show that the contract was wrongfully terminated rather than the government having to prove that the contract was rightfully terminated." Id. FHWA's assertion that UCI must prove that its contract was wrongly terminated is the result the Lisbon Court did not accept. Id. at 765.

The Court in Lisbon did not consider the question of when the contractor is terminated for delays beyond the contract completion date. However, contrary to FHWA's implied assertion that the government need never prove delay, the Federal Circuit in J.D. Hedin expressly stated that the government is in "breach of contract where a default-termination for alleged untimely

performance fails to take into account time-extensions due the contractor for unforeseeable delays, *if such an extension would have taken the contractor out of default*." 408 F.2d at 432 (emphasis added). Therefore, the government must, in showing that its termination was justified, prove that an extension for unforeseeable delay to the contractor would not have taken the contractor out of default. Only if the government has met this burden, then, and only then does the burden shift to the contractor to show why its delay must be excused.

FHWA cites DeVito v. U.S., 413 F.2d 1147, 1153–54 (Ct. Cl. 1969) for the proposition that the government "has the right to immediately terminate the contract for default pursuant to the provisions of the default clause when the delivery date passes and delivery has not been made." Def. Resp. p. 2. DeVito does not stand for this anywhere. Rather, the DeVito court held that the right to terminate for default is waived when not invoked upon default. DeVito, 413 F.2d at 1153. The Court stated that "default terminations—as a species of forfeiture—are strictly construed." Id. at 1153.

The other cases cited by FHWA are distinguishable on their facts, and the holdings are not applicable to the present action. In DCX Inc. v. Perry, 79 F.3d 132 (Fed. Cir. 1996), a supplier of medical tent lights was held negligent when it did not secure adequate back-up capacity for its testing subcontractor. Id. at 134. There was no failed government obligation that caused DCX to be delayed, such as non-conforming government furnished materials. Thus, the DCX court did not need to discuss the government's burden to show the default termination was justified. In, Copeland v. U.S., 350 F.3d 1230 (Fed. Cir. 2003), also cited by FHWA, a contractor hired to build nature trails alleged that its delay was caused when the Forest Service withheld payment. Id. at 1234. Like DCX, there was no government obligation at issue that was

instrumental to Copeland's performance, thus Copeland had to prove that its delay was excusable. Id.

In the present action, as is discussed in UCI's moving papers and below, the government-furnished materials were the cause of the delay in that those materials failed to conform to the project plans and specifications. UCI did not have the option under the Camas contract to use another borrow source. The delays UCI experienced arose as a result of FHWA. Thus, as a consequence of its non-conforming materials, FHWA bears the burden to prove that its termination of UCI was justified.

**B. FHWA's Recent Interpretation of the Camas Project Contract is in Conflict With the Plain Language of the Contract, FHWA's Cited Authority, and FHWA's Own Proposed Findings of Fact**

FHWA correctly cites Abraham v. Rockwell International Corp. 326 F.3d 1242, 1251 (Fed. Cir. 2003) for the proposition that the court is "to interpret provisions of a contract so as to make them consistent." FHWA is also correct as to its citation of Lockheed Martin IR Imaging Systems, Inc. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997) for the proposition that "the various contract provisions must be read as part of an *organic whole*, according to the reasonable meaning to *all of the contract terms*" such that no contract provision is made "inconsistent, superfluous, or redundant." Id. (emphasis added). FHWA, however, is flat wrong in its application of the quoted authority.

*1. The Performance and Materials Specifications, Along With the Camas Project Plans Form the "Organic Whole" of the Camas Contract*

To understand the error of FHWA's interpretation, it is important to understand the "organic whole" of the Camas contract. The contract contained: 1) plans that set forth what to build; 2) specifications that explained how to build; and 3) specifications that set forth the

"materials" to be used. The three parts of the contract worked in harmony to guide the contractor in its performance. The plans have been oft cited by both parties and are not in dispute. The process and materials specifications came from the Standard Specifications for the Construction of Roads and Bridges on Federal Highway Projects ("FP-96") as selectively amended by the Special Contract Requirements ("SCR"). FP-96 was expressly incorporated into the Camas project contract. Pl. App. pp. 290–92. Therefore, the specifications in FP-96 are binding on the parties. Pl. Supplemental App. ("PSA") p. 1 (preface to FP-96); PSA p. 2 (page A-1 of the Camas project contract). While specific provisions of FP-96 may be amended or supplemented by SCRs,[1] the remainder of FP-96 remains in effect when not superseded. FP-96 remains as the basis of the Camas contract.

