# In the United States Court of Federal Claims

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

UNIVERSAL CONSTRUCTION, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Nos. 03-1502C, 03-2370C

(Filed: April 18, 2006)

Contracts; differing site conditions; government delay; government directed change.

*John S. Stewart*, Stewart Sokol & Gray, LLC, Portland, Oregon, for plaintiff, with whom was *Thomas A. Larkin,* Stewart Sokol & Gray, LLC.

*Michael O'Connell*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, and *Donald E. Kinner*, Assistant Director, for defendant.

## O P I N I O N

MARGOLIS, *Senior Judge*.

This construction contract dispute is before the Court on cross-motions for summary judgment, pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC"). Plaintiff filed complaints alleging a differing site condition, government delay, government directed changes, and improper termination for default. Defendant filed a counterclaim seeking recovery from plaintiff of contract reprocurement costs and liquidated damages. The two complaints were consolidated into one action. Defendant moved for summary judgment, which the plaintiff opposed and moved for partial summary judgment. After careful consideration of both parties' briefs and oral arguments, defendant's motion for summary judgment is GRANTED in-part and DENIED in-part, and plaintiff's motion for partial summary judgment is DENIED.

**FACTS**

*I. The Contract*

Plaintiff, Universal Construction, Inc. ("UCI"), an Idaho corporation, entered into contract number DTFH70-01-C-00034 (the "contract") with defendant, United States, acting through the Federal Highway Administration ("FHA"), Western Federal Lands Highway Division ("FHWA"), on August 21, 2001 to widen an auto-tour route and to construct a parking lot and connecting road at the Camas National Wildlife Refuge (the "refuge") located near Hamer, Idaho. The contract's awarded price was $436,282.94. Desert Sage Contractors, Inc. submitted the second low bid of $527,465.30. FHWA's estimated contract price was $606,523.50. The contract required performance to be completed by December 11, 2001 based on an assumed starting date of September 10, 2001.

To construct the roads and parking lot, the contract required UCI to use soil material at the refuge taken from two "borrow source" locations identified as "borrow source no. 1" and "borrow source no. 2," and to then construct wetlands in the two former borrow sources. The contract required UCI to submit a preliminary construction schedule, construction schedule, accident prevention plan, and quality control ("QC") plan to FHWA. The contract required that FHWA approve the preliminary construction schedule and the QC plan before UCI could begin full contract performance. The preliminary construction schedule is a "written narrative with a detailed breakdown of all contract activities for the first 45 days after the notice to proceed is issued." Def.'s App. at 38. The QC plan includes the work of all subcontractors, personnel qualifications, inspection/control procedures for the preparatory, start-up, and production phases. The contract stated that UCI could "not begin the work until the [QC] plan is accepted," and that "[a]cceptance of the [QC] plan will be based on the inclusion of the required information." Id. at 47.

*II. Performance*

On August 30, 2001 UCI submitted its preliminary construction schedule to FHWA. On September 5, 2001 UCI and FHWA conducted a pre-construction conference. On September 7, 2001 FHWA issued a notice to proceed effective September 10, 2001. UCI was therefore required to complete its performance, subject to authorized extensions, by December 11, 2001. On September 10, 2001 UCI submitted its QC Plan to FHWA, which FHWA rejected as deficient on September 11, 2001. Also on September 11, 2001, FHWA rejected UCI's preliminary construction schedule. Although the preliminary schedule had not been approved, FHWA allowed UCI to begin surveying work. On September 13, 2001 UCI submitted by facsimile a revised QC plan, which FHWA marked as "received" on September 17, 2001, and rejected as deficient the same day. On September 18, 2001 UCI submitted a corrected preliminary construction schedule, which FHWA approved the following day. Sometime between September 18 and 27, 2001 UCI submitted a second revised QC plan, which FHWA rejected as deficient on September 27, 2001. On September 28, 2001 UCI submitted a third

revised QC plan, which FHWA approved pending minor additions, thus allowing UCI to begin contract performance.

About September 28, 2001 UCI began contract performance by excavating in borrow source no. 1 and placing the material to construct the parking lot and then placing it to widen the auto-tour route. After UCI constructed the parking lot, it began work on widening the auto-tour route. UCI tested the materials it placed for widening the auto-tour route for both compaction and moisture as required by the contract. The tests revealed problems with achieving the required compaction specifications of the materials taken from the borrow source.