FP-96 is arranged into ten divisions, grouped into two operative parts. PSA p. 3 (FP-96 section 101.02 describing the format of the FP-96 specifications). Divisions 200–600 provide the construction requirements, i.e., the manner in which construction is to be "performed," while Division 700 contains the material requirements for the other Divisions. Id.; See e.g., Pl. App. pp 292–93 (the SCRs mirror the FP-96 structure). Implicit in the "organic whole" of the Camas contract is this inter-relationship of the plans with the performance and material specifications.

*2. The Camas Project Plans Expressly Required the Sliver Fills to be Built With "Unclassified Borrow" Which is Defined in FP-96, Subsection 704.06 as Material Conforming to AASHTO A-1, A-3, or A-2-4*

FHWA erroneously argues there is no place that UCI can point to upon which it based its expectation that the borrow areas would conform to AASHTO[2] A-1, A-3, or A-2-4 material. Def.

---

[1]For instance, in the Camas contract numerous sections of FP-96 were amended or supplemented by Special Contract Requirements ("SCR"). Pl. App. pp. 292–93.

[2]American Association of State Highway and Transportation Officials

Resp. p. 4. UCI's reasonable expectation was formed by the express language of the contract and the interplay between page C.2 of the project plans; section 704, the Soil section of the Materials division; and section 204, the Excavation and Embankment section of the Earthwork division. The plans expressly require the sliver fills to be built from "linear grading excavation and *unclassified borrow*." Pl. App. p. 38 (only the suitability of the unclassified borrow is at issue) (emphasis added). "Unclassified borrow" is a defined term. Subsection 704.06 of the FP-96 provides the definition:

> **704.06 Unclassified Borrow.** Furnish granular material free of excess moisture, muck, frozen lumps, roots, sod, or other deleterious material conforming to the following:
>
> **(a)** Maximum dimension 600 mm
> **(b)** *Soil classification, AASHTO M 145* *A-1, A-3, or A-2-4*

Pl. App. p. 90 (italics added). Subsection 704.06 was not superseded by any SCR provision.[3] The handling of the unclassified borrow is set forth in FP-96 section 204, amended in part by the SCRs, which specifies the excavation and embankment procedures to be used. See Pl. App. 278–84 (FP-96); Def. App. 36–37 (SCR amendments to FP-96, section 204). Therefore, under the Camas contract, the plans, via the definition of "unclassified borrow" in section 704.06, required that the material embanked conform to AASHTO A-1, A-3, or A-2-4.

Since the material to be embanked was to come from the government supplied, mandatory borrow sources, and **only** from those mandatory borrow sources, the borrow material in these sources would have to conform to AASHTO A-1, A-3, or A-2-4. Under the Spearin doctrine, government furnished specifications and materials are impliedly warranted to conform

[3]Ironically, FHWA in its response tries to avoid the effect of subsection 704.06, yet in so doing it contradicts its own assertion in its proposed findings of fact that the contractor was bound by the section. Def. Proposed Findings of Uncontroverted Facts ¶ 8; Def. App. p. 21.

to the purpose for which they are supplied. E.L. Hamm & Assocs. v. England, 379 F.3d 1293, 1338–39 (Fed. Cir. 2004); see also Thompson Ramo Woolridge Inc. v. U.S., 361 F.2d 222, 233 (Ct. Cl. 1966) (holding "the Government-furnished property itself must be suitable . . . taking into consideration the background of price and delivery schedules"). Thus, under P.J. Maffei Building Wrecking Corp. v. U.S., 732 F.2d 913, 917 (Fed. Cir. 1984) UCI had a reasonable expectation of what the contract "indicated" would be in the mandatory borrow areas.