By letter dated October 23, 2001 FHWA notified UCI that FHWA was concerned that UCI would not complete the contract work on time. By letter dated October 23, 2001 UCI notified FHWA that UCI had performed a geotechnical investigation of the borrow sources and found "several different soil types" and therefore it would be "impractical to continue use of these sources without a modification to acceptance procedures for density controls." Def.'s App. at 163. UCI further informed FHWA that UCI intended to request that FHWA pay for its additional costs. Because UCI was having difficulty achieving proper compaction levels of the materials taken from the borrow source, FHWA issued a contract modification on October 29, 2001 that allowed UCI to build the project without meeting the 95 percent compaction requirement. Instead, UCI could compact the soil by performing eight passes over each 200 millimeter layer with a double drum vibratory roller at least 91 centimeters wide. The parties referred to this contract modification as the "method specification."[1]

By letter dated November 1, 2001 UCI gave FHWA "formal notice" that UCI considered the borrow source to be a differing site condition because UCI had encountered "[u]nkown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." Id. at 170. UCI further stated that it would submit a time and cost analysis to FHWA. In a separate letter also dated November 1, 2001 UCI informed FHWA that it would not complete the work on time unless: road closure policies were changed; FHWA accelerated review of submittals; the logic for the construction of certain work was changed; and UCI accelerated its work. UCI projected that the original contract duration of 93 days would need to be extended to 274 days.

By letter dated November 23, 2001 FHWA informed UCI that FHWA considered UCI to be in jeopardy of failing to complete the contract on time. On November 30, 2001 UCI submitted a certified claim to FHWA and notified FHWA that the contract would not be completed by December 11, 2001. In early December UCI ceased contract performance. On June 20, 2002 FHWA denied UCI's claim and terminated the contract for default. Thereafter, on July 10, 2002 FHWA retained Desert Sage Contractors, Inc. to complete the contract, which it did so on October 17, 2002. On October 8, 2003 FHWA found UCI responsible for $125,120.15

[1]FHWA issued the final version of the method specification on November 19, 2001.

in excess contract reprocurement costs and determined that UCI must also pay $152,000 in liquidated damages ($500 per day measured from the original completion date until the replacement contractor completed the work--304 days in this case).

## DISCUSSION

### *I. Differing Site Conditions*

Plaintiff asserts that it is entitled to relief under the contract's differing site conditions clause, Federal Acquisition Regulation ("FAR") 52.236-2 (Apr. 1984), because the contents of the mandatory borrow sources materially differed from what the contract indicated and what UCI actually encountered. The presence of the differing soils in the borrow sources, UCI asserts, impacted performance by preventing UCI from obtaining optimum moisture content and compaction of embankment material. UCI asserts that this caused delay to, and ultimate cessation of, contract performance. Plaintiff argues that it is therefore entitled to recover its incurred costs under a Type I differing site conditions theory.[2]

To recover under a Type I differing site conditions claim plaintiff must establish: (1) that the conditions indicated in the contract differed materially from those encountered during performance; (2) the conditions actually encountered must have been reasonably unforeseeable based on all the information available at the time of the bidding; (3) the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and (4) the contractor was damaged as a result of the material variation between expected and encountered conditions. Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002)(citing FAR 52.236-2(a)(1) (1994)). In its briefs, plaintiff also asserts entitlement to recovery under a defective specification theory, but does not include the theory as a separate count in its complaint. Both the Type I differing site condition and defective specification theories are based on UCI's alleged encounter with non-conforming soil materials in the borrow sources and will therefore be governed by the differing site conditions clause and the cases under that clause. Id. (holding that differing site condition claim and defective specification claim based upon contractor's encounter with quicksand at the work site collapse into a single claim).

#### *A. Conditions indicated versus conditions encountered*

Under the first element of a Type I differing site condition claim, the court must determine what the contract indicated regarding the soil materials in the two borrow sources, and whether there existed a material discrepancy between the contract and what UCI actually encountered.

---

[2]The plaintiff initially argued in the alternative that it is entitled to recover under a Type II differing site condition theory, but has since abandoned that argument. See Hr. Tr. at 7, lns. 13-18.