While it is true that a contract "indication" need not be explicit or specific, the contract documents must still provide sufficient grounds to justify a bidder's expectation of latent conditions materially different from those actually encountered." Id. Thus, under P.J. Maffei, since the borrow areas were mandatory, providing the only material to be incorporated into the sliver fills, it was reasonable for UCI to expect the borrow materials to conform to the intended use, that is the borrow areas must conform to AASHTO A-1, A-3, or A-2-4.

*3. The Project Summary Contained in the Wet-Land Mitigation Plan Appended to the Clean Water Act Discharge Permit Is Independent and Irrelevant From the Camas Contract Materials Specifications and Project Plan Requirements*

FHWA's assertion that UCI should have expected "sandy loam underlain by layers of clay" based solely on the language in a wet-land mitigation plan, which is in conflict with the rest of the contract, is wholly untenable. It is undisputed that the only place the "sandy loam" language FHWA relies upon comes from a five paragraph project summary included in the wet-land mitigation plan.[4] Pl. App. p. 21. It is undisputed that this wet-land mitigation plan was appended to the discharge permit included in the Camas contract. See Def. Response to Pl.

[4]Three of the five paragraphs describe vegetation, planting, and hydrology, not soils or construction.

Proposed Findings of Fact ("DRPFF") ¶ 3. Therefore, at most, the summary of the project provided in the wet-land mitigation plan is general in nature.

The wet-land mitigation plan language is independent from and irrelevant to the operative materials provisions in the Camas contract. The plain language of the wet-land mitigation plan, when read as a whole, shows it relates exclusively to an application for the discharge permit FHWA was required to obtain pursuant to section 404 of the Clean Water Act. See generally, Pl. App. pp. 7–32. Moreover, FP-96, section 107.01, requires: "[a]ll permits and agreements obtained by the Government for performing the work are included in the contract." PSA p. 4. Therefore, the permit was included in the contract, not because of any relevance to the rest of the contract, but rather, due to the requirement of subsection 107.01. This point is further highlighted in that the permit and appended wet-land mitigation plan were included in a section of the contract titled "Permits." Pl. App. pp. 7–32.

The use of United States Department of Agriculture ("USDA") soil classifications in the mitigation plan underscores the plan's independence from the remainder of the contract. Unlike the mitigation plan, all the provisions of FP-96 and all the amendments and supplements in the SCRs use AASHTO standards. As FHWA thoroughly explained in its response, USDA and AASHTO standards cannot be translate; therefore, a USDA description is useless in a contract otherwise governed by AASHTO specifications for reference to construction activities. Def. Resp. p. 6; see also Def. App. p. 33. Conversely, the USDA classifications are perfectly appropriate for wet-land mitigation efforts. Under Abraham, 326 F.3d at 1251, and Lockheed Martin, 108 F.3d at 322, the proper interpretation is one where the "Permit" section (which relates to the mitigation activities) is read to be consistent with the contract as a whole. To

conclude otherwise ignores the rest of the contract—particularly the materials and performance sections.

During its discussion of the contents of the mandatory borrow areas, FHWA attempts to confuse the issue with explanations of whether a road could be built of sandy loam. That question is irrelevant. Def. Resp. p. 8. In Short Bros., PLC v. U.S., 65 Fed. Cl. 695 (Ct. Cl. 2005) the Court noted that while a project could have been built with the government furnished materials, that did not answer the question of whether the materials were conforming. Id. at 798 (citing Thompson Ramo Woolridge Inc., 361 F.2d at 234–35). What is at issue here is whether the borrow areas conformed to the requirements set forth in the contract and the reasonable expectation that arose from that contract. UCI reasonably expected the mandatory borrow areas to conform to the contract and those materials did not conform. That the road was eventually built from the material by some other method that took unreasonable expenditures relative to UCI's contract is irrelevant. See generally Short Bros. Importantly to this point, the road was built of the non-conforming government furnished material at a considerably higher cost by the follow-on contractor. Pl. Proposed Findings of Fact 17.