*1. The Contract's Description of the Borrow Sources*

To determine what was indicated in the contract regarding the soil materials in the two borrow sources the court must give the contract terms their "ordinary and commonly accepted meaning" from the vantage point of a "reasonable and prudent contractor." Brunswick Corp. v. United States, 951 F.2d 334, 336 (Fed. Cir. 1991); See also P.J. Maffei Building Wrecking Corp. v. United States, 732 F.2d 913, 917 (Fed. Cir. 1984). The parties disagree as to which contract section indicated the type of soil material present in the two borrow sources. Plaintiff asserts that the controlling description is located in the FHA's Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, FP-96 ("FP-96"), which are incorporated by reference into the contract. Specifically, plaintiff points to FP-96 section 704, "Soil," subsection 704.06, "Unclassified Borrow," which states that "unclassified borrow" material is to conform to American Association of State Highway and Transportation Officials ("AASHTO") soil classifications of A-1, A-3, or A-2-4.

The defendant, however, asserts that the contract indicates that the borrow sources would contain soil material other than AASHTO classifications A-1, A-3, and A-2-4. First, defendant argues that the contents of the borrow sources are indicated in the contract's "Permits" section. Specifically, defendant points to Nationwide Permit 23 (the "permit") issued by the Army Corps of Engineers, which authorized FHWA to discharge fill material into refuge wetlands to widen the existing road system. With respect to the two borrow sources, the permit states that "[i]mported material would be from the two proposed mitigation sites and is primarily sandy loam which may be underlain with layers of clayey soils." Pl.'s App. at 21. The descriptive soil terms used in the permit correspond with the United States Department of Agriculture's ("USDA") soil classification system, as opposed to the AASHTO system referenced in FP-96 subsection 704.06. Defendant asserts that the USDA soil classifications referenced in the permit, when reconciled with the AASHTO system, allow for the inclusion of AASHTO classifications other than A-1, A-3, or A-2-4. Defendant also cites the contract's Special Contract Requirements ("SCR") section, which amend and supplement corresponding FP-96 sections for the specific project. Specifically, defendant points to SCR section 204, "Excavation and Embankment," subsection 204.11(c), "Compaction," that specifies the moisture content and density requirements for AASHTO soil classifications A-1 through A-7. Defendant asserts that this subsection therefore indicates that soil materials other than those listed in FP-96 subsection 704.06 may be used to construct the road and, therefore, may be present in the two borrow sources.

A contract is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony. Air-Sea Forwarders, Inc. v. United States, 166 F.3d 1170, 1172 (Fed. Cir. 1999); Abraham v. Rockwell Internat'l Corp., 326 F.3d 1242, 1251 (Fed. Cir. 2003). The various contract provisions must be read as part of an organic whole, according reasonable meaning to all of the contract terms. Lockheed Martin IR Imaging Syst., Inc. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997). Such interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant. Id. Where two clauses in a contract conflict, "the clause which is specially directed to a particular matter controls in respect

thereto over a clause which is general in its terms." W.E. Callahan Constr. Co. v. United States, 91 Ct. Cl. 538 (Ct. Cl. 1940).

The contract's relevant parts are the SCRs, project plans RRP-CAMA 101(1) (the "plans"), the permit section, and the incorporated FP-96. The preface to the SCRs contains the following notice:

ATTENTION

> The following [SCRs] are only a portion of the specifications for this project. These SCRs amend and supplement the [FP-96]. The FP-96 is a separately published book. In order to understand the solicitation properly you need to have the FP-96 as well as this packet. Pay particular attention to the provisions of Subsection 104.04 in the FP-96. This Subsection explains how each of the many contract documents fit together.

Id. at 290. FP-96 subsection 104.04 explains that the SCRs, plans, and FP-96 are contract documents, and that:

> A requirement in one document is binding as though occurring in all the contract documents. The contract documents are intended to be complementary and to describe and provide for a complete contract. In case of discrepancy ... the contract documents govern in the following order: ... (c) [SCRs] (d) Plans ... (f) [FP-96].