*4. SCR Subsection 204.11 Does Not Conflict with Subsection 704.06 Because Subsection 204.11 is a Performance Specification, While Subsection 704.06 is a Material Specification. The Two Subsections Are Complimentary*

Equally unavailing is FHWA's alternative assertion that subsection 704.06 is irrelevant because of a supposed conflict with SCR subsection 204.11. There is no conflict. FHWA contends that under subsection 204.11 any soil classified as AASHTO A-1 through A-7 could be embanked without violating the contract. This contention conflicts with the requirements on page C.2 of the project plans, conflicts with the definition of "unclassified borrow" in subsection

704.06, conflicts with subsection 204.03, and strains a proper reading of the contract because it causes subsection 704.06 and the requirements on page C.2 of the project plans to be nullity.

First, FHWA's interpretation of subsection 204.11 conflicts directly with express requirements set forth in the project plans that require "unclassified borrow" be used to build the embankment. See Pl. App. p. 38. Nowhere in the language of subsection 204.11 is there a definition of "unclassified borrow." However, as noted above "unclassified borrow" is expressly defined in subsection 704.06. Furthermore, FHWA's assertion cannot be the proper interpretation because there is no language in subsection 204.11 that dictates what materials must be embanked to properly construct the various features on the project. If FHWA's interpretation were true (which it is not), then based solely on subsection 204.11, the contractor could have used any material, from the coarsest gravel to the finest clay anywhere he saw fit. This conclusion defies logic, ignores provisions of the contract, and cannot be the correct answer.

Second, FHWA's interpretation conflicts with the overall construction of the contract. As explained above, the "200" sections, of which subsection 204.11 is a part, are "performance" specifications. Section 204 is the specification that tells a contractor how to perform excavation and embankment, wherever those functions are to be performed on the project, be it the sliver fills, the parking lot, or road turnouts. The section is intended to cover all compaction activities, and is necessarily broad enough to cover all types of materials that may be specified in the plans and defined in the materials division. As such, the subsection provides guidance for the compaction of gravel in 204.11(a); of sandy gravel materials in 204.11(b); and of various fine grained materials in 204.11(c). Subsection 204.11 does not specify what materials are to be placed in the construction of any given feature. Page C.2 of the project plans and subsection

704.06 do that. Moreover, exactly like every other "performance" section in the Camas contract, section 204 expressly references applicable "material" sections. FP-96, at subsection 204.03, expressly references the materials defined in division 700 of FP-96:

**Material**

**204.03** *Conform* to the following Subsections:

| | |
|---|---|
| Backfill material | 704.03 |
| Select borrow | 704.07 |
| Select topping | 704.08 |
| Topping | 704.05 |
| *Unclassified borrow* | *704.06* |
| Water | 725.01 |

Pl. App. p. 279 (emphasis added). Subsection 204.03 was not superseded by any SCR provision and therefore remained in full force and effect under the Camas contract.

FHWA's contention would require the Court to ignore the plain language of the sections involved, to ignore the contract's structure in light of the "organic whole," and would render subsection 704.06, subsection 204.03, and the specification on the project plans a nullity. FHWA's interpretation is impermissible under Abraham, 326 F.3d at 1251, and Lockheed Martin, 108 F.3d at 322. Conversely, to read subsection 204.11 for what it is, a performance specification, renders all of the contract provisions consistent. UCI's construction of the contract is correct, and FHWA's impermissible interpretation must fail.

*5. FHWA, Not UCI, Has Adopted a Different Contract Interpretation for Litigation Than it Held During Performance*

FHWA again tries to misdirect the court, this time by contending that UCI's stated position in reliance on the contract language in subsection 704.06 is a new position not held during performance. FHWA's assertion ignores the very facts it presents and must be rejected. Tellingly, FHWA only supports its contention by citing a single letter from UCI's attorney

written after UCI was no longer working on the Camas project. What is important, but not noted by FHWA, is that UCI's counsel repeatedly discussed the applicable FP-96 specifications, in fact quoting subsection 704.06 on page 3 of the letter, but only mentions "sandy loam" once. Def. Suppl. App. pp. 4–13. Moreover, this letter that FHWA cites as "proof" of UCI's "position during performance" was written in response to the Draft Contracting Officer's Decision asserting the "sandy loam" representation. Def. Suppl. App. p. 7.