FP-96 section 107, "Legal Relations and Responsibility to the Public," subsection 107.01, "Laws to be Observed," requires the contractor to "[c]omply with all applicable laws, ordinances, safety codes, regulations, orders, and decrees," and states that "[a]ll permits and agreements obtained by the Government for performing the work are included in the contract. Comply with the requirements of these permits and/or agreements."[3]

FP-96 is divided into ten divisions. FP-96 subsection 101.02, as amended by the corresponding SCR, states that "Divisions 200 through 600 consist of construction requirements for specific items of work," and "Division 700 contains the material requirements for Divisions 150 through 600." Subsection C.2 of the plans includes a schematic cross-section of the auto-tour route. The schematic cross-section indicates that the auto-tour route's widened areas will be constructed with "unclassified borrow." Subsection D.2 of the plans provides a schematic profile of the auto-tour route. The schematic profile provides plan quantities for "unclassified borrow."

---

[3]FP-96 subsection 107.01 is supplemented by corresponding SCR subsection 107.01, which states that the "[p]ermits obtained by the Government for work on this contract are included in Section H, Permits." FP-96 subsection 107.01 is otherwise unchanged.

FP-96 subsection 704.06 states that "unclassified borrow" will conform to AASHTO soil classifications A-1, A-3, or A-2-4.

FP-96 section 105, "Control of Material," subsection 105.02, "Local Material Sources," as supplemented and amended, states:

> (a) Government-provided sources.
>
> * * *
>
> The quality of material in provided sources is acceptable in general, but may contain layers or pockets of unacceptable material. It is not feasible to ascertain from samples the quality of material for an entire deposit and variations may be expected. Determine the quantity and type of equipment and work necessary to select and produce acceptable material.
>
> [SCR supplementation:] Government-provided sources for this project are identified as follows:
>
> > (1) Government-provided mandatory sources.
> >
> > Obtain material for use as unclassified borrow from borrow source #1 and borrow source #2, as shown on the plans.

Contract at E-5. While specific provisions of this contract may appear to be in conflict, the court concludes that when read as a whole, the contract indicates that soil materials other than A-1, A-3, or A-2-4 may be present in the two mandatory borrow sites. Lockheed Martin IR Imaging Syst., Inc., 108 F.3d at 322.

Specifically, both SCR subsection 204.11(c) and the permit informed UCI that it might encounter and have to construct the road with silty or clayey materials. SCR subsection 204.11(c) informed UCI that it may have to construct the roadway from materials ranging from A-1 to A-7 using the AASHTO system. The permit indicated that the material would be primarily sandy loam which encompasses AASHTO silt-clay materials. The permit further indicated that the sandy loam may be underlain with layers of clayey soils. FP-96 subsection 704.06 provides that unclassified borrow is limited to A-1, A-2-4, and A-3. However, with the application of FP-96 subsection 104.04, the precedence clause, consideration of SCR subsection 204.11(c), the permit, and FP-96 subsection 105.02, which states that the "quality of material in provided sources is acceptable in general, but may contain layers or pockets of unacceptable material," the only reasonable conclusion is that UCI may have to construct the road from materials ranging from A-1 to A-7, and that the materials in the borrow sources will primarily be sandy loam in the USDA system, which may overlay clayey materials. To conclude otherwise

would render significant sections of this contract meaningless and is not a reasonable interpretation of the contract when read as a whole. Id.

*2. Material discrepancy*

The court must now determine whether a material discrepancy existed between what the contract indicated regarding the contents of the two borrow sources and what UCI actually encountered. Comtrol, Inc., 294 F.3d at 1362. The geotechnical tests conducted after UCI began contract performance reported that the types of soil materials present in the borrow sources were not limited to the classifications listed in FP-96 subsection 704.06. Thus, as FP-96 subsection 105.02 warned, the tests confirmed the presence of "acceptable" and "unacceptable" materials in the borrow sources. The court is therefore unable to determine at this juncture whether a discrepancy exists between what the contract indicated regarding the contents of the borrow sources and what UCI encountered. This issue, therefore, can not be resolved by summary judgment.