FHWA does not cite a single piece of evidence during UCI's performance that shows UCI's reliance on the "sandy loam" language. What FHWA does not point the court to is the ample evidence supporting UCI's consistent position. All of the following are taken directly from FHWA's appendix to its original motion: 1) UCI, in a letter dated October 23, 2001, with the subject "Changes and extra costs associated with pay item 20403 Unclassified Borrow," UCI first highlights its problems with the mandatory borrow areas. Def. App. p. 163. There is no mention of sandy loam but there is express mention of "unclassified borrow," language consistent with the project plans and subsection 704.06. Id. 2) UCI, in its November 1, 2001 letter, expressly contends it has encountered a differing site condition. Def. App. p. 170. Again, UCI makes no mention of "sandy loam" anywhere. Id. 3) UCI, in its November 30, 2001 letter to FHWA, reasserts that it encountered a differing site condition. Def. App. p. 181. Again, no mention of "sandy loam," however, this letter did note the highly variable soil conditions, a position consistently argued by UCI. Id.

By FHWA's own evidence the first place "sandy loam" is mentioned is in FHWA's own letter of June 20, 2002 to UCI. Def. App. p. 189. In that letter, FHWA first tries to use its faulty construction of the contract to reject UCI's differing site condition claim. Also, in that letter, FHWA states, "[a] report provided by UCI developed from post award site investigation shows

five different specific soil types classified using the *AASHTO M145 Classification*" which further proves UCI's reliance on the AASHTO classifications in the contract. Id. (emphasis added).

The undisputed fact that all of the geotechnical testing performed during UCI's tenure on the Camas project was done using AASHTO standards is also strong evidence of the parties' understanding of the contract at the time of performance. See generally Pl. App. pp. 225–34. That is, the AASHTO language of the contract, i.e., the section 704.06 definition of unclassified borrow, controlled. Again, that is consistent with UCI's current position. Therefore, FHWA's contention that UCI should be estopped from asserting the importance of the AASHTO language in the Camas contract is without merit and must be rejected.

**C. MTI's Soil Analysis Conclusively Proves that the Mandatory Borrow Areas Did Not Conform to Subsection 704.06, But Cannot Show Sandy Loam Was Present**

FHWA asserts that Materials Testing & Inspection's ("MTI") tests show that eight of the fifteen samples are consistent with sandy loam. Def. Resp. p. 8. FHWA continues to completely mischaracterize MTI's report and soil analysis. FHWA's assertion is erroneous in that the report does not conclude what FHWA asserts it does. Further, relying upon FHWA's own expert explanation of the difference between AASHTO and USDA standards, MTI's analysis cannot conclude the position that FHWA asserts.

MTI did not find any of the samples were conclusively "sandy loam." MTI's assessment of its soil tests lists the fifteen tests it performed during UCI's performance. Pl. App. p. 288. The samples listed on the report were taken while UCI was still working on the Camas project and were analyzed using AASHTO standards, classifying the soils among AASHTO categories. See generally Pl. App. pp. 225–34. However, at the request of UCI's counsel, MTI attempted to

translate those AASHTO findings to USDA classes, in response to FHWA's litigation assertion. Pl. App. p. 287. Of the fifteen results cited by FHWA, not a single one is conclusively "sandy loam." Of those fifteen results, six could possibly be "sandy loam." However, according to the cited report, each of those six could also be "loam", "sandy clay loam", "loamy sand", or "sandy clay". Two of the fifteen test results that FHWA relies upon to reach its eight, Sample ID "BP-7" and "BP-10", state "**Unknown no gradation**, proctor only." Pl. App. p. 288 (emphasis added). Neither the parties nor Court have any idea whether eight of fifteen samples contain "sandy loam."

While MTI's analysis cannot tell the Court whether a sample is "sandy loam" the analysis can tell that the soil was not sandy loam. Sample ID's "BP-4", "BP-6", "BP-2", "BP-5", "264-S", "284-S", and "286-S" all are not sandy loam. Pl. App. p. 288. Therefore, at best, FHWA can assert that there is a question of material fact whether (at most) slightly more than half of the mandatory borrow area material was "sandy loam."