Next, if there is a discrepancy, that discrepancy must be material. To be material, a discrepancy must have caused unanticipated costs to UCI for which FHWA is liable. Hardwick Bros. Co. v. United States, 36 Fed. Cl. 347, 406 (Ct. Cl. 1996). Plaintiff asserts that the unacceptable material possessed varying geological characteristics, which caused plaintiff to experience significant delays from spending extra time blending the differing materials and working in water to try and get compaction. Defendant argues that plaintiff can not demonstrate causation where the soil materials in the borrow sources could be, and ultimately were, used in constructing the road. Defendant also challenges plaintiff's assertion that UCI actually expended extra time and effort working with the non-conforming soils. In support, defendant cites the deposition testimony of FHWA's contract inspector, Alfred Sites, who discussed his contemporaneous observations of the effort and techniques UCI exhibited in working with the soil. The cause of UCI's performance delay from its inability to achieve the required soil compaction specifications is therefore a disputed issue of material fact that the court can not resolve by summary judgment.

*B. Foreseeability of the Soil Materials Actually Encountered*

Under the second element of a Type I differing site conditions claim, the conditions UCI actually encountered must have been reasonably unforeseeable based on all the information available at the time of the bidding. Comtrol, Inc., 294 F.3d at 1362. In this case, a pre-bid geotechnical analysis of the two borrow sources would have been necessary to determine conclusively whether the soil materials in the borrow sources complied with the contract's specifications. FHWA stated in its pre-bid design narrative that it did not conduct such a test. UCI did not conduct its own pre-bid geotechnical analysis of the borrow sources to confirm their contents. Rather, UCI conducted a pre-bid site visit and visually inspected the borrow sources and questioned refuge personnel about the contents of the borrow sources.

The reasonableness of a contractor's pre-bid inspection is viewed from the perspective of a reasonable and prudent contractor acting under similar conditions. Youngdale & Sons Constr. v. U.S., 27 Fed. Cl. 516, 533 (1993). Plaintiff contends that UCI's pre-bid efforts to learn about the contents of the borrow sources were similar to those of other contractors bidding on the contract. There is evidence, however, that pre-bid investigative efforts by another contractor went beyond a site visit. There is also evidence suggesting that the pre-bid site visit UCI conducted was not thorough. The court therefore concludes that the reasonableness of UCI's pre-bid efforts to determine the contents of the two borrow sources is a disputed material fact that is not appropriate for resolution by summary judgment.

*C. Reliance on the Contract Specifications*

Under the third element of a Type I differing site conditions claim, UCI's reliance upon its interpretation of the contract and contract-related documents must be reasonable. Comtrol, Inc., 294 F.3d at 1362. A necessary component of this element is UCI must demonstrate that it actually relied on the contract specifications. Id. at 1363 (explaining that "[t]o prevail on a differing site conditions claim, the contractor must show reliance on the representations in the contract."); see also E.L. Hamm & Assoc., Inc. v. England, 379 F.3d 1334, 1339 (Fed. Cir. 2004)("[i]n order to recover an equitable adjustment based upon an erroneous specification, a contractor must show that it was misled by the error in the specification."). In this case, the relevant contract terms indicating the content of the borrow sources were located in FP-96, which was a separately published book not included in the contract packet, but incorporated therein by reference. Thus, UCI must show that it actually reviewed and relied upon the relevant provisions in FP-96 when bidding on the contract. Comtrol, Inc., 294 F.3d at 1364 ("[r]easonable reliance cannot exist where the contractor bid without having reviewed the contract documents on which it seeks to rely.").

While plaintiff asserts that it relied on the contract prior to bidding, plaintiff does not specifically state that it referenced FP-96 to determine what soil materials would be present in the borrow sites. Defendant argues that plaintiff did not rely on FP-96 subsection 704.06 prior to bidding on the contract but referenced it only after the current dispute arose. Whether plaintiff actually reviewed and relied upon the relevant FP-96 subsections prior to bidding on the contract is a disputed issue of material fact that the court can not resolve by summary judgment.

*D. Damages*

Under the fourth and final element of a Type I differing site condition claim, UCI must have been damaged as a result of the material discrepancy between expected and encountered conditions. Comtrol, Inc., 294 F.3d at 1362. UCI alleges that the presence of unacceptable soil materials in the borrow sources forced it to cease contract performance. UCI's decision to stop contract performance led to FHWA's decision to terminate the contract for default. Under a termination for default, UCI is liable for any damages to FHWA including increased costs to FHWA in completing the work – in this case, the cost of reprocuring the contract to Desert Sage

Contractors, Inc. UCI allegedly performed approximately 20% of the contract work prior to ceasing performance. Thus, if UCI can demonstrate entitlement to recovery under a Type I differing site conditions claim, then the court concludes that UCI was damaged by a material variation between the expected and encountered conditions.