The MTI analysis is incapable of determining whether sandy loam was present in the mandatory borrow areas. The tests and basic analysis were performed according to AASHTO standards. AASHTO tests do not correlate to USDA classifications, as FHWA explains on page six of its Response brief. As FHWA points out, MTI did not separate the finer grained soils under AASHTO standards, but USDA classification requires the percentage of clay versus silt to be known to classify the soil. Def. Resp. pp. 5–6. Therefore, it is physically impossible to ascertain USDA soil classifications using AASHTO sampling data.

Contrary to the USDA classifications, the AASHTO results are clear. It can be conclusively seen that 30 percent of the samples classified under the AASHTO scheme did not conform to A-1, A-3, or A-2-4. Pl. App. pp. 225–34. Sample "BP-3" was classified A-4, not

conforming; "BP-8" was classified A-6, not conforming; and "BP-6" was classified A-6, not conforming. Id.

**D. UCI Is Not Required to be Geotechnical Experts to Support Its Type II Claim, However, the Mandatory Borrow Area Conditions Were Unique Because They Differed From Conditions Encountered In Nearby Projects**

FHWA makes contradictory assertions regarding UCI's Type II claim. FHWA has asserted that even though it did not perform any geotechnical analysis on the mandatory borrow areas, the contractor must be held to a geotechnical expert's level of knowledge. Def. Resp. p. 17. The applicable standard does not require UCI to possess such knowledge. Under Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264 (Fed. Cir. 2001), a site condition is unknown if it is "one that could not have been *reasonably anticipated from a site visit and review of the contract documents*." Id. at 1276 (nowhere requiring the contractor employ expert knowledge) (emphasis added). This is precisely what UCI did. It made a site visit where it appraised the adequacy of the mandatory borrow sources—represented by the government to be material conforming to AASHTO A-1, A-3, or A-2-4—in the exact same manner government appraised the adequacy of the mandatory borrow areas. Pl. App. p. 94 (R. Standerfer Dep. pp. 27–28). UCI spoke with the refuge personnel. Id. Also, UCI reviewed the contract documents, which called for the complete exhaustion of the fill material contained in the borrow areas. FHWA cites no authority requiring some other level of knowledge on the part of the contractor.

In its second contradictory assertion, FHWA asserts that UCI may not base its belief as to the suitability of the borrow areas on the fact that the existing road was built from local fill. Def. Resp. p. 18. However despite this assertion, FHWA expressly notes that it relied on that same fact to justify its belief that the mandatory borrow areas would be suitable. Def. Response to Pl. Proposed Findings of Fact ¶¶ 5, 8. The government cannot have it both ways. What is reasonable

is what UCI contends. UCI made a reasonable site investigation by visually assessing the borrow areas and project site. It reasonably concluded that since a very nearby project had been successfully built of the local materials, those materials should be suitable for the Camas widening project. The mandatory borrow areas were unique in that they varied dramatically from what UCI reasonably expected to find.

**E. FHWA's Rejections of UCI's Submittals Violated FHWA's Obligation to Refrain From Hindering UCI's Performance**

It is long settled that the government must avoid actions that unreasonably cause delay or hindrance to contract performance. Malone v. U.S., 849 F.2d 1441, 1445 (Fed. Cir. 1988); Lewis-Nicholson, Inc. v. U.S., 550 F.2d 26, 32 (Ct. Cl. 1977); Peter Kiewit Sons' Co. v. U.S., 151 F. Supp. 726, 731 (Ct. Cl. 1957) (explaining that in every government contract there is an implied obligation on part of the government not to willfully or negligently interfere with a contractor's performance). Indeed, not only must the government refrain from hindering the contractor's performance, it must do whatever is necessary to enable the contractor to perform. Lewis-Nicholson, 550 F.2d at 32.