*II. Government Delay*

The plaintiff argues that it is entitled to relief because FHWA improperly delayed UCI's contract performance. Specifically, plaintiff asserts that FHWA delayed UCI's contract performance for approximately 12 days after FHWA issued the notice to proceed by rejecting UCI's preliminary construction schedule, construction schedule, QC plan, and accident prevention plan submissions for non-material deficiencies and by not responding to UCI's submissions in a timely manner. Plaintiff argues that FHWA therefore breached its duties to both refrain from hindering and to enable UCI's performance -- duties plaintiff contends were heightened since the contract was to be completed in 90 days. Defendant argues that FHWA is entitled to a contractor's strict compliance with the contract's specifications. Defendant asserts that UCI is therefore responsible for any delay in contract performance because UCI can not identify any contract violation resulting from FHWA's rejections of UCI's submissions.

The contract required FHWA to approve UCI's preliminary construction schedule and QC plan before UCI could begin full contract performance. With regards to the QC plan, the last submittal to be approved, SCR subsection 153.03 lists the requirements for an acceptable QC plan and states that "[a]cceptance of the [QC plan] will be based on the inclusion of the required information." Def.'s App. at 46-47. The plaintiff argues that FHWA's rejections of UCI's QC plan violated the contract because the rejections were based on non-material discrepancies and, in the case of the final rejection, the submission contained all the required information but was merely unorganized and contained excess information. The plaintiff cites the deposition testimony of its scheduling expert, Richard Pape, to show that FHWA did not have a reasonable basis to reject UCI's QC plan submittals.

The government has an implied obligation to refrain from hindering or delaying the performance of a contractor, and must do whatever is necessary to enable the contractor to perform. C. Sanchez & Sons, Inc. v. United States, 6 F.3d 1539, 1542 (Fed. Cir. 1993); Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir. 1988); Lewis-Nicholson v. United States, 550 F.2d 26, 32 (Ct. Cl. 1977). The defendant is correct that as a purchaser of supplies and services, the government is entitled to the contractor's strict compliance with the contract's specifications. Granite Constr. Co. v. United States, 962 F.2d 998, 1006-07 (Fed. Cir. 1992); Cascade Pacific Internat'l v. United States, 773 F.2d 287, 291 (Fed. Cir. 1985). At this juncture, however, it is not clear from the record whether FHWA's rejections of UCI's submittals were a justifiable enforcement of the contract's terms or an unreasonable hindrance of contract performance. It is also not clear whether the amount of the alleged delay from the rejections -- approximately 12 days, was actually material to UCI's inability to complete the contract. These are issues of material fact that the court can not decide by summary judgment.

*III. Government Directed Change*

The plaintiff alleges that a government-directed change to the contract's performance requirements contributed to UCI's recoverable costs. The plaintiff's government-directed change theory is based upon Contract Modification No. 0001 (the "modification"). The modification relates to SCR section 204, "Excavation and Embankment," subsection 204.11 "Compaction," paragraph (c) "50 percent or less of the material is retained on 4.75 mm sieve." The original SCR subsection 204.11(c) listed the compaction specifications for maximum density and moisture content that UCI was required to achieve. Contract at F-2, 3. The modification added a paragraph to SCR subsection 204.11(c), explaining: "[a]s an alternative to classifying and determining the maximum density of the material, the contractor may use either or both of the following options. The choice to use either or both options, or to use the method set forth in the solicitation package, is entirely the contractors option." Def.'s App. at 169. The modification explains that UCI could compact the soil by performing eight passes over each 200 millimeter layer with a double drum vibratory roller at least 91 centimeters wide. Plaintiff has not provided any evidence challenging the plain language of the modification stating that it is optional. Thus, where there is no issue of material fact in dispute, summary judgment for the defendant on plaintiff's government-directed change claim is granted.

## CONCLUSION

For the foregoing reasons, the court DENIES each party's motion for summary judgment with respect to plaintiff's differing site conditions and government delay claims, and GRANTS defendant's motion for summary judgment with respect to plaintiff's government-directed change claim.

s/Lawrence S. Margolis
LAWRENCE S. MARGOLIS
Senior Judge, U.S. Court of Federal Claims

April 18, 2006