Yet despite this clear obligation, FHWA contends that its rejections of UCI's submittals were fully justified because it could find non-material variations with the submittals. For instance, in its proffered example of UCI's Accident Prevention Plan, FHWA withheld approval for 25 supposed "discrete defects." Def. Resp. p. 23. However, a closer look at the alleged defects shows the dubious nature of the objections in light of the time crunch of this project. The following are examples of the cited reasons for rejection: 1) the project and contract number were missing even though FHWA knew who submitted the plan; 2) the person responsible to check on first aid kits was not listed even though this was a three month project; 3) the

equipment for transporting injured persons was given as calling 911, a reasonable response given that local ambulance was likely the most expeditious possibility; and 4) "n/a" was insufficient to indicate the project did not require flaggers in answer to "Name person designated to train flaggers on the project." See Def. App. pp. 128A–139. Furthermore, several exceptions were noted where UCI provided reference to its attached Health and Safety Program manual. Id. The aforementioned examples illustrate the tenor of FHWA's treatment of UCI with regard to UCI's submittals and is inconsistent with the government's obligation, especially given the very short duration of the Camas project.

**F. FHWA's Attempts to Distinguish Desert Sage's Performance Fail Because FHWA Ignores the Facts in the Case**

FHWA ignores Desert Sage's own recognition of the difficulties the mandatory borrow material presented. When asked why Desert Sage's price for unclassified borrow increased substantially (four-fold), Rance Bare, the President of Desert Sage testified:

> There were probably three—two or three things that influenced the price on this. Added moisture because of the type of materials, the *workability of the material itself*, which we now knew was sand and not a silty loam, and the fact that *we had to overbuild the fill and then cut it back out*, so *a lot of the product had to be handled twice, maybe even three times*

Pl. App. p. 78 (R. Bare Dep. p. 43 lines 8–14) (emphasis added).

FHWA attempts to confuse matters by suggesting that Desert Sage placed only "conserved topsoil" beyond the clearing limits. To this end, FHWA cites FP-96, subsection 204.04 as its authority. However, FHWA offers no support for its contention. Rance Bare testified that material was placed beyond the clearing limits in conjunction with construction of the sliver fills, which Desert Sage did by over-building the embankments and cutting the over-built portions back. Pl. App. pp. 79–80 (R. Bare Dep. p. 35 line 14 – p. 37 line 13).

Even though FHWA suggests Desert Sage was not behind in its work on the Camas contract, the contract was extended by FHWA from October 11, 2002 to October 14, 2002. Pl. App. p. 81 (R. Bare Dep. p. 51 line 22 – p. 52 line 6). Also, beginning in early September of 2002, Desert Sage had to work 6 days a week and overtime to make up its schedule. Pl. App. p. 82 (R. Bare Dep. p. 58 line 20 – p. 59 line 8); Def. Suppl. App. p. 18. FHWA's assertion that Desert Sage was not over budget is completely unsupported. FHWA offers no evidence to support its conclusion. Desert Sage's performance of its reprocurement contract shows, as a matter of fact, that Desert Sage encountered substantial difficulties with the non-conforming fill material on the Camas project. These facts are far from FHWA's suggestion that Desert Sage encountered no problems on the Camas Project and directly support UCI's contention that the unclassified borrow material was non-conforming. That non-conformance lead to UCI's performance delays on the project.

## III. CONCLUSION

For the foregoing reasons, and those set forth in UCI's moving papers, UCI is entitled to entry of partial summary judgment in its favor and against FHWA.

Respectfully submitted,

s/ John Spencer Stewart
JOHN SPENCER STEWART
STEWART SOKOL & GRAY, LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Tel: (503) 221-0699
Fax: (503) 223-5706
Attorney for Plaintiff

December 22, 2005

W:\Work\Clients G-J\Ins Co of West\Universal Construction\SDS\Pleadings\Reply.Memo.Final.wTOC.wpd

CERTIFICATE OF SERVICE

I hereby certify that on this 22th day of December, 2005, a copy of the foregoing PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John Spencer Stewart
JOHN SPENCER STEWART
STEWART SOKOL & GRAY LLC
2300 SW First Avenue, Suite 200
Portland, Oregon 97201-5047
Tel: (503) 221-0699
Fax: (503) 223-5706

December 22, 2005